**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

-------------------------------------------------------------------------- x

KOREN SIMAN TOV HAZOUTTE, AMIT VAHABA
SIMAN TOV, AND RANAE BUTLER *on behalf of the*
ESTATE OF CAROL SIMAN TOV; KOREN SIMAN
TOV HAZOUTTE, AMIT SIMAN TOV VAHABA,
AND RANAE BUTLER *on behalf of the* ESTATE OF
YAHONATAN SIMAN TOV; GAD KEDEM *as
personal heir-at-law on behalf of the* ESTATES OF
TAMAR KEDEM SIMAN TOV, ARBEL SIMAN TOV,
SHAHAR SIMAN TOV, and OMER SIMAN TOV;
REUMA KEDEM *as personal heir-at-law on behalf of
the* ESTATES OF TAMAR KEDEM SIMAN TOV,
ARBEL SIMAN TOV, SHAHAR SIMAN TOV, and
OMER SIMAN TOV; TRUDI DAUB; DAVID DAUB;
RAM BUTLER; LARRY BUTLER; CLARIS BUTLER;
SHACHAR BUTLER, *individually and as the legal
guardian of* E.B., *a minor,* M.B., *a minor,* and Y.B., *a
minor*; NINNA BUTLER; RANAE BUTLER,
*individually*; KOREN SIMAN TOV HAZOUTTE,
*individually and as legal guardian of* Y.H., *a minor,*
B.H., *a minor,* A.H., *a minor, and* M.H., *a minor*; GUIL
HAZOUTTE; YISHAI VAHABA; AMIT SIMAN TOV
VAHABA, *individually and as legal guardian of* G.V., *a
minor*, No.V., *a minor,* Ne.V., *a minor, and* S.V., *a minor*;
HADAS KALDERON, *individually and as an heir-at-
law for the* ESTATE OF CARMELA DAN; GALIT
DAN, *individually and as an heir-at-law on behalf of the*
ESTATE OF CARMELA DAN; DOR DAN,
*individually and as an heir-at-law on behalf of the*
ESTATE OF CARMELA DAN; MIRYAM SHANI,
*individually and as the legal guardian of R.S., and as an
heir-at-law on behalf of the* ESTATE OF ORI
MORDECHAI SHANI; SHULAMIT SHANI;
YEHOSHUA SHANI; YISHAI SHANI; ZOFIYA
ZAGURI; NAVA ROTSHTEN; MALACHI SHANI;
ELYSHA SHANI; BATZION GOLDSHTAIN; TALI
GILBERG; J.K., *individually and as co-legal guardian
of N.P.K., a minor, C.K., a minor,* and *S.M.K., a minor*;
ME.K., *individually and as co-legal guardian of N.P.K.,
a minor, C.K., a minor;* and *S.M.K., a minor*; A.K.;
Ma.K.; D.N.; Y.K.; D.K.; SHALOM STRAUSS,
*individually and on behalf of* Z.S., *a minor;* Y.S., *a*

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**Civil No.**

**COMPLAINT**

**JURY TRIAL
DEMANDED**

*minor,* and D.S., *a minor;* YAEL STRAUSS,
*individually and on behalf of* Z.S., *a minor;* Y.S., *a*
*minor,* and D.S., *a minor;* S.S., *individually, and as the*
*co-legal guardian of* I.S., *a minor;* Yo.S., *individually,*
*and as the co-legal guardian of* I.S., *a minor;* Ch.S.;
As.S.; Am.S.; Ta.S.; Na.S.; Av.S.; Ay.S.S.; BINYAMIN
SHAIN; ZLIL CHEN; DVORIT SHAIN; RUSSEL
SHAIN; MICHAL LUKMAN; ARIEL SHAIN; SHAY
SHAIN; ZION LESHEM, *individually and on behalf of*
M.E.L., *a minor,* L.A.L., *a minor,* M.D.L., *a minor,*
T.B.L., *a minor,* and T.N.L., *a minor*; RIVKA LESHEM;
YEHUDA GUR ARYEH LESHEM; CHEMDA
RACHEL LESHEM; ZVI LESHEM; JULIE LESHEM;
E.H.; De.G.; Mi.H.; Yo.H. ; ASHER GUEDALIA;
SENAI GUEDALIA, *individually and also as heir-at-*
*law on behalf of* JOSEPH GUEDALIA; DAVID
GUEDALIA, *individually and as co-legal guardian of*
E.G., *a minor*; DINA LEA GUEDALIA, *individually*
*and as co-legal guardian of* E.G., *a minor*; SHIRA
EPHRAT; YAEL GUEDALIA; ESTER GUEDALIA;
MICHA GUEDALIA; MICHAL BERKOWITZ,
*individually and as heir-at-law for the* ESTATE OF
EYAL BERKOWITZ; SHMAYA BERKOWITZ;
RIVKA BERKOWITZ; EREZ BERKOWITZ; TZUR
BERKOWITZ; TAMAR BERKOWITZ; EINAV
BERKOWITZ; REUT ZIPORA SHTERN; SHANEE
AHARONI; LENOY AHARONI; GALIT AHARONI*;*
YANIV AHARONI; ROY AHARONI; ETAY
AHARONI; N.P.; E.P.; Hi.P., *individually and as co-*
*legal guardian of* D.P.*, a minor;* Li.P., *individually and*
*as co-legal guardian of* D.P.*, a minor;* Ro.P.; MOSHE
YEHUDA LILINTAL; ESTHER PEREL LILINTAL;
E.N.L.; YAAKOV LILINTAL, *individually and as co-*
*legal guardian of* T.L., *a minor,* N.R.L., *a minor,* S.L., *a*
*minor,* and E.S.L., *a minor;* CHANA LILINTAL
BIALISTOKI *individually and as co-legal guardian of*
T.L., *a minor,* N.R.L., *a minor,* S.L., *a minor,* and E.S.L.,
*a minor;* YESHAYAHU LILINTAL, *individually and as*
*co-legal guardian of* Y.M.L., *a minor,* T.L., *a minor,* and
S.L., *a minor;* TAMAR LILINTAL *individually and as*
*co-legal guardian of* Y.M.L., *a minor,* T.L., *a minor,* and
S.L., *a minor;* DANIEL LILINTAL, *individually and as*
*co-legal guardian of* J.M.L., *a minor* and A.L., *a minor;*
GAL LILINTAL *individually and as co-legal guardian*
*of* J.M.L., *a minor* and A.L., *a minor;* CHAIM TUVIA
LILINTAL, *individually and as co-legal guardian of*

2

M.L., *a minor;* TALYA LILINTAL, *individually and as*   :
*co-legal guardian of* M.L., *a minor;* CHANA LILINTAL   :
HURI; EVYATAR SAADYA SHALOM HURI;   :
RACHEL GUR; YOSEPH LILINTAL; YOSEF   :
LAMDAN; MAYA LAMDAN; SYLVIA ARAD;   :
EINAV VERED; TOM LAMDAN; GUY LAMDAN;   :
J.S.; HOSHEA HAGGAI; EITAN EDRI, *individually*   :
*and as co-legal guardian of* B.H.E., *a minor,* and   :
N.S.E., *a minor;* TAIR EDRI, *individually and as co-*   :
*legal guardian of* B.H.E., *a minor,* and N.S.E., *a minor;*   :
I.E.; It.E.; A.E.; SARAH EDRI; ELIYAHU EDRI;   :
AVIDAN EDRI; ACHIYA EDRI; A.B.; Z.C.J.; Be.B.;   :
Da.B.; SHAI AMAR; NATALIA AMAR; SHIRLEY   :
AMAR; E.A.; Da.A.; Ar.A.; Ra.L.; AVISHAY BEN ZVI,   :
*individually and as an heir-at-law for the* ESTATE OF   :
AMITAI BEN ZVI; GILAD BEN ZVI *individually and*   :
*as an heir-at-law for the* ESTATE OF AMITAI BEN   :
ZVI; HAGAR MADNIK, *individually and as an heir-at-*   :
*law for the* ESTATE OF AMITAI BEN ZVI; ORNA   :
AVISRUR, *individually and as an heir-at-law for the*   :
ESTATE OF AMITAI BEN ZVI; IDO BEN ZVI,   :
*individually and as an heir-at-law for the* ESTATE OF   :
AMITAI BEN ZVI; LIVNAT SHERMAN; ARIE   :
SHERMAN, *individually and as legal guardian of*   :
K.A.S., *a minor,* G.S., *a minor* and S.S., *a minor;*   :
AVRAHAM SHAHAR, *individually and as co-legal*   :
*guardian of* Z.S., *a minor, and* R.S., *a minor;* IDIT   :
SHAHAR *individually and as co-legal guardian of* Z.S.,   :
*a minor, and* R.S., *a minor*; YARDEN SHAHAR;   :
RAQUEL NATALIE SANANDAJI; DALIA   :
YERUSHALMI; MOR LEVZELTER LAVI; GOLAN   :
BARAK; D.B.C.; *individually and as co-legal guardian*   :
*of* M.B.C., *a minor,* and A.B.C., *a minor;* Sh.B.C.,   :
*individually and as co-legal guardian of* M.B.C., *a*   :
*minor,* and A.B.C., *a minor;* Ya.B.C.; Or.B.C.; Ori.B.C.;   :
Ta.B.C.; Shi.B.C.; Ro.B.C.; YISHAI RUBIN,   :
*individually and as the heir-at-law on behalf of the*   :
ESTATE OF AMICHAI RUBIN; BATYA RUBIN,   :
*individually and as the heir-at-law on behalf of the*   :
ESTATE OF AMICHAI RUBIN; DAVID RUBIN;   :
YEDIDYA RUBIN; OZ RUBIN; EITAN RUBIN; YAIR   :
RUBIN; ODEYA BEN SHIMOL; AMIYA TIFERET   :
GAMLA; LOTUS LAHAV; IRIT LAHAV; IVONEI DA   :
SILVA DANIEL; B.E., *individually, and as the co-legal*   :
*guardian of* M.E., *a minor;* R.T.E., *individually, and as*   :
*the co-legal guardian of* M.E.; Sh.E.; R.A.E.; D.M.E.;   :

3

S.B.; Y.Y.B.; E.S.; AVNER SKOLNIK; RAZ VAGIM;    :
M.M.; A.M.; D.J.; SHAYNA CHAYA GOODMAN;    :
JULIA CHAITIN; NOA CHAITIN, *individually and as*    :
*the legal guardian of* N.S., *a minor;* D.T., *as the legal*    :
*guardian of* M.T., *a minor*, and R.T., *a minor;* TEHILA    :
DANSKER; ATARA PETER DASKAL; WILLIAM    :
EICOFF; HADASSA TUNGDIM-EICOFF; OPHIR    :
YEHAYES, *individually and as legal guardian of* Y.Y.,    :
*minor child*, and M.Y., *minor child;* YOSEF YEHAYES;    :
NAAMIT DEKEL CHEN; Y.O.; Y.S.O.; L.R.K.; Y.A.O.;    :
M.D.O.; I.O.; Yo.O.; ELCHANAN BEDEIN; M.K.;    :
A.K.; B.K.; Z.K.; Y.K.; D.K.; YECHIEL    :
KOENIGSBERG; MIRIAM FRANK, *individually and*    :
*as the legal guardian of* L.F., *a minor, and* S.B.Y.*, a*    :
*minor*; M.d.J., *individually and as legal guardian of*    :
M.R.d.J., *minor,* Z.B.d.J., *minor,,* D.Y.d.J., *minor,* and    :
N.E.S.d.J., *minor,*; J.d.J.; SAPIR WEINER, as *legal*    :
*guardian of* C.W., *a minor*, HAREL URIM, SHILO    :
URIM    :
    :
    :
          Plaintiffs,    :
    :
-against-    :
    :
BINANCE HOLDINGS LIMITED, CHANGPENG    :
ZHAO, and GUANGYING "HEINA" CHEN,    :
    :
          Defendants.    :
---------------------------------------------------------------------    :
    :
    :

4

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................ 8

    **A.**   **Overview of Binance's Illegal Activities** ........................................ 12

    **B.**   **Binance's Aiding and Abetting of Terrorist Organizations Involved in the October 7 Attacks** ................................................................. 21

**JURISDICTION AND VENUE** ................................................................................ 27

**DEFENDANTS** ........................................................................................................ 32

    **Binance 32**

    **Changpeng Zhao** ................................................................................ 38

    **Guangying "Heina" Chen** .................................................................. 39

**FACTUAL ALLEGATIONS** .................................................................................... 40

**I.**    **CRYPTOCURRENCIES AND PAYMENT PLATFORMS** ................................. 40

    **A.**   **Blockchain** .......................................................................................... 40

    **B.**   **Cryptocurrency Wallets** .................................................................... 42

    **C.**   **Categories of Cryptocurrency Assets** ............................................... 43

        **1.**   **Native Cryptocurrencies** ........................................................ 43

        **2.**   **Stablecoins** ............................................................................. 46

**II.**   **CRYPTOCURRENCY PLATFORMS ARE SUBJECT TO ANTI-MONEY LAUNDERING AND COUNTER-TERRORISM FINANCING LAWS AND REGULATIONS TO PREVENT TERRORIST ORGANIZATIONS FROM USING THEIR SERVICES** ............................................................................ 48

    **A.**   **The IRGC, Hamas, Hezbollah, PIJ, and other Terrorist Organizations** ............... 48

    **B.**   **The Terrorist Organizations' Emerging Use of Cryptocurrency** ............................ 52

    **C.**   **Binance in the United States** ............................................................... 55

**III.**  **BINANCE STRUCTURED ITS COMPLIANCE TO FACILITATE MONEY LAUNDERING, SANCTIONS EVASION, AND TERROR FINANCING** ................ 58

    **A.**   **Binance Used Binance.US as a Façade to Evade U.S. Oversight** ........................... 58

B.    Binance's Anti-Money Laundering and Counter-Financing of Terrorism Efforts Were a Sham ........................................................................................ 62

C.    Binance Exempted "Level 1" or "Tier 1" accounts From KYC Requirements ..... 70

D.    Binance Knew That Hamas and Other Terrorist Groups Transacted on Its Platform .................................................................................................. 75

IV.    BINANCE KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC, HAMAS, HEZBOLLAH, AND PIJ ........................................................ 93

A.    Binance Knowingly and Willingly Assisted Iran and the IRGC to Evade Sanctions and Finance Terrorism ................................................................................ 93

B.    Tawfiq Muhammad Sa'id al-Law's IRGC/Hezbollah Network ............................. 99

1.    Binance Account No. ***6571 (Raed Abib Habib) ............................................. 102

2.    Binance Account No. ***9799 (Ali Alawieh) ..................................................... 108

3.    Binance Account No. ***0785 (Antonios Boutros Nehme) ................................. 110

4.    Binance Account No. ***9408 (Mohamad Said El Okdi) ................................... 112

5.    Binance Account No. ***9885 ............................................................................ 114

6.    Binance Account No. ***8463 (Gustavo Castro) ............................................... 114

7.    Binance Account No. ***3848 ............................................................................ 115

8.    Binance Account No. ***3951 ............................................................................ 116

9.    Binance Account No. ***9210 ............................................................................ 116

10.    Binance Account No. ***6292 ............................................................................ 119

11.    Binance Account No. ***5587 ............................................................................ 120

12.    Binance Account No. ***7451 ............................................................................ 121

13.    Binance Account No. ***3775 ............................................................................ 124

14.    Binance Account No. ***5363 ............................................................................ 126

15.    Binance Customer A-1 ....................................................................................... 128

16.    Binance Customer A-2 ....................................................................................... 128

17.    Binance Customer A-3 ....................................................................................... 129

18.    Binance Customer A-4 ............................................................ 129

19.    Binance Account No. ***9830 ................................................. 130

20.    Binance Account No. ***7790 ................................................. 132

C.    Other Examples of Designated IRGC Binance Customers ..................................... 134

1.    Ahmad Khatibi Aghada .......................................................... 134

2.    Amir Hossein Nikaeen Ravari ................................................. 135

D.    Nobitex Exchange Network ........................................................................ 136

1.    Iranian sanctions evasion platform ........................................ 136

2.    Binance's $7.8 billion Nobitex transaction processing ........................................ 138

3.    NBCTF designation and leaked Nobitex source code analysis ........................ 139

4.    Nobitex's direct on-chain interactions with FTO wallets ................................. 140

5.    Qatar–Nobitex database ......................................................... 142

6.    Binance's Knowledge and Deliberate Maintenance of Nobitex Relationship .. 144

E.    IranVisaCart .............................................................................................. 145

F.    Alireza Derakhshan & Arash Estaki Alivand Network .......................................... 146

G.    NBCTF's September 2025 Designation of IRGC Wallets ...................................... 147

H.    To This Day, Binance Continues to Knowingly and Willingly Assist the IRGC .. 148

1.    Binance Knowingly Facilitates Accounts Directly Linked to Iran's Central Bank (SDGT) .................................................................................... 148

2.    Binance Knowingly Facilitated Payments to the IRGC Through Zedcex | Zedxion | Babak Zanjani ...................................................... 151

a.    Binance Account ***6529 (Zedcex's Dubai subsidiary) ............................... 156

b.    Binance Account ***8320 (Oimakhmadov - Zedcex) .................................. 159

3.    Binance Knowingly Facilitated Chinese Payments to the IRGC Through Blessed Trust and Hexa Whale ............................................................. 161

a.    Blessed Trust and Blessed Services ............................................... 161

| | | |
|---|---|---|
| b. | Hexa Whale | 166 |
| c. | Mohsen Fahad and the Iranian Connection | 167 |
| d. | Entity A | 168 |

**I. Binance Knowingly and Willingly Assisted Hamas** .......................................... **170**

1. Dubai [Money] Company for Exchange ("Dubai Co.") / al-Kahira Exchange 174

   a. Binance Account No. ***5869 ......... 178

   b. Binance Account No. ***3866 (Khaled A. S. Alhaddad) ......... 179

   c. Binance Account No. ***6645 (Ayman Z. M. Albarbari) ......... 179

2. Buy Cash Money and Money Transfer Company ("BuyCash") ......... 180

3. Gaza Now ......... 184

4. Al Wefaq Co. for Exchange (a/k/a Hamed Co. for Exchange) ......... 185

   a. Binance Account No. ***2283 (Saeed al-Khudry) ......... 185

5. Shamlakh Hamas Network ......... 188

   a. Binance Account No. ***3593 ......... 192

   b. Binance Account No. ***9428 ......... 194

   c. Binance Account No. ***5910 ......... 195

   d. Binance Account No. ***5680 ......... 195

   e. Binance Account No. ***4404 ......... 196

   f. Binance Account No. ***6082 ......... 198

   g. Binance Account No. ***1135 ......... 200

   h. Binance Account No. ***3901 ......... 202

   i. Binance Account No. ***2525 ......... 204

   j. Binance Account No. ***7402 ......... 205

   k. Binance Account No. ***7379 ......... 206

   l. Binance Account No. ***7522 ......... 207

      m.    **Binance Account No. \*\*\*7515**................................................................ 208

      n.    **Binance Account No. \*\*\*1236**................................................................ 210

      o.    **Binance Account No. \*\*\*9055**................................................................ 212

      p.    **Binance Account No. \*\*\*6281**................................................................ 214

      q.    **Binance Account No. \*\*\*7729**................................................................ 216

      r.    **Binance Account No. \*\*\*6569**................................................................ 217

   **6.**    **Other Hamas Binance Customers**................................................. 218

      a.    **Binance Account No. \*\*\*4344 (Yasser Youssef Khechen)**............................ 218

      b.    **Binance Account No. \*\*\*3382 (Hanad Adam)**................................................. 222

**J.**    **Binance Knowingly and Willingly Assisted PIJ** ....................................... 225

   **1.**    **Binance Account No. \*\*\*5345** ...................................................... 225

   **2.**    **Binance Account No. \*\*\*2659** ...................................................... 231

**V.**    **THE FOREIGN TERRORIST ORGANIZATIONS RESPONSIBLE FOR THE OCTOBER 7 TERROR OFFENSIVE**.................................................................. 234

**A.**    **The IRGC and Its Quds Force Run the "Axis of Resistance"**................................ 234

**B.**    **Hamas** ................................................................................................ 238

**C.**    **Palestinian Islamic Jihad (PIJ)**......................................................... 244

**D.**    **Hezbollah**.......................................................................................... 246

**E.**    **The IRGC and Hamas Planned and Coordinated the October 7 Attacks** ............ 248

**VI.**   **ZERO HOUR: OCTOBER 7, 2023** ................................................................ 253

**A.**    **Saturday, October 7** ......................................................................... 257

**B.**    **Geography of the Attack**................................................................... 258

**C.**    **Hamas's Rocket Barrage Overwhelms Israel's Defense Systems**........................ 259

**D.**    **Hamas Attacks by Ground, Air, and Sea**............................................... 260

**E.**    **Hamas Infiltrates Civilian Communities, IDF Outposts, and Highways** .............. 262

F.      The Terrorists Committed Successive Waves of Attacks on Compromised Communities .................................................................................................... 264

G.      Attack on the Nova Music Festival .......................................................................... 265

H.      Hostage-Taking into Gaza ....................................................................................... 267

I.      The Tunnel System ................................................................................................... 268

J.      Hamas's Use of Hostages as Bargaining Chips ...................................................... 269

K.      Hezbollah Opens a Second Front ............................................................................ 270

L.      Israel's Response to October 7 in Gaza .................................................................. 271

VII.   PLAINTIFFS ................................................................................................................. 273

A.      The Siman Tov Family ............................................................................................. 273

B.      The Dan Family ........................................................................................................ 290

C.      The Shani Family ...................................................................................................... 294

D.      The Tali Gilberg Family ........................................................................................... 297

E.      The J.K. Family ........................................................................................................ 298

F.      The Strauss Family ................................................................................................... 301

G.      The S.S. Family ........................................................................................................ 304

H.      The Shain Family ...................................................................................................... 307

I.      The Leshem Family ................................................................................................... 313

J.      The E.H. Family ....................................................................................................... 316

K.      The Guedalia Family ................................................................................................ 319

L.      The Berkowitz Family .............................................................................................. 325

M.      The Aharoni Family .................................................................................................. 327

N.      The N.P. and E.P. Family ......................................................................................... 331

O.      The Lilintal-Huri Family .......................................................................................... 338

P.      The Lamdan Family .................................................................................................. 348

Q.      The J.S. Family ......................................................................................................... 354

R.    The Haggai Family ........................................................................................... 357

S.    The Edri Family................................................................................................ 360

T.    The A.B. Family............................................................................................... 366

U.    The Amar Family ............................................................................................. 370

V.    The E.A. Family............................................................................................... 373

W.    The Ben Zvi Family.......................................................................................... 377

X.    The Sherman Family......................................................................................... 379

Y.    The Shahar Family ........................................................................................... 382

Z.    The Raquel Natalie Sanandaji Family.......................................................... 385

AA.  The Lavi and Barak Families ......................................................................... 389

BB.  The D.B.C. Family............................................................................................ 392

CC.  The Rubin Family............................................................................................. 395

DD.  The Lahav Family............................................................................................. 398

EE.  The B.E. Family ............................................................................................... 402

FF.  The S.B. Family................................................................................................ 404

GG.  The Y.Y.B. Family............................................................................................ 405

HH.  The E.S. Family................................................................................................ 406

II.    The Skolnik Family .......................................................................................... 406

JJ.    The Vagim Family ............................................................................................ 407

KK.  The M.M. Family............................................................................................... 407

LL.  The A.M. Family............................................................................................... 408

MM. The D.J. Family................................................................................................ 408

NN.  The Yehoshua Goodman Family..................................................................... 409

OO.  The Chaitin Family........................................................................................... 409

PP.  The D.T. Family................................................................................................ 410

7

QQ.  **The Daskal Family**..........................................................................................................**411**

RR.  **The Eicoff Family** .........................................................................................................**413**

SS.  **The Yehayes-Dekel Chen Family** ................................................................................**416**

TT.  **The Y.O. Family** ...........................................................................................................**420**

UU.  **The Bedein Family**........................................................................................................**422**

VV.  **The M.K. Family**...........................................................................................................**422**

WW. **The Koenigsberg Family** ..............................................................................................**425**

XX.  **The Frank Family**.........................................................................................................**425**

YY.  **The M.d.J. Family** ........................................................................................................**427**

ZZ.  **The Weiner Family** .......................................................................................................**428**

AAA.    **The Urim Family** .......................................................................................................**428**

**CLAIM FOR RELIEF** ....................................................................................................................**429**

**JURY TRIAL DEMAND** ................................................................................................................**432**

**PRAYER FOR RELIEF**..................................................................................................................**432**

Plaintiffs, by their undersigned counsel, submit this Amended Complaint against Binance Holdings Limited ("Binance"), Changpeng Zhao ("Zhao"), and Guangying "Heina" Chen ("Chen") and allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.    This action is brought by U.S. nationals (including estates) and their close family members, who were murdered, maimed, taken hostage, or otherwise injured in acts of international terrorism perpetrated by Hamas,[1] Iran's Islamic Revolutionary Guard Corps ("IRGC"), Hezbollah, and Palestinian Islamic Jihad ("PIJ") in the State of Israel on October 7, 2023 ("October 7" or

---

[1]    Hamas is an acronym of the Arabic "Harakat al-Muqawama al-Islamiya"—Islamic Resistance Movement.

"October 7 Attacks") and in various terrorist attacks that these terrorist organizations perpetrated following October 7.

2. By this action, Plaintiffs seek damages under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333(a), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. §2333(d)(2), from Defendant Binance (the world's largest cryptocurrency trading platform), Defendant Zhao (its founder and former CEO), and Defendant Chen (its co-founder and de facto CFO).

3. For years, Defendants knowingly, willfully, and systematically assisted the IRGC and its proxy terrorist groups – Hamas, Hezbollah, PIJ, Ansar Allah (Yemen's Houthi terrorist organization), and other terrorist groups, all collectively referred to by Iran as the "Axis of Resistance" – to transfer and conceal the equivalent of billions of U.S. dollars through the Binance platform in support of their terrorist activities.

4. This assistance directly and materially helped finance the October 7 Attacks, which the IRGC largely funded, and subsequent terrorist attacks perpetrated by Hamas, Hezbollah, and PIJ.

5. As described below, the October 7 Attacks were the culmination of a meticulous multi-year effort by the Foreign Terrorist Organization ("FTO") Hamas (with support from the IRGC and other FTOs) that involved amassing an extensive and well-financed arsenal of weapons and constructing hundreds of miles of subterranean attack tunnels.

6. Because Hamas, the IRGC, Hezbollah, and PIJ had all been designated FTOs for many years prior to October 7,[2] and because knowingly providing financial services to any of them

---

[2] Hamas, Hezbollah, and PIJ were designated FTOs on October 8, 1997. *See* Foreign Terrorist Organizations, U.S. DEP'T OF STATE, state.gov/foreign-terrorist-organizations. The IRGC was designated an FTO on April 15, 2019. *See id.*

was (and is) a federal crime with serious penalties, *see* 18 U.S.C. §2339B(a), these FTOs were compelled to raise and transfer funds covertly to finance their operations.

7. Historically, these FTOs have used international financial institutions, money exchange houses, and occasionally couriers to move their money, but in recent years, they have increasingly turned to cryptocurrencies as a new means of moving money covertly, particularly in ways easily convertible into U.S. dollars such as stablecoins like USDT (defined below).

8. Iran has long been a leading world sponsor and coordinator of terrorism—especially terrorism targeting Israel and the United States.

9. Its terror apparatus is directed by the IRGC, an armed force outside the control of Iran's conventional army that is charged with defending Iran's regime. It is composed of ground, naval, and air forces; an internal security militia (the Basij); and an external operations force, the IRGC–Quds Force (IRGC-QF).

10. The IRGC has controlled Iran's oil industry (among other industries) for more than two decades and has long been dependent on oil sales (particularly to China) to fund its network of regional terror proxies.

11. These proxies, which include Hamas, Hezbollah, and PIJ, are materially and financially beholden to the IRGC and have often carried out terrorist attacks in coordination with the IRGC and its direction.

12. Because oil is priced in U.S. dollars and dollars are the most easily convertible and stable foreign currency in both the Palestinian Territories and Lebanon, it has long been critical to the IRGC, Hamas, Hezbollah, and PIJ to be able to access and transfer U.S. dollars.

13. And given that these terrorist groups' infrastructure is vast and their financial needs are equivalent to those of small nation-states, couriers and smuggling are insufficient means to

sustain their funding needs.

14.   However, because nearly all U.S. dollar-denominated transactions utilizing the international financial system flow through U.S. correspondent banks that are legally required to monitor, block, and freeze these terrorist organizations' funds, methods outside the traditional financial system were needed.

15.   Binance provided a game-changing solution, offering a low-cost means of moving *massive* amounts of money in cryptocurrencies that were easily convertible to U.S. dollars and a platform architecture that facilitated essentially invisible transfers between Binance customers.

16.   Unlike U.S. correspondent banks, Binance actively solicited terrorist organizations' business (particularly funds derived from illicit oil and gold sales at large volumes) and willingly assisted them in laundering their money.

17.   Thus, in the years immediately leading up to the October 7 Attacks, Binance provided the Axis of Resistance with a vital alternative financial channel for these FTOs that enhanced their terrorism capabilities, including weapons acquisition, training, preparation, and execution of the planned terror campaign.

18.   As a result of this "business model," on November 21, 2023, Binance pled guilty to federal charges of conducting an unlicensed money transmitting business ("MTB"), failing to maintain an effective anti-money laundering ("AML") program, and violating the Bank Secrecy Act ("BSA") and U.S. counterterrorism sanctions (in violation of the International Emergency Economic Powers Act ("IEEPA"), among other laws).

19.   Binance agreed to pay over $4 billion in fines and subject itself to government monitorship for three years.

20.   But as detailed below, because facilitating illicit sale of Iranian oil to China (and

11

laundering the proceeds for the IRGC) remains a core Binance business objective, even after it pled guilty in November 2023, Binance continued (and continues) to knowingly facilitate those illicit sales and to provide the IRGC with a vital financial lifeline even after its compliance staff have flagged blatant examples of its platform being used for these purposes.

### A.     Overview of Binance's Illegal Activities

21.     Six years before the October 7 Attacks, Defendants Zhao and Chen launched Binance—a cryptocurrency trading platform that they intentionally designed as a criminal enterprise to facilitate money laundering on a global scale.

22.     Binance is the largest global cryptocurrency trading platform by user count and trading volume, with over $300 billion in daily volume across spot and futures markets.

23.     Binance serves more than 280 million users globally.[3]

24.     Its core global business involves the mode of exchange known as cryptocurrency, also referred to as "crypto assets," "tokens," or "coins."

25.     Binance rapidly grew to be the largest crypto trading platform globally because, as detailed below, it purposely attracted criminals including terrorist organizations like the IRGC, Hamas, Hezbollah, and PIJ to its platform and assisted them to launder money in order to maximize Binance's trading volume and monetize criminal activities via platform fees.

26.     From the outset, Binance boasted that it maintained no headquarters anywhere in the world.

27.     Its former CEO and owner, Defendant Zhao, claimed the company was "based" wherever he was situated at any given moment: "Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office."

---

[3]     *See* Binance, CoinMarketCap, https://coinmarketcap.com/exchanges/binance/ (last visited June 9, 2026).

28.     That is, Binance pitched itself to terrorist organizations, narcotics traffickers, and tax evaders as beyond the reach of any single country's laws or regulations.

29.     As discussed above, it also agreed to serve as a willing conduit for the illicit sale of Iranian oil to China – a major source of funding for the IRGC and its terrorist proxies – and to facilitate an alternative payment platform that would undermine the Petrodollar system[4] that had previously made U.S. sanctions so effective.

30.     Binance knowingly helped China, the IRGC, and other rogue actors break free of the Petrodollar system by letting them (1) access the Binance platform to evade sanctions and fund terrorism, (2) transfer funds in stablecoins like Tether ("USDT") (discussed below) (redeemable at a 1:1 ratio with U.S. dollars), (3) conceal much of this activity inside Binance's internal ledger, and (4) use gold smuggling networks tied to the IRGC and Hezbollah to act as a form of strategic reserve backing their cryptocurrency activities.

31.     Helping to launder these vast revenue streams to evade U.S. sanctions for the benefit of the IRGC, Hamas, Hezbollah, and PIJ has been a core facet of Binance's business for years prior to the October 7 Attacks and has remained so even after it entered its guilty pleas in U.S. proceedings and agreed to a monitorship.

32.     As a result, Binance grew quickly to become the world's largest cryptocurrency exchange—and the go-to platform for terrorists, narcotics traffickers, and other criminals to move assets while evading law enforcement, in large part because it was *designed* to launder money, particularly for the IRGC and its terrorist proxies.

---

[4]     The Petrodollar system refers to the arrangement where oil is priced and traded globally in U.S. dollars, meaning countries need dollars to buy oil and more than 95% of U.S. dollars transiting through the global financial system are settled by correspondent banks in the United States. Those financial institutions are required to apply automated Office of Foreign Assets Control filters on all transactions to prevent access by sanctioned countries, individuals, and entities to the U.S. financial system.

13

33.    As Binance's own Chief Compliance Officer Samuel Lim bluntly explained in 2020, Binance's customers "**are here for crime**."

34.    Another Binance compliance officer joked that the company might as well advertise itself with a banner saying, "is washing drug money too hard these days—come to binance we got cake for you."

35.    Then-U.S. Attorney General Merrick Garland observed in November 2023 that Binance "became the world's largest cryptocurrency in part because of the crimes it committed."

36.    In fact, years before (and after) October 7, Binance not only knew that the IRGC, Hamas, Hezbollah, PIJ, and other terrorist organizations were all transacting regularly on its platform, it chose to actively assist their use of the platform.

37.    Binance assisted the terrorist organizations' use of the platform at a time when Hamas, in particular, was publicly directing its donors to send funds to so-called "crypto wallets"[5] held with Binance—a fact of which Binance was well aware.[6]

38.    Additionally, in 2019, a video on Hamas's official website instructed viewers to "create a new account on one of the trading platforms"—explicitly naming Binance—to contribute cryptocurrency to Hamas.

39.    In fact, in April 2019 and July 2020, Binance received reports from one of its

---

[5]    A cryptocurrency wallet is a digital or physical tool that allows someone to store, send, and receive cryptocurrencies. Wallets have both public and private identifiers: addresses (which are public account identifiers) and keys (which function like passwords). It is called a wallet because it functions similarly to a traditional wallet used for organizing cash and cards. Instead of holding physical items, it stores the private keys that enables access to the wallet. Like a bank account, it represents the assets owned by the wallet owner. However, unlike a bank account, a cryptocurrency wallet can be held custodially by the owner (by holding the private keys to their wallet – password, in other words) or it may be custodied by a financial intermediary, such as Binance. A self-custody wallet is pseudonymous, meaning any person can create a wallet without using their name as the accountholder.

[6]    *See* Benoit Faucon, Ian Talley & Summer Said, *Israel-Gaza Conflict Spurs Bitcoin Donations to Hamas*, Wall St. J. (June 2, 2021), https://www.wsj.com/world/middle-east/israel-gaza-conflict-spurs-bitcoin-donations-to-hamas-1622633400.

14

blockchain analytics vendors specifically identifying Hamas-associated transactions on its platform.

40.    But rather than file Suspicious Activity Reports ("SARs") with U.S. regulators (as required by law), Binance instead "attempted to influence how its third-party service provider reported on Binance's conduct" to avoid attracting scrutiny.[7]

41.    For example, in July 2020, when yet another third-party compliance service flagged accounts associated with Hamas on its platform, Binance did not freeze or report the accounts; it affirmatively acted to protect those customers.

42.    Namely, Lim cautioned colleagues that flagging of customers by third-party compliance services was "[e]xtremely dangerous for our company," instructing Binance personnel to check if the Hamas-linked customer was "a VIP account" and, if so, "to… [o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him." The customer was allowed to keep the account for several years in withdrawal-only status and withdraw the balance.[8]

43.    In other words, Binance not only knowingly provided financial services to Hamas and its affiliated FTOs; it actively tried to shield its "Axis of Resistance" customers and their funds from scrutiny by U.S. regulators or law enforcement—a practice that it continues to this day.

44.    As detailed below, Binance often protected its terrorist customers from law enforcement, helped them work around government designations, and facilitated their funds

---

[7]    U.S. DEP'T OF TREAS., Fin. Crime Enforcement Network, Consent Order 2023-04, at 46, https://www.fincen.gov/system/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf. Filing SARs insulates financial institutions from prosecution or regulatory difficulties based on the reported transactions, but filing them, or implementing internal controls, naturally reduces financial institutions' usefulness to criminals. Indeed, Binance took on tremendous risk of prosecution—ending in massive fines and a prison sentence for Zhao—to establish itself as the premier cryptocurrency platform for terrorists and other criminals.

[8]    *Id.* at 47.

transfers, especially if the terror financers were also VIP customers.

45.     This approach was consistent with the way Binance structured its operations from its inception.

46.     Binance did not and does not operate as a traditional financial institution or corporation with a home country, physical offices, and transparent corporate governance.

47.     Instead, Zhao and his confederates set up an amorphous, decentralized structure deliberately designed to avoid regulatory scrutiny, protect the anonymity of its customers, and preserve Binance's appeal as a safe haven for global money laundering.

48.     In September 2019, Binance *claimed* it had begun to block customers based on their internet protocol ("IP") address, in part, to prevent U.S.-based customers from accessing the platform and thereby triggering increased U.S. government oversight.

49.     In reality, Binance simply added a pop-up window on its website that appeared when customers attempted to log in from an IP address associated with the United States, and the pop-up did not block customers from logging in to their accounts.

50.     Thus, in addition to knowingly and actively assisting the IRGC, Hamas, Hezbollah, and PIJ to launder money, Binance also enabled dozens of its customers affiliated with the IRGC, Hamas and other closely affiliated terrorist organizations to execute transactions from IP addresses in the United States, including *at least* nine operations and at least two transactions executed via IP addresses in Kindred, North Dakota.[9]

51.     As Lim informed Binance employees in September 2020, offboarding accounts associated with criminal activity was "bad in [Zhao's] eyes."

---

[9]     Plaintiffs have identified more than 900 instances where Binance customers associated with Hamas and affiliated terrorist organizations accessed their accounts from the United States.

52.     In fact, even after Binance nominally began collecting some Know-Your-Customer ("KYC") information from new users,[10] the company's standing policy (even after its 2023 settlements with the U.S. government) has been to not screen *any* deposits received by its customers—and not even to track funds received by Binance customers that originate from sanctioned entities or known terrorist financiers, despite possessing the technical capabilities to do so.[11]

53.     Binance only screens transactions (if at all) when a customer attempts to transfer funds *out* of Binance, meaning illicit money (including terror financing) is welcome to flow into Binance and within it.

54.     By knowingly providing terrorists capabilities to transfer funds into Binance (and within Binance) without fear of scrutiny from law enforcement agencies and with their knowledge that Binance would attempt to shield their activities to the extent feasible, Binance ensured that terrorist organizations would flock to its platform and deposit and shuffle enormous sums on the exchange with impunity.

55.     Moreover, when specific customers were designated for terrorism financing or particular accounts were subject to terrorism-related seizure orders, Binance helped those customers and accounts to shift the assets into other Binance accounts, thus negating the effect of any "blocking" or "seizing" of the accounts.

56.     Binance's deliberate money laundering IT architecture also enables its customers to open sub-accounts that may be used for different activities and often de-facto enables different

---

[10]     In February 2022, Binance acknowledged that the identities of approximately only 30–40% of its customers had been verified though KYC documentation.

[11]     *See* Press Release, *U.S. Treasury Announces Largest Settlements in History with World's Largest Virtual Currency Exchange Binance for Violations of U.S. Anti-Money Laundering and Sanctions Laws*, U.S. DEP'T OF TREAS. (Nov. 21, 2023), https://home.treasury.gov/news/press-releases/jy1925.

people to conduct activity on the platform anonymously under the main account without KYC.[12]

57.    Although a customer's main account *may* be subject to some "enhanced due diligence," sub-accounts created within the main account are not.

58.    Moreover, when Binance off-boards a sub-account, even due to terrorism financing, other related sub-accounts and the main account are not affected and retain their ability to perform unrestricted activities on the platform.

59.    Allowing customers to open and maintain numerous sub-accounts provides criminals (including terrorists) with a back door into Binance's platform that bypasses the (already intentionally deficient) on-boarding screening processes.

60.    That policy demonstrates Binance's deliberate and conscious effort to enable users, including terrorists and sponsors of terrorism, to operate on the Binance platform and clearly helps facilitate financial crime on an industrial scale.

61.    This is especially true when those sub-accounts trade in high volumes, while registering those accounts as belonging to a single user, which indicates the main account may be performing trading activities on behalf of the sub-accounts, without ever disclosing the beneficial owners.

62.    The fact that Binance intentionally structured itself as a refuge for illicit activity, and knew full well that numerous *specific* accounts controlled by terrorist organizations were among its customers, has been confirmed by, among other things, voluminous evidence from U.S. enforcement actions, the transaction histories of multiple accounts, and published reports detailing Binance's internal deliberations, particularly concerning Chinese payments to the IRGC as a result of illicit sales of Iranian oil.

---

[12]    *See* Binance.US, Terms of Use, Section "Corporate Account Usage," https://www.binance.us/terms-of-use#accountCreation (last updated Feb. 19, 2025).

63.     In late 2023, Binance and Zhao entered criminal plea agreements and civil settlements with the U.S. Department of Justice ("DOJ"), the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"), the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), and the Commodity Futures Trading Commission ("CFTC"), culminating in Binance paying $4.3 billion U.S. dollars in penalties—one of the largest such fines in the history of both FinCEN and OFAC.[13]

64.     As part of these resolutions, Binance admitted that for years it functionally invited terrorists and other illicit actors to transact on its exchange by intentionally evading U.S. laws that require measures to identify, monitor, report, and prevent terrorism financing.

65.     Zhao pled guilty to various federal crimes related to Binance's massive, multi-year scheme of evading U.S. regulators and served four months in prison.

66.     After Zhao completed his prison sentence, he was pardoned by President Donald J. Trump in October 2025.

67.     While Zhao was forced to step down as Binance's CEO, he remains its majority owner and the architect of its business model.

68.     Binance's illegal conduct in support of terrorist organizations was far more serious and pervasive than what the U.S. government disclosed during its 2023 criminal enforcement actions, and it continues to the present.

69.     For example, FinCEN disclosed "multiple direct bitcoin transactions worth over $2,000" for Hamas's terror apparatus, the Izz al-Din al-Qassam Brigades ("Qassam Brigades"), which took the lead in carrying out the October 7 Attacks. But that was just the tip of the iceberg:

---

[13]     *See* Press Release, *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, U.S. DEP'T. OF JUSTICE (Nov. 21, 2023), https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution. *See also* Plea Agreement, *United States v. Binance Holding Ltd.* (Nov. 21, 2023), https://www.justice.gov/criminal/media/1327926/dl?inline.

19

as described in detail below, Binance knowingly sent and received the equivalent of **more than $1 billion** to and from accounts and wallets controlled by the FTOs responsible for the October 7 Attacks.

70.    To this day, there is no indication that Binance has meaningfully altered its core business model or desisted from its long-standing knowing assistance to customers it knows to be acting on behalf of the IRGC, Hamas, and other terrorist organizations.[14]

71.    Following its criminal plea agreements and civil settlements, Binance enlarged its compliance staff and hired some competent analysts in order to give the appearance that it was now taking its legal responsibilities seriously.

72.    Indeed, when permitted by Binance management, Binance compliance staff do have access to enormously detailed customer data, including comprehensive audit trails, geospatial location data (indicating the location used for each log-in to the Binance platform), device data (identifying each individual device used by each customer for each log-in entry), sophisticated compliance software that alerts Binance when its customers' counterparties are connected to or transacting with designated or high risk wallets, and many other monitoring and surveillance tools.

73.    However, *by design*, Binance's management—not the compliance team—controls which customer accounts are reviewed by compliance staff, what information the compliance team has access to, and whether to disclose investigative findings to various law enforcement agencies.

74.    Thus, as detailed below, Binance has evolved to the point where it now endeavors to provide the *optics* of complying with its legal obligations, but it remains committed to facilitating illicit revenue streams for the IRGC and shielding VIP terrorists' accounts from

---

[14]    As detailed below, many of the IRGC, Hezbollah, Hamas, and PIJ funding streams are interconnected, and operatives with accounts at Binance frequently transfer cryptocurrency to and from accounts belonging to one terrorist organization or another.

scrutiny, unless Binance management assesses that law enforcement is already aware of those accounts or will discover them, in which case the company reports the customers to maintain its veneer of credibility.[15]

### B. Binance's Aiding and Abetting of Terrorist Organizations Involved in the October 7 Attacks

75. Binance's provision of material support to the terrorist organizations responsible for the October 7 Attacks did not end on October 7, 2023. Even after they were perpetrated, as detailed below, Binance continued to process billions of dollars in transactions for IRGC-linked networks.[16]

76. Binance's notorious terrorist customers included, among others:

- *BuyCash*. A Gaza-based money-services entity that raises funds for Hamas (and which was designated by the U.S. Department of Treasury in October 2023 as a Specially Designated Global Terrorist ("SDGT") for materially assisting Hamas). Binance facilitated cryptocurrency transactions worth *at least* $240 million U.S. dollars between BuyCash and Binance in the years leading up to October 7, 2023, and cryptocurrency transactions worth *at least* $1.3 million dollars since that date.

- *Dubai Company for Exchange ("Dubai Co.")*. A Gaza-based exchange house designated by the State of Israel as a terrorist organization because it sent tens of millions of dollars annually to Hamas's Qassam Brigades, which was responsible for most of the atrocities committed on October 7, 2023. Binance facilitated cryptocurrency transactions worth *at least* $22 million U.S. dollars between Dubai Co. and Binance accounts in the years leading up to October 7, 2023, and cryptocurrency transactions worth *at least* $26 million U.S. dollars since that date.

---

[15]    At least subsequent to its November 2023 plea agreement, Binance maintained a Sanctions and Counterterrorism financing investigation team that reviewed (some) high-risk customer cases. But although individual investigators may have conducted themselves professionally, the compliance team as a whole did not because it: (1) did not select the cases under review; (2) did not have unfettered access to the Binance platform to fully trace transactions flows; and (3) did not make final decisions concerning freezing accounts or reporting them to law enforcement.

[16]    Published reports indicate law enforcement estimates recording approximately $260 million in direct transactions between Binance accounts and wallets associated with Iranian terrorist financiers and sanctioned entities in 2024 and 2025, but as set forth herein, that number is likely off by a factor of five or more. *See* Angus Berwick, Patricia Kowsmann & Ben Foldy, *Iran Moved Billions Through Binance to Fund Regime—Continuing Into This Month*, Wall St. J. (May 21, 2026), https://www.wsj.com/world/middle-east/iran-binance-crypto-military-e755b218.

- *Al-Markaziya* f/k/a *Al-Mutahadun for Exchange*. A Gaza-based money laundering network[17] operated by Zuhair Shamlakh and his brothers that was designated by the U.S. Department of the Treasury as an SDGT because it became "the main end point for funds transferred from the IRGC-QF to Hamas and PIJ in Gaza." Eighteen separate accounts associated with this network are detailed below. In February 2020, the Israeli Ministry of Defense ordered the confiscation of $4 million that had been transferred in 2019 through Zuhair Shamlakh and his company, al-Mutahadun for Exchange, from the Gaza Strip to Hamas 2019.[18] In a December 22, 2020 press release the Ministry of Defense stated that "the money was earmarked for the development of Hamas' terrorist infrastructure in Gaza, including the production of weapons and payment to the organization's operatives, and originated from the Iranian government that acts against the State of Israel."[19]

- *Tawfiq Muhammad Sa'id al-Law*. A Syrian national who was designated by the U.S. Department of the Treasury as an SDGT because he "provided Hizballah with digital wallets to receive funds from IRGC-QF commodity sales," and "conducted cryptocurrency transfers for sanctioned Hizballah officials." The Israeli government seized cryptocurrency wallets controlled by al-Law on the grounds that his "terrorist infrastructure belonging to Hezbollah and the Iranian Quds Force . . . operated to transfer funds through digital currencies for Quds Force and Hezbollah." Cryptocurrency addresses controlled by al-Law and/or Hezbollah transferred the equivalent of over $400 million to Binance accounts between 2021 and 2023 and received over $190 million during the same period.[20] Twenty-one separate accounts are detailed below.

---

[17]    Binance collects all geolocation data on its customers and is therefore able to screen transactions flowing in and out of Gaza in the same way it possesses that data for all other customer interface across the globe. *See* "Information we collect from you automatically" under "Browsing Information" at https://www.binance.com/en/privacy (last updated Oct. 7, 2025).

[18]    Isr. Nat'l Bureau for Counter Terror Fin., https://nbctf.mod.gov.il/he/PropertyPerceptions/Documents/7-20%20מתוקן.pdf.

[19]    *Defense Minister Benny Gantz Signed an Order to Seize $4 Million Transferred from Iran to Hamas*, Isr. Nat'l Bureau for Counter Terror Fin. (Dec. 22, 2020), https://nbctf.mod.gov.il/he/pages/Gantz4IranHamasHE22122020.aspx.

[20]    The wallets | Binance accounts listed in the NBCTF Administrative Seizure Order (ASO 29/23) were all listed as associated with Hezbollah. One was specifically listed as belonging to al-Law; the remaining 50 were identified as belonging to "a designated terrorist organization or used in the perpetration of a severe terror crime." *See* NBCTF Administrative Seizure Order (ASO 29/23) (Isr.), https://nbctf.mod.gov.il/he/PropertyPerceptions/Documents/%D7%A6%D7%95%20%D7%AA%D7%A4%D7%99%D7%A1%D7%94%2029-23.pdf.

22

- *Raed Abib Habib*. A Syrian national with Venezuelan identification papers known as "El Turco." He works with Tawfiq al-Law and Hezbollah, controls the Orinoco Mining Arc, works with a Venezuelan gold smuggling criminal organization known as Tren de Guayana, and is responsible for laundering money for Hezbollah and the IRGC, including through a network of Binance accounts detailed below.

- *Alireza Derakhshan* and *Arash Estaki Alivand*. Iranian money launderers designated by the U.S. Department of the Treasury as SDGTs for purchasing over $100 million U.S. dollars in cryptocurrency between 2023 and 2025 (including before October 7) for the benefit of the IRGC-QF and Iran's Ministry of Defense and Armed Forces Logistics. Alivand and Derakhshan transferred the equivalent of over $30 million in cryptocurrency transactions by and through Binance which operated as a bridge to Hezbollah's gold smuggling operations in the Tri-Border area in South America.

- *Mohsen Fahad*. Iranian national who used a passport issued by the island of Dominica to open his Binance account. As Binance's compliance team was aware, he was identified by the U.N. as one of three Iranian nationals connected to a gold and cash smuggling operation run between Tehran airport and the airport of Dubai, United Arab Emirates, by North Korean embassy officials in Tehran. Fahad and two other Iranian nationals held multiple bank accounts in China and Bulgaria under their names and those of their family members as well as several companies and bank accounts in Bulgaria. As explained below, Fahad helped facilitate transfers from Binance customers to a cluster of addresses controlled by the IRGC.

- *Zedcex | Babak Zanjani*. Babak Zanjani is a well-known Iranian money launderer and sanctions evader who registered a cryptocurrency exchange in London called Zedcex to help move illicit Iranian oil sales via Turkish banks into Zedcex's Binance accounts. Zedcex's corporate Binance accounts alone engaged in approximately $830 million in total transactions in 2024 and 2025. Binance's own investigators assessed the related Zedcex accounts at Binance, including accounts held by Zanjani's sister, romantic partner, and a director of his Dubai-based diamond vendor, all accessed from the same devices, constituted an illicit money laundering network to finance the Iranian regime.[21]

- *Blessed Trust and Hexa Whale*. Binance accounts nominally controlled by Hong Kong entities and Chinese nationals that transferred the equivalent of more than $1.7 billion to a cluster of IRGC-controlled wallets.

---

[21]    Berwick et al., Iran Moved Billions Through Binance, Wall St. J., https://www.wsj.com/world/middle-east/iran-binance-crypto-military-e755b218.

77.    As detailed below, BuyCash, Dubai Co., the Al-Mutahadun for Exchange, and other laundering networks mentioned above represent only a small fraction of the wallets and transactions that Binance facilitated for Hamas, the IRGC, Hezbollah, and PIJ.

78.    The Hamas and PIJ cryptocurrency money laundering network is tied, *inter alia*, to a series of brokers likely located in the Gaza Strip[22] ("the Gaza Brokers") that serve as hubs for the flow and conversion of cryptocurrencies for Hamas and PIJ.

79.    Wallets owned by the Gaza Brokers[23] (not as Binance users) and multiple external wallets, transact with the same parties that Binance users designated by Israel's National Bureau for Counter Terror Financing ("NBCTF") transacted with. Those Binance users include **Binance Account Nos. \*\*\*6082; \*\*\*2659; \*\*\*9079; \*\*\*3382; \*\*\*3901; \*\*\*2283; and \*\*\*9799**.

80.    While the Gaza Brokers also launder cryptocurrencies for Hamas and PIJ *outside* of Binance, Binance assists its customers to wash those assets and cover their trail through the platform.

81.    They send cryptocurrency transfers to Binance accounts (some of them designated, the rest at high risk for money laundering) and then those cryptocurrencies are internally "mixed" within Binance's systems ("off chain" activity), and either (1) emerge outside Binance's systems back on the blockchain ("on-chain" activity), concealing their linkage to the Gaza Brokers; or (2) the cryptocurrency transferred is exchanged into a different cryptocurrency or fiat currency (legal tender issued by a government, e.g., U.S. dollars, Euros, Yen).

82.    Despite the fact that Binance knew the Gaza Brokers wallets were transacting with government-designated external wallets and designated or high-risk Binance customers, it

---

[22]    The brokers serve Gaza-associated crypto activities, and their hours of general operation are concurrent with Gaza's time zone – 8am-6pm UTC.

[23]    These include at least five identified wallets.

24

continued to receive and send cryptocurrencies to and from the Gaza Brokers until 2025 (for some until November 2025).

83.    The Gaza Brokers are, in turn, part of a larger IRGC financial ecosystem that includes Tawfiq Muhammad Sa'id al-Law's IRGC-Hezbollah network, Alireza Derakhshan and Arash Estaki Alivand's IRGC network, and the Sa'id al-Jamal Network, all of which fund Hezbollah, Hamas, and PIJ (all proxy groups belonging to Iran's "Axis of Resistance").

84.    As discussed below, that financial ecosystem also contains smaller, interconnected networks of exchanges and unlicensed brokers who launder cryptocurrencies for the benefit of Hezbollah, Hamas, and PIJ.

85.    These include BuyCash, Dubai Company for Exchange, and Shamlakh networks (Al-Mutahadun Exchange) – all of them using Binance, interconnected, and ultimately designated as SDGTs.

86.    Accounting solely for Binance customers publicly identified by the U.S. and Israeli governments as associated with Hamas, the IRGC, Hezbollah, and PIJ, Binance knowingly facilitated the equivalent of more than $700 million in transactions for these FTOs between 2019 and October 7, 2023, on the public blockchains.

87.    Based on an analysis of these terrorist organizations' activities on the blockchain, Binance also knowingly facilitated the equivalent of more than **$2 billion** in transactions *since* October 7, 2023, for Hamas, the IRGC, Hezbollah, and PIJ on public blockchains fully understanding the horrific consequences of enhancing these FTOs' capacity to commit acts of international terrorism.

88.    Binance's own omnibus wallets sent the equivalent of more than $300 million to designated wallets on the blockchain before the October 7 Attacks and more than $115 million

25

after October 7.

89.     However, Hamas, the IRGC, Hezbollah, and PIJ did not transfer money to and from Binance wallets solely on publicly visible blockchains.

90.     Binance operates an exchange for cryptocurrency where transactions can occur either "on-chain" (recorded on a public blockchain ledger) or "off-chain" (recorded only on Binance's internal private ledger).

91.     Only transactions validated and recorded on a public blockchain are visible and traceable to outside observers.

92.     Thus, when a transaction is processed on a public blockchain like the Bitcoin blockchain or the Ethereum blockchain, it is possible to trace the flow of funds from one wallet to another (even if the real identities of the wallet owners are pseudonymous).

93.     However, when a Binance customer transfers assets internally to another Binance customer, that transfer occurs entirely "off-chain," leaves no public trace whatsoever, and exists solely on Binance's books.

94.     In practical terms, when a customer deposits assets into Binance, those assets are moved into Binance-controlled omnibus wallets (visible on the blockchain but owned by Binance).

95.     Thereafter, Binance can transfer value between customer accounts simply by debiting and crediting its internal ledger, just as a bank might internally transfer dollars between two account holders (or even between two accounts held by the same person) without any external wire transfer.

96.     These internal Binance transfers do not appear on any public blockchain; only when a customer withdraws funds from Binance does Binance execute a corresponding on-chain blockchain transaction.

26

97.    But even then, the outbound transaction is executed by a Binance-controlled omnibus wallet (that contains assets belonging to multiple customers)—thereby making all outgoing on-chain blockchain transactions effectively anonymous.

98.    Thus, the structure of Binance's platform was (and is), among other things, designed to assist Hamas, the IRGC, Hezbollah, PIJ, and other FTOs in rapidly and clandestinely moving funds worth hundreds of millions of U.S. dollars to fund their terrorist operations.

99.    Use of this internal ledger system—combined with the movement of vast sums Binance knowingly helped these FTOs transfer and ultimately cash out via money service businesses and banks—constituted the financial plumbing that substantially assisted Hamas and other FTOs in perpetrating the October 7 Attacks and the various terrorist attacks described herein that followed.

100.    Binance's facilitation occurred at multiple levels. First, Binance knowingly assisted the IRGC, of which the other FTOs operated as proxies, to evade U.S. sanctions on a massive scale, including by helping the IRGC to conceal the proceeds of its illegal sales of Iranian oil.

101.    Second, Binance knew that in concealing the proceeds of the IRGC's illegal sales of Iranian oil (and Venezuelan gold) and helping it transfer cryptocurrency around the world in USDT, it was providing a method by which the IRGC could access the U.S. financial system through the use of stablecoins pegged to and backed by the U.S. dollar.

102.    Third, Binance knew that a substantial portion of funds it was moving in cryptocurrency (and fiat money) for the IRGC and Iran, the world's leading state sponsor of terror, would enhance their ability to coordinate, finance, and help execute acts of international terrorism.

**JURISDICTION AND VENUE**

103.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

27

§1331 and 18 U.S.C. §§2333(a) and (d), which provide for jurisdiction over civil actions brought by citizens of the United States, their estates, and family members who have been killed or injured by reason of acts of international terrorism.

104. Plaintiffs in this action are U.S. nationals who were injured (or are close family/estates of those killed or injured) by acts of international terrorism as defined in 18 U.S.C. §2331.

105. This Court has personal jurisdiction over Binance, Zhao, and Chen pursuant to FRCP 4(k)(1)(C), FRCP 4(h)(1)(B) and 18 U.S.C. § 2334, because Plaintiffs served a summons on Binance's CEO in Washington D.C., and because Zhao and Chen created, designed and deployed Binance as a criminal enterprise in large measure directed at the United States.

106. This Court has personal jurisdiction over Binance, Zhao, and Chen pursuant to FRCP 4(k)(2) because (1) this claim arises under federal law and (2) it is reasonable to exercise jurisdiction over Binance, Zhao, and Chen under flexible Fifth Amendment due-process principles.

107. Exercising jurisdiction over Binance, Zhao, and Chen is reasonable because (1) the burden on the defendants is minimal and (2) the interests of the forum in providing a forum for American victims of terrorism and (3) Plaintiffs' interest in obtaining relief from U.S. courts are overwhelming.

108. The burden is minimal because modern technology makes litigating in the United States no less convenient, especially for a corporation whose records are almost entirely in electronic form (Zhao famously stated in 2020, "wherever I sit is going to be the Binance office") and many of whose most relevant records have already been produced in the United States.

109. The United States has a strong interest in providing a forum for its citizens injured in terrorist attacks. But the United States has a further interest because Binance—and Zhao and

28

Chen in designing and operating Binance—are heavily dependent on the United States' financial system and technological infrastructure to operate, all while undermining United States national security.

110.    Prior to October 7, 2023, Binance served more than 5 million U.S. customers—in fact, the United States was its single largest market.[24]

111.    Despite presenting itself as a company without any physical address or locus of operations, Binance conducts its internal operations through Palo Alto Networks, a cybersecurity platform based in California.[25]

112.    As the CFTC detailed in a December 2023 Consent Order with Binance and Zhao, Binance's largest and most important users included three trading firms in the United States:

- *Trading Firm A*. A quantitative trading firm identified by *The Wall Street Journal* as Radix Trading LLC in a March 28, 2023, article titled "Chicago's Radix Says It Is 'Trading Firm A' in Binance Lawsuit." Radix is a Delaware limited liability company headquartered in Chicago, Illinois. Benjamin Blander, Radix's co-founder, confirmed that his firm "had traded on Binance during the past few years using offshore affiliates and a prime brokerage that provided access to the exchange."

- *Trading Firm B*. A quantitative trading firm—identified by *Bloomberg* as Jane Street Group LLC in an April 5, 2023, article titled "Jane Street, Tower and Radix Are Unnamed 'VIPs' in Binance Case." Jane Street is a Delaware limited liability company headquartered in New York. Jane Street has been among Binance's largest customers and has consistently received reduced trading fees due to its status as a Binance VIP.

- *Trading Firm C*. A quantitative trading firm identified by *Bloomberg* as Tower Research Capital LLC in an April 5, 2023, article titled "Jane Street, Tower and Radix Are Unnamed 'VIPs' in Binance Case." Tower Research is a New York limited liability company headquartered in New York City.

---

[24]    Binance suspended all U.S. dollar deposits for its U.S. arm after October 7, 2023, due to the U.S. criminal and regulatory actions taken against it.

[25]    Binance employees cannot access the platform except by using a "dongle" that plugs into their computers and routes their connection through Palo Alto Networks' security platform.

113.    Additionally, Binance and its affiliates utilized U.S. bank accounts to move billions of U.S. dollars through the U.S. banking system.

114.    Notably, Binance (through Zhao-owned entities) maintained accounts at the now-defunct, New York-based Signature Bank through which it transferred billions of U.S. dollars between 2019 and 2022 via banking funds transfer platforms such as Fedwire, SWIFT, and CHIPS.

115.    Signature Bank was a New York-chartered bank with approximately 40 branches across the United States and nearly $100 billion U.S. dollars in assets before its collapse in 2023.

116.    Zhao owned and controlled multiple foreign entities that held accounts at Signature Bank and were the counterparties to many large transfers totaling hundreds of millions of U.S. dollars.

117.    These banking relationships in New York facilitated the flow of U.S. dollar funds integral to Binance's operations (including the "off-ramps" for Binance users, *i.e.*, converting crypto back to U.S. dollars).

118.    Chen also maintained multiple bank accounts at the now defunct California-based Silvergate Bank that were used by both Binance and its sham U.S. subsidiary.[26]

119.    Binance worked with Paxos Trust Company LLC ("Paxos"), a New York-chartered limited purpose trust company, to issue a Binance-branded stablecoin[27] called "BUSD" (Binance USD) beginning in September 2019.

120.    BUSD was a U.S. dollar–pegged cryptocurrency that was approved by and operated

---

[26]    Chen acted as the "Primary Admin User" for the five bank accounts at Silvergate Bank, including a customer deposit account; an account for corporate clients that later sent funds to Merit Peak; and a trading firm controlled by Zhao.

[27]    A stablecoin is a type of cryptocurrency designed to maintain a stable value by being pegged to an asset or a basket of assets, such as fiat currencies or commodities. For example, a stablecoin pegged to the U.S. dollar derives its value from the value of its underlying asset—the U.S. dollar.

under the supervision of the New York State Department of Financial Services ("NYDFS").

121. Paxos and Binance shared in the profits from investing the reserve assets backing BUSD, which grew to over $16 billion U.S. dollars in circulation by early 2023.

122. BUSD was traded on Binance's platform and provided critical liquidity until February 2023, when NYDFS ordered Paxos to cease issuing new BUSD due to unresolved issues with Binance's oversight of the token.

123. Despite public claims to the contrary, Binance deliberately structured its systems architecture to allow its customers to access its platform using U.S. IP addresses and make cryptocurrency (and fiat currency)[28] transfers from IP multiple addresses in the United States.

124. Moreover, numerous operatives known to Binance to be affiliated with Hamas, the IRGC, Hezbollah, and PIJ initiated transactions from IP addresses in the United States and in some confirmed cases, off-ramped fiat currency through U.S. payment systems like Zelle.

125. These transactions included transfers initiated from Kindred, North Dakota, by Hamas operative Sharif Turkmani, using **Binance Account No. \*\*\*6082**.

126. On more than **900 other occasions** Binance permitted IP usage across the U.S. by specific Binance customers identified herein who transferred funds on behalf of Hamas, the IRGC, Hezbollah, and PIJ, including from Miami, Florida; North Bergen and Clifton, New Jersey; and Cheyenne, Wyoming.[29]

127. To take just one example, **Binance Account No. \*\*\*9210** (described below and

---

[28] *See, e.g.*, Binance Account No. \*\*\*9830's use of Bank of America's Zelle payment processing platform (described below).

[29] In addition, as detailed below, BuyCash, the Gaza-based exchange designated by the U.S. government for "having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Hamas," funded its Binance accounts (**Account Nos. \*\*\*1098 and \*\*\*0091**) through transfers from U.S. bank accounts, which Binance processed, knowing the transfers were from U.S. bank accounts. Defendants Zhao and Chen constructed the platform to process these transactions - and many others used for the benefit of FTOs - through the United States.

part of Hezbollah's gold smuggling network) was accessed extensively from Miami (FL), Orem (UT), McAllen (TX), Los Angeles (CA), Seattle (WA), Chicago (IL), and New York (NY).

128.    In sum, Binance deliberately chose to assist customers it knew to be terrorists to engage in terrorism financing transactions in the United States that enhanced the ability of those same terrorists to perpetrate the attacks described herein that foreseeably resulted in the deaths, abduction and torture of American citizens – conduct that is more than sufficient to justify the exercise of personal jurisdiction under Fifth Amendment.

129.    Defendants Zhao and Chen and other Binance executives constructed the platform to process these transactions – and many others for the benefit of FTOs – through the United States in ways that evaded detection by U.S. law enforcement.

130.    Venue is proper in this District pursuant to 18 U.S.C. §2334(a) and 28 U.S.C. §§1391(b) and (c)(3).

## DEFENDANTS

**Binance**

131.    Binance was founded in Shanghai in 2017 by Zhao, a Chinese-Canadian national, and Yi He, who previously worked together at Chinese cryptocurrency exchange OKCoin.

132.    The company launched through an Initial Coin Offering conducted from June 26 to July 3, 2017, raising $15 million by selling 100 million Binance Coin ("BNB") tokens[30] at approximately $0.15 each.

133.    The exchange went live just 11 days later on July 14, 2017, operating initially from Shanghai, China.

134.    Within six months of launch, Binance became the world's largest cryptocurrency

---

[30]    BNB was the native cryptocurrency for the Binance exchange. It does not function as stablecoin.

exchange by trading volume in January 2018, achieving $1 billion in daily trading and a $1.3 billion market capitalization.

135. In September 2017, following China's ban on cryptocurrency exchanges, Binance relocated servers and operations from Shanghai to Japan. This stay proved brief—on March 23, 2018, Japan's Financial Services Agency issued a warning that Binance was operating without required licensure. That same day, Zhao announced Binance would relocate to Malta.

136. While Binance publicly claimed Malta as its headquarters, the Malta Financial Services Authority ("MFSA") issued a definitive public statement on February 21, 2020, clarifying that Binance "is not authorized by the MFSA to operate in the cryptocurrency sphere and is therefore not subject to regulatory oversight by the MFSA." Binance had never been licensed or regulated in Malta.

137. Binance was in fact incorporated in the Cayman Islands as a limited liability company in 2017 and owned by Zhao.[31]

138. As noted above, Binance's principal servers now run in a server farm in Japan, but Binance's leadership operated from various countries. Zhao himself has been a digital nomad of sorts, at times living in Canada, Singapore, and most recently, the United Arab Emirates.

139. Binance's internal communications were conducted over U.S-based Gmail and via

---

[31] Binance Holdings Limited is complemented by several other Binance entities, including, Binance (Services) Holdings Limited (Ireland Company Number 704568), which owns Binance Holdings (IE) Limited and manages matching engines, financial products, and vendor contracts; and, Binance Holdings (IE) Limited (Ireland Company Number 704567), which operates the Binance platform directly. Additional Irish entities include Binance (Ireland) Holdings Co., Limited (Company Number 675947), Binance (APAC) Holdings (Company Number 704567), Binance Technologies (Company Number 704569), and Binance Exchange (IE) Limited (Company Number 707774). All Irish entities share registered addresses in Dublin or Limerick and identify Changpeng Zhao as a Canadian citizen residing in Malta. The CFTC named three entities as defendants in its March 27, 2023, complaint: Binance Holdings Limited (Cayman Islands), Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited. Binance also operates through a web of entities across multiple jurisdictions, including Binance Investments Company (Seychelles Business Registry Number 212603, LEI 254900PAH70HVI8D2Q25) and Nest Services Limited (Seychelles Registration Number 238045), both registered at the same address.

the Chinese messaging app WeChat.[32]

140. Customers can, and often do, use Gmail to log into their Binance accounts and to verify internal crypto transactions.[33]

141. Since at least July 2017, Binance (together with an array of affiliated entities controlled by Zhao) has operated the Binance.com exchange—an international crypto asset trading platform which is currently hosted on servers in Tokyo, Japan (in Amazon Web Services' data centers).

142. Binance.com, Binance's primary platform, markets its services to customers in more than 100 countries and currently offers trading in over 350 different crypto assets.

143. Binance operates through a byzantine network of affiliated entities in multiple jurisdictions; all are ultimately tied to Zhao as the beneficial owner.

144. Binance has famously claimed that it has no formal corporate headquarters and refuses to disclose the true location of its main Binance.com operations.

145. As noted above, Zhao has publicly dismissed "traditional" corporate formalities and regulatory requirements, claiming, "Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office."

146. According to Zhao, the concept of a formal corporate entity with a headquarters and its own bank account is unnecessary: "All of those things doesn't have to exist for blockchain companies."

147. However, as U.S. regulators later uncovered, billions of dollars from Binance's

---

[32] The company's internal use of WeChat (a particularly unsecure Chinese government-monitored platform) indicates that its other technological choices (such as its 30-day document retention policy) are not predicated on cybersecurity concerns.

[33] In theory, a single Gmail address is supposed to be used by one customer, but in practice Binance permits multiple users to use the same Gmail account.

crypto exchange platforms flowed through dozens of U.S.-based bank accounts owned by Binance and Zhao, belying the notion that Binance is nowhere and everywhere at once.

148.    Binance.com allows users (once their account is funded) to trade in hundreds of cryptocurrencies and related financial instruments, including spot, futures, derivatives, and margin trading.

149.    To onboard, a user opens a Binance account and deposits assets, either by transferring cryptocurrency from an outside wallet or by making a "fiat" currency (legal tender issued by a government, e.g., U.S. dollars, Euros, Yen) deposit by electronic funds transfer from a bank account, credit card, or other payment channel.

150.    Once a deposit is made, Binance moves all customer assets to Binance-owned omnibus wallets (pooled wallets) that are visible on public blockchains but controlled by Binance and only identifiable as Binance wallets. Fiat deposits are kept in Binance bank accounts, visible only to Binance.

151.    Binance acts as custodian of these pooled assets and internally tracks individual users' balances via its own ledger.

152.    Because of this structure, once funds are deposited and pooled into Binance's wallets, external observers can no longer discern which specific customer is moving funds *out* of Binance's wallets or making internal transfers between wallets. All external transfers are identified on the public blockchain only as transfers originating from wallets owned by Binance. Only Binance knows the "real" counterparty to a transfer, i.e. which customers' assets were transferred.

153.    All internal transfers between Binance customer accounts are recorded solely on Binance's internal systems—only when assets completely leave Binance does an on-chain record or bank record become visible to outsiders—and even those transactions lack transparency, as they

appear only as transfers made by Binance.

154.   Binance customers may place orders on www.binance.com, through a Binance mobile application, and by direct connection to Binance's matching engines via the Binance application programming interface ("API").

155.   API connections are generally used by more technologically sophisticated customers, such as proprietary trading firms or other institutional market participants.

156.   By design, Binance's cryptocurrency platform was built to facilitate money laundering on a global scale.

157.   It proudly touted itself as the world's "largest crypto exchange by trade volume" and reportedly captured over half of the global market share for crypto trading by the end of 2022.

158.   Binance revenue comes primarily from fees charged on trades and transactions processed on its exchange.

159.   In 2021 and 2022, Binance reportedly generated approximately $20 billion and $12 billion U.S. dollars in revenue, respectively.

160.   Binance's growth and competitive advantage over other major cryptocurrency platforms were predicated on its conscious decision to do business with criminals and facilitate illicit transactions, including money laundering and terrorism financing.

161.   Unlike law-abiding exchanges, Binance made a conscious decision not to implement standard KYC or AML programs for years, thereby attracting volumes of illicit business as a way to generate liquidity that attracted more and more customers (through network effects) and transformed it into a market leader.

162.   Binance went further, not only attracting criminals, including money launderers and customers affiliated with terrorist organizations, but cultivating them and assisting them to launder

36

their money, shield it from seizure, and hide their activities from regulators.

163.    For example, after a third-party service provider flagged accounts associated with Hamas, Binance, concerned about the user's VIP status, permitted him to leave with his funds and alert the user that he had been flagged by third-party compliance tools. Binance also intentionally failed to file SARs with respect to certain terrorist groups despite being "aware of extensive suspicious activity."[34]

164.    In June 2019, amid concerns about U.S. regulatory exposure, Binance publicly announced the launch of a separate U.S.-only exchange, called Binance.US, that would supposedly wall off U.S. customers from Binance.com.

165.    In truth, as described below, this was a sham.

166.    Binance continued to secretly cater to U.S. users on Binance.com—especially its largest U.S. clients—while using Binance.US in an attempt to circumvent U.S. regulatory oversight.

167.    Internally, Zhao described the goal as "reduc[ing] the losses to ourselves" while keeping regulators at bay.

168.    On November 21, 2023, Binance pled guilty to federal charges of failing to maintain an effective AML program, conducting an unlicensed money transmitting business, and violating U.S. counterterrorism sanctions in violation of the Bank Secrecy Act, the IEEPA, and related laws.

169.    On the same date, Binance and Zhao entered into a comprehensive settlement with the DOJ, FinCEN, OFAC, and the CFTC to resolve years-long investigations into their misconduct.

---

[34]    FinCEN Consent Order at 48, https://www.fincen.gov/system/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf.

170.    Binance agreed to pay $4.3 billion U.S. dollars in forfeiture and penalties, one of the largest such penalties ever imposed by OFAC and FinCEN.

171.    In its OFAC settlement, Binance admitted to egregious violations of U.S. sanctions, including violations of the Iranian Transactions and Sanctions Regulations, the Syrian Sanctions Regulations, and Section 594.201(a) of the Global Terrorism Sanctions Regulations.

172.    Zhao separately pled guilty to willfully violating the BSA, and he agreed to a fine of $50 million U.S. dollars; he was later sentenced to four months in federal prison (on April 30, 2024).

173.    The CFTC separately entered into a settlement with Lim (for aiding and abetting Binance's violations) that imposed an injunction and a civil fine of $1.5 million U.S. dollars.

**Changpeng Zhao**

174.    Changpeng Zhao is Binance's primary founder, majority owner, and (until recently) its Chief Executive Officer.

175.    Zhao is a Canadian citizen (born in China), who, upon information and belief, presently resides in the United Arab Emirates.

176.    He launched Binance in 2017 and along with a core senior management group (including Defendant Chen and former Chief Compliance Officer Lim), has always exercised near-total control over Binance's strategy, operations, and finances.

177.    Zhao was also a named party with "control person" liability in regulatory settlements with Binance.

178.    Even after stepping down as CEO, Zhao has retained an overwhelming ownership interest in Binance and, on information and belief, continues to wield significant influence over its business decisions.

38

179.    Zhao has been the key architect of Binance's illicit conduct described herein, including the intentional and knowing provision of critical financial services to Hamas, the IRGC, Hezbollah, PIJ, and other terrorist organizations, even at the risk of legal and reputational harm to him and Binance.

**Guangying "Heina" Chen**

180.    Guangying "Heina" Chen is a close associate of Zhao. Despite not holding any formal title visible to the public in the years preceding the October 7 Attacks, she has long functioned as Binance's *de facto* Chief Financial Officer.[35]

181.    Chen was an early co-founder of Binance and initially held herself out in 2017 as the legal representative and 80 percent shareholder at the firm's original entity in Shanghai, China.

182.    Two years later, when Binance set up its U.S. affiliate (BAM Trading Services, which operates Binance.US), Chen was listed as the signatory on its corporate bank accounts.[36]

183.    According to the SEC, Chen served as Binance's "Back Office Manager" or "finance director," who executed phony "wash trades" to inflate trading volumes on the Binance platform.

184.    Chen has controlled more Binance bank accounts and served as a director of more Binance-related entities than any executive besides Zhao himself.

185.     As of October 2023, the SEC determined that Chen was a director of at least eight key Binance companies and was a signatory for dozens of bank accounts belonging to 27 entities registered in 13 countries.

186.     This included Binance bank accounts at Signature Bank and Silvergate Bank in the

---

[35]     Chen is now listed as "a Senior Executive and Co-Founder" of the company.

[36]     According to the Malta registry, as of June 2023, Chen submitted a Chinese passport. Those filings indicate that she resided in Singapore, but her LinkedIn profile at the time stated that she is based in the United Arab Emirates.

U.S. (both of which collapsed and are now defunct), through which vast sums flowed on Binance's behalf.

187.    Without Chen's active complicity, Binance could not have created and operated its opaque global network of accounts to launder (fiat) money and cryptocurrency, at scale.

188.    Chen has thus been a key enabler of Binance's illicit conduct described herein, including the provision of financial services to Hamas, the IRGC, Hezbollah, PIJ, and other terrorist organizations.

189.    She is jointly responsible with Zhao for building the infrastructure of a money laundering enterprise that served and protected terrorists among its other criminal clientele.

## FACTUAL ALLEGATIONS

## I.    CRYPTOCURRENCIES AND PAYMENT PLATFORMS

190.    For clarity, the terms "crypto asset," "digital asset," or "token" as used herein refer to assets issued or transferred using blockchain or distributed ledger technology.

191.    These terms encompass what are colloquially known as "cryptocurrencies" (or "virtual currencies")—essentially digital "coins" or ledger entries that represent value and can be transferred between users.

192.    Unlike traditional forms of money (which exist as physical cash or as balances recorded in a bank's centralized database), crypto assets exist primarily as entries on a decentralized ledger ("blockchain") maintained by a network of computers.

### A.    Blockchain

193.    A blockchain is essentially a public digital distributed ledger—akin to a globally shared database—that is distributed across a network of computers ("nodes").

194.    It records transactions in batches of data called "blocks," with each new block

40

cryptographically linked to the previous one, forming a chronological chain.

195.    This design makes the ledger highly tamper-resistant: once a block of transactions is added to the chain, it is computationally not feasible to alter that data without detection, since any modification would break the cryptographic links and be rejected by the network.

196.    Blockchains typically employ a "consensus mechanism"—a protocol that network participants use to agree on the contents of the ledger and validate new transactions.

197.    In simple terms, a consensus mechanism is an automated method for the network's nodes to agree on which pending transactions will be included in the next block, thereby ensuring integrity and synchronization of the ledger without any central authority.

198.    The two major consensus mechanisms in use are "Proof of Work" and "Proof of Stake."

199.    In Proof of Work (used by Bitcoin), specialized computers compete to solve a mathematical puzzle; the winner adds the next block and earns newly minted Bitcoin. In Proof of Stake (used by Ethereum), validators are selected based on the number of tokens they have "staked," and are rewarded for honest behavior or penalized ("slashed") for dishonest behavior.

200.    Both mechanisms aim to make it impractical for any malicious actor to alter the ledger – providing positive and negative financial incentives.

201.    Importantly, transactions that are validated on a public blockchain (like Bitcoin or Ethereum) are visible and traceable by anyone with access to the internet.

202.    In those systems, every transfer between crypto "wallet" addresses is recorded openly or "on-chain" (though the identities of the address owners are pseudonymous).

203.    By contrast, transactions that occur "off-chain" (within an exchange's internal systems) are not visible on a public blockchain. Those transactions occur between customers

41

whose assets are held custodially by the same financial provider. In other words, internal transactions are only recorded on internal ledgers—the asset itself does not move— the only change is the identity of the registered owner.

204. When, for example, a Binance customer internally transfers crypto assets to another Binance customer, no public blockchain records that movement.

205. The only record is on Binance's internal ledger, which is not publicly accessible.

206. Thus, as noted, when a Binance customer deposits cryptocurrency into Binance, that deposit shows up on the blockchain as going into an interim Binance wallet allocated to a specific customer, and then moved to Binance omnibus wallets which aggregates customers' assets.

207. Subsequent movements of that value between Binance customer accounts occur "off chain" and cannot be seen on the blockchain.

208. For government regulators, law enforcement, and intelligence agencies, this means that once assets enter Binance's platform, they effectively enter a black box: Binance knows whose funds are whose, but outsiders cannot readily trace the internal flow or final destination of those funds.

**B.     Cryptocurrency Wallets**

209. Owners of crypto assets manage them using "cryptocurrency wallets" (or "digital wallets").

210. A crypto wallet stores the cryptographic keys necessary to access and transfer the owner's crypto assets.

211. There are generally two types of keys: a "public key" (often represented as a wallet address) and a "private key."

212. The public key (wallet address) is akin to a bank account number or email address—it can be shared with others to receive funds.

213. The private key is analogous to a secret password or PIN code—it confers the ability to control the wallet and, accordingly, to authorize transfers from that wallet.

214. Whoever possesses the private key controls the crypto assets associated with the corresponding public address.

215. When Binance customers, including terrorist organizations, use the platform, they generally do not handle their own private keys for funds held on Binance.

216. Instead, Binance holds the keys (and thus custody of the assets), and users have an account with Binance that shows their balance.

217. In effect, Binance's system pools the crypto deposits of many users into omnibus wallets it controls; Binance's internal ledger keeps track of how much each user is entitled to.

### C. Categories of Cryptocurrency Assets

218. There are many types of crypto assets, but for the purpose of this Amended Complaint, the relevant categories are "native cryptocurrencies" and "stablecoins," which differ in their purpose, price behavior, and underlying design.

219. Hamas and other terrorist organizations initially showed a willingness to accept volatile native cryptocurrencies like Bitcoin but shifted predominantly to stablecoins like USDT, which has become the dominant cryptocurrency used by the IRGC, Hamas, Hezbollah and PIJ.

### 1. Native Cryptocurrencies

220. Native cryptocurrencies are the fundamental units of value on a given blockchain network (for example, Bitcoin on the Bitcoin network, Ether on Ethereum, XRP on the XRP Ledger).

43

221.    They are typically created by the blockchain protocol itself (such as through mining or initial allocation) and are used to pay transaction fees on that network.

222.    The market value of native cryptocurrencies is determined on open markets and is notoriously volatile.

223.    Prices can swing due to factors like the coin's supply and issuance schedule (Bitcoin, for instance, has a fixed supply cap of 21 million Bitcoin (asset symbol "BTC"), creating a perceived scarcity), network demand and usage, broader economic sentiment, regulatory news, and speculative trading waves.

224.    Double-digit percentage moves in a day are not uncommon in crypto markets.

225.    As of 2025, hundreds of public blockchain networks exist, each with its own native cryptocurrency.

226.    Each network's software dictates how its native coins are created and distributed—some have a fixed supply or diminishing issuance (like Bitcoin), others have no cap (like Ether, which is managed to target a modest annual issuance or even deflation post-upgrade), and others pre-mined a supply for founders.

227.    Below are a few major native cryptocurrencies relevant to this case:

228.    ***Bitcoin***. Bitcoin was the first native cryptocurrency, introduced in a 2008 whitepaper titled "Bitcoin: A Peer-to-Peer Electronic Cash System" by the pseudonymous Satoshi Nakamoto.

229.    The Bitcoin blockchain is a proof-of-work network where miners compete to add blocks and are rewarded with newly minted BTC.

230.    Ownership of each Bitcoin is established purely by the blockchain record and control of the corresponding private keys.

44

231. Bitcoin transactions are pseudonymous but fully public on its blockchain ledger.

232. Bitcoin's decentralization, permissionless nature and global liquidity made it attractive to various illicit actors (including, as discussed below, Iranian sanction evaders and terrorist donors), despite its volatility and the traceability of its flows, especially because it is impossible to freeze or seize Bitcoin that reside in self-custody wallets.

233. *XRP*. XRP (asset symbol "XRP") is the native token of the XRP Ledger, a blockchain developed by Ripple Labs INC (a/k/a/ Ripple, f/k/a Open Coin, Inc.), a Delaware corporation founded in September 2012, with its principal place of business in San Francisco, California, and an office in New York City.

234. XRP is known for fast and low-cost transactions, which made it more practical for certain uses like cross-border payments.

235. While XRP's price floats in the market, its network's efficiency (seconds to confirm transactions, minimal fees) has led some criminals to launder funds using XRP due to the speed at which they can move large sums.

236. Law enforcement, however, can and have traced XRP movements on the public ledger.

237. *Ether*. Ether (asset code "ETH") is the native cryptocurrency of Ethereum, a blockchain that extends Bitcoin's concept by introducing programmable smart contracts.[37]

238. Many other crypto tokens (including USD-pegged stablecoins like USDT and USD Coin (asset symbol "USDC")) (discussed below) run on top of Ethereum as ERC–20

---

[37] A smart contract is a program written into a blockchain that automatically executes, controls, or documents actions according to agreed-upon rules once specific conditions are fulfilled. In simpler words, it is a code that behaves like a contract.

tokens.[38]

239.    Because Ethereum is widely used, ETH is very liquid and often used as a bridge or intermediate asset in crypto transfers.

240.    *Tron*. Tron (asset code "TRX") is the native token of the Tron network, founded by Justin Sun and launched in 2017.

241.    Tron aimed to offer high throughput (many transactions per second) at low cost, making it attractive for everyday payments and especially for moving stablecoins.

242.    Tron has become popular for transferring USDT stablecoin because transactions are fast and fees are negligible (often less than a penny).

243.    In fact, as noted by *Reuters*, about 75% of the $8 billion in Iran-related crypto transactions on Binance involved Tron's network—likely because Iranian users (and Hamas's networks) favored Tron's low-profile and cheap transactions to mask transfers.[39]

### 2.  Stablecoins

244.    So-called "stablecoins" are cryptocurrency tokens designed to maintain a stable value, typically by being pegged 1:1 to a major reference asset like the U.S. dollar.

245.    In theory, and to keep the peg, each USD-pegged stablecoin token is backed by reserves of underlying assets such as U.S. dollars, U.S. dollar-denominated banknotes, bank credit balances, or bonds making it redeemable at par.

246.    In practice, users trust the stablecoin issuer's claim of reserves. But the true extent of these reserves may be unknown.

---

[38]    ERC-20, short for "Ethereum Request for Comment No. 20," is a technical standard that establishes the rules governing how tokens operate on the Ethereum blockchain. An ERC-20 token refers to any cryptocurrency or digital asset created on the Ethereum network in accordance with this standard.

[39]    Angus Berwick and Tom Wilson, *Crypto Exchange Binance Helped Iranian Firms Trade $8 Billion Despite Sanctions*, REUTERS (Nov. 7, 2022), https://www.reuters.com/business/finance/exclusive-crypto-exchange-binance-helped-iranian-firms-trade-8-billion-despite-2022-11-04.

247.    The majority of stablecoins are pegged to the U.S. dollar. These stablecoins enable crypto users to trade and store value in a U.S. dollar-denominated form without exiting the crypto ecosystem.

248.    Stablecoins are extensively used on exchanges like Binance as a substitute for U.S. dollars—for instance traders often convert volatile native cryptocurrencies like Bitcoin into stablecoins during market turbulence, or use stablecoins to send funds globally almost instantly.

249.    Two of the most prominent stablecoins are Tether and Circle USD Coin and are built on existing blockchains like Ethereum and Tron.

250.    *Tether*. Tether (asset symbol "USDT") is a stablecoin issued by Tether Limited Inc., a Hong Kong corporation formed in 2014. USDT is pegged to the U.S. dollar.[40]

251.    USDT became widely used on exchanges worldwide (including Binance) as an unofficial U.S. dollar substitute.

252.    Tether Limited has claimed that USDT is "100% backed" by reserves, and it periodically publishes attestations of its holdings (which include cash, U.S. Treasury bills, commercial paper, loans, even other crypto like Bitcoin).

253.    USDT exists on multiple blockchains (originally on Bitcoin's Omni layer, now predominantly on Ethereum and Tron, among others).

254.    USDT's ubiquity and liquidity have made it a favored tool for moving crypto assets: Hamas-affiliated wallets frequently used USDT (especially on Tron) to receive and send funds, as it allowed them to effectively move dollars without relying on commercial banks.

255.    *Circle*. USD Coin (asset symbol "USDC") is stablecoin issued by Circle Internet Group INC, a Delaware corporation with headquarters in New York City. USDC is another U.S.

---

[40]    Tether International Limited was incorporated in the British Virgin Islands and moved to El Salvador in 2025. Tether Limited, incorporated in Hong Kong, is the entity that actually issues the USDT token.

dollar-pegged stablecoin.

256.   USDC prides itself on regulatory compliance and transparency, with monthly reserve attestations by Deloitte and the majority of reserves held in the Circle Reserve Fund—an SEC-registered government money-market fund run by BlackRock with custody at BNY Mellon.

## II.   CRYPTOCURRENCY PLATFORMS ARE SUBJECT TO ANTI-MONEY LAUNDERING AND COUNTER-TERRORISM FINANCING LAWS AND REGULATIONS TO PREVENT TERRORIST ORGANIZATIONS FROM USING THEIR SERVICES

### A.   The IRGC, Hamas, Hezbollah, PIJ, and other Terrorist Organizations

257.   It has long been illegal to do business with or provide any support or services to terrorist organizations like the IRGC, Hamas, Hezbollah, and PIJ.

258.   *The IRGC*. Since 1984, the Islamic Republic of Iran ("Iran") has been designated by the United States as a State Sponsor of Terrorism pursuant to what is now Section 1754(c) of the John S. McCain National Defense Authorization Act of 2019, *see* 50 U.S.C. §4813, Section 620A of the Foreign Assistance Act, 22 U.S.C. §2371, and Section 40(d) of the Arms Export Control Act, 22 U.S.C. §2780(d), due in large part to its support for groups like Hezbollah, Hamas, and PIJ.[41] A series of laws prohibits performing nearly any services for Iran or Iranian entities without following specific regulations.

259.   At all relevant times, Iran's IRGC provided Hamas, PIJ, and Hezbollah with substantial material support, including training, weapons, funds, and resources.

260.   The IRGC and its Quds Force are paramilitary forces answerable only to the Supreme Leader of Iran, until recently Ayatollah Ali Khamenei, who was eliminated on February 28, 2026.

---

[41]   Iran was also designated under section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j). This designation continued in effect after the enactment of the John S. McCain National Defense Authorization Act of 2019. *See* 50 U.S.C. § 4826(c)(1).

261.   The IRGC differs from Iran's "regular" armed forces, which ostensibly function under a national command structure answerable to the nominal government rather than the Supreme Leader.

262.   The IRGC is tasked with "protecting the revolution," which it accomplishes by silencing perceived enemies at home through secret police methods and attacking perceived enemies abroad (via its Quds Force) through terrorist tactics.

263.   On October 13, 2017, the United States designated the IRGC as an SDGT under Executive Order 13224, and the IRGC remains so-designated.[42]

264.   On April 15, 2019, the United States designated the IRGC as an FTO pursuant to section 219 of the Antiterrorism and Effective Death Penalty Act, codified at 8 U.S.C. §1189, and the IRGC remains so-designated.

265.   The Quds Force ("IRGC–QF") is Iran's primary tool for exporting the Iranian Islamic revolution beyond Iran's borders.

266.   The IRGC-QF does so by setting up and operating armed terrorist cells, establishing educational systems for indoctrination, and subverting pro-Western Arab regimes.

267.   It also provides substantial material support to terrorist organizations, including Hamas, Hezbollah, and PIJ.

268.   On October 25, 2007, the IRGC-QF was designated an SDGT pursuant to Executive Order 13224 and remains so-designated.

269.   The IRGC-QF was also included in the April 15, 2019, designation of the entire

---

[42]   Executive Order 13224, as amended, has the effect of blocking the assets of and transactions with certain identified terror groups and individuals. It also provides the Secretary of State with the authority to (1) designate additional individuals or entities that have committed or pose a significant risk of committing terrorist acts and (2) identify individuals or entities controlled or owned by terrorist groups or individuals. An entity or individual designated under E.O. 13224, as amended, is referred to as an SDGT.

49

IRGC as an FTO.

270.    *Hamas*. Hamas was established in 1987 with the stated core purpose of eliminating the State of Israel, and seeks that end through violence and terror—including rocket attacks, bombings, suicide bombings, shootings, stabbings, hostage taking, and more.

271.    On January 23, 1995, pursuant to Executive Order 12947, the United States designated Hamas as a Specially Designated Terrorist ("SDT").[43]

272.    On October 8, 1997, Hamas was designated an FTO and remains so-designated.

273.    On October 31, 2001, Hamas was designated as an SDGT under E.O. 13224 and remains so-designated.

274.    *PIJ*. PIJ is another prominent terrorist group operating in Palestinian-controlled territory. It, too, has as its core purpose destroying the State of Israel through terrorism and violence.

275.    PIJ was established in 1981 and has committed numerous acts of terrorism since, including suicide bombings, small arms attacks, and mortar and rocket attacks.

276.    On January 23, 1995, pursuant to E.O. 12947, the United States designated PIJ as an SDT.

277.    On October 8, 1997, PIJ was designated an FTO and remains so-designated.

278.    On October 31, 2001, PIJ was designated as an SDGT under E.O. 13224 and remains so-designated.

---

[43]    Executive Order 12947 preceded E.O. 13224 and was narrower. It provided the Secretary of the Treasury with the authority to freeze the assets of and prohibit transactions with entities or persons designated as "foreign terrorists that disrupt the Middle East peace process," as opposed to all terrorist entities or individuals. Entities or individuals designated under E.O. 12947, as amended by E.O. 13099, are referred to as SDTs. On September 9, 2019, E.O. 12947 was revoked and replaced by E.O. 13886, which amended E.O. 13224.

279. *Hezbollah*. Hezbollah (Arabic for "the party of God") is one of the world's largest and deadliest terrorist organizations.

280. Hezbollah first emerged during the Lebanese civil war in the early 1980s as a militia recruited by the IRGC and comprising Shi'a followers of Iran's then-Supreme Leader, Ayatollah Ruhollah Khomeini.

281. From Hezbollah's inception, it has always served as an instrument of Iran's IRGC.

282. Indeed, its members have been trained, organized, and funded by a contingent from the IRGC.

283. In 1985, Hezbollah issued a manifesto describing its objectives to include expelling Western influence from Lebanon and the wider region, destroying the State of Israel, pledging allegiance to Iran's supreme leader, and establishing an Islamist government influenced by Iran's political ideology.

284. Since its inception, Hezbollah has committed numerous high-profile and extraordinarily deadly terrorist attacks against U.S. citizens and others, including the Marine barracks bombing in Beirut in 1983, which killed over 300 people. It has also committed hundreds of attacks on U.S. service members in Iraq between 2004 and 2011.

285. On January 23, 1995, pursuant to E.O. 12947, the United States designated Hezbollah as an SDT.

286. On October 8, 1997, Hezbollah was designated an FTO and remains so-designated.

287. On October 31, 2001, Hezbollah was designated as an SDGT under E.O. 13224 and remains so-designated.

288. In sum, the IRGC, Hamas, PIJ, and Hezbollah have long-been designated under U.S. law as FTOs and SDGTs because they murdered hundreds of U.S. and Israeli citizens, acts

51

for which they are globally infamous.

289.    Accordingly, knowingly providing material support—including financial services—to any of these FTOs is a felony under 28 U.S.C. §2339B, punishable up to life in prison.

290.    The International Emergency Economic Powers Act also gives the Executive Branch authority to impose sanctions to counter threats (including blocking transactions with State Sponsors of Terrorism like Iran).

291.    OFAC regulations implement these sanctions, making it generally illegal for U.S. persons or any person within U.S. jurisdiction to conduct unlicensed transactions with sanctioned countries (like Iran or Syria) or SDGTs.

292.    Separately, the BSA and its implementing regulations require financial institutions (including MSBs) to (1) maintain robust AML and counter-financing of terrorism ("CFT") programs, (2) perform due diligence KYC on customers, (3) monitor transactions for suspicious activity, and (4) file SARs with FinCEN for any transactions suspected to involve criminal or terrorist conduct (or otherwise lack an apparent lawful purpose).

### B.    The Terrorist Organizations' Emerging Use of Cryptocurrency

293.    In theory, the large body of criminal laws, financial regulations (including economic sanctions on Iran and other State Sponsors of Terrorism)—combined with the implementation of robust AML programs—pose a significant impediment for Hamas, the IRGC, Hezbollah, and PIJ to transfer funds through the global financial system.

294.    But FTOs, like other criminal organizations, constantly adapt and innovate to circumvent safeguards, and they seek new avenues to help them facilitate their illicit methods.

295.    In 2019, FinCEN published guidance titled "Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies," which, among other things,

52

detailed the legal obligations of MSBs involved in the transfer of cryptocurrencies.[44]

296.    In October 2021, OFAC issued a sanctions compliance guidance publication for the virtual currency industry.

297.    OFAC advised that "[a]n effective sanctions compliance program will include . . . controls to identify, interdict, escalate, report (as appropriate), and maintain records for transactions or activities prohibited by OFAC-administered sanctions" and "will enable a company to conduct sufficient due diligence on customers, business partners, and transactions and identify 'red flags.'"

298.    OFAC further noted that "internal controls often involve the use of industry-specific tools, such as screening, investigation, and transaction monitoring," and that third-party service providers such as Elliptic and TRM "can be helpful tools for an effective sanctions compliance program."

299.    As noted by the Global Investigations Review in its *Guide to Anti-Money Laundering*, "[a] critical component of [customer] onboarding and KYC is wallet screening," which is facilitated by using public blockchain information to "pinpoint[] a wallet's source and destination of funds" as well as "making links with other crypto wallets on the network" in order "to detect if a specific crypto exchange, sanctioned entity or darknet market is in control of a wallet."[45]

300.    That same publication also identified transaction monitoring as a key component

---

[44]    Fin. Crimes Enforcement Network, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, U.S. DEP'T. OF TREAS. (May 9, 2019), https://www.fincen.gov/system/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.
[45]    Mendes, Stella, *et al.*, *Navigating the Regulatory Landscape for Virtual Assets from a Compliance Perspective,* in The Guide to Anti-Money Laundering (Global Investigations Review, May 27, 2025), https://globalinvestigationsreview.com/guide/the-guide-anti-money-laundering/third-edition/article/navigating-the-regulatory-landscape-virtual-assets-compliance-perspective.

of an effective AML program.

301. Numerous companies offer blockchain transaction monitoring services expressly for AML compliance.

302. For example, in November 2019, Elliptic stated that its tools "enable [crypto exchanges and other financial] services to identify whether funds are being laundered through their businesses, by tracing each crypto-asset transaction all the way through the blockchain, to its source ... If this source is one of the illicit wallets we have previously identified, the business is alerted and can take steps to prevent the money laundering from taking place."

303. Binance instead chose to be structurally indispensable to terrorist organizations in a way that few financial institutions or crypto exchanges could (or would want to) replicate. Its sheer size, *i.e.*, trillions of dollars in monthly transaction volume, provided essential cover: transactions for FTOs were camouflaged within the platform's enormous volume of internal transactional traffic – off-chain.

304. Iran's largest domestic crypto exchange, Nobitex (SDGT), publicly acknowledged Binance's centrality, describing it on its website in 2020 as "the best option" for Iranians to buy cryptocurrency because it "causes less problems for Iranian users."

305. Binance was also the dominant external source of funds flowing into Iran's crypto ecosystem. According to blockchain intelligence firm TRM Labs, 60% of all funds handled by Iranian exchanges in 2022 came from services located outside Iran, and global cryptocurrency exchanges accounted for 80% of that outside volume, the majority of it from Binance.

306. Binance's off-chain transfer capability provided the IRGC and other FTOs with a means of moving funds that remain entirely invisible to law enforcement and blockchain analytics tools. When Binance customers transfer funds between accounts internally, those transfers never

touch any public blockchain; they are recorded only in Binance's own internal ledger, leaving no external trace. As further alleged herein, Binance has assisted accounts subject to government seizure and forfeiture orders to move assets into other Binance customer accounts off-chain, effectively mixing the illicit cryptocurrency and preventing its traceability by law enforcement.

307. That financing flowed through the same IRGC-QF network of front companies, exchange houses, and cryptocurrency facilitators that Binance knowingly serviced throughout the years preceding October 7, drawing a direct link between Binance and the IRGC-QF's funding and planning of the October 7 Attacks. Binance was, in the words of foreign law enforcement officials and researchers, the "primary gateway" for Iranian cryptocurrency during that entire period.

308. Binance's knowing conduct therefore enabled and furthered the lethal capabilities of the IRGC, Hamas, Hezbollah and PIJ and enabled the "Axis of Resistance" to plan and perpetrate the October 7 Attacks and commit the attacks that followed.

C. Binance in the United States

309. As an MSB[46] operating in the United States, Binance was (and is) subject to IEEPA, which authorizes the President to declare the existence of an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. IEEPA is a principal tool used by the U.S. to enforce sanctions against State Sponsors of Terrorism like Iran.

---

[46] The term "money services business" is defined in 31 C.F.R. § 1010.100(ff) to include "money transmitters," which are further defined in 31 C.F.R. § 1010.100(ff)(5) as a person who either "provides money transmission services" or who is otherwise "engaged in the transfer of funds." FinCEN regulations define "money transmission services" as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." Foreign-located businesses are considered MSBs if they do business "wholly or in substantial part within the United States." In 2013, FinCEN defined crypto exchanges as MSBs and therefore under its regulatory supervision. *See* Fin. Crimes Enforcement Network, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001, U.S. DEP'T OF TREAS. (Mar. 18, 2013), https://www.fincen.gov/system/files/shared/FIN-2013-G001.pdf.

55

310.    Moreover, as an MSB operating in the United States, Binance was (and is) subject to the BSA which, among other things, require banks and MSBs to adhere to recordkeeping and reporting requirements and to develop, implement, and maintain effective AML programs reasonably designed to prevent them from being used to facilitate money laundering and the financing of terrorism.

311.    The BSA and its implementing regulations also require MSBs like Binance to file SARs with FinCEN as to transactions they "know, suspect, or ha[ve] reason to suspect" are suspicious.

312.    Binance announced in December 2021 that it was using TRM Labs "to screen for high-risk wallets, and monitor and investigate suspicious transactions," touting TRM's "best-in-class" risk assessment, and forensics technology as a mechanism to "manage regulatory and reputational risk related to digital assets."[47]

313.    In June 2023, Binance's website misleadingly described its Transaction Monitoring team (which was purportedly "responsible for auditing transactions for potential money laundering and terrorist financing activities") as "leverag[ing] cutting-edge technology and sophisticated analytical tools to detect suspicious patterns and identify potential risks," explicitly mentioning efforts to prevent "money laundering and terrorist financing."[48]

---

[47]    TRM Labs provides a helpful summary of U.S. efforts to target Hamas's cryptocurrency money laundering efforts, including the types of patterns of transactions that alert compliance analysts like TRM Labs to illicit activities. *See* TRM Labs, Inc., *DOJ Targets Hamas-Linked BuyCash Exchange in $2 Million Civil Forfeiture for Terrorist Financing*, TRM Blog (July 24, 2025), https://www.trmlabs.com/resources/blog/doj-targets-hamas-linked-buycash-exchange-in-2-million-civil-forfeiture-for-terrorist-financing.

[48]    Binance identified blockchain analytics firms Chainalysis, TRM, and Elliptic as partners that helped them "arrive at the most comprehensive mapping and identification of potentially illicit activities in the crypto industry." TRM Labs, Inc., *Playing by the Rules: An Overview of Binance's Compliance Program*, TRM Blog (Jun. 29, 2023), https://www.binance.com/en-KZ/blog/compliance/7787599269355947143. In November 2022, Jonathan Levin, Chief Strategy Officer at Chainalysis, submitted formal comments to the U.S. Treasury Department stating that:

> Iran stands out for its embrace of cryptocurrency…. Several generals in the Islamic Revolutionary Guard Corps (IRGC) — which plays an outsize role in Iran's politics and economy and is designated

314.    In truth, however, Binance's guidelines and compliance tools were a sham because Binance was purpose-built to attract criminals to its platform, and it proved to be a perfect fit for the needs of FTOs that needed new ways to move money anonymously across the globe without their transactions being blocked and their assets seized.

315.    For example, Binance's guidelines and compliance tools showed that Hamas-linked and IRGC-linked accounts exhibited patterns like "peeling chains" (where a large sum is gradually peeled off into smaller transfers across many addresses, a common laundering technique to obscure the origin) and address clustering (transactions with shared characteristics suggesting the same entity is moving funds through intermediate wallets).

316.    Binance instead chose to willfully ignore these and many other patterns and obvious additional risk factors (such as customers purportedly located in the Gaza Strip or Lebanon making extensive use of VPNs, using cryptocurrency mixing services, and making withdrawals to exchanges in high-risk jurisdictions).

317.    But Binance went further than merely looking the other way. It took affirmative action to assist its terrorist-affiliated customers. As a matter of high policy, it wanted to be recognized as a vital alternative payment system for terrorists and it particularly wanted to carve out an important slice of the business of laundering IRGC sales of oil to China and other IRGC cryptocurrency enterprises.

318.    For example, when U.S. law enforcement began pressing the company for its records, Binance, under Zhao's direction destroyed or withheld documentation of its illicit activities.

---

as a Foreign Terrorist Organization — have publicly endorsed the use of cryptocurrency, including the launch of a central bank digital currency, to circumvent sanctions.

Yet, Binance's partnership with Chainalysis did not reduce Binance's appetite for soliciting Iranian customers.

319.    It avoided keeping formal records of certain meetings and communications (for instance, Zhao and others often used self-deleting message apps like Telegram and WeChat or communicated verbally for sensitive matters).

320.    The result was that the IRGC used Binance at extraordinary scale. According to Chainalysis, IRGC-associated digital wallet addresses accounted for over 50% of Iran's total cryptocurrency ecosystem in the fourth quarter of 2025, with the volume of funds received by IRGC-associated addresses reaching over $2 billion in 2024 and spiking to over $3 billion in 2025.[49] Importantly, even these extraordinary figures are a lower-bound estimate that includes only a limited number of addresses from sanctions designations of IRGC wallets OFAC and NBCTF. As FinCEN has confirmed, the IRGC relies on networks of shell companies and financial facilitators specifically to launder digital asset proceeds through layered corporate structures and cross-border transactions.[50]

321.    Binance has been at the center of that activity since its launch in 2017, serving as a primary gateway for Iranian /IRGC cryptocurrency transactions, as law enforcement and other researchers have discovered.

## III.    BINANCE STRUCTURED ITS COMPLIANCE TO FACILITATE MONEY LAUNDERING, SANCTIONS EVASION, AND TERROR FINANCING

### A.    Binance Used Binance.US as a Façade to Evade U.S. Oversight

322.    As noted, Binance was (and is) an MSB that conducted substantial business in the United States, thus subjecting it to U.S. laws like the BSA and IEEPA.

---

[49]    Chainalysis Team, *Inside Iran's Growing $7.8 Billion Crypto Ecosystem: IRGC Dominance and a Flight to Bitcoin Reflect Geopolitical Tensions and Domestic Unrest*, Chainalysis (Jan. 15, 2026), https://www.chainalysis.com/blog/iranian-crypto-activity-geopolitical-tensions-2026/.

[50]    FinCEN, Alert on the Use of Front Companies, Financial Facilitators, and Digital Asset Infrastructure by Iran's Islamic Revolutionary Guard Corps to Evade Sanctions and Launder Proceeds, FIN-2026-Alert002 (May 11, 2026), https://www.fincen.gov/system/files/2026-05/FinCEN-Alert-IRGC.pdf.

58

323.     To evade regulatory scrutiny of its global money laundering enterprise, Binance devised a scheme to retain its vast number of U.S. customers while pretending to create a parallel U.S. exchange exclusive to those U.S. customers.

324.     Thus, Binance.US was born as a spinoff of Binance.com (Binance Holdings Limited) that would purportedly be the exclusive platform on which U.S. persons could trade on Binance.

325.     In reality, Binance's objective was to retain its over five million U.S. users, who accounted for 15 to 20 percent of Binance's transaction fees and generated billions of dollars in revenue—all while evading U.S. regulatory oversight.

326.     As FinCEN noted in its November 2023 Consent Order, "Binance [] prioritized attracting and maintaining relationships with large U.S. market makers to drive activity on the platform and increase profits" and "[a]s a result of these actions, Binance now conducts roughly five times the daily trading volume of its next largest competitor" and has "an unfair competitive advantage in the marketplace as compared to other companies offering similar products and services."

327.     When Binance.US launched in late 2019, Binance claimed that U.S. customers would be geo-blocked[51] from the general Binance.com platform and redirected solely to Binance.US.

328.     In fact, Binance did the opposite: it ensured that major U.S. traders never left Binance.com.

---

[51]     Geo-blocking (also called geofencing) means a website or app restricts access based on the user's apparent geographic location. The service infers location primarily from the user's IP address—the network number assigned by an internet provider—and may corroborate it with other signals (for example, device or GPS settings, payment-method country). If those indicate a prohibited region, the site displays a "not available in your location" message or disables functions such as trading.

329.    As detailed below, Zhao and others privately provided its VIP customers in the U.S. with instructions and workarounds to help them to access Binance.com via offshore shell companies, VPNs, and alternate documentation.

330.    As the SEC later noted:

Zhao directed Binance to assist certain high-value U.S. customers in circumventing those controls and to do so surreptitiously because—as Zhao himself acknowledged—**Binance did not want to "be held accountable"** for these actions. As the Binance CCO explained, **"[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means."** Indeed, Zhao's stated "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us." (Emphasis added.)

331.    The DOJ later explained:

Zhao's willful violation of U.S. law was no accident or oversight. He made a business decision that violating U.S. law was the best way to attract users, build his company, and line his pockets. Despite knowing Binance was required to comply with U.S. law, Zhao chose not to register the company with U.S. regulators; he chose not to comply with fundamental U.S. anti-money-laundering (AML) requirements; he chose not to implement and maintain an effective know-your-customer (KYC) system, which prevented effective transaction monitoring and allowed suspicious and criminal users to transact through Binance; and even when Binance employees detected suspicious transactions, Zhao's choices meant those transactions were not reported to U.S. authorities. And when it became clear that Binance had a critical mass of lucrative U.S. customers, Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base. *Critically, Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between U.S. users and users in Iran and other sanctioned countries and regions in violation of U.S. law.* (Emphasis added.)

332.    On a June 2019 Binance conference call, Binance employees and executives confirmed to Zhao that they were implementing his scheme by contacting U.S. VIP users "offline," through direct phone calls, "leav[ing] no trace."

333.    If a U.S. VIP user owned or controlled an offshore entity (located outside of the

United States), Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred its holdings to the new account.

334.    On the same call, an employee described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was purportedly "misidentified" in Binance's records as a U.S. customer.

335.    Also, during this June 2019 conference call, a senior employee provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law…. But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which makes us believe it is a US account ... if you think we made a wrong judgment, please do the following, you know, and we have a dedicated customer service VIP service officer."

336.    The senior employee described Binance's plan as "international circumvention of KYC."

337.    Zhao personally authorized and directed Binance's strategy of purportedly "mischaracterizing" its users' locations, explaining on the June 2019 call with Binance employees that "[w]e cannot say they are U.S. users and we want to help them. We say we miscategorized them as U.S. users, but actually they are not."

338.    Likewise, Zhao directed Binance to implement a plan to encourage customers to circumvent geo-blocking controls.

339.    Zhao directed Binance employees to encourage certain U.S.-based VIP customers to circumvent KYC restrictions by submitting updated KYC information that deleted any U.S.

61

nexus.

340. An internal document titled "VIP handling" makes clear that Zhao directed this scheme.

341. Some VIP customers were exempted entirely from Binance's compliance monitoring.

342. Zhao summed up his philosophy regarding compliance with U.S. law, stating that it was "***better to ask for forgiveness than permission***."

343. But secret access to the Binance.com platform was not even limited to "VIP" customers.

344. For example, as discussed below, multiple Binance processed transactions for customers it knew were affiliated with Hamas, the IRGC, and Hezbollah that were executed from IP addresses in the United States, including transactions executed in Kindred, North Dakota.

## B. Binance's Anti-Money Laundering and Counter-Financing of Terrorism Efforts Were a Sham

345. As Binance grew, it recognized the need to *appear* to develop an AML/CFT program and procedures to comply with U.S. counter-terrorism laws and sanctions.

346. Thus, in May 2018, Binance updated its Terms of Use to state that by using the platform users declared themselves not to be on "any economic sanctions list."

347. The Terms of Use also stated that Binance "may restrict or deny its services to sanctioned countries."

348. In June and July 2018, Binance issued compliance policies, including a Global Compliance Policy, which stated that Binance "adheres to the Sanctions list maintained by the Office of Foreign Assets Control" and that "Binance will not conduct business with any personnel, entities or countries listed in the Sanctions list under any conditions."

349. At the same time, Binance's Chief Compliance Officer deliberately and affirmatively misled a financial institution by writing in an AML/CFT due diligence questionnaire that "we use IP blocking to deny business from sanctioned countries. It is also clearly written in our Terms and Conditions that we prohibit business with all sanctioned countries."

350. Per OFAC, Binance's statements "misrepresented Binance's actual compliance procedures and communicated a commitment and practices that did not in fact exist."

351. In October 2018, Binance updated its stated policy to prohibit new users from sanctioned and other high-risk jurisdictions (including Iran, Syria, North Korea, and Cuba).

352. All of these public statements and Binance's establishment of internal compliance functions were announced to deceive U.S. and foreign regulators and disguise Binance's core business: money laundering.

353. For example, on August 3, 2018, Binance's then-CCO, Samuel Lim, explained in a chat message to a Binance employee that "our stance is [n]ot to *openly* do business with Iran due to sanctions. [I]t affects our banking relationships. I understand that we still support [I]ranian customers but that has to be done *non-openly*." (Emphasis added.)

354. The following month, in response to an inquiry from Binance's newly appointed Deputy Head of Compliance asking if Binance was servicing users from Iran on Binance.com, the then-CCO explained that, with respect to users from sanctioned countries, "[w]e are servicing [them] but non-public."

355. He further added, "[I] [t]old [yo]u we have [I]ranian customers; [the CEO of Binance] knows also. And allows it."

356. Binance's then-CCO further explained to the Deputy Head of Compliance that the sanctions restrictions language in Binance's Terms of Use "has to be there to protect us, [it is]

protective language. In biz, ceo doesn't want to enforce."

357. Later, in the same chat, Binance's then-Deputy Head of Compliance stated that Binance's Operations Director said that Binance "can service sanctioned countries" on Binance.com.

358. In another September 2018 chat, the then-Deputy Head of Compliance noted: "Zhao keeps saying that compliance is here to make Binance APPEAR compliant."

359. In an October 18, 2018, message regarding the potential blocking of sanctioned country IP addresses, the then-CCO informed Zhao that "we currently have users from sanction[ed] countries on [Binance.com]," adding that the "[d]ownside risk is if fincen or ofac has concrete evidence we have sanction[ed] users, they might try to investigate or blow it up big on worldstage."

360. Also in 2018, then-CCO Lim said in an internal chat that "there is no fking way we are clean," admitted that Binance's customer service employees were "teaching ppl how to circumvent sanctions," and openly worried about "land[ing] in jail."

361. Another compliance employee wrote, "we need a banner '*is washing drug money too hard these days - come to binance we got cake for you*.'" (Emphasis added.)

362. At the same time, Binance also misled both U.S. regulators and companies that were its business partners about its compliance functions.

363. For example, in August 2019, Binance's CCO falsely assured a U.S. state regulator that Binance "provides for AML/CFT controls to ensure the safe and legitimate use of our platforms," "screens all its customers prior to the establishment of a business relations or undertaking a transaction against OFAC, EU, UK and Hong Kong sanctions," and performs "customer due diligence," including where "there is suspicion of money laundering or terrorism

financing."

364.    Binance made all of these assertions knowing that they were false at the time and remain false today.

365.    In fact, in December 2019, that same CCO admitted in a message to a colleague that Binance.com "doesn't even do AML namescreening/sanctions screening."

366.    Similarly, according to the Commodities Futures Trading Commission, when a corporate business partner requested a compliance audit, Binance "purposely engaged a compliance auditor that would 'just do a half assed individual sub audit'" to "'buy us more time.'"

367.    Binance's Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a fake annual MLRO report," and the CCO assured her "yea its fine I can get mgmt... to sign" off on the fake report.

368.    In another instance, a Binance senior employee noted: "its [sic] challenging to use the aml standards to impose on [Binance].com *especially when Cz [Mr. Zhao] doesn't see a need to*." (Emphasis added.)

369.    Binance's culture of promoting a platform so that it could provide services to terrorists and criminals continued for years.

370.    In 2020, Binance's CCO, in response to having been presented with evidence of criminal transactions on its exchange, admitted that Binance was designed to attract bad actors to the platform, stating "*Like come on. They are here for crime*."

371.    Binance's comically titled Money Laundering Reporting Officer agreed, commenting "*we see the bad, but we close 2 eyes*." (Emphasis added.)

372.    In late 2022, Binance publicly boasted about its compliance capabilities:

> We invest heavily in KYC (Know Your Customer) and transaction monitoring technology with some of the strictest protocols in the industry.

> Unlike many other exchanges out there, we do not allow users to trade on our platform without passing KYC checks that include country of residence and personal ID information. One area in particular that we have ramped up is transaction monitoring. This is a dynamic process that utilizes the latest technology to keep an eye on every transaction to ensure that we can, in real-time, discover and halt any illicit transactions and transfers. To achieve this, we work with partners such as Chainalysis, TRM Labs, CipherTrace by Mastercard and Elliptic, as well as a robust suite of internal tools.[52]

373. Binance did in fact purchase these sophisticated compliance tools, but before the U.S. government launched its multi-pronged investigation into the company, its core business model was to attract customers interested in using the platform for criminal purposes. Therefore, while Binance had (and has) incredibly sophisticated technical capabilities to implement rigorous KYC verification and institute transaction monitoring to detect and prevent money laundering and terror financing, it consciously chose not to perform these functions, particularly as to its VIP clients— notwithstanding its false representations that it was monitoring for suspicious transactions related to terrorism and obeying the law.

374. The company employed a number of qualified and dedicated compliance investigators, often with law enforcement or intelligence community backgrounds. However, Binance carefully controlled the pipeline of customers and cases that each analyst reviewed and restricted their access to its systems to ensure that internal investigations were confined to the particular customers and cases assigned and did not expand into VIP accounts without special authorization.

375. *Within the parameters set by Binance's senior management*, the company's compliance analysts and investigators did (and do) have access to powerful KYC and transaction monitoring technology that allowed them to:

- Cross-check KYC documentation against transaction levels to see whether

---

[52]    Poyraz, Chagri, *On Binance, Iran and Why We Need to Do Better as an Industry*, Binance Blog (Nov. 4, 2022), https://www.binance.com/en/blog/leadership/7764694498135290896.

activity in an account was consistent with the customer's stated residence, employment and plausible sources of income;

- Cross-check KYC documentation against the geographical locations from which the customer accesses his or her account;
- Instantly monitor the geographical locations where transactions are initiated;
- Instantly monitor each unique electronic device with which the customer accesses his or her account;
- Instantly monitor every transaction in and out of the account by currency, volume, timing, and counterparty wallet; and
- Instantly ascertain whether a customer is transacting with a counterparty wallet that has been designated or has transacted with a designated wallet.

376. Thus, Binance had incredibly sophisticated KYC and transaction monitoring capabilities and routinely detected indicia of money laundering and terror financing used on Binance prior to the October 7 Attacks. But Binance's "compliance" functions were designed to limit what the compliance team itself could actually review. And as detailed below, key decisions on compliance issues were made by Zhao and other Binance executives, not the senior compliance team.

377. Before 2023, Binance's compliance functions existed in name only and its promotional materials touting its capabilities were fraudulent and intended to deceive regulators and law enforcement agencies.

378. Once the company came under investigation, however, it began to implement *some* genuine compliance functions and hired some qualified investigators to placate U.S. authorities.

379. After its guilty plea in November 2023, its monitoring system maintained an ongoing and constantly updated list of users and accounts that had been flagged for potentially suspicious, unlawful, or high-risk activity. Users could be added to this list for many different reasons, including alerts generated by transaction monitoring systems, receipt of cryptocurrency from wallets associated with suspicious or illicit activity, unusual transaction patterns, internal intelligence indicators, or requests and referrals received from law enforcement and regulatory

authorities in different jurisdictions.

380.    *However*, even then, an important limitation existed at the first stage of the process, since the policies defining what would be considered a "red flag" were determined by the Binance's executives (led by Zhao) according to their own operational and business considerations.

381.    To this day, Binance's monitoring systems do not operate independent of the C-Suite. For example, Elliptic, which provides blockchain monitoring services, generates alerts based on risk indicators and parameters that have been *predefined* by the platform. As a result, transactions, wallets, and activity patterns that Binance does not wish to be included within the monitoring policy are not necessarily escalated for human review by Binance's compliance team.

382.    As detailed below, even today, Binance deliberately shields terrorist financing from both its own compliance investigators and law enforcement agencies, assisting illicit actors like Blessed Trust and Zedcex to operate extensively on the platform long before any of their activities are flagged by its internal investigators.

383.    For similar reasons, *to this day*, Binance is structured so that its customers can receive assets to their platform accounts, regardless of where those assets came from or whether those assets originate from illicit activities such as transfers from government-designated wallets. None of those assets are monitored or blocked at the time of deposit.

384.    Moreover, even when a Binance customer's crypto wallet or Binance account becomes subject to a seizure or forfeiture order by a government, Binance has helped many of these designated accounts to continue operating for extended periods of time or facilitated the movement of their assets into another Binance customer's account ("off-chain"), effectively "mixing" the illicit cryptocurrency and preventing its traceability by law enforcement.

68

385. As the CFTC found, Binance and Zhao destroyed documents related to illegal conduct, demonstrating their awareness that their conduct was wrongful and would subject them to legal liability. Even now, after all of Binance's legal difficulties, the company continues to maintain a document retention policy of only 30 days for its communications—a level of data destruction that is unheard of in the financial services industry.

386. Moreover, even today—after Zhao served time in prison and Binance paid multibillion dollar fines—the company's compliance team does not have direct access to Binance data. Instead, when a customer is brought to the attention of a compliance employee, the employee receives specific data on excel sheets reflecting only the activities Binance determines the employee should review.

387. As detailed below, particularly as it relates to Binance's internal investigations of IRGC transactions that flowed through Blessed Trust, Hexa Whale, and Zedcex, Binance's Criminal Conduct Committee made key decisions on whether and when to disclose terror financing activities to law enforcement agencies and often delayed taking action even when compliance investigators identified clear indications of criminal activity.

388. Furthermore, Binance's compliance teams regularly receive law enforcement inquiries, including from NBCTF and are fully aware of NBCTF designations. However, as illustrated by its handling of *e.g.*, Zedcex, Binance's Criminal Conduct Committee was (and is) willing to continue facilitating transfers for persons and entities designated by NBCTF even knowing that they are designated because of their terror financing activities.[53]

---

[53]    On October 10, 2023, Binance published on Binance Square, its own user-generated content platform, a detailed article reporting that: "Earlier this year, Israel reported that it had intercepted 189 cryptocurrency accounts on Binance, suspecting them to be linked to Islamist militant groups, including Hamas. These accounts were managed mainly by three Palestinian cryptocurrency exchanges, all classified as terror groups. Before this operation, Israeli authorities had confiscated nearly $140,000 worth of crypto from 80 Binance accounts tied to these sanctioned exchanges."

**C.      Binance Exempted "Level 1" or "Tier 1" accounts From KYC Requirements**

389.    Binance purposefully designed its systems architecture and its core business model described herein, to assist illicit actors including the IRGC, Hamas, Hezbollah, and PIJ to freely transact on its platform.

390.    Binance has knowingly and affirmatively assisted the use of its platform by illicit actors, including – as described in detail below – FTOs who planned and carried out the atrocities on October 7, 2023, and their agents.

391.    Indeed, Binance intentionally created a financial ecosystem through which it could provide services to illicit actors so they could freely transact without fear that Binance would block their transactions, freeze or seize their assets, and/or report them to authorities.

392.    Binance's creation of a free-for-all financial ecosystem for criminals is reflected by Binance's account levels.

393.    As the U.S. Attorney's Office for the Western District of Washington set forth in its criminal information of Binance, prior to August 2021, Binance allowed users to open "Level 1" (or "Tier 1") accounts without submitting any KYC information whatsoever.[54]

394.    Instead, users could open Level 1 accounts simply by providing an email address and a password.

395.    Binance required no other information (not even the user's name, citizenship, or location).

396.    A Level 1 account holder could deposit virtual currency into its account and then transact in an unlimited amount of virtual currency.

397.    While Level 1 accounts had certain limitations, including a virtual currency

---

[54]    Binance's internal terminology has changed since 2021.

70

withdrawal limit of up to the-value of two Bitcoins ("BTC") per day, Binance allowed users to open multiple Level 1 accounts with different email addresses, which effectively circumvented the withdrawal limit.

398. Even if a user adhered to the daily two BTC withdrawal limit on a single account, for most of Binance's existence, the user could still withdraw thousands—and sometimes many tens of thousands—of U.S. dollar value per day due to the rising value of a single Bitcoin, which increased from approximately $3,000 to $63,000 U.S. dollars in value between December 2018 and April 2021.

399. Level 1 accounts comprised the vast majority of user accounts on Binance.com.

400. These Level 1 accounts were effectively playgrounds for terrorists and criminals to secretly transfer illicit funds.

401. After August 2021 (when Binance first began performing perfunctory customer due diligence), Binance built a compliance program that *by design* still contained massive gaps to allow criminal activity to take place.

402. Notwithstanding Binance's announcement that it would require all new users to submit full KYC information, Binance allowed existing users who had not previously submitted KYC information—including all Level 1 accounts (which again were the majority of Binance's user accounts)—to trade on the platform without providing full KYC information until May 2022.

403. In other words, the platform was still usable for terrorist entities with existing Level 1 accounts.

404. Binance frequently chose not to close accounts it knew were operating for the benefit of FTOs and other customers in sanctioned jurisdictions, and even customers whose accounts were blocked could contact customer support and successfully ask Binance to reactivate

71

their account.

405.   This problem was pervasive and systemic.

406.   The government found, for example, that Binance continued to serve thousands of users that its employees had identified as being from comprehensively sanctioned countries—including, for example, more than 7,000 accounts that had submitted KYC documents from a comprehensively sanctioned country and more than 12,500 users who had provided Iranian phone numbers.

407.   Binance did so even though its official stance was that it had blocked all Iranian customers.

408.   Indeed, a year after Binance claimed to have blocked all Iranian accounts, it had approximately 600 "verified level 2" users from Iran (that is, users who had gone through Binance's KYC process but remained on the platform).

409.   As an additional way to attract money launderers, Binance enabled large entity customers, including exchange brokers, to directly access Binance.com through sub-accounts created by the broker under its own account.

410.   Binance knowingly enabled exchange brokers to create up to 1,000 sub-accounts under their master accounts, and did not subject those sub-account users to any meaningful scrutiny.

411.   This allowed multiple exchange brokers that had been designated by OFAC (and those brokers' users) to access Binance.com and conduct hundreds of millions of dollars in suspicious transactions.

412.   Binance also knowingly processed transactions for cryptocurrency "mixers"—services that deliberately obfuscate the source of funds by pooling crypto from many wallets and

72

redistributing them in a way that breaks the traceable link between sender and receiver (a classic money laundering technique in the crypto realm).

413. Mixers are an essential tool for money launderers, whose mission is to hide the sources and destination of ill-gotten money.

414. Binance nonetheless processed tremendous volumes for mixers.

415. For instance, OFAC found that Binance processed more than $275 million U.S. dollars in deposits and more than $273 million U.S. dollars in withdrawals from February 2018 to May 2019 for a single mixer called BestMixer, a prominent crypto mixing service that was shut down by Dutch authorities in May 2019.

416. Consistent with this approach, Binance took steps to retain known illicit actors on the platform, particularly if they were VIP users such as Russia's Hydra (a darknet market's associated mixer and well-known haven for dirty crypto).[55]

417. For example, in July 2020, Binance's CFO and others discussed a VIP user who was offboarded after being publicly identified as among the "top contributors to illicit activity."

418. The CFO wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before offboarding them, and then Binance could "give them a new account (if they are important/VIP)" with instructions "not to go through XXX channel again."

419. Binance's willful failure to implement an effective AML program was critical to its ability to attract criminal activity.

---

[55] *See* Press Release, *Treasury Sanctions Russia-Based Hydra, World's Largest Darknet Market, and Ransomware-Enabling Virtual Currency Exchange Garantex*, U.S. DEP'T OF TREAS. (Apr. 5, 2022), https://home.treasury.gov/news/press-releases/jy0701 ("Hydra's offerings have included ransomware-as-a-service, hacking services and software, stolen personal information, counterfeit currency, stolen virtual currency, and illicit drugs.").

420. As FinCEN concluded in its 2023 Consent Order against Binance, Binance's knowing failure to implement an effective AML program led to the exchange "being used to process transactions related to . . . unregistered convertible virtual currency mixing services used to launder illicit proceeds, high-risk jurisdictions, individuals listed on OFAC's SDN List, *[and] terrorist financing*." (Emphasis added.)

421. The U.S. Department of Treasury reported in the *2024 National Terrorist Financing Risk Assessment* that terrorist groups like Hamas, Hezbollah, and the IRGC foreseeably finance their operations using "anonymity-enhancing technologies such as anonymity-enhanced virtual assets and techniques, like virtual asset mixing, to obfuscate the source, destination, or movement of virtual assets."

422. FinCEN determined that Binance's willful failure to report hundreds of thousands of suspicious transactions "inhibited law enforcement's ability to disrupt the illicit actors" and that its conduct "extensively harmed FinCEN's mission to safeguard our financial system from illicit use" and "expos[ed] the U.S. financial system to a significant volume of illicit financial activity."

423. Similarly, FinCEN concluded that "Binance senior management misled U.S. authorities," and that Binance's "**willful failure to implement an effective [anti-money laundering] program directly led to the platform being used to process transactions related to . . . terrorist financing**," among other illicit activities. (Emphasis added).

424. Binance's contempt for U.S. regulators was apparent even after the October 7 Attacks (and continues to this day).

425. In May 2024, *Wall Street Journal* reporting revealed that Binance, despite being in U.S. regulators' crosshairs in 2023, still overrode compliance concerns to retain lucrative clients.

426. Binance had promised "unceasing efforts to deliver a safe and trusted platform."

74

427. However, when confronted by one of its internal investigations with direct evidence of market manipulation conducted by a VIP market-making client, Binance (in late-2023) fired its investigator and retained its market-manipulating VIP client so Binance could continue "generating trading fees from large clients over fixing its practices."

428. There is no indication Binance has reformed itself or will remediate any of its misconduct.

429. Rather, Binance continues to conduct business as usual: allowing criminal activity on its platform seemingly contemptuous of U.S. regulators and its violations of U.S. law.

**D.      Binance Knew That Hamas and Other Terrorist Groups Transacted on Its Platform**

430. In February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim (Binance's Chief Compliance Officer at the time) explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering."

431. Lim's colleague replied: "can barely buy an AK47 with 600 bucks."

432. As noted above and detailed below, Binance regularly identified transactions for accounts, entities, and persons that NBCTF and OFAC identified as acting on behalf of the IRGC, Hamas, Hezbollah, and PIJ and failed to block their activities or report them to law enforcement authorities. It also took active steps to protect those customers from government scrutiny and from losing access to their funds.

433. Hamas and related entities regularly transacted on Binance with its full knowledge (see details concerning Hamas's Shamlakh Network below).

434. In April 2019, Binance received reports from its third-party service provider identifying Hamas-associated transactions and chose not to file any SARs with FinCEN.

435. Instead, Lim attempted to influence how the third-party service provider reported

on Binance's conduct.

436.    Even when Binance was left no choice but to shut down a Hamas-linked account, it went out of its way to protect these users from losing access to their funds.

437.    Specifically, FinCEN concluded in its November 2023 consent order that:

> [I]n July 2020, after a third-party service provider flagged ***accounts associated with ISIS and Hamas***, [Binance's] former Chief Compliance Officer [Lim] described it as "[e]xtremely dangerous for our company" and instructed compliance personnel to "[c]heck if he is a VIP account, if yes, to… *[o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him*."

(Emphasis added.)

438.    Beyond Binance's many outright admissions of knowledge, three additional types of evidence demonstrated that it knew it was assisting the IRGC, Hamas, Hezbollah, and PIJ (and other terrorists).

439.    First, Binance was directly and explicitly warned by government and third-party compliance/monitoring services that it had specific terrorist customers.

440.    Second, public reporting abounded on Hamas's and other terrorists' use of Binance, from Hamas's own websites to media and trade publications, to government advisories and specific designations, including Israeli designations targeting named Hamas-affiliated Binance accounts identified by account number.

441.    Third, the customers' wallets themselves—even with nominal KYC documentation—often provided glaring red flags, including (1) the use of VPNs to disguise transactions from high-risk locations like Gaza and Lebanon, (2) churning of transactions through specific wallets, (3) receiving and sending cryptocurrency to designated wallets identified with terrorist organizations, (4) customers transacting in enormous sums of money with no discernible economic basis and (5) customers transacting directly from high-risk locations like Gaza, Lebanon

and the tri-border area in South America.

442.    Additionally, the sheer magnitude of terrorist-associated *on-chain* transactions identified below (over 5,000 transactions totaling the equivalent of **more than $184 million** in easily identifiable terror financing transactions) for **more than 150 Binance accounts** listed in the chart below further confirms Binance's policy of assisting its customers to continue financing terrorism until pressure from law enforcement or the risk of public disclosure necessitated action. The chart lists accounts that Binance did not close when their on-chain counterparties were designated for terrorism financing activities and the number of days those accounts remained active on the blockchain once their terrorism connections became obvious:[56]

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***TpFZ | Ansarallah | Binance Address ***hXFr | 1 | $118,680 | 02/04/2025 | 08/07/2024 | 02/09/2026 | 370 |
| Address ***rPWD | Ansarallah | Binance Address ***UtmE | 6 | $52,500 | 02/04/2025 | 08/05/2024 | 04/07/2025 | 62 |
| Address ***e1jr | ASO 34/24 | Binance Address ***d6da | 27 | $252,282 | 12/24/2024 | 09/16/2024 | 04/22/2026 | 484 |
| Address ***k1m9 | ASO 34/24 | Binance Address ***5Zig | 2 | $287,500 | 12/24/2024 | 09/28/2024 | 04/07/2026 | 470 |
| Address ***yHrh | ASO 34/24 | Binance Address ***gMzV | 2 | $40,000 | 12/24/2024 | 05/10/2024 | 03/03/2026 | 434 |
| Address ***e1jr | ASO 34/24 | Binance Address ***o8Zq | 20 | $49,327 | 12/24/2024 | 12/11/2024 | 10/19/2025 | 300 |
| Address ***e1jr | ASO 34/24 | Binance Address ***giRF | 17 | $314,573 | 12/24/2024 | 07/08/2024 | 09/16/2025 | 267 |
| Address ***e1jr | ASO 34/24 | Binance Address ***W7S8 | 26 | $140,479 | 12/24/2024 | 12/07/2024 | 09/09/2025 | 260 |

[56]    Accounts highlighted in blue are discussed in more detail below.

77

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***wX4K | ASO 34/24 | Binance Address ***P5sU | 1 | $35,000 | 12/24/2024 | 06/01/2024 | 04/02/2025 | 99 |
| Address ***3e1jr | ASO 34/24 | Binance Address ***NXcc | 2 | $57,558 | 12/24/2024 | 08/13/2024 | 03/31/2025 | 98 |
| Address ***eBFj | ASO 34/24 | Binance Address ***MiZ3 | 13 | $226,800 | 12/24/2024 | 11/25/2024 | 02/20/2025 | 59 |
| Address ***eBFj | ASO 34/24 | Binance Address ***t4iK | 6 | $28,710 | 12/24/2024 | 11/07/2024 | 01/14/2025 | 22 |
| Address ***eBFj | ASO 34/24 | Binance Address ***UU2o | 19 | $116,649 | 12/24/2024 | 10/23/2024 | 01/09/2025 | 17 |
| Address ***e1jr | ASO 34/24 | Binance Address ***C5un | 5 | $52,880 | 12/24/2024 | 02/28/2024 | 01/09/2025 | 17 |
| Address ***k1m9 | ASO 34/24 | Binance Address ***uHgu | 2 | $44,290 | 12/24/2024 | 04/15/2024 | 12/30/2024 | 7 |
| Address ***ARCX | ASO 34/24 | Binance Address ***dvYR | 13 | $46,937 | 10/20/2023 | 10/23/2023 | 10/23/2023 | 3 |
| Address ***HCGd | ASO 53/23 | Binance Address ***G7bB | 31 | $32,718 | 10/20/2023 | 04/24/2023 | 12/02/2025 | 775 |
| Address ***Rd5c | ASO 53/23 | Binance Address ***aG5s | 1 | $28,500 | 10/20/2023 | 09/26/2023 | 07/03/2025 | 623 |
| Address ***tKvi | ASO 53/23 | Binance Address ***s6W | 1 | $100,000 | 10/20/2023 | 04/23/2023 | 12/22/2024 | 429 |
| Address ***HCGd | ASO 53/23 | Binance Address ***bTK2 | 24 | $144,770 | 10/20/2023 | 03/06/2023 | 01/01/2024 | 74 |
| Address ***ARCX | ASO 53/23 | Binance Address ***bTK2 | 11 | $54,697 | 10/20/2023 | 03/01/2023 | 01/01/2024 | 74 |
| Address ***HCGd | ASO 53/23 | Binance Address ***dvYR | 9 | $39,734 | 10/20/2023 | 10/16/2023 | 10/23/2023 | 3 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***siQa | 134 | $367,909 | 05/21/2023 | 06/26/2023 | 05/21/2024 | 367 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***myFW | 4 | $48,315 | 05/21/2023 | 05/14/2023 | 03/07/2024 | 291 |

78

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***znVF | BuyCash (Hamas) | Binance Address ***fZAG | 21 | $722,363 | 05/21/2023 | 06/29/2023 | 01/30/2024 | 255 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***6K8p | 483 | $18,254,178 | 05/21/2023 | 06/04/2023 | 01/28/2024 | 253 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***RVqB | 406 | $1,640,332 | 05/21/2023 | 05/09/2023 | 01/01/2024 | 225 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***BhSN | 11 | $72,900 | 05/21/2023 | 08/02/2022 | 12/05/2023 | 199 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***EHDv | 6 | $157,960 | 05/21/2023 | 01/06/2022 | 08/19/2023 | 91 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***1uso | 4 | $90,295 | 05/21/2023 | 03/01/2023 | 07/16/2023 | 57 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***D7fF | 147 | $611,188 | 05/21/2023 | 06/24/2023 | 07/15/2023 | 56 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***Dd5L | 199 | $3,788,851 | 05/21/2023 | 06/25/2023 | 07/07/2023 | 48 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***9Fno | 21 | $225,772 | 05/21/2023 | 04/04/2023 | 07/03/2023 | 44 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***G7kU | 58 | $2,520,294 | 05/21/2023 | 06/13/2023 | 06/13/2023 | 24 |
| Address ***znVF | BuyCash (Hamas) | Binance Address ***6dhD | 1475 | $50,725,500 | 05/21/2023 | 05/31/2023 | 05/31/2023 | 10 |
| Address ***5Ux6 | Dubai Exchange (Hamas) | Binance Address ***vLH4 | 12 | $73,681 | 01/26/2025 | 01/06/2025 | 05/02/2026 | 462 |
| Address ***zoLP | Dubai Exchange (Hamas) | Binance Address ***zT71j | 2 | $60,001 | 01/26/2025 | 08/12/2024 | 04/11/2026 | 441 |
| Address ***XPyx | Dubai Exchange (Hamas) | Binance Address ***JtNb | 9 | $58,765 | 01/26/2025 | 01/13/2025 | 11/03/2025 | 281 |
| Address ***9RHC | Dubai Exchange (Hamas) | Binance Address ***Cbno | 50 | $71,950 | 03/07/2022 | 09/22/2022 | 09/22/2022 | 200 |
| Address ***4qpB | Dubai Exchange (Hamas) | Binance Address ***vhum | 78 | $487,580 | 01/26/2025 | 08/12/2024 | 05/07/2025 | 101 |

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***GUdC | Dubai Exchange (Hamas) | Binance Address ***jsSD | 1 | $43,240 | 03/07/2022 | 12/07/2021 | 06/13/2022 | 99 |
| Address ***GTST | Dubai Exchange (Hamas) | Binance Address ***PonV | 2 | $100,000 | 01/26/2025 | 10/02/2024 | 04/24/2025 | 89 |
| Address ***Gd99 | Dubai Exchange (Hamas) | Binance Address ***9D7q | 3 | $84,286 | 01/26/2025 | 08/12/2024 | 03/05/2025 | 39 |
| Address ***aGKU | Dubai Exchange (Hamas) | Binance Address ***y4JV | 6 | $39,973 | 03/07/2022 | 01/11/2022 | 04/11/2022 | 36 |
| Address ***Gd99 | Dubai Exchange (Hamas) | Binance Address ***C3bC | 4 | $110,000 | 01/26/2025 | 05/09/2024 | 02/28/2025 | 34 |
| Address ***9RHC | Dubai Exchange (Hamas) | Binance Address ***iXE3 | 19 | $45,895 | 03/07/2022 | 12/05/2022 | 02/28/2023 | 358 |
| Address ***GUdC | Dubai Exchange (Hamas) | Binance Address ***uEUT | 18 | $31,510 | 03/07/2022 | 05/09/2022 | 07/07/2022 | 123 |
| Address ***7MmT | Dubai Exchange (Hamas) | Binance Address ***pTsM | 1 | $50,000 | 01/26/2025 | 06/22/2024 | 05/25/2025 | 120 |
| Address ***ukNQ | Hamas | Binance Address ***VEWA | 1 | $110,700 | 10/23/2025 | 08/26/2025 | 05/02/2026 | 192 |
| Address ***ZBef | Hamas | Binance Address ***UEdb | 77 | $1,785,559 | 10/30/2025 | 09/25/2025 | 04/10/2026 | 162 |
| Address ***iZrA | Hamas | Binance Address ***sg3n | 22 | $295,038 | 03/06/2025 | 08/26/2024 | 08/12/2025 | 159 |
| Address ***iZrA | Hamas | Binance Address ***3RW9 | 47 | $838,874 | 03/06/2025 | 01/16/2025 | 08/09/2025 | 156 |
| Address ***iZrA | Hamas | Binance Address ***rvVs | 27 | $229,598 | 03/06/2025 | 10/12/2024 | 07/07/2025 | 123 |
| Address ***ZBef | Hamas | Binance Address ***sz4T | 12 | $186,535 | 10/30/2025 | 03/01/2025 | 02/10/2026 | 104 |
| Address ***ukNQ | Hamas | Binance Address ***SXw7 | 3 | $30,086 | 10/23/2025 | 07/07/2025 | 12/31/2025 | 70 |
| Address ***ZBef | Hamas | Binance Address ***ed3e | 10 | $54,390 | 10/30/2025 | 05/01/2024 | 12/30/2025 | 62 |

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***CvEY | Hamas | Binance Address ***Susp | 1 | $34,700 | 07/31/2025 | 07/09/2025 | 09/16/2025 | 48 |
| Address ***iZrA | Hamas | Binance Address ***6Bzx | 36 | $534,088 | 03/06/2025 | 09/17/2024 | 04/11/2025 | 37 |
| Address ***iZrA | Hamas | Binance Address ***ThSp | 5 | $78,376 | 03/06/2025 | 06/21/2024 | 04/09/2025 | 34 |
| Address ***dJ2p | Hamas | Binance Address ***GTav | 25 | $671,627 | 02/16/2026 | 12/05/2025 | 03/10/2026 | 22 |
| Address ***rwFE | Hamas | Binance Address ***F5ih | 9 | $31,560 | 10/23/2025 | 10/24/2025 | 10/24/2025 | 1 |
| Address ***AAc2 | Hezbollah | Binance Address ***odc7 | 20 | $1,214,885 | 05/21/2023 | 01/26/2023 | 04/28/2026 | 1074 |
| Address ***EEm4 | Hezbollah | Binance Address ***z44n | 6 | $339,499 | 05/21/2023 | 05/04/2023 | 04/25/2026 | 1070 |
| Address ***rGrV | Hezbollah | Binance Address ***K3xC | 1 | $40,000 | 05/21/2023 | 03/30/2023 | 04/22/2026 | 1068 |
| Address ***M5PL | Hezbollah | Binance Address ***E2F3 | 7 | $554,631 | 05/21/2023 | 06/14/2023 | 12/24/2025 | 949 |
| Address ***M5PL | Hezbollah | Binance Address ***qzHU | 1 | $51,835 | 05/21/2023 | 02/24/2023 | 12/24/2025 | 949 |
| Address ***M5PL | Hezbollah | Binance Address ***3AKP | 1 | $49,425 | 05/21/2023 | 06/15/2023 | 12/15/2025 | 940 |
| Address ***M5PL | Hezbollah | Binance Address ***Z9LA | 17 | $1,001,676 | 05/21/2023 | 03/10/2023 | 08/13/2025 | 816 |
| Address ***pvCU | Hezbollah | Binance Address ***f8xK | 1 | $41,000 | 05/21/2023 | 11/24/2022 | 08/09/2025 | 811 |
| Address ***pvCU | Hezbollah | Binance Address ***Du3h | 12 | $119,589 | 05/21/2023 | 02/02/2023 | 07/21/2025 | 792 |
| Address ***xTdp | Hezbollah | Binance Address ***1tMb | 26 | $3,075,440 | 05/21/2023 | 04/22/2023 | 03/29/2025 | 678 |
| Address ***MCTK | Hezbollah | Binance Address ***qxSb | 1 | $50,000 | 05/21/2023 | 03/16/2023 | 03/19/2025 | 668 |

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***kWZF | Hezbollah | Binance Address ***8SVN | 1 | $500,000 | 05/21/2023 | 07/14/2022 | 03/05/2025 | 654 |
| Address ***M5PL | Hezbollah | Binance Address ***owZX | 1 | $50,000 | 05/21/2023 | 03/06/2023 | 03/01/2025 | 651 |
| Address ***xTdp | Hezbollah | Binance Address ***q5V8 | 2 | $88,181 | 05/21/2023 | 04/20/2023 | 02/05/2025 | 627 |
| Address ***MCTK | Hezbollah | Binance Address ***Gspd | 2 | $200,000 | 05/21/2023 | 02/24/2023 | 12/20/2024 | 579 |
| Address ***M5PL | Hezbollah | Binance Address ***BJF1 | 2 | $49,128 | 05/21/2023 | 02/02/2023 | 12/19/2024 | 579 |
| Address ***xTdp | Hezbollah | Binance Address ***qDzr | 1 | $341,550 | 05/21/2023 | 04/14/2023 | 12/06/2024 | 566 |
| Address ***Dwte | Hezbollah | Binance Address ***vSp6 | 2 | $283,400 | 05/21/2023 | 04/05/2023 | 10/24/2024 | 523 |
| Address ***MCTK | Hezbollah | Binance Address ***q9za | 14 | $56,794 | 05/21/2023 | 03/08/2023 | 06/21/2024 | 397 |
| Address ***M5PL | Hezbollah | Binance Address ***pm3M | 66 | $2,979,792 | 05/21/2023 | 05/08/2023 | 05/17/2024 | 362 |
| Address ***M5PL | Hezbollah | Binance Address ***33QZ | 2 | $249,960 | 05/21/2023 | 04/26/2023 | 05/13/2024 | 359 |
| Address ***xTdp | Hezbollah | Binance Address ***2GeT | 17 | $2,302,048 | 05/21/2023 | 04/23/2023 | 05/12/2024 | 358 |
| Address ***M5PL | Hezbollah | Binance Address ***a2Dm | 3 | $999,900 | 05/21/2023 | 06/23/2023 | 04/19/2024 | 335 |
| Address ***M5PL | Hezbollah | Binance Address ***hJHg | 4 | $132,755 | 05/21/2023 | 11/29/2022 | 04/11/2024 | 326 |
| Address ***Dwte | Hezbollah | Binance Address ***jetf | 1 | $49,900 | 05/21/2023 | 04/09/2023 | 04/04/2024 | 320 |
| Address ***M5PL | Hezbollah | Binance Address ***KpvY | 1 | $49,525 | 05/21/2023 | 12/16/2022 | 03/28/2024 | 313 |
| Address ***Y6JP | Hezbollah | Binance Address ***ymHs | 6 | $580,174 | 05/21/2023 | 02/22/2023 | 03/05/2024 | 290 |

82

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***AAc2 | Hezbollah | Binance Address ***qjBN | 7 | $1,170,000 | 05/21/2023 | 03/06/2023 | 02/27/2024 | 283 |
| Address ***M5PL | Hezbollah | Binance Address ***AcxT | 1 | $48,730 | 05/21/2023 | 05/11/2023 | 02/24/2024 | 280 |
| Address ***gmJr | Hezbollah | Binance Address ***95nW | 6 | $42,075 | 05/21/2023 | 07/04/2023 | 02/19/2024 | 275 |
| Address ***M5PL | Hezbollah | Binance Address ***bBnq | 2 | $140,000 | 05/21/2023 | 06/09/2023 | 02/14/2024 | 269 |
| Address ***M5PL | Hezbollah | Binance Address ***fout | 2 | $123,825 | 05/21/2023 | 05/06/2023 | 02/05/2024 | 260 |
| Address ***M5PL | Hezbollah | Binance Address ***ogPG | 5 | $542,506 | 05/21/2023 | 03/24/2023 | 01/04/2024 | 229 |
| Address ***M5PL | Hezbollah | Binance Address ***Ptjj | 1 | $55,961 | 05/21/2023 | 12/02/2022 | 01/03/2024 | 227 |
| Address ***M5PL | Hezbollah | Binance Address ***BfDP | 13 | $1,558,645 | 05/21/2023 | 05/02/2023 | 12/24/2023 | 217 |
| Address ***M5PL | Hezbollah | Binance Address ***mzd3 | 14 | $122,452 | 05/21/2023 | 05/10/2023 | 11/22/2023 | 185 |
| Address ***MCTK | Hezbollah | Binance Address ***zvC2 | 30 | $866,398 | 05/21/2023 | 03/15/2023 | 11/18/2023 | 182 |
| Address ***W3WY | Hezbollah | Binance Address ***bCU9 | 2 | $123,000 | 05/21/2023 | 03/18/2023 | 11/18/2023 | 182 |
| Address ***AAc2 | Hezbollah | Binance Address ***Cuyk | 5 | $61,520 | 05/21/2023 | 03/09/2023 | 11/08/2023 | 172 |
| Address ***pvCU | Hezbollah | Binance Address ***gWHs | 25 | $748,279 | 05/21/2023 | 03/08/2023 | 10/26/2023 | 158 |
| Address ***M5PL | Hezbollah | Binance Address ***gwRQ | 11 | $106,777 | 05/21/2023 | 06/15/2023 | 10/23/2023 | 156 |
| Address ***MGHM | Hezbollah | Binance Address ***fZzP | 2 | $92,000 | 05/21/2023 | 03/03/2023 | 09/21/2023 | 124 |
| Address ***pvCU | Hezbollah | Binance Address ***oais | 75 | $227,380 | 05/21/2023 | 02/01/2023 | 09/20/2023 | 123 |

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***Dwte | Hezbollah | Binance Address ***tdvM | 5 | $64,109 | 05/21/2023 | 05/16/2023 | 09/15/2023 | 118 |
| Address ***MCTK | Hezbollah | Binance Address ***KLiu | 13 | $49,075 | 05/21/2023 | 03/07/2023 | 09/07/2023 | 110 |
| Address ***M5PL | Hezbollah | Binance Address ***Jag8 | 3 | $47,034 | 05/21/2023 | 06/12/2023 | 08/18/2023 | 90 |
| Address ***MCTK | Hezbollah | Binance Address ***Vpei | 43 | $276,966 | 05/21/2023 | 03/08/2023 | 08/18/2023 | 89 |
| Address ***tS4A | Hezbollah | Binance Address ***RzzJ | 4 | $46,920 | 05/21/2023 | 05/18/2023 | 08/12/2023 | 83 |
| Address ***M5PL | Hezbollah | Binance Address ***hFhW | 6 | $269,448 | 05/21/2023 | 06/17/2023 | 08/05/2023 | 76 |
| Address ***M5PL | Hezbollah | Binance Address ***YbDM | 5 | $212,635 | 05/21/2023 | 06/24/2023 | 08/02/2023 | 74 |
| Address ***gmJr | Hezbollah | Binance Address ***cKo8 | 4 | $101,390 | 05/21/2023 | 07/03/2023 | 08/01/2023 | 72 |
| Address ***J8DY | Hezbollah | Binance Address ***wzq9 | 1 | $100,000 | 05/21/2023 | 06/07/2023 | 07/31/2023 | 72 |
| Address ***Y6JP | Hezbollah | Binance Address ***EVJF | 4 | $62,310 | 05/21/2023 | 07/31/2023 | 07/31/2023 | 72 |
| Address ***M5PL | Hezbollah | Binance Address ***VDdh | 8 | $256,727 | 05/21/2023 | 05/02/2023 | 07/21/2023 | 61 |
| Address ***MCTK | Hezbollah | Binance Address ***S9HM | 14 | $35,031 | 05/21/2023 | 02/23/2023 | 07/19/2023 | 60 |
| Address ***M5PL | Hezbollah | Binance Address ***ntaB | 1 | $76,000 | 05/21/2023 | 05/12/2023 | 07/19/2023 | 59 |
| Address ***pvCU | Hezbollah | Binance Address ***qa3p | 3 | $49,955 | 05/21/2023 | 02/09/2022 | 07/18/2023 | 59 |
| Address ***pvCU | Hezbollah | Binance Address ***C3gi | 111 | $1,241,308 | 05/21/2023 | 02/02/2023 | 07/10/2023 | 51 |
| Address ***M5PL | Hezbollah | Binance Address ***8KRi | 6 | $54,940 | 05/21/2023 | 06/17/2023 | 07/10/2023 | 50 |

84

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***M5PL | Hezbollah | Binance Address ***F92g | 20 | $347,192 | 05/21/2023 | 06/26/2023 | 07/08/2023 | 49 |
| Address ***M5PL | Hezbollah | Binance Address ***6u1G | 29 | $2,239,948 | 05/21/2023 | 07/03/2023 | 07/07/2023 | 48 |
| Address ***MCTK | Hezbollah | Binance Address ***h2ed | 7 | $604,675 | 05/21/2023 | 02/24/2023 | 07/07/2023 | 48 |
| Address ***M5PL | Hezbollah | Binance Address ***7W5u | 17 | $159,000 | 05/21/2023 | 07/03/2023 | 07/07/2023 | 48 |
| Address ***W3WY | Hezbollah | Binance Address ***bYjM | 143 | $14,051,994 | 05/21/2023 | 07/01/2023 | 07/06/2023 | 47 |
| Address ***M5PL | Hezbollah | Binance Address ***UHSe | 15 | $3,564,670 | 05/21/2023 | 06/13/2023 | 07/05/2023 | 46 |
| Address ***M5PL | Hezbollah | Binance Address ***CxWV | 22 | $380,154 | 05/21/2023 | 06/19/2023 | 07/05/2023 | 46 |
| Address ***W3WY | Hezbollah | Binance Address ***923o | 116 | $11,638,427 | 05/21/2023 | 07/04/2023 | 07/04/2023 | 45 |
| Address ***M5PL | Hezbollah | Binance Address ***Thh3 | 7 | $641,031 | 05/21/2023 | 05/12/2023 | 07/05/2023 | 45 |
| Address ***M5PL | Hezbollah | Binance Address ***VJez | 4 | $363,790 | 05/21/2023 | 07/03/2023 | 07/05/2023 | 45 |
| Address ***W3WY | Hezbollah | Binance Address ***LuMo | 136 | $10,114,838 | 05/21/2023 | 07/03/2023 | 07/03/2023 | 44 |
| Address ***M5PL | Hezbollah | Binance Address ***VDA5 | 5 | $ 1,550,000 | 05/21/2023 | 06/06/2023 | 07/04/2023 | 44 |
| Address ***M5PL | Hezbollah | Binance Address ***erbd | 32 | $10,610,000 | 05/21/2023 | 06/08/2023 | 07/03/2023 | 43 |
| Address ***pvCU | Hezbollah | Binance Address ***vMraj | 3 | $57,965 | 05/21/2023 | 07/25/2022 | 06/28/2023 | 39 |
| Address ***M5PL | Hezbollah | Binance Address ***UJU1 | 24 | $3,443,985 | 05/21/2023 | 06/26/2023 | 06/26/2023 | 37 |
| Address ***M5PL | Hezbollah | Binance Address ***FrcC | 50 | $2,435,946 | 05/21/2023 | 03/17/2023 | 06/26/2023 | 37 |

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***M5PL | Hezbollah | Binance Address ***JvwM | 3 | $73,314 | 05/21/2023 | 12/14/2022 | 06/23/2023 | 33 |
| Address ***gmJr | Hezbollah | Binance Address ***GQ6R | 1 | $124,760 | 05/21/2023 | 06/18/2023 | 06/18/2023 | 29 |
| Address ***W3WY | Hezbollah | Binance Address ***m2pA | 1 | $68,380 | 05/21/2023 | 05/19/2023 | 06/18/2023 | 29 |
| Address ***gmJr | Hezbollah | Binance Address ***QZhs | 3 | $38,527 | 05/21/2023 | 06/19/2023 | 06/19/2023 | 29 |
| Address ***AAc2 | Hezbollah | Binance Address ***XEMt | 1 | $250,000 | 05/21/2023 | 08/20/2022 | 06/15/2023 | 26 |
| Address ***MCTK | Hezbollah | Binance Address ***Wqxo | 2 | $101,285 | 05/21/2023 | 02/19/2023 | 06/16/2023 | 26 |
| Address ***M5PL | Hezbollah | Binance Address ***1B2G | 3 | $109,446 | 05/21/2023 | 06/15/2023 | 06/15/2023 | 25 |
| Address ***M5PL | Hezbollah | Binance Address ***ES3F | 11 | $591,634 | 05/21/2023 | 06/14/2023 | 06/14/2023 | 24 |
| Address ***M5PL | Hezbollah | Binance Address ***rWJa | 7 | $1,600,937 | 05/21/2023 | 06/12/2023 | 06/12/2023 | 23 |
| Address ***M5PL | Hezbollah | Binance Address ***zGxQ | 2 | $99,112 | 05/21/2023 | 04/18/2023 | 06/13/2023 | 23 |
| Address ***M5PL | Hezbollah | Binance Address ***8ZtD | 6 | $283,194 | 05/21/2023 | 06/12/2023 | 06/12/2023 | 22 |
| Address ***M5PL | Hezbollah | Binance Address ***1vAA | 10 | $263,883 | 05/21/2023 | 04/24/2023 | 06/12/2023 | 22 |
| Address ***M5PL | Hezbollah | Binance Address ***qarK | 1 | $50,000 | 05/21/2023 | 11/21/2022 | 06/12/2023 | 22 |
| Address ***pvCU | Hezbollah | Binance Address ***pBFF | 8 | $156,910 | 05/21/2023 | 06/28/2022 | 06/04/2023 | 15 |
| Address ***M5PL | Hezbollah | Binance Address ***aJMp | 6 | $465,580 | 05/21/2023 | 06/02/2023 | 06/02/2023 | 13 |
| Address ***M5PL | Hezbollah | Binance Address ***pHpn | 6 | $50,310 | 05/21/2023 | 01/20/2023 | 05/23/2023 | 2 |

| Sender | Terrorist Organization / Designated Entity | Binance Customer | Total Transactions with Designated Entity | Total Value of Deposits from Designated Entity in US Dollars | Designation Date | Last Transaction with Designated Wallet | Binance wallet - Last Activity | Days from Designation to Last Account Activity |
|---|---|---|---|---|---|---|---|---|
| Address ***hfnE | IRGC | Binance Address ***j1yv | 2 | $41,873 | 09/01/2025 | 02/15/2025 | 04/16/2026 | 228 |
| Address ***eKuU | IRGC | Binance Address ***tJ91 | 3 | $3,500,000 | 09/01/2025 | 12/19/2024 | 03/22/2026 | 203 |
| Address ***Ajsc | IRGC | Binance Address ***kB2J | 1 | $70,000 | 09/01/2025 | 12/02/2024 | 02/28/2026 | 180 |
| Address ***9Nt6 | IRGC | Binance Address ***XNn9 | 2 | $40,000 | 09/01/2025 | 11/20/2024 | 02/27/2026 | 180 |
| Address ***Ajsc | IRGC | Binance Address ***Uiw5 | 3 | $160,000 | 09/01/2025 | 12/20/2024 | 02/02/2026 | 155 |
| Address ***JkNG | IRGC | Binance Address ***o1xi | 29 | $473,787 | 09/01/2025 | 12/04/2024 | 01/18/2026 | 140 |
| Address ***Ajsc | IRGC | Binance Address ***grj2 | 2 | $100,110 | 09/01/2025 | 12/25/2024 | 10/22/2025 | 51 |
| Address ***YKUq | PIJ | Binance Address ***j7Ls | 13 | $33,794 | 07/04/2023 | 12/18/2022 | 07/30/2023 | 27 |
| Address ***foQF | PIJ | Binance Address ***veJ7 | 5 | $73,500 | 07/04/2023 | 09/30/2022 | 07/28/2023 | 24 |
| Address ***foQF | PIJ | Binance Address ***TCfM | 8 | $36,314 | 07/04/2023 | 06/03/2022 | 07/24/2023 | 20 |
| Address ***vmEx | Zedcex | Binance Address ***QV3S | 4 | $962,182 | 09/01/2025 | 04/17/2025 | 11/16/2025 | 77 |
| **Total** | | | **5,111** | **$184,075,384** | | | | |

443.    Below are three examples providing greater illustrative details from the chart. Each example involves a Binance account receiving deposits from BuyCash, an NBCTF and OFAC designated Gaza-based Hamas money laundering enterprise that transferred funds for the IRGC/Hezbollah cryptocurrency networks.

444.    **Binance Addresses ***6K8p, *** rvVs** and **Binance Address *** Dd5L** each

illustrate how Binance maintained accounts it knew were engaged in terrorism financing but nevertheless continued to process transactions for them for substantial periods of time, including, in some cases, in the crucial months preceding the October 7 Attacks.

445.    Using **Binance Address \*\*\*6K8p** as an illustration from the chart above, a compliance investigator typing in the wallet address into the Chainalysis platform would immediately see that **Address \*\*\*6K8p** is hosted on Binance:



446.    A few keystrokes later, the investigator would see that this Binance account received almost 40% of its funding from OFAC designated BuyCash wallets (indicated in red below), totaling the equivalent of $22 million. **BuyCash Address \*\*\*znVF** alone sent this Binance account the equivalent of over $18 million.

88



447.    **BuyCash Address \*\*\*znVF** was first designated by NBCTF on May 21, 2023 and associated with Tawfiq al-Law's IRGC/Hezbollah network. Yet the Binance account corresponding to **Address \*\*\*6K8p** remained active until January 28, 2024 – almost *eight months* later.

448.    During that period of time, Binance processed additional on-chain deposits totaling the equivalent of more than $26 million, including nine more deposits totaling the equivalent of $225,000 from **BuyCash Address \*\*\*znVF** through June 4, 2023.

449.    From July 2023 forward, **Binance Address \*\*\*6K8p** began receiving funds totaling the equivalent of $3.6 million from another **BuyCash Address\*\*\*sWGy** (also later designated by OFAC) in a series of 68 deposits – most of them before October 7.

450.    Another example highlighted in the chart above is the **Tron Address \*\*\*iZrA** which was designated by NBCTF on April 7, 2025 and sent the equivalent of close to $230,000 to

**Binance Address \*\*\*rvVs.**

451.    Again, a compliance investigator typing in the wallet **address \*\*\*rvVs** into Chainalysis would immediately see that the address is hosted on Binance:



452.    A few keystrokes later, the investigator would see that this Binance account received multiple transfers between May 15, 2023 and July 7, 2025 valued at almost $950,000 along with a pie chart indicating that a significant portion of its funds were related to terror financing:



453. Another few keystrokes show that this Binance account received the equivalent of $230,000 from **Tron Address \*\*\*iZrA** designated by NBTF in April 2025 as associated with Hamas:



454. Yet the account remained active through July 7, 2025.

455. Like **Binance Address \*\*\*6K8p, Binance Address \*\*\*Dd5L** received deposits from **BuyCash Address \*\*\*znVF** – in this case beginning on April 4, 2022. During its entire period of operation, it received from this BuyCash address the equivalent of more than $3.7 million via 199 deposits.

456. As noted above, **BuyCash Address \*\*\*znVF** was first designated by NBTF on May 21, 2023 and associated with Tawfiq al-Law's IRGC/Hezbollah network. At that time, nearly

91

half of **Binance Address \*\*\*Dd5L**'s deposits originated from **BuyCash Address\*\*\*znVF.**

457.    **Binance Address \*\*\*Dd5L** also received deposits from **Tron Address \*\*\*M4nS,** later designated as a PIJ wallet on July 4, 2023.

458.    It also received the equivalent of $1.5 million from another Tron address that received the equivalent amount from yet another **BuyCash Address - \*\*\*zt5t.**[57]

459.    Even apart from the internal indicators described below, the tools used by Binance to track its customers as well as their on-chain counterparties made identifying these terror financing Binance accounts almost self-evident – and yet in every case, Binance continued to process transactions for the accounts for a substantial period of time, *see, e.g.*, **Binance Account No. \*\*\*3951**, **Binance Account No. \*\*\*5587** and **Binance Account No. \*\*\*6529** below.

460.    In addition to wallets designated by governments and the sophisticated tools Binance had at its disposal to track its terror financing customers, third-party institutions also publicly identified Binance wallets associated with Hamas on their websites.

461.    These reports—stemming from industry reporting, intelligence reports, and traditional news media—extend beyond official sanctions lists by identifying crypto wallets published by Hamas and their affiliates on their social media platforms.

462.    Such reporting is exemplified by the following:

- On February 3, 2019, the Meir Amit Intelligence and Terrorism Information Center published a report listing a crypto wallet posted on the Twitter (now X) account of the Hamas-affiliated Popular Resistance Committees.

- On October 10, 2023, TRM Labs published an article including a number of screenshots of crypto wallets posted on Hamas social media accounts.

---

[57]    As described in detail below, **BuyCash Address - \*\*\*zt5t** was tied to multiple Binance accounts such as that of Mohammed Khalaf Khamis Zakaria Alden, a part of Hamas's Shamlakh network (**Binance Account No. \*\*\*7729**) and Hamas account held by Yasser Youssef Khechen (**Binance Account No. \*\*\*4344**).

- On October 23, 2023, the Middle East Media Research Institute published an article detailing Hamas's historical use of cryptocurrency to elicit donations. MEMRI's article identifies an Ethereum e-wallet that had posted to Gaza Now's Telegram channel. Gaza Now solicited donations to Hamas's terror apparatus, the Qassam Brigades, in the aftermath of October 7, 2023.

## IV.    BINANCE KNOWINGLY PROVIDED SUBSTANTIAL ASSISTANCE TO THE IRGC, HAMAS, HEZBOLLAH, AND PIJ

463.    Binance knowingly assisted Hamas, the IRGC, Hezbollah, and PIJ to transfer and launder funds on and through its platform for many years prior and subsequent to the October 7 Attacks.

464.    This included both "on-chain" transactions on the (public) blockchains and "off-chain" transactions between Binance customers.

### A.    Binance Knowingly and Willingly Assisted Iran and the IRGC to Evade Sanctions and Finance Terrorism

465.    Binance knowingly performed vast amounts of illegal services for Iran—Hamas's chief benefactor.

466.    In October 2018, FinCEN issued a detailed Advisory titled *Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System*—targeted to financial institutions, including virtual currency exchanges like Binance.

467.    FinCEN warned that in Iran "virtual currency is an emerging payment system that may provide potential avenues for individuals and entities to evade sanctions."

468.    Iranians could "access virtual currency platforms" through "Iran-located, Internet-based virtual currency exchanges" as well as "U.S.- or other third country-based virtual currency exchanges."

469.    FinCEN thus warned that "[i]nstitutions should consider reviewing blockchain ledgers for activity that may originate or terminate in Iran," and should "have the appropriate

systems to comply with all relevant sanctions requirements and AML/CFT obligations."

470. Binance knew it was violating U.S. laws, including counterterrorism laws designed to prevent Iran from financing terrorist groups: FinCEN underscored that "a non-U.S.-based exchanger or virtual currency provider doing substantial business in the United States is subject to AML/CFT obligations and OFAC jurisdiction."

471. In January 2020, Yaya Fanusie, an adjunct senior fellow at the Center for a New American Security, published an article in *Forbes* explaining that "[t]he Iranian regime has stepped up its support for blockchain technology research, particularly after the U.S. reimposed sanctions on many Iranian banks . . . in 2018."

472. In June 2021, Eric Lorber, of the Foundation for Defense of Democracies, testified before Congress that "Iran has turned to bitcoin mining as one way to mitigate the impact of the restrictions on its oil sector" and "provide[] a way for Iranians to earn revenue"—estimating "that the amount of bitcoin mined in Iran could equal approximately $1 billion annually."

473. Accordingly, Mr. Lorber warned, "Iranian think tanks have recognized the potential for sanctions evasion, noting that bitcoin may not be traceable and can be used on international exchanges."

474. In November 2022, similarly, following reports from *Reuters* that "Binance had processed **$7.8 billion** worth of Iranian crypto transactions since 2018 despite extensive US financial sanctions against Tehran," *Arab News* reported that "almost all the funds passed between Binance and Iran's largest crypto exchange, Nobitex, which offers guidance on its website on how to skirt sanctions." (Emphasis added).

475. Interviewing several scholars, *Arab News* reported:

> Iran has increasingly utilized cryptocurrencies, and crypto mining, in recent years to evade US-imposed sanctions on its economy and to bolster

94

domestic revenue with some success, [Ali Plucinski, a cybersecurity analyst for the risk intelligence company RANE] told Arab News…. 'After four decades of assorted sanctions, the Iranian government has perfected a variety of techniques for evading sanctions, and crypto is certainly one of its tools,' Barbara Slavin, the director of the Future of Iran Initiative and a non-resident senior fellow at the Atlantic Council, told Arab News. "I would bet that the Islamic Revolutionary Guard Corps is behind these 'illegal' mining efforts,' she said…. 'Iran's shift to cryptocurrencies has proven to be quite effective for the regime in evading US sanctions, evidenced by the recent article of Reuters,' Plucinski said.

476. *Arab News* quoted Ms. Plucinski of RANE as saying "Iran has had significant success in finding alternate ways to bolster its economy through cryptocurrency production in spite of strong international sanctions," noting the regime's approval of the "use of crypto funds to pay for imports in August 2022, thereby enabl[ed] the regime to circumvent extensive US sanctions imposed on Iran's finance and banking sector."

477. Indeed, the "Iranian government has announced its intention to bolster foreign trade with specific countries through the use of cryptocurrencies and smart contracts."

478. In February 2022, Chainalysis issued a public warning: "[s]ome in the Iranian government have called for the country to use cryptocurrency to circumvent [U.S.] sanctions," noting that "Iranian Bitcoin mining is well underway at a surprisingly large scale," and "Iranian state actors are well aware of the opportunity."

479. Chainalysis also cautioned that this growth in Iranian state crypto activity has "opened up a new avenue of risk for cryptocurrency businesses" that may "face penalties or even criminal prosecution if found in violation of OFAC sanctions."

480. But this risk did not stop Binance. Binance admitted that between approximately August 2017 and October 2022, it processed at least 1,667,153 virtual currency transactions—totaling approximately $706,068,127—involving sanctioned jurisdictions, including Iran, Syria, and North Korea.

481.    These violations included 1,205,784 trades totaling **$599,515,938** U.S. dollars in virtual currency and futures products between U.S. persons and Iranian counterparties.

482.    The U.S. Department of Justice found (and Binance admitted) that Binance "willfully caused transactions between U.S. users and users in comprehensively sanctioned jurisdictions in violation of U.S. law," including "at least 1.1 million transactions" that violated prohibitions on transactions between U.S. users and users residing in Iran, "with an aggregate transaction value of at least **$898,618,825** [U.S. dollars]."

483.    For example, one of Binance's users was Ahmad Khatibi Aghada, an Iranian cybercriminal associated with the IRGC who was sanctioned in 2022 by OFAC for ransomware operations.[58]

484.    Binance processed transactions for Aghada's wallets but failed to file any SAR or freeze his funds even after public designations.

485.    Similarly, IranVisaCart (an illicit Iran-based crypto service) maintained Binance accounts that Binance knew about as early as 2019, yet Binance did not report them.

486.    In November 2022, *Reuters* thoroughly investigated and reported on the volume of Iran-affiliated transactions occurring on the Binance exchange.

487.    The *Reuters* investigation found that since 2018 (through November 2022), Binance "processed Iranian transactions with a value of **$8 billion**." (Emphasis added.)

488.    According to Reuters, "almost all the funds, some **$7.8 billion**, flowed between Binance and Iran's largest crypto exchange, Nobitex, according to a review of data from leading U.S. blockchain researcher Chainalysis." (Emphasis added.) (Nobitex is discussed in detail below.)

489.    According to *Reuters*, Binance's "popularity in Iran was known inside the

---

[58]    Press Release, *Treasury Sanctions IRGC-Affiliated Cyber Actors for Roles in Ransomware Activity*, U.S. DEP'T OF TREAS. (Sept. 14, 2022), https://home.treasury.gov/news/press-releases/jy0948.

company. Senior employees ***knew of, and joked about***, the exchange's growing ranks of Iranian users, according to 10 messages they sent to one another in 2019 and 2020. 'IRAN BOYS,' one of them wrote in response to data showing the popularity of Binance on Instagram in Iran." (Emphasis added.)

490.    OFAC later concluded that Binance's senior management had "encouraged the use of VPNs and surreptitiously allowed U.S. users and sanctioned jurisdiction users to trade even after ostensibly blocking them. For example, Binance continued to allow trades by users who were logged in from an IP address in a comprehensively sanctioned jurisdiction so long as that user had submitted KYC documents from a non-sanctioned jurisdiction."[59]

491.    Binance's willful decision to violate U.S. sanctions on Iran translated concretely into active facilitation of the IRGC's terrorism financing—evidenced by the fact that Binance knowingly provided illegal services to IRGC-affiliated persons.

492.    As FinCEN identified (and Binance admitted), Binance knowingly processed:

> several transactions with [convertible virtual currency] wallets associated with sanctioned entities and individuals, including … Ahmad Khatibi Aghada, an individual associated with the sanctioned ***Iranian Revolutionary Guard Corps (IRGC)*** that engaged in ransomware activities. Binance failed to file SARs with FinCEN on any of these transactions, ***even after OFAC's designations***. Binance was similarly aware of other Iran-related illicit transactions that occurred on the Binance.com platform but filed no SARs with FinCEN. For example, prior to the institution of full KYC, IranVisaCart, and other illicit actors maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC. ***Binance was made aware of these accounts and the related illicit transactions as early as 2019***, and filed no SARs with FinCEN. (Emphasis added.)

493.    In other words, Binance concealed the fact that it was actively assisting the IRGC to launder money on its platform and did not inform U.S. law enforcement of its illicit activities

---

[59]    According to *Reuters*, "Binance itself had supported the use of VPNs. Zhao . . . tweeted in June 2019 that VPNs were 'a necessity, not optional.'"

until it was caught.

494. Binance's knowing assistance to the IRGC also extended to IRGC conduits to Hezbollah, Hamas, and PIJ.

495. One of these major conduits was the "Sa'id al-Jamal Network" which uses a web of companies and vessels to facilitate shipments of Iranian commodities on behalf of the IRGC-QF through forged shipping documents to the People's Republic of China (PRC) (among others).

496. Some of the IRGC-QF's illicit commodities sales proceeds are then laundered to Hezbollah, Hamas, and PIJ through Tawfiq Muhammad Sa'id al-Law and several companies in Kuwait and Syria that he controls. As described extensively below, Tawfiq al-Law's money laundering network also extended into South America and Hezbollah's gold smuggling operations and is also closely tied to the IRGC. It also has links to designated Hamas accounts at Binance – some of them discussed below – *e.g.*, **Binance Account Nos. \*\*\*6255 and \*\*\*3793.**

497. In reviewing the numerous accounts discussed below it is important to recall that during the time these accounts have been active Binance used (and uses) blockchain analytics tools such as Reactor by Chainalysis and the investigative systems of TRM Labs which empowered its investigators to review both direct and indirect connections between the Binance customers and external cryptocurrency wallets, including deposits and withdrawals. The tools enable Binance to identify the source and destination of funds and determine whether there are links to wallets connected to illicit activity, money laundering, terrorism financing, darknet marketplaces, mixers, sanctioned entities, fraud activity, or other high-risk actors.

498. At the same time, Binance can also conduct off-chain investigations focused on the internal technological and identifying information connected to its customer accounts. This includes reviewing IP addresses, email addresses, phone numbers, linked devices, payment

methods, identification documents, and other technological indicators. Binance investigators also examine connections to other users who have sent funds to or received funds from the account, including whether those related accounts had previously been flagged, restricted, or removed from the platform.

### B. Tawfiq Muhammad Sa'id al-Law's IRGC/Hezbollah Network

499. Binance directly hosted at least one wallet held by Lebanon-based Syrian money exchanger and IRGC/Hezbollah operative Tawfiq al-Law as well as a network of other Binance accounts and other wallets working under his direction (the "al-Law Network").

500. On March 26, 2024, the U.S. Department of the Treasury designated Tawfiq al-Law as an SDGT. According to the U.S. Department of the Treasury, al-Law "provided Hizballah with digital wallets to receive funds from IRGC-QF commodity sales," and "similarly conducted cryptocurrency transfers for sanctioned Hizballah officials."[60]

501. Tawfiq al-Law is a senior IRGC/Hezbollah operative responsible for overseeing a network of cryptocurrency wallets that move vast sums for the IRGC and Hezbollah, including proceeds obtained from illicit oil sales and gold smuggling.

502. The Israeli government previously seized cryptocurrency wallets controlled by al-Law on the grounds that his "terrorist infrastructure belonging to Hezbollah and the Iranian Quds Force . . . operated to transfer funds through digital currencies for Quds Force and Hezbollah."

503. Chainalysis similarly reported that "Al-Law . . . worked with senior Hezbollah operators like Muhammad Qasim Al-Bazzal and Muhammad Ja'far Qasir—both of whom are sanctioned by OFAC—to operate Hezbollah's crypto funding infrastructure. Qasir is a critical conduit for financial disbursements from Iran's Quds Force used to fund Hezbollah's activities."

---

[60]    *See* Press Release, *Treasury Targets Qods Force, Houthi, and Hizballah Finance and Trade Facilitators*, U.S. DEP'T OF TREAS. (Mar. 26, 2024), https://home.treasury.gov/news/press-releases/jy2209.

504.    Even after NBCTF designated 12 Binance accounts and 39 wallet addresses controlled by al-Law on May 21, 2023 (in order to "thwart the activity of the designated terrorist organization Hezbollah and impair its ability to further its goals" because the "cryptocurrency wallets and customer accounts containing cryptocurrencies [were] used for the perpetration of a severe terror crime"), Binance continued to provide services to 19 of those listed 39 wallets—facilitating post-designation transactions worth more than $53 million U.S. dollars.

505.    Nearly half of these transfers occurred three weeks or more *after* those wallets were designated by the NBCTF.[61]

506.    A significant aspect of Tawfiq al-Law's money laundering operation for the benefit of the IRGC and Hezbollah revolves around a Hezbollah-run gold smuggling network in Venezuela shipping gold from Venezuela to Iran to bypass U.S. sanctions and finance the Hezbollah's and Hamas's terrorist activities. According to published reports, the gold is then sold in Türkiye, and other GCC and Middle Eastern countries, to generate funds for the IRGC that are churned together with proceeds from Chinese oil sales to the IRGC to obscure the pathways by which the IRGC accesses U.S. dollars.

507.    Hezbollah's representatives in Iran, Ali Kassir and Muhammad Ja'far Qasir, both SDGTs, help coordinate the flow of gold sales proceeds to the IRGC and then ultimately back to its terror proxies.

508.    Muhammad Ja'far Qasir is, in turn, closely tied to Tawfiq al-Law and his money laundering operation (as was reported, *inter-alia*, by Chainalysis and the U.S. Treasury Department) which helps launder a portion of the proceeds from the illicit gold smuggling back to Venezuela via cryptocurrency transfers made to Venezuelan and Brazilian operatives belonging to

---

[61]    At all times relevant to this Amended Complaint, Binance Holdings Limited was aware of (and routinely monitored) designations by NBCTF.

the criminal network. These local (Hezbollah-affiliated) operatives pass the funds through their Binance accounts as set forth below.

509. One of the key players in this transnational money laundering syndicate is Raed Abib Habib (a/k/a El Turco Raed) (**Binance Account No. \*\*\*6571)**, a 34-year-old Syrian national with Venezuelan identification papers who helps run the South American side of the Hezbollah affiliated gold smuggling and money laundering criminal enterprise that is based in Venezuela and conducts gold transactions that exceed the entire volume of gold held by the Venezuelan Central Bank.

510. Habib's criminal organization has conducted the equivalent of hundreds of millions of dollars-worth of crypto transactions with Tawfiq al-Law (SDGT) and his Lebanese/Syrian money laundering cryptocurrency accounts.

511. Between 2021 and 2023, Habib's organization ramped up its operations to industrial scale and introduced the use of cryptocurrency as a means of distributing proceeds from the sale of illicit gold mining.

512. Members of Habib's organization include Gustavo Adolfo Rangel Castro (**Binance Account No. \*\*\*8463)**, an operative in El Callao who has two active criminal arrest warrants in place, Antonios Boutros Nehme (**Binance Account No. \*\*\*0785)**, a Lebanese-Venezuelan operative, and George Jesus Mardeni Mardeni (**Binance Account No. \*\*\*3848)**, a Venezuelan merchant with ties to the local Venezuelan business community of Middle Eastern origin.

513. Habib's organization collaborates with other cryptocurrency money launderers in central America, Africa, GCC and China—**Binance Account No. \*\*\*9830** (discussed below) and **Binance Account No. \*\*\*9885** are major players in Central America and the United States.

514. For example, **Binance Account No. \*\*\*9694**, owned by a Chinese counterpart, is

101

linked to Tawfiq al-Law's network of wallets,[62] and **Binance Account No. \*\*\*3951**, owned by a Republic of Niger national (operating from the UAE), is linked by transaction with both al-Law and the same Chinese counterparty using **Binance Account No. \*\*\*9694**.

515.    Venezuelan intelligence services and law enforcement are aware of the Hezbollah gold smuggling operation and actively monitor it.

### 1.    Binance Account No. \*\*\*6571 (Raed Abib Habib)

516.    **Binance Account No. \*\*\*6571** was nominally[63] opened in 2021, also by Raed Abib Habib (a/k/a El Turco Raed).

517.    The account was accessed from multiple locations outside of Venezuela, including Lebanon, Türkiye, Khartoum in Sudan, Medellin and Bogota in Colombia, Ecuador, Spain, Germany, Switzerland, and the United States.

518.    The account remained active as of November 2025, almost six years after the Venezuelan authorities issued a warrant for his arrest.

519.    It has received the equivalent of more than $50 million, nearly half of which was transferred off-chain to other Binance customers.

520.    In August 2022, **Binance Account No. \*\*\*6571** received the equivalent of more than $100,000 in a single transaction from **Tron Address \*\*\*XY9D** which served as a central hub in the IRGC-Hezbollah cryptocurrency laundering network and transferred and received (within a

---

[62]    **Binance Account No. \*\*\*9694** received USDT valued at $300,000 from a wallet identified by NBCTF as a Hezbollah affiliated wallet belonging to Tawfiq al-Law's network. The account converted the equivalent of more than $3.7 million USDT to Chinese Yuan. The account is also linked to the U.S. designated IRGC money launderer Alireza Derakhsahn (discussed below) through a Tron wallet that sent him the equivalent of $1 million and *also* sent **Binance Account No. \*\*\*9694** almost $1 million.

[63]    As used in this Amended Complaint, the term "nominally registered" and "nominally opened" indicate the scant KYC information provided to Binance to operate the account. It is likely that in many cases, accounts were actually operated by one or more persons who did not provide any KYC documentation and that the person whose KYC information was provided was simply a front for the real owners of the account. In the case of **Binance Account No. \*\*\*6571**, the Venezuelan authorities identified this account as the "Prime Trust" account for the gold smuggling enterprise.

course of less than two years) USDT equivalent to more than $1.2 billion (including to and from addresses that were later blacklisted by Tether itself).

521. In the same month of August 2022, **Binance Account No. \*\*\*6571** received $400,000 in one transaction directly from the NBCTF designated (ASO 29/23) **Tron Address \*\*\*odDd** controlled by Hezbollah money launderer Tawfiq al-Law (SDGT).

522. NBCTF identified Tawfiq al-Law and numerous wallets and Binance accounts as affiliated with Hezbollah in May 2023 (ASO 29/23),[64] but Binance did not take any action against **Binance Account No. \*\*\*6571.**

523. In fact, from the date of al-Law's designation by NBCTF and until the October 7 Attacks, **Binance Account No. \*\*\*6571** received and transferred more than $17 million in USDT.

524. **Binance Account No. \*\*\*6571** received an equivalent of $390,000 from the NBCTF designated **Tron Address \*\*\*tKvi** (ASO 53/23) that was also transacting with **Binance Account Nos. \*\*\*0785** and **\*\*\*9408** mentioned below.

525. Habib—using **Binance Account No. \*\*\*6571**—sent the equivalent of more than $328,000 off-chain through the Binance internal ledger to other nodes of his Hezbollah money laundering network, including the Binance account of the 26-year-old Venezuelan woman discussed below (**Binance Account \*\*\*9830)** as well as the equivalent of more than $1.9 million to **Binance Account No. \*\*\*0785**.

526. Not only were the transactions flowing through Habib's account alone extremely suspicious, but Habib's public profile itself raised glaring red flags. A search of his name on the social media platform X (previously Twitter) brings up a post from a Venezuelan blogger that

---

[64] The U.S. Department of the Treasury subsequently designated Tawfiq al-Law as an SDGT in March 2024. *See* Press Release, *Treasury Targets Qods Force, Houthi, and Hizballah Finance and Trade Facilitators*, U.S. DEP'T OF TREAS. (Mar. 26, 2024), https://home.treasury.gov/news/press-releases/jy2209.

warns (in Spanish) "Raed Abib Habib" is a criminal known by the alias "el turco Raed" who is among those who controls the Orinoco Mining Arc and is responsible for laundering money through various commercial establishments and smuggling gold.



527.    Official Venezuelan government databases confirm these money laundering activities and further identify Habib (and his alias, "El Turco") as affiliated with Hezbollah and an associate of Phanor Vladimir Sanclemente Ojeda, a deceased former leader of a Venezuelan gold smuggling criminal organization known as Tren de Guayana.[65]

---

[65]    An article published in a Latin American online periodical details the arrest in Florida of two Venezuelan nationals named Victor Manuel Fossi Greico and Jean Carlos Sánchez by the FBI. They had entered the United States on a private Venezuelan aircraft transporting 209 kilograms of gold secreted in the nose of the plane. The article indicates that the Venezuelan "Public Ministry" issued 18 arrest warrants of the Venezuelan organization behind this gold smuggling operation. Raed Abib Habib is listed as one of those 18 individuals for whom an arrest warrant was reportedly issued. *See* https://www.laiguana.tv/articulos/1327805-mafia-sacaba-oro-vendian-extranjero-nombres-cargos/ (last visited May 27, 2026).



528.    Habib is an associate or protégé of former Venezuelan Vice-President Tareck El Aissami who was designated in February 2017 by the U.S. Department of the Treasury as a Specially Designated Narcotics Trafficker pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act) "for playing a significant role in international narcotics trafficking."

529.    Nevertheless, in June 2018, El Aissami was named the Venezuelan Minister of Industry and National Production[66] and subsequently visited Türkiye's Ahlatçi gold refinery in 2019 with Turkish President Erdogan. (He was later arrested in Venezuela in April 2024 on charges of corruption involving a massive bribery scheme involving cryptocurrency.)

---

[66]    He was later succeeded as Alex Nain Saab Morán ("Saab") as Minister of Industry and National Production. Minister of Industry and National Production. According to the U.S. government, Saab worked with El Aissami when he was Minister of Industries and National Production and former Executive Vice President, "to create a structure for the Government of Venezuela to sell gold to Turkey." To prevent former Venezuelan president Maduro and his associates from further exploiting Venezuela's people and resources, the gold sector of the Venezuelan economy was sanctioned by the U.S. treasury Department in November 2018. See Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, July 25, 2019, available at: https://home.treasury.gov/news/press-releases/sm741. Raed Habib also worked with Alvaro Pulido Vargas a/k/a "Cuchi." Pulido Vargas was the business partner of Alex Saab.

105

530.    Habib worked with El Aissami to smuggle gold out of Venezuela for transit to Türkiye and the UAE, for the benefit of Hezbollah and the IRGC and Habib's money laundering network used Binance as a platform to settle illicit gold sale transactions with Tawfiq al-Law's network and the wider IRGC crypto-laundering enterprise.

531.    Most of Habib's money laundering described below flowed through Binance, but he and his Venezuelan partners also utilized Binance's U.S. subsidiary, Binance.US, which – through its relationship with Prime Trust (a Nevada corporation), provided a valuable off-ramp to convert illicit gold into U.S. dollars.[67]

532.    On September 20, 2019, a Venezuelan registered aircraft YV-3325 was interdicted at Opa-Locka Executive Airport in Opa-Locka, Florida, containing 209 kilograms of gold. It had flown from El Callao in Bolivar State – part of the Orinco Mining Arc.

533.    The pilots, Victor Fossi Greico and Carlos Sanchez Rojas, were charged with smuggling under 18 U.S.C § 545 and were ultimately sentenced and deported back to Venezuela.

534.    In January 2020, a Venezuelan judge issued 18 arrest warrants relating to Raed Abib Habib's gold smuggling enterprise, charging him as well as two others affiliated with Hezbollah, Yanet Nasser Nasser and Jonny Nasser Nasser, with corruption related to his gold smuggling enterprise. He opened Binance Account ***6571 a year later.

535.    Raed Habib and Yanet Nasser Nasser were business partners in a now defunct Florida corporation named Imperio Gold Cars. Corporate records show Habib and Nasser to be the owners with a listed corporate address in Miami, Florida owned by Habib.

---

[67]    To transact in fiat currency, customers like Habib first established and deposited funds into an account with Prime Trust Company, which is linked by APIs to the Binance.US Platform. The Binance.US Platform allowed for deposits and withdrawals in U.S. dollars via bank transfer (ACH), debit card (deposits only), Apple Pay (debit card only), or wire transfer. Like other customers, Habib used Prime Trust to have Binance.US debit and credit his account directly to settle the fiat leg of his trades. As noted above, the Venezuelan authorities identified **Binance Account No. ***6571** as the "Prime Trust" account for the gold smuggling enterprise under investigation.

536.    Both Habib and Nasser were among 26 defendants named in Delaware Bankruptcy case *PCT Litigation Trust v. ADVSAT et al.* seeking to claw back funds from them in the Prime Trust and Prime Core Technologies bankruptcy proceedings.

537.    Prior to its bankruptcy filing in 2023, Prime was one of the largest crypto currency market participants in the U.S. It was a Nevada state-chartered trust company that provided services for cryptocurrency and digital assets that experienced a disastrous liquidity event caused by the SEC action filed against Binance Holdings Limited, BAM Trading Services Inc. and related companies on June 5, 2023.

538.    Habib and Nasser's investments in Prime Trust and the seizure of their Venezuelan registered aircraft YV-3325 in 2019 both point to the Habib network's efforts to diversify the money laundering elements of their gold smuggling operation beyond Türkiye and the UAE.

539.    Habib and his confederates used Binance not only (as described below) to move cryptocurrency equivalent to hundreds of millions of dollars for Hezbollah and the IRGC and off-ramp millions of dollars in various South American currencies, but also to off-ramp in the U.S. some of their illicit proceeds through Binance and Binance.US (via Prime Trust).

540.    Habib's inroads into the U.S. include his association with numerous companies. For example, he is listed as the manager of EBS Supply Company (EBS) and Suministros Liccioni LLC (SL). Both companies are listed as limited liability companies (LLCs) in Wyoming.

541.    EBS controls entities in Cyprus (EBS Supply Limited—where Habib and his brother Amer Adrian Abib Habib are both listed as directors) and Dubai (EBS Supply FZCO, where Habib is listed as a manager).

542.    EBS's website lists its activities as "Powering Industries Worldwide with Reliable Equipment & Global Reach" and "Importing and exporting high-quality machinery and parts from

107

the UAE to the world."

543. The website details its offices in the Dubai, UAE; Sheridan, Wyoming; and Nicosia, Cyprus.

544. SL's website advertises that "At Suministros Limited LLC, we provide a full spectrum of industrial supplies tailored to meet the demands of construction, metalworking, and heavy-duty operations." It lists the same address in Wyoming as EBS: 30 N Gould Street, Suite R, Sheridan, Wyoming, 82801, USA.

545. Habib is also listed as the manager of another Dubai based company named Big Ocean Trading LLC, which advertises itself as dealing in precious metals. It specifically advertises its sourcing of "scrap gold, mining gold and other non-manufactured precious metals."

### 2. Binance Account No. ***9799 (Ali Alawieh)

546. **Binance Account No. ***9799** was registered by Ali Mohammad Alawieh, the son of Hezbollah commander Muhammad Abd al-Rasul Alawieh, whose death was publicly announced in early 2024. At the time of his death, Muhammad Alawieh was reportedly one of the most senior Hezbollah commanders killed after the October 7 Attacks.

547. The phone number listed by NBCTF ASO 5/24 linked to **Binance Account No. ***9799** (+96138----) links to a Facebook with user id 64244---- and URL https://www.facebook.com/ali1.alawieh.

548. It displays multiple images honoring Hezbollah commander Muhammad Abd al-Rasul Alawieh:



549. Ali Mohammad Alawieh himself was photographed at a Hezbollah funeral procession for Ahmed Shehimi who was killed in Syria.



550. **Binance Account No. ***9799** transacted with numerous designated wallets and Binance customers.

551. For example, it sent an equivalent of more than $75,000 to **Tron Address ***HE2q**, a node in the IRGC-Hamas-Hezbollah network, designated by NBCTF (ASO 5/24).

552. Immediately after the October 7 Attacks, **Binance Account No. ***9799** transferred cryptocurrency to **Binance Account No. ***0190** – belonging to an individual identified as Ayman Khalel. On October 17, 2023, it sent to Ayman Khalel's account the equivalent of $51 and once receipt was confirmed, it sent the same account the equivalent of $9,950 the next day. Thus, by structuring the transaction, the two accounts stayed under the $10,000 threshold and remained off-chain, using Binance alone to facilitate the transfer. During the time it was active, **Binance Account No. ***9799** received an equivalent of more than $680,000 and withdrew more than $645,000. Most of that cryptocurrency was transferred off-chain using the Binance internal transfer system.

553. On one occasion, Ali Mohammad Alawieh also tried to send the equivalent of $4,949 to another (later designated) Tron address—**Tron address ***wtmZ**—but Binance rejected this transaction. Despite rejecting this specific transaction, Binance took no action with respect to the account generally, which continued to further process Hezbollah transactions (incoming and outgoing) worth more than $500,000.

554. **Binance Account No. ***9799** also operated and logged into his Binance account from the same IP addresses in Lebanon that Habib's Binance Account No. ***6571 used on other occasions.

### 3. Binance Account No. ***0785 (Antonios Boutros Nehme)

555. **Binance Account No. ***0785** was nominally opened by a Lebanese and

Venezuelan dual national named Antonios Boutros Nehme who was part of the IRGC's cryptocurrency financing network with Hezbollah. For example, on one occasion, he received the U.S. dollar equivalent of $500,000 in a single cryptocurrency transfer from Tawfiq Muhammad Sa'id al-Law (who had been designated as an SDGT). Two weeks later, he received another $250,000 deposit of cryptocurrency from a different al-Law address.

556.    **Binance Account No. ***0785** transacted directly with other terrorist financiers as well. For example, on February 8, 2022, it received the U.S. dollar equivalent of $50,000 from **Tron Address ***tKvi**, later designated by NBCTF (ASO 53/23) as being "property used for perpetration of severe terror crime."

557.    Engaging with the BuyCash network, **Binance Account No. ***0785** sent the U.S. Dollar equivalent of $495,000 in a single transaction to **Tron Address ***ihmS**.

558.    **Tron Address ***ihmS**, in turn, transferred the U.S. Dollar equivalent of $885,000 to BuyCash.

559.    **Tron Address ***ihmS** also received the U.S. Dollar equivalent of $3.7 million from wallets belonging to the Hezbollah-IRGC-al-Law cryptocurrency laundering network and transferred the U.S. Dollar equivalent of more than $9.4 million from these wallets and those of other designated terrorists.[68]

560.    Between January and October 2022, **Binance Account No. ***0785** received the equivalent of more than $120 million in USDT deposits and $121 million in withdrawals. The transactions followed a consistent structure of round-number entries, mainly between 100,000 and 1,000,000 USDT, repeating across several months (another indicium of money laundering). The largest single transfer was of 3,999,900 USDT on June 1, 2022, followed within minutes by

---

[68]    For example, **Tron Address ***ihmS** received $165,000 from **Tron Address ***foQF** (discussed above and designated for its affiliation with PIJ).

111

multiple withdrawals of similar size.

561.     Deposit and withdrawal timings frequently match within the same hour, producing near flat end-of-day balances. Internal (off-chain) transfers included a $1 million USDT transfer and a 20.25 BTC refund in February 2023, demonstrating that funds moved inside Binance's ledger during the same periods. **Binance Account No. \*\*\*0785** utilized additional cryptocurrencies including the U.S. Dollar equivalent of $2.5 million in XRP.

562.     **Binance Account No. \*\*\*0785** also received 14 transfers totaling the equivalent of more than $1.9 million from Raed Abib Habib's **Binance Account No. \*\*\*6571**— all of them off-chain—using Binance's architecture to conceal the transfers on its internal ledger.

563.     Despite all of the foregoing, Binance even provided Antonios Boutros Nehme a loan (in USDT) in February 2023 for the U.S. Dollar equivalent of more than $300,000.

564.     Nehme also occasionally deposited U.S. dollars (Fiat) into his account or converted USDT in his account into dollars using eight Mastercard and Visa credit cards issued in Panama and associated with his bank account at Banesco, Panama. He also made direct transfers from his Binance account to this bank.

565.     **Binance Account No. \*\*\*0785** was primarily accessed from Caracas Venezuela throughout 2022, but transactions were also initiated that year from Lebanon, Türkiye, Southern France, and Florida.

566.     **Binance Account No. \*\*\*0785** was accessed and logged into from the same IP addresses in Caracas, Venezuela, that other members of Habib's network **(**including, among others – Binance Accounts No. **\*\*\*6571, \*\*\*6292, \*\*\*9210, \*\*\*9885, \*\*\*9830**) also have used.

#### 4.   Binance Account No. \*\*\*9408 (Mohamad Said El Okdi)

567.     **Binance Account No. \*\*\*9408** was nominally registered by a Brazilian resident

112

named Mohamad Said El Okdi with the email address ████ saidsaid0317@hotmail.com.

568.    The account did not pass the "enhanced" due diligence process and was marked Refused.[69] Nevertheless, Binance continued to process transactions for it for five months between April and September 2022, despite Okdi's involvement in a gold smuggling enterprise in Venezuela and Brazil.

569.    During that time, **Binance Account No. ***9408** received the U.S. dollar equivalent of more than $5.2 million in cryptocurrency transfers from Hezbollah money launderer Tawfiq al-Law (SDGT) during a two-month period.

570.    It also received the equivalent of more than $2.2 million from **Tron Address ***sMUj**, which itself heavily transacted with the al-Law Hezbollah-IRGC Network (receiving from his designated wallets more than $7 million and sending to those wallets more than $13 million).[70]

571.    **Binance Account No. ***9408** was also linked to Alireza Derakhshan (SDGT), an IRGC money launderer (see below) through a Tron address that sent Derakhshan's Tron wallet the equivalent of $350,000 and **Binance Account No. ***9408** the equivalent of $50,000.

572.    Over the course of the five months, it was active—between April and September 2022—**Binance Account No. ***9408** received the U.S. dollar equivalent of more than $12 million in USDT. More than half of that cryptocurrency was converted into fiat currencies— Brazilian Real and Venezuelan Bolívar.

573.    Had Binance not been designed to facilitate money laundering, the transactional

---

[69]    Okdi provided a 20-year-old ID and Binance registered a date of birth that made him 20 years younger than he is.

[70]    It also received the equivalent of $56,400 from the NBCTF-designated **Tron Address ***tKvi**, which was transacting with **Binance Account No. ***0785** mentioned above.

patterns in the account would have easily confirmed what a basic open-source search would have revealed: that Yehia Said Okdi, Youseff Said Okdi, and Mohamad Said Okdi were implicated in a 2022 criminal investigation in Brazil for operating a gold smuggling business. The Okdi brothers' partner in the operation was further charged in a sister case for overseeing a money laundering operation for the benefit of organized crime.

574. **Binance Account No. ***9408** accessed and logged into from same IP addresses in Boa Vista and Manaus (Brazil) that other members of Habib's network **(**including, among others – **Binance Accounts No. ***3775, ***5363, ***9830**) also have used.

### 5. Binance Account No. ***9885

575. **Binance Account No. ***9885** was registered in December 2017 by a Venezuelan passport holder, but was almost dormant for four years.

576. The account started sending and receiving cryptocurrencies (mainly USDT) in 2021, and within two years of operation, moved the equivalent of more than $150 million.

577. Within one day in June 2022, **Binance Account No. ***9885** received the U.S. dollar equivalent of $500,000 from two different Hezbollah-affiliated wallets belonging to Tawfiq al-Law's network.

578. In that same month, it also received the U.S. dollar equivalent of more than $390,000 from Raed Abib Habib's organization via **Binance Account No. ***0785**.

579. As already mentioned above, **Binance Account No. ***9885** was accessed, *inter alia*, from the same IP addresses accessed by other members of Habib's network that used Binance - **Binance Accounts No. ***0785, ***9830, ***6292, ***6571** and ***9210.**

### 6. Binance Account No. ***8463 (Gustavo Castro)

580. **Binance Account No. ***8463** was registered to a 26-year-old Venezuelan

114

national named Gustavo Adolfo Rangel Castro, a member of Raed Abib Habib's Hezbollah gold smuggling organization.

581.    **Castro** has two active Venezuelan criminal arrest warrants out for him.



582.    **Binance Account No. ***8463** was active for 9 months—until the end of 2022.

583.    During that time, it moved the U.S. dollar equivalent of more than $25 million (deposits and withdrawals) – millions of it off-chain on Binance's internal ledger.

584.    Within a span of 9 days in August 2022, **Binance Account No. ***8463** received the U.S. dollar equivalent of more than $2.9 million from three different Hezbollah-affiliated al-Law related wallets.

### 7.    Binance Account No. ***3848

585.    **Binance Account No. ***3848** was registered on May 2021, by a then 22-year-old Venezuelan resident who proceeded to transfer the equivalent of more than $60 million in cryptocurrency on behalf of Raed Abib Habib's Hezbollah gold smuggling network — approximately a third of those funds moving off-chain through Binance's internal ledger.

586.    The account also received the U.S. dollar equivalent of more than $3.1 million from

three different wallets controlled by Tawfiq al-Law that were all designated in the May 21, 2023, NBCTF Seizure Order.

587. Nevertheless, Binance helped **Binance Account No. ***3848** to launder funds for at least two years after those Tawfiq al-Law wallets were known to it to be acting on behalf of Hezbollah.

588. Binance Account No. ***3848 was accessed from an IP address that was also used by Binance Account No. ***6292 mentioned below.

### 8. Binance Account No. ***3951

589. **Binance Account No. ***3951** was registered in August 2021, to a then 23-year-old Republic of Niger national, residing in the UAE.

590. Within a three-and-a-half-year period of activity, the account received deposits in the cryptocurrency equivalent of more than $62 million and withdrew almost the same amount (moving the equivalent of more than $120 million) — more than the U.S. dollar equivalent of $28 million of these withdrawals were off-chain, visible only inside Binance's internal ledger

591. Within a two-day period in March 2023, **Binance Account No. ***3951** received the equivalent of almost $1 million from two wallets identified by NBCTF in May 2023 as associated with Tawfiq al-Law and Hezbollah, but Binance nevertheless continued to assist **Binance Account No. ***3951** launder funds for Hezbollah and the IRGC for at least 18 months after NBCTF designated these wallets.

### 9. Binance Account No. ***9210

592. **Binance Account No. ***9210** was nominally registered by a then 25-year-old Venezuelan national, in December 2020 and was active at least until December 2025.

593. According to his LinkedIn profile, since 2018 the nominal account holder was

116

employed as a commercial agent and service coordinator for several financial firms where he handled account openings, supervised junior staff, and managed customer service operations.

594.    According to the account information and KYC data provided, **Binance Account No. \*\*\*9210** was a personal account.

595.    Yet, **Binance Account No. \*\*\*9210** processed the equivalent of close to **$200 million** in USDT, receiving more than **$95 million** in deposits and withdrawing more than $100 million.

596.    **Binance Account No. \*\*\*9210** used several Tron deposit addresses.[71]

597.    A Hezbollah/Tawfiq **al-Law Network address \*\*\*dDd**, deposited in a single transaction the amount of $500,000 into **Binance Account No. \*\*\*9210** in February 2023. The deposit went into the account's **Tron Deposit Address N-1** (hosted by Binance), which was the sole Tron operational deposit wallet this account used at that time.

598.    **Tron Deposit Address N-1** continued to operate until May 3, 2023; until then it was a very active address – receiving tens and even hundreds of thousands of dollars almost on a daily basis. For example, in the period between the Hezbollah deposit, February 6, 2023, and May 3, 2023 (three months), **Tron Deposit Address N-1** received USDT equivalent to more than $3 million and during the period from the inception of **Tron Deposit Address N-1** and until the Hezbollah deposit (17 months) it received the equivalent of more than $12.9 million.

599.    But when **Tron Deposit Address N-1** stopped operating on May 3, 2023, **Binance Account No. \*\*\*9210** simply defaulted to a new **Tron Deposit Address: N-2**. Within the next 7 days **Tron Deposit Address N-2** received the equivalent to more than $614,000, and it remained

---

[71]    A deposit address is the public block-chain address that users outside of Binance utilize to send cryptocurrency to a specific Binance customer. Binance then credits the customers on its internal ledger and transfers the incoming cryptocurrency into its omnibus aggregate wallets.

active at least until December 2025 by which time it had received the equivalent of more than $13.5 million.

600. It is likely that the owner of **Binance Account No. \*\*\*9210** and **Tron Deposit Address N-1** were tipped off about the impending NBCTF designation on May 21, 2023, that identified **Tron Address \*\*\*dDd** as part of the Hezbollah/Tawfiq al-Law Network and that **Tron Deposit Address N-1** would be linked to Hezbollah.

601. In addition to transacting directly with the Hezbollah designated addresses mentioned above, **Binance Account No. \*\*\*9210** also received USDT equivalent to $6,100 from a later blacklisted **ETH address \*\*\*8dcf.**

602. **Binance Account No. \*\*\*9210** converted more than $12 million from cryptocurrencies into fiat money (and vice versa) and used Binance to funnel the fiat currency into the international banking system: U.S. dollars were moved using Zelle, Wise, and other payment services; Euros were moved via Banco Sabadel Spain, Banco Santander Spain, BBVA Bank and ING; and Venezuelan Bolivar were moved through other banks.

603. In addition to being accessed from Venezuela, **Binance Account No. \*\*\*9210** was also accessed extensively from Colombia (mainly Bogota), from Miami (FL) and Orem (UT). Less extensively, but on multiple occasions, the account was active in McAllen (TX), Los Angeles (CA), Seattle (WA), Chicago (IL) and New York, NY. The account was also used many times in Osaka and Tokyo (Japan), and in various locations in the Netherlands, Romania, and London (UK).

604. **Binance Account No. \*\*\*9210** has shared the same IP address with many of the other members of the network and operating from Venezuela (including **Binance Accounts Nos. \*\*\*9830, \*\*\*6292, \*\*\*0785**, and others), but notably it accessed the account from a specific IP

118

address in Bogota, Colombia, from which Raed Habib (a/k/a - El Turco) **Binance Account No. ***6571** often accessed his account.

### 10. Binance Account No. ***6292

605. **Binance Account No. ***6292** was registered in February 2021, and nominally owned by a then 24-year-old Venezuelan woman (Hernandez Perez), registering it with the email user crip*****@gmail.com.

606. All told, over the course of four years, this young woman's account, moved through her account (deposits, withdrawals, and off-ramping fiat currency into the international banking system) the equivalent of more than $190 million.

607. **Binance Account No. ***6292** received $420,000 from two different designated Tawfiq al-Law Network addresses into her **Tron Deposit Address N-3** (i.e. - the public block-chain address that users outside of Binance can send USDT or TRX to **Binance Account No. ***6292**). These deposits from Hezbollah/IRGC wallets on the blockchain exposed the **Tron Deposit Address N-3** to law enforcement agencies and public scrutiny.

608. Binance provided its customer with a solution to the exposure of **Tron Deposit Address N-3**, so that **Binance Account No. ***6292** could continue to operate even after transacting with the blockchain made the connection between Hezbollah and this address clear: it provided the customer with a new, operational **Tron Deposit Address N-4** as described below.

609. The deposits from Tawfiq al-Law Network to **Tron Deposit Address N-3** occurred in January and February 2023. Three months later, on May 21, 2023, the NBCTF designated the two addresses that previously sent USDT to **Tron Deposit Address N-3** (which was the only Tron deposit address used by **Binance Account No. ***6292** up to that time).

610. Like **Binance Account No. ***9210**, **Binance Account No. ***6292** appears to

119

have been tipped off to the imminent NBCTF designation because it suddenly stopped using **Tron Deposit Address N-3** and began using a new **Tron Deposit Address N-4** on the same day (May 3, 2023) that **Binance Account No. \*\*\*9210** stopped using **Tron Deposit Address N-1** and switched to **Tron Deposit Address N-2**.

611.    From its inception (until May 3, 2023) **Tron Deposit Address N-3** received USDT in an amount exceeding $13.9 million.

612.    From its inception (May 4, 2023) **Tron Deposit Address N-4**, the successor deposit address that served **Binance Account No. \*\*\*6292** received the equivalent of more than $58 million.

613.    Similarly to **Binance Account No. \*\*\*9210**, **Binance Account No. \*\*\*6292** was accessed extensively, not only from Venezuela but also from the U.S. – including multiple times from North Bergen, Clifton, and Secaucus (NJ); Atlanta (GA), Los Angeles (CA) and Dallas (TX). During a whole month in 2023, the account was also active from Nairobi, Kenya.

614.    As mentioned above, **Binance Account No. \*\*\*6292** had used same IP addresses (to access her Binance account) as other members of Tawfiq al-Law's Network, among them Habib, **\*\*\*9830, \*\*\*3848, \*\*\*9885 and \*\*\*0785**.

### 11. Binance Account No. \*\*\*5587

615.    **Binance Account No. \*\*\*5587** was registered in April 2021 and was still active in October 2025.

616.    The nominal owner of the account was a 40-year-old (at the time of registration) Paraguayan national, residing next to the Brazilian border in Ciudad del-Este – a city in the Tri-Border area.

617.    **Binance Account No. \*\*\*5587** moved the equivalent of more than $4.7 million

(deposits and withdrawals).

618.    More than 50% of the cryptocurrency deposits into **Binance Account No. ***5587** came from other Binance customers, using Binance's internal ledger.

619.    However, one of the visible deposits into the account that was transferred on the blockchain was a transaction from the Tawfiq al-Law Network on July 17, 2023, in an amount equivalent to $35,700. The sender's Tron address was already designated by NBCTF at the time of the deposit.

620.    Binance immediately identified that these funds were received from a designated address associated with terrorism. Its response is telling: it simply placed the asset under "live monitoring freeze" for 24 hours, extended the "freeze" order for another 24 hours, and then released the equivalent of $15,000 in USDT received from Hezbollah which was then converted into BTC. In short, Binance actively assisted its customer and prevented the customer's assets from being frozen as terror assets.

**12. Binance Account No. ***7451**

621.    **Binance Account No. 7451** was registered on May 15, 2021, with a Yemeni mobile number, nominally opened by a woman holding a Yemeni passport indicating she was a 28-year-old student at that time.

622.    **Binance Account No. ***7451** was mainly operated from Egypt, but it was accessed and used multiple times from Paris, France.

623.    Despite the fact that **Binance Account No. ***7451** nominally belonged to a "student" from an impoverished country, it moved the equivalent of more than $9 million within three and a half years of operation.

624.    Most of these transfers occurred in temporal proximity to the October 7 Attacks.

625.    The average deposit into **Binance Account No. \*\*\*7451** exceeded $49,000, 15% of all the deposits into the account exceeded $99,000, and an average withdrawal was approximately $52,000.

626.    In fact, **Binance Account No. \*\*\*7451** was an IRGC-Houthi controlled account that played an important role in the preparations for the October 7 Attacks, mixing funds originating from the IRGC and transiting through Dubai Co. – the Gaza-based intermediary between the IRGC and Hamas's Qassam Brigades.

627.    **Binance Account No. \*\*\*7451** received an equivalent of $320,000 from two Iranian designated Sa'id Ahmed al-Jamal Network Tron addresses.

628.    When another Binance customer transferred U.S. dollars to Binance Account No. \*\*\*7451, it identified the payee on the account as "Ahmed" – an Arabic (male) first name that does not correspond to the KYC identity of the account's (nominal) female owner.

629.    In the days approaching the October 7 Attacks, **Binance Account No. \*\*\*7451** experienced a surge of large deposits and withdrawals that continued through October 9, 2023.

630.    The peak of activity (by volume size) of **Binance Account No. \*\*\*7451** was reached on the days prior to the attacks.

631.    In the days immediately preceding the October 7 Attacks – from October 3 through October 6, 2023 – a total amount equivalent to more than $4.3 million (8 deposits in total, all in USDT) was deposited into **Binance Account No. \*\*\*7451**. Between October 3 and October 9, 2023, the account made seven withdrawals – all in Bitcoin totaling the equivalent of more than $2.5 million and all to a single **BTC address (\*\*\*h89yx)**.

632.    The entirety of the incoming USDT equivalent of $4.3 million came from un-hosted addresses that were transacting directly with Dubai company addresses and moving the funds

between themselves:

633.    **Binance Account No. \*\*\*7451** received the equivalent of $110,000 from **Tron address \*\*\*XTNV which** directly transacted with **Tron address \*\*\*Z3PL,** controlled by Dubai Co. and later designated

634.    **Binance Account No. \*\*\*7451** directly received the equivalent of $100,000 on October 5th from **Tron address \*\*\*VE23** that, in turn, received the equivalent of $106,000 from another later designated Dubai Co. **Tron address \*\*\*jmAC** shortly beforehand – on September 23rd.

635.    **Binance Account No. \*\*\*7451** received the equivalent of $710,000 on October 4th from **Tron address \*\*\*ETKK**. Previously, on October 2nd **Tron address \*\*\*ETKK** sent designated Dubai co. **Tron address \*\*\*jmAC** the equivalent of $132,000

636.    On October 3, 2023, **Tron address \*\*\*ETKK** sent equivalent of $140,000 to **Tron Address \*\*\*PQEY**. The next day, **Tron Address \*\*\*PQEY** transferred the equivalent of $1,175 million to **Binance Account No. \*\*\*7451**.

637.    **Tron Address \*\*\*PQEY** also transferred the equivalent of $1.83 million to Dubai co. designated **Tron address \*\*\*Z3PL** (mentioned above) between August 3 and October 9, 2023.

638.    **Tron address \*\*\*XTNV** and **Tron address \*\*\*VE23** that deposited funds into **Binance Account No. \*\*\*7451** also (cumulatively) sent millions of USDT in September and December 2023 to addresses identified by Chainalysis as belonging to Garantex – an OFAC SDN sanctioned entity.

639.    All of the deposits to the account were extraordinary in their volume, size, and concentration, but this did not stop Binance from executing them: the largest single deposit during the period of October 3-9, 2023, amounted to an equivalent of $510,000, while the largest single

withdrawal was more than 35 Bitcoin (circa U.S. dollar equivalent of 972,000).

640.    Given that the deposits from this IRGC-Dubai co. cluster of addresses arrived in U.S. dollar-pegged stablecoin USDT and the withdrawals were made in Bitcoin, **Binance Account No. \*\*\*7451** was required to purchase a huge (especially for a 28-year-old student from Yemen) amount of Bitcoin. The account bought, through Binance, more than 50 Bitcoins – more than two hundred times more than the cumulative Bitcoin purchases by this account during the rest of the 3.5-year period.

641.    **Binance Account No. \*\*\*7451** continued to operate until the end of 2024.

### 13. Binance Account No. \*\*\*3775

642.    **Binance Account No. \*\*\*3775** was registered on December 14, 2020. It was nominally owned by a 24-year-old (at that time) Venezuelan woman, residing in Boa Vista, Brazil.

643.    This account moved huge amounts of both crypto and fiat currency, including some major transactions with the al-Law Network, while its KYC suffered from serious defects from its inception.

644.    The KYC user verification was based on a National Migratory Registry Card (CRNM) number \*\*\*77-P that was issued nine months after the account was registered (i.e. - August 21, 2021). Moreover, it appears that Binance performed this verification of the identity even later than August 2021 – only on July 2023, by which date **Binance Account No. \*\*\*3775** had already received deposits in an equivalent of more than $10.5 million (mostly in USDT) and had exchanged that mass of USDT into fiat currency (mostly Brazilian Real) that was sent via various Money Services Businesses (mainly - Pix Payment system) and banks (including Bank of Brazil) into the international banking system.

645.    On May 21, 2023 – two months before Binance performed the identity verification

124

of the owner of **Binance Account No. \*\*\*3775** – NBCTF designated crypto addresses associated with the Hezbollah and IRGC financier Tawfiq al-Law. Among those addresses were three Tron addresses that since November 2022 had been sending to **Binance Account No. \*\*\*3775** the USDT equivalent of more than $3 million altogether. The public designation of these addresses did not affect Binance's identity verification which found the account's documentation satisfactory three months later and thereafter assisted the account holder to continue sending and receiving funds for many months.

646.    **Binance Account No. \*\*\*3775** had close interaction with important nodes on the al-Law Network serving Hezbollah and the IRGC:

647.    **Tron address \*\*\*q2cV** deposited an equivalent of $54,612 into **Binance Account No. \*\*\*3775**. This Tron address received from the al-Law Network $500,000 and sent back to the al-Law Hezbollah-IRGC designated wallets more than $14 million.

648.    The same **Tron address \*\*\*q2cV** sent directly to a BuyCash designated address $250,000 and received from BuyCash $400,000.

649.    The obvious operational characteristics of **Binance Account No. \*\*\*3775** were receiving large amounts of crypto and cashing those out through the Binance platform: during the period of its activity, the account received crypto deposits exceeding $14.5 million, withdrew only $1.3 million, while the balance of the received crypto was exchanged into fiat and moved into the financial system, using payment services and banks. Such money laundering typologies would have placed Binance on notice that this account was associated with money laundering and criminal activity, but Binance already knew the account was receiving the equivalent of millions of dollars from the Hezbollah and IRGC affiliated counterparties.

650.    **Binance Account No. \*\*\*3775** also used visa credit card \*\*\*\*8035 to operate the

account.

651.    The nominal owner of **Binance Account No. \*\*\*3775** is the spouse of the nominal owner of **Binance Account No. \*\*\*5363** that is discussed next.

**14. Binance Account No. \*\*\*5363**

652.    **Binance Account No. \*\*\*5363** was registered three weeks after the registration of **Binance Account No. \*\*\*3775**.

653.    The nominal owner of the account is a Venezuelan national, age 37 at that time, residing in Brazil and married to the owner of **Binance Account No. \*\*\*3775**.

654.    The KYC procedures of this account reflect even more disturbing risks than those mentioned with regard to his wife's Binance Account. The KYC status, including the residential address and ID verification that were provided by the registrant of the account, were marked "REFUSED" by Binance. Despite that, Binance facilitated the account's receipt of the equivalent of more than $14 million. And similar to the modus operandi of the Binance account of his spouse, most of it – an amount exceeding $13 million – was exchanged into fiat currency (Brazilian Real and Venezuelan Bolivar) and funneled to the banking system.

655.    The repetitive amounts deposited into this account raised red flags for money laundering operations. A few examples (out of many more) demonstrate how obvious the money laundering activities of this account were:

    (a)    within two days in August 2023, the account received three deposits, from three different Tron addresses, each in the exact amount of USDT $118,200;

    (b)    within six days in July 2023, the account received the following nine USDT deposits, from seven different Tron addresses: $59,200.00, $59,400.00, $59,400.00, $59,500.00, $59,700.00, $59,700.00, $59,300.00, $59,300.00, and $59,900.00; and

    (c)    within 26 hours in November 2022, the account received 4 deposits from three different accounts, each in the exact amount of USDT $15,810. The same pattern was seen time and again: funds were

poured into the account in almost identical amounts within hours (or not more than a day).

656. **Binance Account No. ***5363** heavily interacted with the Hezbollah/IRGC al-Law Network, as well as with the Hamas BuyCash addresses.

657. For example, the account received within a three-month period starting in October 2022, a total amount in excess of $1.6 million from a single al-Law designated address.

658. Another al-Law Tron designated address, sent between October 19 and November 11, 2022, an amount exceeding in value $387,000 to **Binance Account No. ***5363**.

659. A third al-Law Tron designated address contributed more than $1 million to **Binance Account No. ***5363** – all within 70 days starting October 10, 2022.

660. Other interactions with the al-Law Network took place using intermediary **Tron address **hSrB**, which interacted directly with BuyCash and with Hezbollah known addresses and also sent directly to **Binance Account No. ***5363** an amount of $286,830. Had Binance adhered to its compliance obligations, all terror funding contributions of **Tron address **hSrB** would have been avoided, as by the time the first interaction of it with **Binance Account No. ***5363** took place on June 2023, it was already obvious that **Binance Account No. ***5363** received millions of USDT from al-Law designated wallets (published by the NBCTF on May 2023). Binance also did not freeze the activity of the account after it was obvious it directly transacted with Hezbollah and IRGC designated addresses.

661. **Binance Account No. ***5363** also used the internal Binance transfer architecture – off the block chain, to send (and receive) crypto to (and from) other Binance users, including, *inter alia*, to his spouse – owner of **Binance Account No. ***3775**.

662. **Binance Accounts No. ***5363** and **No. ***3775** shared the same IP addresses to access their respective accounts with each other, as well as with **Binance Accounts No. ***9830**

127

**and No. \*\*\*9408**.

### 15. Binance Customer A-1

663.    A Tron wallet owned by **"Binance Customer A-1"** received USDT in a total amount equivalent to more than $28 million up until October 2025.

664.    The equivalent of more than $2 million in deposits into the account of **Binance Customer A-1** were made from only 3 other Tron addresses—all held by Hezbollah,[72] and associated with Tawfiq al-Law (SDGT).

665.    Even after these Hezbollah-affiliated addresses were designated by NBCTF, Binance continued to process the equivalent of hundreds of thousands of dollars for **Binance Customer A-1**'s account.

666.    For example, on June 13, 2023, **Binance Customer A-1** received the equivalent of more than $145,000 from a Hezbollah-affiliated **Tron Address \*\*\*gmJr**—an address that had been designated by NBCTF three weeks earlier.

667.    For 29 months after Binance was alerted to the fact that **Binance Customer A-1**'s account had received the equivalent of more than $2 million from Hezbollah addresses, it nevertheless continued to service the account.

### 16. Binance Customer A-2

668.    A Tron wallet owned by "**Binance Customer A-2**" received USDT in a total amount equivalent to more than $27 million up through October 2025.

669.    **Binance Customer A-2** received the equivalent of more than $2.3 million in deposits from three other Tron addresses associated with Tawfiq al-Law (SDGT) who was first designated by NBCTF in June 2023 (ASO 29/23).

---

[72]    All three addresses were subject to NBCTF Administrative Seizure Orders (ASO 29/23) on May 21, 2023.

670.    Even after the Hezbollah-affiliated addresses were designated by NBCTF, Binance continued to process the equivalent of millions of dollars for **Binance Customer A-2**.

671.    For more than two years after Binance was alerted to the fact that **Binance Customer A-2**'s account had received the equivalent of more than $2.3 million from Hezbollah-affiliated addresses, Binance nevertheless continued providing services and enabled the account to continue laundering cryptocurrency.

### 17. Binance Customer A-3

672.    A Tron wallet owned by "**Binance Customer A-3**" received USDT in a total amount equivalent to more than $10 million up through October 28, 2025.

673.    Nearly all deposits into **Binance Customer A-3**'s account were made from three other Tron addresses that were all designated by NBCTF on September 1, 2025, as property of IRGC and used to perpetrate severe crime (ASO 43/25).

### 18. Binance Customer A-4

674.    A Tron wallet owned by "**Binance Customer A-4**" received USDT in a total amount equivalent to more than $31 million up through October 22, 2025.

675.    The equivalent of $6.7 million in deposits were transferred into **Binance Customer A-4** from a single Tron address that has been reported to be part of Hezbollah and the IRGC-QF money laundering network.

676.    An equivalent of $2.6 million deposits arrived from two other Hezbollah designated wallets addresses associated with al-Law (NBCTF ASO 29/23).

677.    More than $713,000 arrived from another Hezbollah-IRGC-QF Tron associated address.

678.    For more than 29 months after Binance was alerted to the fact that **Binance**

**Customer A-4**'s account had received the equivalent of more than $2.6 million from Hezbollah addresses, it nevertheless continued to service the account.

### 19. Binance Account No. ***9830

679.    **Binance Account No. ***9830** was nominally registered by a then-26-year-old Venezuelan woman in April 2022. It was accessed from Venezuela, Brazil, and the United States.

680.    The named account holder resides in San Félix de Guayana, Bolivar, Venezuela and appears to operate a livestock/agriculture-related company in Roraima, Brazil, called Seu Humilde Vendedor, a/k/a Fazenda Amazônia Ltda ("Amazonia Farm" in English).

681.    She serves as a front for Hezbollah's gold smuggling network, and by May 2023, she had moved the U.S. dollar equivalent of $40 million in and out of the account and received the equivalent of over $6.7 million from the al-Law (SDGT) wallets.

682.    Then, on May 21, 2023, NBCTF designated al-Law for his role as a money launderer for the IRGC and Hezbollah. **Binance Account No. ***9830** suddenly received the equivalent of more than $116 million and transferred out more than $110 million—all of this after it was already clear she had previously received more than $6.7 million from al-Law, a money launderer for the IRGC and Hezbollah.

683.    **Binance Account No. ***9830** received off-chain transfers equivalent to more than $320,000 from Raed Abib Habib's **Binance Account No. ***6571**.

684.    **Binance Account No. ***9830** remained active in 2024.

685.    Over the lifespan of the account, **Binance Account No. ***9830** received deposit of cryptocurrency equivalent to more than $177 million with more than $50 million received off-chain from other Binance accounts and only appearing on Binance's internal ledger. Withdrawals in cryptocurrency totaled more than USDT 130 million with the equivalent of approximately $43

million transferred off-chain on Binance's internal ledger.

686.    Binance facilitated the off-ramping (the conversion of cryptocurrency to fiat currency) of the balance of the account—the equivalent of approximately $45.5 million—in fiat money (U.S. dollars through Bank of America, Zelle, and a Panamanian digital payment system called Zinli, Brazilian Real, Colombian Peso and Venezuelan Bolívar via the Pix Payment system, Banco De Venezuela, and Banco Colombia SA).

687.    From May 21, 2023, when al-Law was publicly identified as a terror financier for the IRGC and Hezbollah until August 2024, Binance assisted **Account No. \*\*\*9830** to double the number of deposits and increase withdrawals six-fold.

688.    In fact, between al-Law's designation and the October 7 Attacks, the account received the equivalent of more than $97 million and withdrew the equivalent of $38 million.

689.    During a six-week window of time in July-August 2023 (preceding the October 7 Attacks), **Binance Account No. \*\*\*9830** received the equivalent of $1.7 million (USDT) from BuyCash—a Gaza-based entity whose crypto wallet was first designated by NBCTF in June 2021 for assisting Hamas's Qassam Brigades (with the first transaction two months after al-Law's designation).[73]

690.    **Binance Account No. \*\*\*9830** is also linked to the IRGC through the U.S. designated Iranian money launderers, Derakhshan and Alivand (discussed below) and the Sa'id al-Jamal Network (discussed above).

691.    Alivand received the equivalent of more than $7 million from two Tron wallets.

---

[73]    BuyCash was designated an SDGT by the U.S. Department of the Treasury on October 18, 2023, "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Hamas." *See* Press Release, *Following Terrorist Attack on Israel, Treasury Sanctions Hamas Operatives and Financial Facilitators*, U.S. DEP'T OF TREAS. (Oct. 18, 2023), https://home.treasury.gov/news/press-releases/jy1816.

One of those Tron wallets sent the equivalent of more than $1.5 million to **Binance Account No. \*\*\*9830**. The other Tron wallet received the equivalent of $90,000 from **Binance Account No. \*\*\*9830**—demonstrating that **Binance Account No. \*\*\*9830** was part of the larger IRGC/Hezbollah money laundering ecosystem.

692.    Derakhshan received the equivalent of $350,000 from a Tron wallet that also sent the equivalent of more than $1.5 million to **Binance Account No. \*\*\*9830**.

693.    Sa'id al-Jamal's designated Tron wallet similarly received the equivalent of $1 million from another Tron wallet that sent **Binance Account No. \*\*\*9830** the equivalent of little more than $1 million.

694.    **Binance Account No. \*\*\*9830** was accessed, *inter alia,* from IP addresses that other Binance users transacting with the Hezbollah network used as well, such as **Binance Account Nos. \*\*\*3775, \*\*\*9210, \*\*\*6292, \*\*\*9885, \*\*\*9408 and \*\*\*5363**.

### 20. Binance Account No. \*\*\*7790

695.    **Binance Account No. \*\*\*7790** was opened in 2021, nominally by a Lebanese national with Brazilian identification using a Hotmail e-mail address.

696.    The account was accessed more than 200 times from Lebanon and more than 300 times from Hezbollah's South American money laundering hub, the notorious "Tri-Border Area," as well as from Brazil, Paraguay, Türkiye, and Qatar.

697.    Between 2022 and 2023, Binance received more than 200 cryptocurrency deposits into **Binance Account No. \*\*\*7790**, totaling more than $8 million in USDT, with an average deposit of over 35,000 and individual transactions ranging from hundreds of dollars to $200,000. This took place in less than a year.

698.    Notably, the account received the U.S. dollar equivalent of $1.5 million in

cryptocurrency transfers from Hezbollah "Super Facilitator" Tawfiq al-Law during a six-month period.[74]

699.    For example, **Binance Account No. ***7790** received four deposits totaling almost $180,000 during a three-day period directly from cryptocurrency **Address ***vpab**, controlled by al-Law.

700.    The final deposit from al-Law into this account was on May 15, 2023.

701.    Six days later, on May 21, 2023, NBCTF issued Administrative Seizure Order (ASO 29/23) identifying Tawfiq al-Law as affiliated with Hezbollah and a list of Binance accounts and wallet addresses as "containing cryptocurrencies used for the perpetration of a severe terror crime." Despite knowing about NBCTF's May 21, 2023 designation, Binance continued to process transactions for **Binance Account No. ***7790** resulting in the account withdrawing funds until October 20, 2023—both inside the platform (to other Binance customers) and to external wallets outside the platform.

702.    In total, **Binance Account No. ***7790** processed nearly $17.8 million in combined deposits and withdrawals in less than two years while receiving funds directly from a designated Hezbollah financier and exhibiting textbook money laundering patterns, including rapid deposit-to-withdrawal cycling of cryptocurrency through the account, with same-day deposits and withdrawals often involving hundreds of thousands of dollars.

703.    For example, on February 15, 2023, **Binance Account No. ***7790** received deposits of $376,970 and executed withdrawals of $352,625 *on the same day*—a 93% same-day turnover rate indicating funds deposited were being quickly moved to break audit trails.

---

[74]    For a discussion of the role played by Hezbollah's "super facilitators," *see, e.g.,* Matthew Levitt, *Attacking Hezbollah's Financial Network: Policy Options*, Wash. Inst. for Near E. Pol'y (June 8, 2017), https://www.washingtoninstitute.org/policy-analysis/attacking-hezbollahs-financial-network-policy-options.

704.    **Binance Account No. \*\*\*7790** exhibited multiple money laundering patterns, including the rapid cycling of transfer (with same-day deposits and withdrawals often involving the equivalent of hundreds of thousands of dollars), high-value transactions of sums equivalent to $50,000 or more, and minimal retention of account balances (maintaining a net balance of approximately $25,000 but processing the equivalent of almost $9 million through the account).

### C.    Other Examples of Designated IRGC Binance Customers

#### 1.  Ahmad Khatibi Aghada

705.    Ahmad Khatibi Aghada is an Iranian cybercriminal who served as managing director of Afkar System Yazd Company, an IRGC-affiliated cyber threat company that conducted ransomware operations targeting critical infrastructure on behalf of the IRGC.

706.    In September 2022, OFAC designated Mr. Aghada as an SDGT pursuant to Executive Order 13224, publicly identifying him as "an individual associated with the sanctioned Iranian Revolutionary Guard Corps (IRGC) that engaged in ransomware activities."[75]

707.    As part of Aghada's designation, OFAC listed three Bitcoin wallet addresses that Aghada had used to receive ransomware proceeds and conduct IRGC-affiliated financial operations:

- **Bitcoin Address \*\*\*RzgL**
- **Bitcoin Address \*\*\*ws6s**
- **Bitcoin Address \*\*\*8ngk.**

708.    Binance had processed cryptocurrency transactions for Aghada's designated wallet addresses through the Binance platform, enabling him to move IRGC ransomware proceeds through the international financial system.

709.    As FinCEN documented in its November 2023 Consent Order, Binance knowingly

---

[75]    Press Release, *Treasury Sanctions IRGC-Affiliated Cyber Actors for Roles in Ransomware Activity*, U.S. DEP'T OF TREAS. (Sept. 14, 2022), https://home.treasury.gov/news/press-releases/jy0948.

"processed several transactions with [convertible virtual currency] wallets associated with sanctioned entities and individuals, including … Ahmad Khatibi Aghada, an individual associated with the sanctioned Iranian Revolutionary Guard Corps (IRGC) that engaged in ransomware activities," yet "Binance failed to file SARs with FinCEN on any of these transactions, even after OFAC's designations."

710.    The FBI subsequently offered a reward of $10 million U.S. dollars for information leading to Aghada's arrest, reflecting the severity of his IRGC-affiliated ransomware operations that Binance had knowingly facilitated through its platform.

711.    Blockchain analysis firms documented that Aghada moved funds through Nobitex, Iran's largest cryptocurrency exchange, which then channeled those funds through Binance—establishing that Binance served as the critical international gateway enabling IRGC operatives like Aghada to convert Iranian-sourced ransomware proceeds into globally fungible cryptocurrency.

### 2.    Amir Hossein Nikaeen Ravari

712.    Amir Hossein Nikaeen Ravari is an Iranian cybercriminal who worked as an employee of IRGC-affiliated Afkar System from 2015 through 2019, conducting cyber operations on behalf of the IRGC alongside Aghada.

713.    In September 2022, OFAC designated Ravari in the same enforcement action that designated Aghada, identifying Ravari as an IRGC operative who "leased and registered network infrastructure used in furtherance of this malicious cyber group's activities and participated in compromising victims' networks."

714.    OFAC's designation identified four Bitcoin cryptocurrency wallet addresses that Ravari had used to receive payments for his IRGC ransomware operations, with blockchain records showing that these wallets had transacted through Binance.

135

715.   These designated Bitcoin wallet addresses are:

- **Bitcoin Address *** RzgL (used by both operatives)**
- **Bitcoin Address ***ws6s (Aghda)**
- **Bitcoin Address ***8ngk (Aghda)**
- **Bitcoin Address ***mwuc (Ravari)**
- **Bitcoin Address ***xzty (Ravari)**
- **Bitcoin Address ***ys3s (Ravari).**

716.   Chainalysis documented that these six Bitcoin addresses designated by OFAC in September 2022 sent the equivalent of over $230,000 in ransomware extortion proceeds directly to Nobitex (SDGT), establishing Nobitex as a documented recipient of proceeds from OFAC-designated cryptocurrency addresses.

717.   Binance knowingly processed transactions for Ravari's designated wallets but, as with Aghada, deliberately chose not to file SARs with FinCEN—even after OFAC's public designation identified these wallets as instruments of IRGC terrorist financing operations.

718.   Ravari's use of Binance to move IRGC ransomware proceeds demonstrates that Binance served as essential financial infrastructure for a coordinated IRGC cyber operations cell, knowingly enabling multiple designated terrorists to launder funds through its platform.

**D.     Nobitex Exchange Network**

**1.  Iranian sanctions evasion platform**

719.   Nobitex (website nobitex.ir), founded in 2017 by CEO Amirhosein Rad and headquartered in Tehran, operates as Iran's largest cryptocurrency exchange.

720.   By 2021, Nobitex claimed to support more than 11 million registered users and processed 70 percent of all Iranian cryptocurrency transactions.

721.   Nobitex serves as the primary Iranian platform for converting Iranian rials (the official currency of the Islamic Republic of Iran) into Bitcoin, Ethereum, USDT, and other

cryptocurrencies—functioning as what blockchain intelligence firm Elliptic described as "a critical piece of infrastructure within Iran's cross-border sanctions evasion apparatus."[76]

722. Nobitex's website explicitly instructed Iranian users on circumventing U.S. sanctions, advising customers to avoid "direct transfers" of cryptocurrency between Iranian and foreign platforms, recommending the use of Tron for anonymous trading, and identifying Binance as "the best option for Iranians."

723. Nobitex's main configuration file is named "**SANCTIONED_APIS_ PROXY.**" In other words, Nobitex's infrastructure assumed that its Iranian servers would have no direct internet access because Iranian IP addresses are blocked at the network layer by Western internet service providers as a consequence of U.S. sanctions.

724. To reach them, Nobitex sent every outbound request through an internal HTTP proxy (proxy.local:1100) that egressed from a non-Iranian network. The proxy variable was explicitly named SANCTIONED_APIS_PROXY, and Nobitex's withdrawal pipeline (WITHDRAW_PROXY) was turned on by default because of the same sanctions barrier.

725. As described above, on September 14, 2022, OFAC designated Aghada and Ravari—two IRGC-affiliated operatives responsible for distributing BitLocker ransomware and targeting critical infrastructure through the cyber threat-facilitating Afkar System Yazd Company.

726. OFAC's designation identified six cryptocurrency addresses through which both individuals sent over $110,000 U.S. dollars to Nobitex during 2022, documenting that IRGC operatives used Nobitex to monetize ransomware proceeds and fund critical infrastructure attacks.

---

[76] In 2025, according to TRM Labs, Nobitex handled approximately 87% of all Iranian-linked cryptocurrency transaction volume, roughly US $3 billion in that year alone. Chainalysis reports cumulative inflows exceeding $11 billion.

727.    TRM Labs and Elliptic subsequently documented direct on-chain transactions between Nobitex omnibus wallets and wallets controlled by Aghada and Ravari, establishing Nobitex's operational role as IRGC cryptocurrency processing infrastructure.

728.    On June 2, 2026, OFAC designated Nobitex an SDGT, finding that it "processed over 50 percent of all Iranian digital asset inflows in 2025 and has provided significant support to the Iranian regime. The company has facilitated a significant number of digital asset transactions linked to the IRGC… [and had] previous connection to the Central Bank of Iran…" According to the U.S. OFAC designated Nobitex "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, the IRGC."[77]

### 2.    Binance's $7.8 billion Nobitex transaction processing

729.    Between 2018 and November 2022, Binance processed approximately $7.8 billion in cryptocurrency transactions flowing between Binance and Nobitex—representing 97.5 percent of Binance's $8 billion total Iranian transaction volume during this period, according to *Reuters*'s investigation using blockchain data from Chainalysis.

730.    Approximately 75% of the $7.8 billion Binance-Nobitex transactions were denominated in Tron (TRX)—the cryptocurrency that Nobitex specifically recommended for anonymous trading to evade sanctions detection.

731.    Between April 2020 and November 2022, Binance and Nobitex processed more than 1.15 million direct transactions in Tron, establishing systematic high-volume processing through the cryptocurrency network Nobitex had identified as optimal for sanctions evasion.

---

[77]    Press Release, *Economic Fury Targets Iran's Largest Digital Asset Exchange for Terror Finance and Sanctions Evasion*, U.S. DEP'T OF TREAS. (June 2, 2026), https://home.treasury.gov/news/press-releases/sb0519.https://home.treasury.gov/news/press-releases/sb0519.

732.    Even after Binance announced in 2019 that it would voluntarily cut off Iranian transactions, Binance continued processing over $1 billion U.S. dollars in trades from Nobitex through 2022.

733.    Binance continued to process Nobitex trades despite the fact that Nobitex's public website openly instructed its Iranian customers to create "multiple digital wallets to facilitate funds movement in discrete stages" specifically to improve access to Binance's platform.

734.    Binance's sustained provision of liquidity, omnibus wallet integration, and Tron cryptocurrency processing gave Nobitex the transactional capacity to operate as Iran's largest cryptocurrency exchange, processing 70% of Iranian cryptocurrency transactions while serving as what blockchain intelligence firm Elliptic described as "a critical piece of infrastructure within Iran's cross-border sanctions evasion apparatus."[78]

### 3.   NBCTF designation and leaked Nobitex source code analysis

735.    On September 1, 2025, NBCTF designated 187 cryptocurrency wallet addresses as property of the IRGC "used for the perpetration of a severe terror crime."

736.    The designated wallets had collectively received $1.5 billion U.S. dollars in Tether's USDT stablecoin over time.

737.    TRM Labs and Elliptic documented that more than half of the 187 NBCTF-designated IRGC wallets were linked to Nobitex, establishing Nobitex's systematic operation as IRGC cryptocurrency infrastructure.

738.    Tether subsequently blacklisted 39 of the 187 addresses on September 13, 2025, freezing $1.5 million in USDT held in those wallets.

---

[78]    *See* Elliptic, Inside Nobitex: *How Iran's Largest Crypto Exchange Fuels Sanctions Evasion and Illicit Finance*, Elliptic Blog (June 30, 2025), https://www.elliptic.co/blog/inside-nobitex-how-irans-largest-crypto-exchange-fuels-sanctions-evasion-and-illicit-finance.

739.    In June 2025, the hacking group Gonjeshke Darande ("Predatory Sparrow") conducted a cyberattack on Nobitex, releasing Nobitex's complete source code through its Telegram channel.

740.    Blockchain intelligence firms TRM Labs, Elliptic, and Chainalysis subsequently analyzed the leaked materials.

741.    The Nobitex source code reveals that its trading platform relied solely on Binance IT infrastructure. For example, Nobitex's own market pricing engine depended on real-time Binance data. When Binance spot prices would become stale, Nobitex substituted Binance's futures prices — evidence of Nobitex's live, dependent integration with Binance rather than one-time data copying of Binance data.

742.    Nobitex also operated its own Binance Chain hot wallet, signed by a secret key file on the Nobitex production server:

```
core-2/core/exchange/base/connections.py
 142  class BinanceChainClient(HotWalletClient):
 143      hot_wallet_url = settings.BNB_JSONRPC_URL
 144      key_file_name  = 'bnb.key'
 145      client_name    = 'binance_chain'
```

### 4.  Nobitex's direct on-chain interactions with FTO wallets

743.    Nobitex serves as a key vehicle for the IRGC's financing of its proxy Foreign Terrorist Organizations, including Hamas.

744.    Chainalysis documented through on-chain analysis[79] that Nobitex "facilitated transactions with entities tied to Houthi and Hamas-affiliated networks as identified by the [NBCTF] of Israel," establishing Nobitex's systematic operation as terrorist financing infrastructure connecting Iranian state actors to designated FTOs.

---

[79]    On-chain analysis refers to the examination of publicly available data recorded on a blockchain (such as Bitcoin or Ethereum) to derive insights regarding transactional patterns, user behavior, and overall financial activity.

745.    Elliptic's blockchain forensic analysis identified direct on-chain interactions between Nobitex omnibus wallets and cryptocurrency addresses associated with:

- Hamas-affiliated wallets that NBCTF had designated as terrorist property
- PIJ wallets designated by NBCTF
- Houthi militant group (Ansarallah) cryptocurrency addresses
- OFAC-sanctioned pro-Hamas media outlet *Gaza Now* (SDGT)
- Pro-al-Qaeda propaganda channels, and sanctioned Russian cryptocurrency exchanges Garantex and Bitpapa.

746.    Elliptic published an Investigator graph depicting "a non-exhaustive selection of on-chain interactions between Nobitex and wallets associated with Hamas, the Palestinian Islamic Jihad and the Houthis," documenting direct blockchain transactions between Nobitex-controlled addresses and FTO-designated wallets.



747.    Elliptic's investigation identified ownership connections establishing that "relatives of the Supreme Leader Ali Khamenei and IRGC-linked business partners" were connected to Nobitex's ownership and operations, documenting the exchange's direct ties to Iran's highest political and military leadership.

748.     The ownership structure revealed that Nobitex functioned not merely as a commercial cryptocurrency exchange but also as state-controlled financial infrastructure operated by and for the benefit of the IRGC.

### 5.  Qatar–Nobitex database

749.     Nobitex maintained systematic customer databases for its Qatari cryptocurrency market.

750.     Qatar serves as the primary host for Hamas's political leadership and has provided billions in financial support to Hamas and other designated terrorist organizations, making Qatar–Iran cryptocurrency flows particularly significant for Hamas financing operations.

751.     Nobitex customers included more than 25,000 Qatar-connected individuals, including 10 Qatar government officials with official government email addresses (@gov.qa domains) spanning multiple ministries and 9 employees of four major Qatari banks.

752.     The Qatar government officials identified in the Nobitex database included personnel from Qatar's Ministry of Finance, Ministry of Energy (oil sector), Civil Aviation Authority, Primary Health Care Corporation, Ministry of Municipality and Environment, Ministry of Labor and Social Affairs, Supreme Council for Health, Ashghal (Public Works Authority), and Securities/Economic Council.

753.     Qatar Government Officials with Nobitex Accounts included:

| Name | Email Address | Mobile Number | Ministry/Agency |
|---|---|---|---|
| Alim Shan Abdulhai | ███@phcc.gov.qa | +974 3076 ██ | Primary Health Care Corporation |
| M. Khalaf | ███@ashghal.gov.qa | +974 3335 ██ | Ashghal (Public Works Authority) |
| Naseem Ahmed Rafiq | ███@mmaa.gov.qa | +974 4426 ██ | Ministry of Municipality & Environment |
| Abdulrahman | ███@ | +974 4455 ██ | Civil Aviation Authority |

| | | | |
|---|---|---|---|
| Ahmed Abu Baker | caa.gov.qa | | |
| A. Abedli | ███@mlsa.gov.qa | +974 4468 ██ | Ministry of Labor & Social Affairs |
| Abdullah Allangawi | ███@sch.gov.qa | +974 5513 ██ | Supreme Council for Health |
| A. Taan | ███@sec.gov.qa | +974 5527 ██ | Securities/Economic Council |
| Shaikha Almannai | ███@mof.gov.qa | +974 5584 ██ | Ministry of Finance |
| Muneera Almesaifri | ███@adlsa.gov.qa | +974 6666 ██ | Ministry of Labor & Social Affairs |
| Pervez Akhtar Sharif | ███@mme.gov.qa | +974 7799 ██ | Ministry of Energy (Oil & Gas) |

754.    Qatar Bank Employees with Nobitex Accounts included:

| Name | Email Address | Phone Number | Bank |
|---|---|---|---|
| Sultan Al-Qarata | ███@qnb.com.qa | +974 3318 ██ | Qatar National Bank |
| Hamad Al-Shahri | ███@cbq.com.qa | +974 5549 ██ | Commercial Bank of Qatar |
| Jamla Mubarak al Khayareen | ███@qnb.com | +974 5551 ██ | Qatar National Bank |
| Hadi Bou Khuzam | ███@cbq.com.qa | +974 5574 ██ | Commercial Bank of Qatar |
| Syed Rashid Mahdi | ███@cbq.com.qa | +974 5580 ██ | Commercial Bank of Qatar |
| Mohamed El Sharkawy | ███@ahlibank.com.qa | +974 5584 ██ | Ahli Bank Qatar |
| John Hackwood | ███@dohabank.com.qa | +974 6634 ██ | Doha Bank[80] |
| Ahmed Al-Moaaz | ███@dohabank.com.qa | +974 6657 ██ | Doha Bank |
| Laurence Black | ███@standardbank.com | +974 4330 ██ | Standard Bank |

[80]    In April 2009, FinCEN and the Office of the Comptroller of the Currency ("OCC") imposed a $5 million fine on Doha Bank's New York branch for "fail[ing] to file suspicious activity reports (SARs) more than 500 times" involving "transactions potentially tied to terrorism." FinCEN's enforcement order documented that Doha Bank "filed 610 late suspicious activity reports involving suspicious transactions totaling approximately $7.4 billion," with the bank having "processed a substantial volume of funds transfers that should have been identified as suspicious transactions including transactions involving entities with potential connections to terrorist financing and/or in jurisdictions that posed heightened risk of terrorist financing."

755. The presence of Qatar Ministry of Finance and Ministry of Energy officials in Nobitex's customer database—alongside Qatar bank employees from major financial institutions including Ahli Bank Qatar, Doha Bank, Qatar National Bank, and Commercial Bank of Qatar—suggests that the IRGC-controlled exchange served as institutional infrastructure for Qatar-Iran financial flows.

756. This created a cryptocurrency financing network in which Qatari banks and government entities provided entry points, IRGC-controlled Nobitex served as the intermediary sanctions evasion mechanism, and Binance provided the international liquidity and reach necessary to sustain the system—as evidenced by the $7.8 billion in transactions between Nobitex and Binance.

757. The use of Nobitex by Qatari government officials, bank employees, and tens of thousands of Qatari cryptocurrency transactions enabled the IRGC to identify potential intermediaries for sanctions evasion. Without Binance's systematic processing of Nobitex transactions—including over $1 billion U.S. dollars processed *after* September 2022 when OFAC designated IRGC operatives who used Nobitex for ransomware operations—this institutional terrorist financing infrastructure could not have operated at organizational scale.

### 6. Binance's Knowledge and Deliberate Maintenance of Nobitex Relationship

758. As described above, Binance and Binance's senior management were aware of and celebrated Binance's integration with Nobitex and its popularity among Iranian users.

759. Despite OFAC's September 2022 designation of IRGC-affiliated operatives who used Nobitex for ransomware operations, and despite Binance's 2019 announcement that it would cut off Iranian transactions, Binance continued processing over $1 billion U.S. dollars in Nobitex trades through 2022.

760. Binance made a deliberate decision to service Iran's cryptocurrency market through its largest exchange even after learning that IRGC operatives were using Nobitex to fund ransomware operations and critical infrastructure attacks.

761. Thus, although Nobitex itself was first designated an SDGT in June 2026, for many years prior to the designation Binance already knew that Nobitex was using its platform to support the IRGC, including through specific crypto wallets and specific transactions, but affirmatively decided to continue actively assisting both Nobitex and the IRGC to evade U.S. sanctions in the months and years leading up to the October 7 Attacks.

**E.    IranVisaCart**

762. IranVisaCart is an Iran-based illicit cryptocurrency service that maintained multiple accounts on Binance's platform, using Binance as the international exchange gateway for Iranian customers seeking to evade sanctions and move funds out of Iran.

763. Binance's compliance personnel identified IranVisaCart's accounts and their use in suspicious Iran-related transactions as early as 2019, yet Binance deliberately chose not to file SARs with FinCEN or take any action to freeze their assets or off-board these accounts.

764. As FinCEN documented in its November 2023 Consent Order, "IranVisaCart, and other illicit actors maintained accounts with Binance, taking advantage of Binance's policies surrounding opening multiple accounts with weak or no KYC," and critically, "Binance was made aware of these accounts and the related illicit transactions as early as 2019, and filed no SARs with FinCEN."

765. Binance's deliberate decision not to report IranVisaCart despite having actual knowledge of the accounts' illicit Iranian activities since 2019 demonstrates a pattern of knowingly retaining Iranian customers engaged in sanctions evasion rather than reporting them to authorities as required by U.S. law.

145

766.    IranVisaCart's ability to maintain multiple Binance accounts for years after being flagged by Binance's own compliance personnel illustrates how Binance's AML/CFT program was deliberately structured to attract criminal users, assisting sanctioned-jurisdiction customers to continue operating even after internal identification.

### F.    Alireza Derakhshan & Arash Estaki Alivand Network

767.    Alireza Derakhshan and Arash Estaki Alivand operated a sophisticated cryptocurrency-based sanctions evasion network that facilitated the purchase of over $100 million U.S. dollars in cryptocurrency for Iranian government oil sales between 2023 and 2025, directly benefiting Iran's IRGC-QF and Ministry of Defense.

768.    In September 2025, OFAC designated both Derakhshan and Alivand, along with multiple front companies they controlled, for "facilitat[ing] the purchase of over $100 million worth of cryptocurrency for oil sales for the Iranian government" and for working directly with previously designated Hezbollah financial facilitator Tawfiq Muhammad Sa'id al-Law.[81]

769.    OFAC also designated five wallets (three belonging to Alivand and two belonging to Derakhshan) that received the equivalent of over $25 million from Binance accounts and sent the equivalent of more than $8 million to other Binance accounts.

770.    As described above, Derakhshan and Alivand were also linked via intermediary Tron wallets to Raed Habib's gold smuggling network through several Tron wallets that transferred the equivalent of millions of dollars to Binance accounts such as Mohamad Okdi's **Binance Account No. \*\*\*9408** and **Binance Account No. \*\*\*9830**.

771.    The Derakhshan–Alivand network utilized a complex web of front companies in Hong Kong, UAE, and other jurisdictions to obscure the Iranian government's beneficial

---

[81]    Press Release, *Treasury Targets Financial Network Supporting Iran's Military*, U.S. DEP'T OF TREAS. (Sept. 16, 2025), https://home.treasury.gov/news/press-releases/sb0248.

ownership of cryptocurrency transactions, with the designated cryptocurrency wallet addresses showing "over $600 million in total inflows" according to blockchain analysis firm Chainalysis.

772.    Alivand specifically "conducted cryptocurrency transfers on behalf of the Al-Qatirji Company"—a Syrian conglomerate that OFAC designated in November 2024 for materially assisting the IRGC–QF—establishing that this network served as a critical financial conduit channeling hundreds of millions of dollars from Iranian oil sales to IRGC terrorist financing operations.

773.    The U.S. Department of Treasury identified this network as part of Iran's "shadow banking" infrastructure that "abuse[s] the international financial system, and evade[s] sanctions by laundering money through overseas front companies and cryptocurrency," with Binance' platform serving as the essential international exchange enabling this shadow banking system to function.

774.    The Derakhshan–Alivand network's $100 million in cryptocurrency purchases for Iranian oil proceeds and their work with designated Hezbollah financier al-Law demonstrates that Binance's platform functioned as critical infrastructure connecting multiple nodes of IRGC–QF terrorist financing—enabling Iranian regime oil revenues to flow through cryptocurrency to Hezbollah and other designated terrorist organizations where it was ultimately used to facilitate terrorist attacks.

### G.    NBCTF's September 2025 Designation of IRGC Wallets

775.    In September 2025, NBCTF designated a list of 187 cryptocurrency wallet addresses that Israeli intelligence had identified as linked to Iran's IRGC, documenting that these IRGC-controlled wallets had collectively received approximately $1.5 billion U.S. dollars in Tether's USDT stablecoin.[82]

---

[82]    Nat'l Bureau for Counter Terror Fin., Administrative Seizure Order 43/25 (Isr. Sept. 1, 2025),

776.    Israel's designation identified these wallets as part of the IRGC's systematic use of cryptocurrency to evade international sanctions and finance terrorist operations, with the wallet addresses representing active IRGC cryptocurrency holdings at the time of designation.

777.    Blockchain analysis of these 187 designated wallets shows that many had conducted transactions through Binance's platform, utilizing Binance as the international exchange for converting between different cryptocurrencies and moving funds across borders while evading traditional banking system scrutiny.

778.    The scale of IRGC cryptocurrency holdings identified by Israel—$1.5 billion in Tether's USDT stablecoin across 187 wallets—demonstrates that Iran's use of cryptocurrency for sanctions evasion and terrorist financing has become a multi-billion-dollar operation,[83] with Binance serving as essential infrastructure facilitating this operation.

779.    NBCTF's September 2025 designation of these wallets and its call to cryptocurrency platforms—including Binance—to freeze them illustrates that Binance has been repeatedly notified by Israeli authorities about specific IRGC-linked accounts, yet Binance has systematically prioritized retention of this lucrative IRGC business over compliance with international counter-terrorism efforts.

**H.    To This Day, Binance Continues to Knowingly and Willingly Assist the IRGC**

    **1.    Binance Knowingly Facilitates Accounts Directly Linked to Iran's Central Bank (SDGT)**

780.    Notwithstanding the atrocities committed by the Iranian proxy groups Hamas and

---

https://nbctf.mod.gov.il/he/Announcements/Documents/%D7%A6%D7%AA%2043-25.pdf.

[83]    *See* Tom Robinson, *Israel Links Crypto Wallets That Received $1.5 Billion to Iran's Revolutionary Guard,* ELLIPTIC ENTERPRISES LTD (Sept. 14, 2025), https://www.elliptic.co/blog/israel-links-crypto-wallets-handling-billions-to-irans-revolutionary-guard; *Israel Claims Iran's Revolutionary Guard Holds $1.5B in Stablecoins,* Coindesk (Sept. 15, 2025), https://www.coindesk.com/business/2025/09/16/israel-claims-iran-s-revolutionary-guard-holds-usd1-5b-in-stablecoins.

PIJ on October 7, 2023, and its November 2023 plea agreement and paying more than $4 billion in fines, Binance has continued to knowingly assist the IRGC to launder cryptocurrency through its platform.

781.    Beginning on February 28, 2026, the United States and Israel engaged in a brief military conflict with Iran which began when the U.S. and Israel launched airstrikes on Iran, targeting military and government sites. That too appears not to have influenced Binance's approach – other than recognition that its conduct was once again under greater scrutiny.

782.    As part of U.S. efforts to combat continuing Iranian malign influence, on April 24, 2026, the U.S. Treasury Department (through OFAC) froze a **Tron wallet address ****ZH81** with the equivalent of over $200 million deposited in USDT.

783.    The Tron Wallet belongs to the Central Bank of Iran (Bank Markazi) which was designated an SDGT in 2019.

784.    The U.S. Treasury Department found that "Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hezbollah."[84]

785.    Treasury further noted:

> Since at least 2016, the IRGC-QF has received the vast majority of its foreign currency from the CBI and senior CBI officials have worked directly with the IRGC-QF to facilitate CBI's financial support to the IRGC-QF. In 2017, the IRGC-QF oversaw the transfer of tens of millions of euros to Iraq from the CBI…. During 2018 and early 2019, the CBI facilitated the transfer of several billion of U.S. dollars and euros to the IRGC-QF and hundreds of millions to MODAFL [Iran's Ministry of Defense and Armed Forces Logistics] from the NDF [National Development Fund of Iran]. Additionally, millions were to be transferred to the Houthis. CBI has also coordinated with the IRGC-QF to transfer funds to Hezbollah. OFAC is designating the CBI today for having materially assisted, sponsored, or provided financial, material, or

---

[84]    Press Release, *Treasury Sanctions Iran's Central Bank and National Development Fund*, U.S. DEP'T OF TREAS. (Sept. 20, 2019), https://home.treasury.gov/news/press-releases/sm780.

technological support for, or goods or services to, the IRGC-QF and Hezbollah.

786.   **Tron address ****ZH81** sent funds *only* to two Binance wallets.

787.   These Binance accounts also received the equivalent of $10 million from a single un-hosted **Tron address **** AicT**.

788.    Four days after OFAC froze **Tron address ****ZH81**, Binance sent 150 TRX to the un-hosted **Tron address **** AicT** clearly associated with the frozen CBI wallet that enabled this Tron Address to start sending USDT back into Binance as of May 1, 2026.

789.   Given Binance's internal review procedures and technological capabilities, its compliance team almost certainly identified **Tron address ****ZH81** almost immediately as an illicit Iranian wallet, yet chose to assist its terror financing customers (which were all of the Binance accounts that transacted with the CBI Tron Address ***ZH81) to continue using the platform.

790.   But even had Binance somehow overlooked **Tron address ****ZH81** before OFAC froze it on April 24, 2026, it would automatically have been alerted that two of its customers were linked to this wallet and it would have immediately understood that one of its customers was directly connected to **Tron address **** AicT** because it was sending TRX to the wallet; however, it permitted its platform to be used for this purpose.[85]

791.   Binance also contributed more than 20% of the TRX **Tron address ****AicT** received during the wallet's duration.

---

[85]    TRX is the only currency accepted by the Tron blockchain to pay for transactions. The transfer of TRX which is used almost exclusively to "gas" or fund the operation of Tron addresses indicates a close relationship between a wallet sending TRX and the wallet receiving it.

792. Iran's central bank moved at least $107 million in cryptocurrency through a series of transactions into Binance accounts.

793. Foreign law-enforcement agencies recorded approximately $260 million in direct transactions during 2024 and 2025 alone between Binance accounts and digital wallets associated with Iranian terrorist financiers and sanctioned Iranian entities.

### 2. Binance Knowingly Facilitated Payments to the IRGC Through Zedcex | Zedxion | Babak Zanjani

794. In the 2000s, Babak Zanjani founded the Sorinet Group of companies, which spanned Iran, Malaysia, Tajikistan, Türkiye and was used to facilitate oil sales for the Iranian government.

795. In 2013, the U.S. government first sanctioned Babak Zanjani for using a Malaysian bank to help the Iranian government move billions of dollars and evade U.S. sanctions.

796. That same year, the Iranian regime imprisoned him on corruption charges for alleged embezzlement of $2.2 billion, then sentenced him to death.

797. In 2016, sanctions on Zanjani were lifted as part of the U.S.-Iran nuclear deal.

798. Due to his expertise at sanctions evasion, despite falling afoul of the Iranian regime, Zanjani proved too valuable to kill or imprison.

799. The Iranian regime commuted Zanjani's death sentence in 2024 but he appears to have resumed his money laundering operations at least three years earlier and released from prison as far back as 2019.

800. OFAC later described Babak Morteza Zanjani, as "a criminal Iranian investor who previously embezzled billions of dollars in Iranian oil revenue that rightfully belonged to the Iranian people and was never fully recovered. Freed from imprisonment in order to launder money

151

for the regime, Zanjani has provided financial backing for major projects that support the Islamic Revolutionary Guard Corps (IRGC) and the Iranian regime more broadly."

801. Zanjani registered Zedxion Limited in London from May 17, 2021 to May 11, 2022. It then became Zedxion Exchange LTD. He officially resigned from the company in August 2022, but retained control of both Zedxion Exchange and its sister company, Zedcex (as described below).

802. Zedcex is a British private limited company registered on August 8, 2022. It is registered to the same address in London as Zedxion Exchange LTD.[86]

803. Both crypto exchanges have filed paperwork to Companies House in London every year since then, claiming to be dormant.

804. The listed CEO of Zedxion LTD (since August 2022) and director of Zedcex, is listed as "Elizabeth Newman," identified as a national of the island nation of Dominica.

805. A promotional video features a person identified as Ms. Newman and British corporate records identify a middle-aged woman with correspondence addresses in the Caribbean, London's Covent Garden neighborhood and Dubai, but the Elizabeth Newman listed in the corporate filings of Zedxion and Zedcex does not appear to exist.

806. An OCCRP investigation has discovered that the on-line images of Newman are actually those of a stock-footage model and there is no evidence of a physical person corresponding to the Elizabeth Newman described in corporate filings.

807. Although both Zedxion and Zedcex were officially listed as dormant, according to *The Wall Street Journal*, since their establishment, funds from illicit Iranian oil sales have transited

---

[86]   UK corporate filings revealed that the two entities functioned as a single enterprise rather than independent exchanges, with coordinated timing of incorporation and management changes.

into Zedcex through banks in Türkiye, then flowed into among other repositories Zedcex's Dubai subsidiary's **Binance Account No. \*\*\*6529**.

808. According to the same published reports, Binance's own Internal Compliance Reports ("ICRs") found that Zedcex transferred the equivalent of approximately $830 million in total transactions across 2024 and 2025 (including deposits and withdrawals), through a series of interconnected Binance accounts controlled by Zedcex and Babak Zanjani.[87]

809. Binance's own investigators concluded the related Zedcex accounts at Binance constituted an illicit money laundering network developed to finance the Iranian regime, but as set forth herein, Zedcex's money laundering activities and connections to the IRGC were evident from the moment the accounts were registered by Zanjani's strawmen.

810. As with Blessed Trust, discussed below, Binance's compliance team also flagged in their ICRs the fact that Zanjani's sister, romantic partner, and a director of one of Zanjani's companies all maintained additional Binance accounts that were accessed from the same devices— a pattern the Binance investigators identified as evidence the group was evading U.S. sanctions on Iran and concealing the true controlling interest in the accounts.

811. As described below, Zedcex's Dubai subsidiary's Binance account was accessed repeatedly from Tehran, beginning in February 23, 2023.

812. Late in 2024, Binance's compliance team finally detected that Zedcex's account was being repeatedly accessed from Tehran, triggering a belated internal alert.

813. However, even then, after multiple internal flags were identified by Binance's compliance team, Binance continued to process transactions for Zedcex's main account in Dubai for more than 15 months and was open as of January 2026, according to Binance's own internal

---

[87] There were at least 87 on-chain deposits from designated Zedcex addresses into Binance accounts in 2024-2025 totaling the equivalent of more than $8.3 million.

reports.

814.    On September 1, 2025, NBCTF identified 187 USDT wallets belonging to the IRGC, including several Zedcex addresses that were later designated by OFAC.

815.    In November 2025 device access from Tehran by Zedcex's account triggered yet another internal alert – two months *after* NBCTF publicly linked Zedcex to the IRGC.

816.    According to *The Wall Street Journal*, Zanjani's network of companies executed their last transaction on the Binance platform in December 2025.

817.    On January 30, 2026, OFAC sanctioned Zedcex Exchange Ltd, Zedxion Exchange Ltd, and Iranian sanctions-evasion financier Babak Morteza Zanjani, designating them as SDGTs.[88]

818.    Binance's compliance investigators reportedly filed internal reports recommending the Zedcex-linked accounts be removed from Binance and reported to authorities.

819.    *The Wall Street Journal* reported that TRM Labs even approached Binance executives to propose a joint investigation into Iranian central bank funds and share findings with U.S. authorities; Binance declined to participate.

820.    Overall, Zedcex and Zedxion Babak Zanjani's two UK-registered cryptocurrency platforms facilitated the flow of approximately $1 billion in funds linked to the IRGC.[89]

---

[88]    Press Release, *Treasury Sanctions Iranian Regime Officials for Violent Repression and Corruption U.S.*, DEP'T OF TREAS. (Jan. 30, 2026), https://home.treasury.gov/news/press-releases/sb0375; OFAC, Iran-related Designations; Counter Terrorism Designations; Non-Proliferation Designation Update and Designation Removal (Jan. 30, 2026), https://ofac.treasury.gov/recent-actions/20260130.

[89]    In 2025, IRGC-linked flows declined to approximately $410.4 million, while activity through non-IRGC-linked Zedcex addresses increased, reducing the IRGC share to about 48%. *See How Two UK-registered Companies Moved Over a Billion in Stablecoins for the IRGC,* TRM Labs, https://www.trmlabs.com/resources/blog/how-two-uk-registered-companies-moved-over-a-billion-in-stablecoins-for-the-irgc.

821.    A Zedcex account also received the equivalent of $2 million from "Entity A" (described below), a cluster of Tron wallets controlled by the IRGC that was largely funded by various Chinese front companies.

822.    The U.S. government found that: "Since its registration in August 2022, Zedcex has processed over $94 billion in transactions. When Zedxion was registered in May 2021, it initially listed Zanjani as its director. Multiple Zedcex and Zedxion-attributed addresses have processed funds for wallets linked to the IRGC."

823.    In late 2024, the equivalent of more than $10 million in USDT was transferred from a wallet attributable to both Zedcex infrastructure and IRGC-linked entities to addresses associated with the Sa'id Ahmad Muhammad al-Jamal Network.

824.    OFAC-designated Zedcex **Tron Address \*\*\*vmEx** alone received 19 deposits totaling the equivalent of more than $20 million in USDT from Binance wallets.

825.    OFAC-designated Zedcex **Tron Address \*\*\*UroE** alone received 17 deposits totaling the equivalent of more than $6.4 million in USDT from Binance wallets.

826.    OFAC-designated Zedcex **Tron Address \*\*\*vSNa** alone received 59 deposits totaling the equivalent of more than $680,000 in USDT from Binance wallets.

827.    In sum, the contents of Binance's own ICRs demonstrated a consistent pattern of the company's senior leadership assisting IRGC-related accounts to transfer vast sums of cryptocurrency knowing precisely that it was actively facilitating terrorism financing. Even after internal alerts from its compliance team and law-enforcement agencies inquiries made it untenable to ignore Zedcex's IRGC funding activities, Binance stalled for as long as it could before belatedly and reluctantly acting – conduct consistent with Binance's special treatment for many of its other FTO-affiliated customers.

### a. Binance Account ***6529 (Zedcex's Dubai subsidiary)

828.    **Binance Account No. ***6529** belonged to Zedcex Exchange, a U.S. designated SDGT. The email address registered for the operation of the account was ███@zedxdmcc.com.

829.    The KYC documentation included the passport of an individual by the name - Sukhrob M. Oimakhmadov, issued by the Republic of Tajikistan – the same documentation Mr. Oimakhmadov used to register his "personal" **Binance Account ***8320** (discussed below).

830.    The account was registered on January 13, 2023 and started its transactional and trading activity in February, 2023. From February 23, 2023 through November 2025, the account was repeatedly accessed from Tehran, Iran.[90]

831.    In fact, 99.99% of all deposits, withdrawals and Fiat transactions executed by the account, occurred **after** February 23, 2023 when **Binance Account No. ***6529** was first recorded as accessed from Tehran – a glaring red flag that it was (at a minimum) engaged in sanctions evasion.

832.    Moreover, Binance reached its settlement agreement with the U.S. government on November 21, 2023. The equivalent of more than $110 million was deposited and transferred in and out of **Binance Account No. ***6529** after the date of the settlement even though it was clearly operating from Iran – conduct at the center of the criminal charges that were resolved by the plea agreement. It was also trading heavily in USDT – a stablecoin redeemable at a fixed rate of 1:1 with the U.S. dollar and backed by U.S. treasury bonds held by Tether – thereby accessing the U.S. financial system.

833.    Un-hosted Tron addresses responsible for the majority of funds deposited into

---

[90]    In addition to operating the account from Teheran, **Binance Account No. ***6529** was also accessed from UAE, Bulgaria, Singapore, the United Kingdom, Japan, Australia, Germany, Ireland, Canada and Boardman and Hillsboro (OR) in the U.S.

156

**Binance Account No. \*\*\*6529** - equivalent of tens of millions of dollars – were designated by NBCTF on September 1, 2025, but Binance still let the account deposit the equivalent of $600,000 on October 9, 2025 to its associated Tron Address and additional equivalent of more than $2.6 million to its associated BSC Address between September 6 and November 3, 2025. Moreover, Binance continued to support the activity of the account, facilitating the withdrawal of an equivalent of almost $3.3 million after the NBCTF designation of practically all addresses that deposited into **Binance Account No. \*\*\*6529**.[91]

834.    **Binance Account No. \*\*\*6529** had special status with Binance – with unique permissions and upgraded features allowing it to operate a) sub-account; and - b) a customized API with Binance[92] – meaning it had programmatic access to parts of Binance's code that allowed it to integrate its activities with Binance, receive live market data, execute trades, track portfolios, automate strategies – through Binance.

835.    At the same, time **Binance Account No. \*\*\*6529** (belonging to Zedcex Exchange) received the equivalent of more than $56 million via 84 deposits from February 2023 until October 2025, with more than $36 million of those deposits originating from eight Tron addresses controlled by the IRGC and designated by NBCTF on September 1, 2025.[93]

836.    **Binance Account No. \*\*\*6529** also made 168 transfers out the account totaling

---

[91]    The equivalent of more than $1.6 million was transferred to Zedcex **Tron Address \*\*\*HEsi** and almost $1 million was sent via intermediary accounts to other Zedcex and IRGC addresses.

[92]    "API" stands for Application Programming Interface, which is a software intermediary that allows two different applications to communicate and share data with each other. **Binance Account No. \*\*\*6529** enjoyed a custom, account-specific API connection tied to that account and recorded under the API name "ZEDCEX."

That configuration – not available to ordinary retail customers who download an API from Binance's website - included a defined permission rule governing what the connection was authorized to do and two pre-registered IP addresses comprising a "whitelist" limiting the connection to designated, approved locations in Hong Kong and Singapore.

[93]    The equivalent of more than $35 million originated from five Tron Addresses designated by NBCTF as IRGC wallets – addresses **\*\*\*nRDD**, **\*\*\*eKuU**, **\*\*\*WHNX**, **\*\*\*LuM9**, **\*\*\*6FmM**.

the equivalent of more than $56.3 million.[94]

837.  That included **Binance Account No. \*\*\*6529** sending the equivalent of more than $20 million to Tron Address \*\*\*vmEx, designated on September 1, 2025 by the NBCTF as an IRGC address and by OFAC on January 2026 as a Zedcex address. **Binance Account No. \*\*\*6529** also sent equivalent of more than $1.6 million to Zedcex **Tron Address \*\*\*HEsi**.

838.  **Binance Account \*\*\*6529** also sent an equivalent of $4 million to **Tron Address \*\*\*6Rps,** which has direct exposure to the IRGC's **Tron Address \*\*\*eKuU**.

839.  **Tron Address \*\*\*6Rps** sent the equivalent of $9 million to the IRGC's **Tron Address \*\*\*eKuU**.

840.  Nine attempts to withdraw funds were initially rejected by Binance's automated systems as "withdrawReject-sanction-vip" but all were immediately approved within minutes once redirected to an alternative beneficiary – eight of those transactions coming **after** most of the counterparties who made deposits into the account were designated by NBCTF on September 1, 2025.

841.  Binance investigators themselves noted that Zedcex's **Binance Account \*\*\*6529** was accessed from devices shared by other Binance Accounts, including **Binance Accounts Nos.: \*\*\*1131** (Solmaz Bani),[95] **\*\*\*6518** (Solmaz Bani), **\*\*\*0932** (Solmaz Bani), **\*\*\*4210** (Solmaz Bani), **\*\*\*9429, \*\*\*9068** (BZ Diamonds)[96] – all closely related to Zedcex, Babak Zanjani and his

---

[94]  In addition to its crypto transfers, the account also purchased and sold fiat currency - mainly Emirati Dirham (equivalent of $1,455,300) but also some Turkish Lira (equivalent of $119,000) and on one occasion EUR. For its fiat currency transactions **Binance Account No. \*\*\*6529** used bank accounts held with Emirati and Turkish banks, using the following account names: Zedpay Digital Software System; ZEDX DMCC; BZ Group and Solmaz Bani.

[95]  Bani is likely an alias for Babek Zanjani using the name or nickname of his romantic partner, a former model known as Niyoosha Bani, Sara Bani or "Niu Niu."

[96]  BZ Diamond is a Dubai based jeweler that claims to be the first business in Dubai to produce lab grown diamonds (CVD). The nominal owner of BZ Diamonds is Bahareh Zanjani. Two other directors are listed for BZ Diamonds Ltd: Babak Morteza (Zanjani) and Solmaz Bani. Sukhrob Oimakhmadov listed himself as the Executive Director of BZ Diamonds on his LinkedIn profile. https://www.linkedin.com/in/sukhrob-oimakhmadov-3a835327/

(romantic) partner.

842. **Binance Account ***6529** also used a BSC (Binance Smart Chain – Binance's own network) deposit address hosted under its Binance Account.

843. Prior to the NBCTF designation of many of **Binance Account ***6529**'s counterparties on September 1, 2025 - the BSC deposit address was rarely used but between September 6, 2025 and November 3, 2025, that BSC address received the equivalent of more than $2.6 million in eight transactions. Only Binance knew that the BSC and public Tron addresses controlled by Zedcex belonged to the same customer - **Binance Account ***6529**.

844. As discussed below, in January 2026 OFAC designated seven Tron addresses belonging to Zedcex Exchange.

845. Three out of those seven Zedcex Exchange addresses designated by OFAC contributed the equivalent of more than $6.1 million to **Binance Account ***6529** – and all three were previously designated on September 1, 2025, by NBCTF.

### b. Binance Account ***8320 (Oimakhmadov - Zedcex)

846. **Binance Account No. ***8320** was registered in November 2020 as a "personal" account by Sukhrob Oimakhmadov, a citizen of the Republic of Tajikistan (and later ZEDCEX executive).

847. **Binance Account No. ***8320** was accessed on multiple occasions from Russia, the United Kingdom, the UAE, Latvia, Tajikistan, Romania, Uganda, Portugal, South Africa, Singapore and once from Dallas (TX).

848. According to the KYC information submitted, Mr. Oimakhmadov's source of income was listed as "Trading" and he marked "Investment" as the account's purpose. He also listed his net assets in Emirati Dirham as AED 600,000 (equivalent to less than US $180,000) and

159

the yearly expected trade cycle as AED 500,000-5,000,000 (equivalent to $137,000 - $1,370,000).

849.    However, the account received deposits exceeding the equivalent of $10 million within its 31 months of activity and transferred out the equivalent of more than $10 million.

850.    More than 95% of the deposited funds received by **Binance Account No. \*\*\*8320** originated from IRGC sources, including $9.6 million from a single **Tron Address \*\*\*6FmM** designated by the NBCTF as an IRGC wallet.

851.    Transfers followed a similar pattern with the equivalent of more than $2.3 million sent directly to **Tron Address \*\*\*Kf5Z which, in turn** sent the equivalent of $2 million to a later IRGC designated **Tron Address \*\*\*YsAu**. Other counter parties of Tron Address \*\*\*Kf5Z included Bitpin.ir and Wallex.ir (both SDN as of June 2026 and knowingly operated for years from a sanctioned jurisdiction) and other known Iranian Virtual Assets Service Providers.

852.    Similarly, **Binance Account No. \*\*\*8320** transferred the equivalent of more than $2.5 million to **Tron Address \*\*\*Aetf,** a central IRGC node that connected the operations of Zedcex, "Entity A" (discussed below) and IRGC operational level.[97]

853.    **Binance Account No. \*\*\*8320** also transferred funds to **Tron Address \*\*\*L8qs** which sent the equivalent of $26 million to Garantex (SDN).

854.    Although **Binance Account No. \*\*\*8320** was self-evidently associated with the IRGC and engaged in terrorism financing, Binance nevertheless enabled the activities of related Binance accounts on its platform. For example, **Binance Account No. \*\*\*8320** sent the equivalent of $30,000 off-chain to **Binance Account \*\*\*0582** but was permitted to operate as of March 2026.

---

[97]    **Tron Address \*\*\*Aetf** received the equivalent of $700,000 from Alireza Darekhsan's address \*\*\*6ojz (later designated by OFAC). It also received equivalent of more than $90 million **Tron Address \*\*\*78wW** described below as Wallet 4 within "Entity A" and received a total equivalent to more than $45 million and received the equivalent of $14.5 million from four different IRGC addresses – \*\*\*uRxX, \*\*\*CFp7, \*\*\*Yns6 and \*\*\*6jhT – all designated by the NBCTF on September 1, 2025. **Tron Address \*\*\*Aetf** also received the equivalent of $30 million from a single Zedcex **Tron Address \*\*\*vSNa**.

Similarly, **Binance Account No. ***8320** sent the equivalent of $10,000 off-chain to **Binance Account ***3467** but it was still operating as of April 2026.

### 3. Binance Knowingly Facilitated Chinese Payments to the IRGC Through Blessed Trust and Hexa Whale

#### a. Blessed Trust and Blessed Services

855.    Between November 2024 and August 2025 Binance processed $1.2 billion in transfers from a VIP customer called Blessed Trust to an IRGC-linked network Binance later termed "**Entity A,**"[98] with nearly half of the funds flowing through two Chinese Binance customers who were Binance VIPs.[99]

856.    Blessed Trust was initially a Hong Kong-registered company, registered in November 2023 as a trust company under section 78 of the Hong Kong Trustee Ordinance.

857.    According to documents reviewed by *The New York Times*, Blessed Trust served as "a vendor for Binance and operated a trading account on the exchange."

858.    *Fortune Magazine* reported on March 12, 2026 that Blessed Trust was "a Hong Kong-based business that helps firms convert crypto funds to fiat, and that also performed back-office tasks such as payroll and taxes for Binance."

859.    A spokesperson for Blessed Trust told *The Wall Street Journal* that the company "operated in accordance with laws and regulatory requirements, and carried out sanctions-screening procedures and appropriate compliance and risk management controls."

860.    Yet, Blessed Trust's corporate filings tell a very different story – one wholly incompatible with Binance's purported know-your-business diligence, operational onboarding and

---

[98]    Entity A consisted of at least seven Tron wallets, at least one them also linked to a Binance account held by Zedcex.

[99]    Blessed Trust is closely linked to another entity called Blessed Services. They are referred to here as Binance customers, but as noted, may in fact be accounts controlled by Binance itself. According to *Fortune*, Blessed Trust "performed back-office tasks such as payroll and taxes for Binance."

internal controls. A normal asset manager or trust business (as Blessed Trust was presented) would show paid-in capital, stable directors, auditable bank balances, records of the client or custody assets it claims to manage, a visible operating footprint, and clean ownership.

861.    Blessed Trust's filings do not match the business described in published reports or its own (limited) public statements.

862.    Its audited accounts show HK$3 million of stated share capital offset by HK$3 million due from shareholders.[100]

863.    The accounts record no audited evidence of client assets, trust assets, custody balances or fiduciary liabilities. The company was funded through director loans rather than paid-in capital. Its audited accounts for the year ending March 31, 2025 record no audited evidence of client assets, trust assets, custody balances or fiduciary liabilities.

864.    It booked HK$5,585,683 in "asset-management service fees" against total assets of about HK$7 million, with at least $1.2 billion flowing through Blessed Trust to the IRGC network discussed below. A company that recorded well under $1 million in fees and recorded no client assets is not consistent with a commercial entity moving a billion dollars for its clients.

865.    On June 2, 2024, all five identified shareholders of the company transferred their full 600,000-share blocks to five offshore companies. Two of these companies were BVI-registered vehicles, MYBT Inc. (BVI No. 2148659) and Turboo Studio Inc. (BVI No. 2148660) that were incorporated on May 21, 2024 with consecutive numbers and the same sole director, Qilong Zheng, with the same Tortola agent address.

---

[100]    Blessed Trust's audited accounts show that its owners never paid for their shares. The company funded itself through director loans rather than paid-in capital.

866. Another 20% of Blessed Trust's shares went to a company listed as registered in the Cayman Islands but the Cayman registry has no company registered under the alternate spellings of its name.

867. Two different audit firms qualified Blessed Trust's accounts in consecutive years. Righteous CPA and Company handled the audit for the reporting year ending March 31, 2024 but subsequently resigned; the founding director resigned the next day.

868. For the reporting year ending March 31, 2025, Wilson C.P.A. Limited reported that it could not verify HK$4.05 million of the company's HK$7.05 million in total assets, including bank balances and restricted cash. The auditor could not confirm approximately 57% of the assets on the balance sheet.

869. Blessed Trust's primary website itself provides a Binance sign-in, with the same feature provisioned across a family of related sites run by a single operator: blessedtrust.com, blesstrust.com, yunhuichain.com, unitedcustody.com, eon-pay.com, wallets-trust.com, and blessedtrading.net.

870. The site tells its own users that the login is official Binance authorization.

871. In both Chinese and English, the login instructs users to "[s]ign in with your Binance account to quickly register and log in to the system."

872. Users who choose the Binance sign-in option are authenticated by Binance and have their Blessed Trust account bound to a Binance account at the moment of registration.

873. Both on its face and embedded in its technical infrastructure, Blessed Trust's primary website indicates it is an official, sanctioned Binance integration and structurally *every* Blessed Trust account is linked to a Binance account.

874. Binance's own published rules state that this type of sign-in feature is offered only to close business partners and tell Binance informs applicants that the feature is only provided to close ecosystem partners.

875. According to Binance, to obtain the sign-in function evident on Blessed Trust's website, a company must open a verified business account with Binance, which calls for company information, identity documents, the business controller's identification, a certificate of incorporation and an operating license, followed by manual approval.[101]

876. Yet, despite clear evidence that Blessed Trust acted as a close partner or that it "operated a trading account on the exchange," Binance deliberately ignored the documentation required by its own stated "know-your-business" due diligence policies and gave Blessed Trust "highly restricted" VIP status. This required special approval from Internal Audit—whose leader reported directly to CEO Richard Teng. Moreover, in labeling Blessed Trust's Binance account as "internal," the company effectively confirmed that Blessed Trust was not an arms-length customer that simply registered on the platform – it was an instrument through which Binance knowingly laundered more than a billion dollars to the IRGC.

877. A trading account belonging to Blessed Trust's director, Qilong Zheng, and one controlled by a group of Binance employees had both been accessed from the same electronic device, according to Binance's own ICR.

878. According to *The Wall Street Journal*: "In the exchange's internal systems, accounts belonging to Mr. Zheng and Blessed Trust were marked with a note: 'Don't block. Internal accounts.'"

---

[101] The feature traces to "Sign in with Binance", launched in September 2022 in private beta with a few partners and available by request only.

879. Despite the account's unique approval requirements and relationship with senior management, Binance has claimed the "internal" label on Blessed Trust was a mistake.

880. Binance has denied allegations that it operated Blessed Trust's accounts, despite the fact that Binance employees logged directly into Blessed Trust trading accounts, including a login from the same device as an account operated by one of the teams of Jukai He ("Rock"), a Binance founding member who leads its fiat business.

881. Internal Binance communications identified Blessed Trust's account manager as "Karry…friend of Rock" and "the big shot" whom "Boss Rock has mentioned before," indicating high-level protection. Blessed Services, an entity closely tied to Blessed Trust, shared device access with the two VIP accounts at Binance. The first VIP was a 38-year-old Chinese woman and the other was a 79-year-old Chinese national named Wu Jintu.

882. Both VIP accounts of the 38-year-old Chinese woman and the 79-year-old Chinese national named Wu Jintu were accessed from the *same device*, suggesting a single actor or third-party entity controlled both accounts.

883. The 38-year-old Binance VIP sent the equivalent of nearly $200 million in USDT to an intermediary wallet, which then sent the funds to Entity A between November 13 and December 31, 2024.

884. The 79-year-old Wu Jintu's account was used to send the equivalent of $439 million in USDT to Entity A, with more than $300 million dollars deposited into that same account coming from Blessed Trust.

885. Wu Jintu was a decade long business partner of an individual named Wu Junliang, whose company Porchoen Trade Pte. has its business address listed to a luxury villa in Singapore that is also listed as the business address for Blessed Trust.

886.    In 2024, the U.S. Department of Commerce added a Hong Kong address used by another firm Porchoen 2014 Co., to an export-restriction list. Six companies registered at the address were found to be at risk of violating sanctions against Iran.

887.    Binance did not take any action to investigate Wu Jintu's account or the account of the 38-year-old Binance VIP until a law enforcement agency in the Seychelles submitted a request to Binance on August 11, 2025, concerning "a serious case involving terrorism financing."

888.    Blessed Trust told *The Wall Street Journal* that "it operated in accordance with laws and regulatory requirements and carried out sanctions-screening procedures and appropriate compliance and risk management controls."

889.    It also stated that it "doesn't provide services to sanctioned jurisdictions or sanctioned persons and doesn't knowingly maintain business relationships with sanctioned entities."

890.    Binance's investigators found that Blessed Trust had transferred more than $1 billion in USDT to the IRGC-run Entity A network between November 2024 and August 2025, directly or through other Binance account holders.

891.    The investigators referred to the accounts collectively as the "Chinese Nexus."

#### b.  Hexa Whale

892.    Hexa Whale Trading is an entity registered in Hong Kong in 2024.

893.    According to an investigation by *The Wall Street Journal*, Hexa Whale provided Binance with false documentation when it initially opened its account, which was flagged internally at the time: "Hexa Whale was allowed to open its Binance account and move hundreds of millions of dollars, even after providing the exchange with a fraudulent bank statement that was flagged at the time, according to [Binance internal documents]."

894. Despite the false documentation and internal flagging, Binance elevated Hexa Whale to VIP status and its compliance team was not alerted - highlighting the degree to which Binance restricts access to crucial AML data, keeping it from its compliance team *years after it 2023 plea agreement*.

895. Binance investigators were also told by an Israeli official that Hexa Whale was financing Iran-backed terrorist organizations such as the Houthis. Hexa Whale transferred $500 million worth of USDT to seven wallets linked to Entity A over several months in 2024, i.e., after Binance's guilty plea and agreement to compliance review by an outside monitor.

### c. Mohsen Fahad and the Iranian Connection

896. Two other Iran linked Binance customers belatedly raised concern amongst Binance's internal investigators.

897. The two customers again highlight the fact that Binance's KYC screening remains largely perfunctory.

898. The first account was opened in 2021 by Binance and belonged to a 44-year-old Iranian national named Mohsen Fahad who presented Binance with a Dominica ID listing Iran as his birthplace.

899. As noted by Binance's internal investigators, Fahad's name appeared in a 2020 UN Security Council Report on a gold-and-cash smuggling network for Iran and North Korea. He appears to be a gold trader who helped Iran settle its balance of payments with North Korea in gold.

900. The second account was also opened in 2021 and was for a 37-year-old with an Iraqi ID listing Iran as birthplace.

901.    In 2024, both Iranian-linked accounts sent the equivalent of $100 to **Entity A**, using TRX which is the only currency accepted by the Tron blockchain to pay for transactions. The transfer of TRX which is used almost exclusively to "gas" or fund the operation of Tron addresses indicates a close relationship between these two Iranian Binance customers and Entity A.

### d.  Entity A

902.    **Entity A** is a group of at least seven Tron wallets addresses linked to an Iranian network outside of Binance.

903.    According to *The Wall Street Journal*, law enforcement officials have identified Entity A as part of an IRGC shadow-banking corridor run between Hong Kong and Tehran which helps Chinese companies to illegally purchase Iranian oil.

904.    Binance investigators submitted the report with their findings to Binance's internal Criminal Conduct Committee, chaired by Chief Compliance Officer Noah Perlman.

905.    Over the course of its investigation, Binance investigators found **Entity A** had received $1.7 billion from businesses and individuals who held Binance accounts.

906.    **Entity A** subsequently sent a portion of those funds to Nobitex and to wallets linked to designated terrorist groups like the IRGC.[102]

907.    According to published reports, Binance compliance staff were unable to access crucial data during their investigation of Entity A and the various Binance customers linked to this network.

---

[102]    Leo Schwartz & Ben Weiss, *Inside the Binance Accounts Internal Investigators Say Helped Transfer More Than $1 Billion to Iran-Linked Entities: A 79-Year-Old VIP Chinese Trader and a Suspected Iranian Gold Smuggler*, Fortune (Mar. 12, 2026), https://fortune.com/2026/03/12/binance-accounts-iranian-entities-sanctions-chinese-vips-gold-smuggler/.

168

908.    Binance's investigators shared their findings with Binance's leadership, including Chief Executive Richard Teng and Chief Compliance Officer Noah Perlman (a successor to Binance's first CCO, Samuel Lim), in October 2025.

909.    On November 13, 2025, Binance suspended the main investigator who researched Blessed Trust and a second person, the head of sanctions and counter-terrorist financing investigations, and fired them in the following weeks.

910.    According to *The Wall Street Journal*, on November 24, 2025, other members of the investigations team told a Binance executive they would continue to investigate Blessed Trust and two days later, they were "locked out of Binance's systems, suspended—and fired soon after."

911.    Binance has publicly stated that at the conclusion of its internal investigation, it duly responded to law enforcement inquiries and that its firing of multiple compliance staff members was unrelated to the Blessed Trust | Hexa Whale | Entity A investigation.

912.    Binance denied that the employees were let go for raising compliance concerns and said in a blog post that some left "after an internal review found breaches of company data-protection and confidentiality guidelines."

913.    This likely refers to the fact that "$1.1 billion … from a major regulated stablecoin issuer" flowed into Binance for Blessed Trust. This matches transactions between Binance and Circle wallet ***54cd hosted on Ethereum. To the extent that Binance investigators may have reached out to Circle to gain insights into Binance's *own* customer(s), this purported "breach of company data-protection and confidentiality guidelines" only highlights the degree to which Binance restricts access to its core data, keeping it from its compliance team *years after its 2023 plea agreement*.

914.    Binance claimed that it directly exchanged only $110,000 with four major Iranian crypto exchanges in 2025 – requiring the word "directly" carry the weight of that assertion – knowing in detail that its own internal investigators were well aware that networks like Entity A use intermediary wallets to transact with Iranian exchanges.

915.    A simplified representation of the flow of funds to Entity A is set forth below:



916.    A key IRGC node – **Tron Address \*\*\*Aetf** – received the equivalent of more than $90 million from one of the addresses that constitute "Entity A" – **Tron Address \*\*\*78wW** (referred to here as Wallet 4).

### I.    Binance Knowingly and Willingly Assisted Hamas

917.    Since at least early 2019, Hamas's Qassam Brigades has used cryptocurrency as a fundraising method to support its terror operations.

918.    In January 2019, a spokesman for the Qassam Brigades announced on the group's official Telegram channel that its supporters should use Bitcoin to finance "the resistance," stating:

The Zionist enemy combats the resistance [i.e., Hamas] by attempting to

170

stop the support [it receives] by any means, but the supporters of the resistance in the entire world are fighting these Zionist's attempts and are seeking to find all possible means to support it... We call upon all supporters of the resistance and aides of our just cause to support the resistance financially through Bitcoin using mechanisms that we will soon publish.

919.    Hamas specifically publicized its use of Binance.

920.    A video published on the Qassam Brigades' website in 2019 (soliciting donations), provided a public explanation of cryptocurrency and how it could be used for donations, advising viewers to "create a new account on one of the trading platforms" in order to deposit donations.[103]

921.    Notably, one of the crypto platforms shown was Binance, as reflected in the screenshot below of a donation page on the Qassam Brigades' website (archived on June 6, 2019):



*Figure 1: Screenshot of archived video tutorial instructing users to create accounts on one of the trading platforms.*

922.    On January 31, 2019, the Qassam Brigades' public Telegram channel published a poster soliciting donations to the **Bitcoin Address *\*\*\*Nj3y***. The address was also published by

---

[103]    *See* MEMRI, *Hamas Military Wing Al-Qassam Brigades Releases Video of How to Send Secure Donations via Bitcoin*, MEMRI CJ Lab (Mar. 26, 2019), https://www.memri.org/cjlab/hamas-military-wing-al-qassam-brigades-releases-video-of-how-to-send-secure-donations-via-bitcoin; Al-Qassam Brigades Funding Page, archived at https://web.archive.org/web/20190606050636/http://fund.alqassam.ps/0 (last visited Nov. 17, 2025).

the official website of Hamas's Political Bureau – Palinfo,[104] the Hezbollah satellite network *al-Manar*,[105] and other Palestinian news websites, both in English and in Arabic.[106] Thus, this cryptocurrency address was published and openly associated with Hamas but Binance allowed its customers to send money directly to this Qassam Brigades address.

923.   In February 2019, the Israeli business publication *Globes* reported that Hamas had "received donations from wallets of U.S. trading platforms from Bittrex and Coinbase, ***from Binance … wallets*** ..." (Emphasis added.)

924.   That same month, an Israeli blockchain analysis group, Whitestream, flagged on Twitter (now X) that Binance was involved in Hamas's crypto donation chain:



*Figure 2: Screenshot of Whitestream's February 16, 2019, tweet flagging Hamas's*

---

[104]   *QB Reveals Way to Send Bitcoin Support for Palestinian Resistance*, Palestinian Info. Ctr. (Feb. 1, 2019), https://english.palinfo.com/o_post/QB-reveals-way-to-send-Bitcoin-support-for-Palestinian-resistance/.

[105]   *Al-Qassam Brigades Announces Start of Receiving Financial Support for the Resistance in Bitcoin* [in Arabic], *Al-Manar* (Feb. 1, 2019), https://www.almanar.com.lb/4816011.

[106]   *Al-Qassam Brigades Announces Start of Receiving Financial Support in Bitcoin* [in Arabic], Quds Net News Agency (Jan. 31, 2019), https://qudsnet.com/post/441254; *Al-Qassam Brigades Announces How to Receive Financial Support via Bitcoin* [in Arabic], Zamn Press (Feb. 1, 2019), http://zamnpress.com/news/122251; *"Al-Qassam" Announces Start of Receiving Support in Bitcoin* [in Arabic], Palestine Now (Jan. 31, 2019), https://paltimeps.ps/post/216024; Khadr Abd al-Aal, *"Abu Obeida" Announces Start of Receiving Support for the Resistance via Bitcoin* [in Arabic], Palestine Online (Jan. 31, 2019), https://felesteen.news/post/41605; "Hamas Calls on Supporters to Donate to Group in Bitcoin" Bloomberg (January 30, 2019), www.bloomberg.com/news/articles/2019-01-30/hamas-calls-on-supporters-to-donate-to-group-in-bitcoin; "Hamas calls for supporters to send bitcoins" Al Jazeera (January 30, 2019), https://www.aljazeera.com/economy/2019/1/30/hamas-calls-for-supporters-to-send-bitcoins.

*cryptocurrency fundraising campaign on Twitter*.[107]

925.    The Hamas bitcoin fundraising campaign that started in early 2019 was dismantled by the U.S. Department of Justice by August 2020. The investigation revealed that the money raised during the 2019 al-Qassam bitcoin fundraising campaign was used for "violent causes," as the Qassam Brigades had boasted.[108]

926.    The campaign organized by the Qassam Brigades throughout 2019 was covered extensively in the media and it was addressed in DOJ's public enforcement actions in 2020. At the same time, in April 2019, Binance received reports from its third-party service provider identifying Hamas-associated transactions and filed no Suspicious Activity Reports (SARs) with FinCEN.[109]

927.    Following a July 2021 seizure of crypto wallets by the Israeli government, the blockchain analysis firm Elliptic (which Binance "partnered" with for AML and counter terror financing compliance) published a report outlining the seized wallets, noting that Hamas used a variety of crypto assets including Dogecoin, Ether, and Tether—all available on the Binance exchange.

928.    In September 2021, Coinbase (a U.S. based cryptocurrency exchange and a business competitor of Binance), published a report noting an escalation in Hamas's cryptocurrency fundraising efforts.

---

[107]    Whitestream-Blockchain Intelligence (@whitestream5), X (Feb. 16, 2019, https://x.com/whitestream5/status/1096886501898633218.

[108]    Press Release, *Global Disruption of Three Terror Finance Cyber-Enabled Campaigns*, U.S. DEP'T OF JUSTICE (Aug. 13, 2020), https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns.

[109]    *In re Binance Holdings Ltd., Binance (Servs.) Holdings Ltd., & Binance Holdings (IE) Ltd.*, No. 2023-04, Consent Order Imposing Civil Money Penalty (Fin. Crimes Enf't Network Nov. 21, 2023), https://www.fincen.gov/sites/default/files/enforcement_action/2023-11-21/FinCEN_Consent_Order_2023-04_FINAL508.pdf. On October 10, 2023, Binance's website publicly acknowledged that in 2019 "the military arm of Hamas, Izz ad-Din al-Qassam Brigades (AQB), initiated one of the most complex terrorism funding campaigns using Bitcoin."

173

929.    Coinbase concluded the report by pledging to "take three critical steps" to minimize the ability of Hamas and other insurgent groups to use crypto:[110]

1. Blocklist[111] any crypto addresses associated with such organizations to prevent users from sending funds to them.

2. Leverage Coinbase Analytics to detect wider terror organization campaign efforts and identify possible participants and accessories.

3. Coordinate with law enforcement and regulatory agencies, such as FinCEN, the FBI, and others.

930.    Binance, however, deliberately chose not to take any of these steps.

931.    In August 2023, Elliptic found that "major terrorist groups such as al-Qaeda, Hamas's al-Qassam Brigades and the Islamic State have been using crypto assets for an ever-growing range of objectives"—that is, not just public fundraising, but also sanctions evasion, cybercrime, extortion, investment trading, and internal value transfers.

932.    Elliptic identified wallets, including Hamas-affiliated wallets, receiving proceeds from sources including stolen credit card vendors, dark web markets, Ponzi schemes, and crypto investment scams.

### 1. Dubai [Money] Company for Exchange ("Dubai Co.") / al-Kahira Exchange

933.    Dubai Co. is a Gaza-based currency exchange and money services business that operates on behalf of Hamas.

934.    It provides Hamas with currency conversion, remittance services, and cryptocurrency exchange capabilities—including the ability to convert between fiat currency and digital assets such as Bitcoin, Tether (USDT), and other cryptocurrencies.

---

[110]    Coinbase, *An Overview of the Use of Cryptocurrencies in Terrorist Financing*, Coinbase Blog (Sept. 21, 2021), https://www.coinbase.com/blog/an-overview-of-the-use-of-cryptocurrencies-in-terrorist-financing.

[111]    A crypto term equivalent to "blacklist." *See* Elliptic, Blocklists, https://www.elliptic.co/platform/blocklists (last visited Nov. 17, 2025).

935.    Dubai Co. maintained dozens of cryptocurrency accounts on the Binance exchange platform, which it used to facilitate digital asset transactions for Hamas and to transfer funds internationally through blockchain networks.

936.    On March 7, 2022, NBCTF designated Dubai Co. as a terrorist organization, finding that it was:

> [A]n exchange platform located in the Gaza Strip and has for years been a significant part of Hamas' economic infrastructure for laundering and transferring capital from sources of funding abroad to Hamas in the West Bank and Gaza Strip. Khader Dan—who is the owner and manager of the exchange, is a prominent money exchanger in the service of Hamas and is a key figure in Hamas' economic infrastructure.[112]

937.    According to NBCTF, Khader Dan (a/k/a Elden) operated Dubai Co. and al-Kahira Exchange in coordination with his brother who lived in Türkiye for years.[113]

938.    NBCTF documented that "[o]ver the past few years they have been involved in transferring millions of dollars to Hamas through money laundering offenses, systematically evading law enforcement, and circumventing the international banking system."

939.    Khader Dan's affiliation with Hamas was publicly documented on his personal Facebook page, which was openly accessible. For example, in April 2014, he posted the image below.[114]

---

[112]    *See* Nat'l Bureau for Counter Terror Fin., *Designation No. 377 - Dubai Co. for Exchange* (Isr.), https://nbctf.mod.gov.il/he/Announcements/Documents/Designation%20No.%20377%20-%20DUBAI%20Co.%20forExchange(2).pdf (updated June 4, 2022).

[113]    The families' names are transliterated from Arabic with different spellings in English.

[114]    https://www.facebook.com/photo/?fbid=685844554797964&set=ecnf.100001172723481.

175



"We are the Resistance"

940.    He also praised the deceased Qassam Brigades senior leader Ahmed al-Jaabari in a post featuring photos of the car he was in when it was struck by a missile.[115]

941.    Khaldoun al-Dan is the owner of al-Kahira exchange in Istanbul which was designated by Israel on December 3, 2025 as the alter-ego or successor of Dubai Co.[116]

942.    According to the designation, the Al-Kahira Exchange Company, operating in Türkiye and the Gaza Strip, has been used in recent years by Hamas and PIJ to transfer funds for terrorist activities. The company is linked to the declared terrorist organization Dubai Exchange and Money Transfer Company (declared a terrorist organization by Israel on March 7, 2022), and is managed by the same owners.

---

[115]    https://www.facebook.com/permalink.php?story_fbid=pfbid0B2ndaWNy6duKicsQEYJq3A14JAKFQXFW2P64NaySWKjx8jec9S9VD8WqhL3ND8Ybl&id=100001172723481.

[116]    Its Gaza branch shares an address and phone numbers with Dubai Money Exchange.

176

943.    According to the IDF, the al-Kahira company "transferred funds to terrorist organizations in the Gaza Strip, including Hamas' military wing." It indicated that a building belonging to the al-Kahira company in Deir al-Balah, Gaza served "as a central part of the infrastructure used to store large amounts of funds to terrorist organizations in the Gaza Strip, as well as to carry out terror activities."

944.    To provide broader context, between 2018 and 2022, Iranian firms and IRGC-affiliated entities used the Tron blockchain network to conduct cryptocurrency transactions worth $8 billion U.S. dollars, leading NBCTF to identify and seize 56 Tron wallet addresses that it determined were linked to Hamas terror financing operations.

945.    Of these 56 Hamas-linked Tron wallets identified and seized by NBCTF, 46 wallets (82%) were **directly connected to Dubai Co.'s money laundering network**, establishing Dubai Co. as a primary cryptocurrency exchange facilitating Hamas's use of the Tron blockchain for terrorist financing.

946.    As noted above, Binance facilitated cryptocurrency transactions worth at least $22 million U.S. dollars between Dubai Co. and Binance accounts in the years leading up to October 7, 2023. Dubai Co. received the equivalent of more than $12 million from Binance customer accounts and sent the equivalent of more than $10 million to Binance customer accounts.

947.    The value of Dubai Co. cryptocurrency transactions through Binance increased significantly *after* October 7. The cryptocurrency transaction flow was worth at least $26 million U.S. dollars, with Dubai Co. sending the equivalent of more than $15 million to Binance customer accounts and receiving the equivalent of more than $11 million from Binance customer accounts.

948.    On January 26, 2025, NBCTF designated 46 additional Binance accounts affiliated with Dubai Company for Exchange, a/k/a al-Kahira Exchange.

949.    On May 22, 2025, the NBCTF designated 11 more Binance accounts and a list of 95 USDT crypto wallets that were the property of Dubai Company for Exchange, a/k/a al Kahira Exchange in Istanbul, Türkiye, further confirming that Binance's assistance to Hamas through Dubai Company for Exchange, a/k/a al Kahira Exchange persisted long after October 7, 2023.

### a.    Binance Account No. ***5869

950.    Khaldoun al-Dan's **Binance Account No. ***5869** was designated by NBCTF on November 1, 2023.

951.    **Binance Account No. ***5869** received the equivalent of $1,000 from **Binance Account No. ***6281** (which was part of Hamas's Shamlakh network) and five days later, sent the equivalent of $50,000 in return from this same account.

952.    **Binance Account No. ***5869** sent **Binance Account No. ***7729** (which was part of Hamas's Shamlakh network) the equivalent of $672,000 in 24 transfers and received from that account the equivalent of $139,000 in 6 deposits.

953.    **Binance Account No. ***5869** received the equivalent of $395,222 in eight transactions from **Binance Account No. ***9055** (Fayez Alkhazendar, part of the Shamlakh network mentioned below), to whom **Binance Account No. ***5869** also transferred the equivalent of $20,000.

954.    Once NBCTF designated his two brothers' Binance accounts under ASO 79/21 on December 29, 2021 (as well as **Binance Account No. ***9055**) for being used for perpetration of severe terror offenses and had already transferred the equivalent of more than $1.1 million, Binance unmistakably knew that **Binance Account No. ***5869** was (and had always been) engaged in terrorism financing.

955.    Nevertheless, Binance chose to support the account for at least an additional *six*

*months*, receiving the equivalent of more than $190,000 on-chain (and probably much more off-chain) from, among others, the infamous **BuyCash Wallet \*\*\*zt5t** on February 21, 2022 and six deposits totaling the equivalent of more than $100,000 from a **Tron Address \*\*\*foQF** affiliated with PIJ.

### b.  Binance Account No. \*\*\*3866 (Khaled A. S. Alhaddad)

956.    Khaled A. S. Alhaddad registered **Binance Account No. \*\*\*3866** which was designated by NBCTF on April 23, 2023.

957.    **Binance Account No. \*\*\*3866** received approximately $33,000 in USDT from a Dubai Co. Tron address, **Tron Address \*\*\*GUdC**, already designated almost a year earlier on March 7, 2022.

958.    **Nevertheless, despite this glaring red flag, over the next full year** Alhaddad's **Binance Account No. \*\*\*3866** continued to trade extensively, including receiving approximately $80,000 in USDT from an address later designated by NBCTF on July 4, 2023 (ASO 34/23) as property of PIJ (that sent BuyCash more than $1.5 million and also transacted with **Binance Account No. \*\*\*3382**, discussed below).[117]

### c.  Binance Account No. \*\*\*6645 (Ayman Z. M. Albarbari)

959.    Ayman Z. M. Albarbari registered **Binance Account No. \*\*\*6645** which was designated by NBCTF on April 23, 2023.

960.    Between October and December 2021, Albarbari's account received the equivalent of more than $550,000.00 from a Dubai Co. address[118] which was designated by NBCTF on March 7, 2022 (ASO 15/22).

---

[117]    Administrative Seizure Order 34/23, Anti-Terrorism Law 5776-2016 (Isr. Ministry of Defense, July 4, 2023), https://nbctf.mod.gov.il/he/PropertyPerceptions/Documents/%d7%a6%d7%aa%2034-23.pdf.    (Address: DAegnxRRBVuRFJ1tkpmignshcu12nfoQF) (last visited Jun. 5, 2026).

[118]    **TRX address \*\*\*cME5**.

961.    **Binance Account No. \*\*\*6645** also received the equivalent of $96,000 from another Dubai Co. address[119] which was designated by NBCTF on March 7, 2022 (ASO 15/22).

962.    Yet the account was permitted to continue operating for a full year, and until three months after NBCTF's March 7, 2022, designations, Binance processed transactions for **Binance Account No. \*\*\*6645** totaling the equivalent of $30,000 from a PIJ address that traded extensively with other BuyCash, Dubai Co., PIJ, and Hezbollah wallets.

### 2.    Buy Cash Money and Money Transfer Company ("BuyCash")

963.    Since 2014, BuyCash operated as a Gaza-based remittance company, currency exchanger, money transfer service, and electronic payment processor that served as a critical financial node for channeling funds to Hamas operations in Gaza, a significant portion of it originating from an IRGC-Hezbollah network of cryptocurrency accounts.

964.    BuyCash and its owner, Ahmed M. M. Alaqad, who is also based in Gaza, were designated for providing material support to Hamas on October 18, 2023.[120]

965.    The U.S. Treasury Department found that "[i]n addition to involvement in Hamas fundraising, Buy Cash has also been used to transfers funds by affiliates in other terrorist groups" and designated it an SDGT for "having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Hamas."

---

[119]    **Tron Address \*\*\*GUdC** sent the equivalent of approximately $600,000 to Dubai Co., BuyCash and other wallets associated with Hezbollah and PIJ and also received the equivalent of more than $1.6 million from them.

[120]    Press Release, *Following Terrorist Attack on Israel, Treasury Sanctions Hamas Operatives and Financial Facilitators,* U.S. DEP'T OF TREAS. (Oct. 18, 2023), https://home.treasury.gov/news/press-releases /jy18_16 #:~: text=WASHINGTON%20%E2%80%94%20Today%2C%20the%20U.S.%20Department,T%C3%BCrkiye%2 C%20Algeria%2C%20and%20Qatar.

966.    As noted above, BuyCash received the equivalent of more than $22 million from Binance wallets prior to the October 7 Attacks and sent more than $218 million to Binance customers prior to the October 7 Attacks.

967.    The temporal pattern of these BuyCash-to-Binance transfers shows marked concentration immediately preceding the October 7 Attacks: the largest of these individual transactions, ranging from $150,000 to $230,000 U.S. dollars, occurred during July, August, and September 2023.

968.    After October 7, 2023, the pace and value of cryptocurrency transaction between BuyCash and Binance declined to the equivalent of approximately $1.3 million.

969.    Examples of BuyCash accounts linked to Hamas include:

**Binance Account No. ***1098:**
BuyCash marketed its money transfer services through the website buy-cash.com and various social media platforms. The buy-cash.com website listed buycash0@gmail.com as an official contact email address. Binance's records show that a closely related address—buycash222@gmail.com— was used to register **Binance Account No. ***1098**, which Defendants opened under the name Ahmed Y.A. Abughali and funded through Abughali's U.S. bank account.

Between April 2018 and January 2022, Binance processed transactions through Abughali's **Binance Account No. ***1098** that received cryptocurrency with the aggregate value of approximately $145,680 U.S. dollars from a BuyCash-controlled address. OFAC's October 18, 2023, designation order specifically identified this BuyCash address as "a wallet that has been used to facilitate the transfer of virtual currency in support of known affiliates supporting terrorism financiers."[121]

**Binance Account No. ***0091:**
That same email address (buycash222@gmail.com) was used to register a second Binance account, **Binance Account No. ***0091**, which Binance opened under the name Nirmeen Kimal Hasni Mousa. This account used the identical mobile telephone number that Abughali had listed as BuyCash's contact number for **Binance Account No. ***1098**.

---

[121]    **Binance Account No. ***9222** and **Binance Account No. ***6855** are also registered to Abughali by name and were also initiated through email addresses and telephone numbers associated with BuyCash.

Binance processed U.S. dollar deposits into **Binance Account No. \*\*\*0091** through a U.S. correspondent bank and facilitated the conversion of approximately $258,433 from Tether (USDT) stablecoin into U.S. dollars via Tether Limited's relationships with the U.S. correspondent banks.

Between January 2022 and June 2023, Binance processed transactions through **Binance Account No. \*\*\*0091** that received cryptocurrency with an aggregate value of approximately $508,000 U.S. dollars from **Tron Address \*\*\*znVF**.

In September 2023—the month immediately before the October 7 Attacks—Binance processed an additional $13,227 U.S. dollars into **Binance Account No. \*\*\*0091** from **Tron Address \*\*\*sWGy (BuyCash)**.

Analysis of Binance access logs shows that the same mobile phone accessed **Binance Account Nos. \*\*\*1098** and **\*\*\*0091** from IP addresses resolving to various locations—including the Palestinian Territories and Türkiye—establishing coordinated operational control of both accounts.

**Binance Account Nos. \*\*\*8922 and \*\*\*6855:**
Binance opened two additional accounts—**Binance Account Nos. 28568922** and **\*\*\*6855**—also registered to Abughali using email addresses and telephone numbers associated with BuyCash operations. The same mobile device was used to access both **Binance Account Nos. \*\*\*8922** and **\*\*\*46855** from various locations including the Palestinian Territories and Türkiye.

970.    As noted, in the years leading up to October 7, 2023, BuyCash received the equivalent of more than $22 million from Binance customer accounts and sent the equivalent of more than $200 million to Binance customer accounts.

971.    The volume of cryptocurrency dropped significantly after October 7 (likely due to the U.S. government designation of BuyCash a few days after the Attacks) but did not cease altogether. After October 7, BuyCash sent the equivalent of more than $450,000 to Binance customer accounts and received the equivalent of more than $800,000 from Binance customer accounts.

972.    FinCEN, in its November 2023 Consent Order, found that: "Binance also failed to file a SAR with FinCEN on its connections to BuyCash … Prior to OFAC's designation of BuyCash, *Binance was aware of extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file a SAR with FinCEN*." (Emphasis added.)

973.    A review of public blockchain data between March 29, 2021, and September 1, 2025, shows that Binance was responsible for 90% of the funds sent by BuyCash to crypto exchanges (the equivalent of over $250 million U.S. dollars).



### 3. Gaza Now

974.    On January 21, 2024, NBCTF identified Gaza Now as an organization "affiliated with the military arm of Hamas," seizing its **Binance Account No. \*\*\*1732** (determined to be controlled by Mustafa Ayash).[122]

975.    On March 27, 2024, Gaza Now and its founder Ayash were designated by the U.S. Treasury Department as SDGTs, finding them to be "key financial facilitators involved in fundraising for Hamas."[123]

976.    Gaza Now posed as a media organization focused on reporting about Gaza, but OFAC's investigation established that the entity operated as a fundraising vehicle (and propaganda tool) for Hamas operations.

977.    One of the crypto addresses identified by OFAC as Gaza Now wallets, was a Binance customer deposit **Tron Address \*\*\*aVNU**, which reportedly was first published by Gaza Now in August 2021. Over the period in question $769,531 was collected in **Tron Address \*\*\*aVNU**, with funds arriving, *inter alia*, from three different (later designated) PIJ addresses. **Tron Address \*\*\*aVNU** was active until two days after October 7, 2023. The account processed donations equivalent to approximately $5,000 into this wallet between that day and October 9.

978.    Prior to the October 7 Attacks, Gaza Now operated a Hamas-affiliated Telegram channel with approximately 350,000 subscribers, which the organization used to disseminate Hamas propaganda and solicit cryptocurrency donations that were channeled through Binance's platform.

---

[122]    *See* Nat'l Bureau for Counter Terror Fin., Administrative Seizure Order 2/24 (Isr.), https://nbctf.mod.gov.il/he/PropertyPerceptions/Documents/%D7%A6%D7%95%20%D7%AA%D7%A4%D7%99%D7%A1%D7%94%202-24.pdf. Ayash is a 33-year-old Palestinian resident of Austria.

[123]    *See* Press Release, *Treasury Sanctions Hamas-Aligned Terrorist Fundraising Network*, U.S. DEP'T OF TREAS. (Mar. 27, 2024), https://home.treasury.gov/news/press-releases/jy2213.

#### 4. Al Wefaq Co. for Exchange (a/k/a Hamed Co. for Exchange)

979. Al Wefaq Co. for Exchange was designated a terrorist organization by Israel on June 21, 2018.

980. Hamed Ahmad Abed al-Khudry, who founded the Al Wefaq Co. for Exchange, was killed in a targeted airstrike in May 2019, following Israeli intelligence establishing his role in Hamas terrorist financing operations and money laundering activities.

981. Following Khudry's death, his brother, Saeed Ahmad Abed al-Khudry (a/k/a Saeid Alhkudri), took over the family's terror financing business, continuing Al Wefaq's operations under family control.

982. Saeed al-Khudry was killed in an Israeli airstrike on April 4, 2025. The Israeli military stated that "Khudry has been involved in numerous financial transfers to Hamas's military wing over the years, especially during the Iron Swords War and since the assassination of his brother, Hamed Al- Khudry, in 2019, who also served as the key money changer for Hamas' military wing."[124]

#### a. Binance Account No. ***2283 (Saeed al-Khudry)

983. Saeed Ahmad Abed al-Khudry registered **Binance Account No. ***2283** in April 2021, using the e-mail account ██████████████ and a Palestinian mobile phone number.

984. According to the documentation he provided, he was 29 years old at the time and was born in the Gaza Strip.

985. Despite Saeed being the brother of a known Hamas facilitator, Binance accepted him as a client and on-boarded him—about two years after his brother was killed in an airstrike.

---

[124] Israel Def. Forces (@idfonline), X (Apr. 4, 2025), https://x.com/idfonline/status/1908176748505641163.

986.    The account was most frequently accessed by IP addresses located in Khan Yunis in the Gaza Strip. On one day in March 2022, the account twice used the same IP address that **Binance Account *** 5345** was using frequently during September and November of 2022. Another IP address was used by **Binance Account No. ***2283** and **Binance Account No. ***4404** (Younes Shamlakh) and **Binance Account No. ***5680** (Imad Shamlakh, SDGT) within one hour on April 29, 2021.

987.    NBCTF seized this account on April 23, 2023 (ASO 19/23), determining it constituted "property belonging to designated terrorist organization" Al Wefaq Co. for Exchange. Crucially, Binance had processed transactions through this account for over two years following the initial 2018 NBCTF designation of Al Wefaq as a terrorist organization. The designation explicitly stated that al-Wefaq "facilitates the transfer of a significant amount of money to Hamas, and has done so for many years. These funds are designated for Hamas' military buildup and preparations for a future confrontation with Israel and to encourage terrorist attacks against the State of Israel."[125]

988.    It was public knowledge since at least May 2019 that Saeed's brother, Hamed Al-Khudry was a Hamas military commander, and that he "transferred large sums of money to Hamas's military wing... through his money exchange company and with the help of money exchangers abroad." It was also known in the English-language media that the company Hamad Co. for Exchange/Al Wefaq Co. for Exchange, had been designated a terrorist organization by Israel in 2018.[126]

---

[125]    Isr. Nat'l Bureau for Counter Terror Fin., Terror Organization Designation List [in Hebrew], https://nbctf.mod.gov.il/he/Announcements/Documents/NBCTFIsrael%20-%20Terror%20Organization%20Designation%20List_XL.xlsx (last visited June 5, 2026).

[126]    *Hamas Leader Killed in Targeted Assassination*, Gulf News (May 5, 2019), https://gulfnews.com/world/mena/hamas-leader-killed-in-targeted-assassination-1.63758141; Daniel Siryoti, i24NEWS & Israel Hayom Staff, *IDF Confirms Death of Gaza Official Who Handled Iranian Money*, Israel Hayom

989.    Saeed Ahmad Abed al-Khudry was the successor to his brother's terror financing and money laundering business. Between April 2021 and January 2022, **Binance Account No. \*\*\*2283** received deposits from five other Binance accounts that have been identified by NBCTF as associated with terror financing. Accounts seized or designated by NBCTF accounted for more than 60% of the cryptocurrency deposited into al-Khudry's account.

990.    Between April 2021 and May 2022, **Binance Account No. \*\*\*2283** withdrew and transferred cryptocurrency to four Binance accounts that have been identified by NBCTF as associated with terror financing.

991.    The account continued receiving and sending funds for months after Binance knew that some of **Binance Account No. \*\*\*2283's** counterparties had been designated by NBCTF as early as December 29, 2021.

992.    On the account's very first operational day (April 6, 2021), it received its first deposit from **Binance Account No. \*\*\*7729** (later designated by NBCTF for belonging to Al Mutahadun For Exchange or for being "property used for the perpetration of a severe terror crime"), and, within less than three hours, sent its first withdrawal to another Binance account identified by NBCTF as associated with the same network of terror financing (**Binance Account No. \*\*\*9834**). Al-Khudry's account received from the al-Mutahadun network other USDT payments on several occasions. For example, during December 2021 it had received two deposits equivalent to $1,500 each, from **Binance Account No. \*\*\*7379**; on April 6 and 11, 2021 it received $999 and $989 (respectively) from **Binance Accounts No. \*\*\*7729 and \*\*\*0519** (respectively), both part of the al-Mutahadun network.

---

(May 5, 2019), https://www.israelhayom.com/2019/05/05/idf-reports-strikes-on-homes-of-hamas-operatives-in-gaza/.

993.    Saeed Ahmad Abed al-Khudry also transacted with PIJ nodes on the network. He sent the equivalent of $2,944 to **Tron Address \*\*\*rCR7** that in turn sent almost the exact same amount in cryptocurrency to **Tron Address \*\*\*wirR**, and the equivalent of $100 to **Tron Address \*\*\*E1fd**, both designated by NBCTF on July 4, 2023, and identified as PIJ property (ASO 34/23).

994.    **Binance Account No. \*\*\*2283** worked with the Gaza Brokers network using Binance's IT architecture. For example, on November 13, 2021, it sent the equivalent of $1,693 to another designated Binance customer—Bahaa Kasco (**Binance Account No. \*\*\*0941**, designated April 21, 2023, and identified as being part of the al-Wefaq and Al-Mutahadun networks). Seventeen days before that transfer, Kasco received the equivalent of $1,199 from **Gaza Broker Tron Address B-1**.

995.    Most of the cryptocurrency deposited into **Binance Account No. \*\*\*2283** originated off-chain from other Binance customers.

### 5.  Shamlakh Hamas Network

996.    The Shamlakh[127] family operates a Gaza-based money exchange and money laundering network that, according to the U.S. Department of the Treasury, serves as "the main end point for funds transferred from the IRGC–QF to Hamas and PIJ in Gaza," channeling tens of millions of dollars annually from the IRGC–QF to designated terrorist organizations.

997.    The Shamlakh family's primary money exchange business is known as Al-Markaziya (formerly Al-Mutahadun for Exchange). It controlled and operated dozens of Binance accounts under a variety of names.[128]

---

[127]    The spellings of the family name in English transliteration vary. The complaint adopts OFAC's chosen spelling.

[128]    *See, e.g.,* **Binance Account Nos. \*\*\*4716, \*\*\*6569, \*\*\*0699, \*\*\*0337, \*\*\*7300, \*\*\*2525, \*\*\*0534, \*\*\*4344, \*\*\*4636, \*\*\*7515, \*\*\*9055, \*\*\*1743, \*\*\*7522, \*\*\*3901, \*\*\*7402, \*\*\*0519, \*\*\*6716, \*\*\*7729, \*\*\*1236** and **\*\*\*6281**.

188

998.    On February 7, 2020, the Israeli Ministry of Defense first identified Zuhair Shamlakh and his company, al-Mutahadun Exchange as a source of funding for Hamas.[129]

999.    Later that year, on November 29, 2020, issued an updated administrative seizure order (ASO 7/20 updated) and later noted in a press release December 22, 2020 press release that, "the money [from al-Mutahadun Exchange] was earmarked for the development of Hamas' terrorist infrastructure in Gaza, including the production of weapons and payment to the organization's operatives, and originated from the Iranian government that acts against the State of Israel."[130] It was clarified that al-Mutahadun had changed its name and had begun operating under a new name: al-Markazia li-Sirafa (The Central Exchange Company).

1000.    On May 25, 2021, the Israeli Ministry of Defense designated two more companies owned by Zuhair Shamlakh as terrorist organizations: al-Markazia li-Sirafa (al-Mutahadun in the past) and the Arab-China trading company, finding that:

> According to intelligence collected and processed by the Military Intelligence Directorate, since 2019 "Al-Markaziya li-siarafa" (formerly known as "Al Mutahadun For Exchange") and "Arab Trading Company China" have been facilitating the transfer of tens of millions of dollars to Hamas annually, specifically to the military wing of the organization.
>
> The funds originate from Iran and are given as part of the framework of assistance granted by the Iranian Revolutionary Guards – Quds Force to terrorist organizations acting against Israel. The funds are transferred via the direct facilitation of the aforementioned companies, with the full knowledge of the individual who owns both of the companies.[131]

---

[129]    Isr. Nat'l Bureau for Counter Terror Fin., Seizure Order No. 7/20 (Amended) [in Hebrew] (Dec. 22, 2020), https://nbctf.mod.gov.il/he/MinisterSanctions/Announcements/Documents/7-20.pdf.

[130]    *Defense Minister Benny Gantz Signed an Order to Seize $4 Million Transferred from Iran to Hamas* [in Hebrew], Isr. Nat'l Bureau for Counter Terror Fin. (Dec. 22, 2020), https://nbctf.mod.gov.il/he/pages/Gantz4IranHamasHE22122020.aspx.

[131]    *See* Press Release, *Minister of Defense Designates Companies That Transfer Millions of Dollars from Iran to Hamas as Terrorist Organizations*, Isr. Nat'l Bureau for Counter Terror Financing (May 25, 2021), *available at* https://nbctf.mod.gov.il/en/Pages/ShamalchMutahadun25052021ENG.aspx.

1001.   On December 29, 2021, 19 months before the October 7 Attacks, Israel designated 47 Binance accounts linked to Al-Mutahadun Exchange, finding that the cryptocurrency [property] held in them was "used for the perpetration of a severe terror offense…." Less than half of those accounts are described below, and discovery will no doubt further elucidate the connections between and among the remaining accounts and between them and other addresses and wallets controlled by Hamas, Hezbollah, PIJ, and the IRGC.

1002.   The operational characteristics of the Shamlakh network's Binance accounts included significant transactional activity conducted through Binance's off-chain internal ledger, operation from Gaza and Turkish IP addresses, complete absence of KYC verification, large sums transiting in and out of accounts with no discernible business purpose and no obvious (legitimate) sources of income, and processing of funds through complex layering transactions.

1003.   In short, as described in detail below, Binance knew that the Shamlakh Network accounts were all interconnected and were part of Hamas's terror financing apparatus.

1004.   Binance knew, for example, that the Shamlakh Network accounts exhibited nearly all conceivable warning signs for money laundering, including large sums moving quickly in and out of the accounts (in some cases with funds returning to the same parties who previously sent them), and no stated commercial purposes.

1005.   The accounts themselves were also opened from a supremely high-risk jurisdiction —Gaza—territory *controlled by an FTO* where economic development was limited. Yet, some of the Shamlakh Network accounts received and transferred the equivalent of millions of dollars despite lacking any economic explanation for these customers having access to such sums.

1006. Moreover, Binance had greater visibility than even law enforcement and intelligence agencies into the fact that the Shamlakh Network accounts at Binance received and

190

sent money to other Binance customers and Tron addresses designated for their connections to FTOs and terrorism.

1007. When the U.S. Department of Treasury designated the Shamlakh Network on January 22, 2024, it found:

> Over the last several years, members of the Shamlakh family have become the main end point for funds transferred from the IRGC-QF to Hamas and PIJ in Gaza. Gaza-based financial facilitator Zuhair Shamlakh (Zuhair) is a Gaza-based moneychanger who facilitates funds transfers in the tens of millions of dollars from Iran to Hamas. Zuhair has used his companies Al-Markaziya Li-Siarafa (Al-Markaziya) and Arab China Trading Company to channel funds for the Izz al-Din al Qassam Brigades (al-Qassam Brigades), the military wing of Hamas. Zuhair has been facilitating funds transfers to terrorist groups in Gaza since at least 2017, when he worked with Muhammad Kamal al-Ayy to coordinate the transfer of millions from Lebanon to Gaza. Al-Ayy was designated in August 2019 for providing financial, material, technological support, financial or other services to or in support of Hamas.
>
> Gaza- and Türkiye-based Al-Markaziya is owned by Zuhair and managed by his family members. Formerly known as Al-Mutahadun for Exchange, it has been directly involved in facilitating tens of millions of dollars from IRGC-QF to Hamas and PIJ. In April 2023, the Israeli Defense Ministry's National Bureau for Counter Terror Financing (NBCTF) seized 189 cryptocurrency accounts associated with three Palestinian currency exchanges, one of which was Al-Markaziya. Arab China Trading Company is also based in Gaza and Türkiye and is owned by Zuhair. Israel designated both Arab China Trading Company and Al-Markaziya for their support to Hamas.
>
> Gaza-based financial facilitators Ahmed Shamlakh (Ahmed), Alaa Shamlakh (Alaa), and Imad Shamlakh (Imad), serve as key players in the financial flow from Iran to Hamas and PIJ using their ties to money changing companies, including Al-Markaziya. Ahmed is one of the owners or directors of Al-Markaziya and Alaa is the sole employee and officer of Al-Markaziya's branch in Türkiye. Both Ahmed and Alaa have been involved in transferring money to Hamas. Imad has directly facilitated the transfer of Chinese yuan from bank accounts in China to accounts controlled by Hamas in Gaza. Imad has also facilitated multiple transfers, worth approximately 50,000 Chinese yuan, to accounts in China likely for the benefit of Hamas. Additionally, Imad has smuggled cash from Egypt to Gaza on behalf of the Islamic State of Iraq and Syria in the Sinai (ISIS-Sinai).

191

Zuhair Shamlakh, Ahmed Shamlakh, Alaa Shamlakh, and Imad Shamlakh are being designated pursuant to E.O.13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or good or services to Hamas.

Al-Markaziya and Arab China Trading Company are being designated pursuant to E.O.13224, as amended, for being owned, controlled or directed by Zuhair Shamlakh.

### a.   Binance Account No. ***3593

1008.   Ahmed Shamlakh registered **Binance Account No. ***3593** in May 2021, using email address █████████@gmail.com and mobile number +972████████ (Jawwal Mobile).

1009.   Nevertheless, it was a *multi-user account* jointly held with Sharif Turkmani, a 32-year-old Palestinian team leader in the Hamas elite Nukhba forces—later eliminated by the IDF—and Rajaa Shamlakh, a 53-year-old Palestinian woman.[132]

1010.   Even apart from the account facially appearing to be used by three separate individuals simultaneously, the account would have been obvious to Binance as linked to terrorism due to the Shamlakh family's prominent role in terrorist activities. For example, a Muhammed Shamlakh served as a senior Hamas commander in southern Gaza until his death in 2012. Another Muhammed Shamlakh served as a commander of Hamas southern Gaza brigade before his death in 2014.

1011.   Yet, Binance never completed KYC verification on this account, instead processing 20 transactions for the account worth the equivalent of almost $35,000 in deposits and $20,000 in withdrawals over its operational period.

---

[132]   These were the ages of Turkmani and Shamlakh when the account was opened.

1012. The account received 85% of its deposits from other Binance users, and 100% of the withdrawals from the account were transferred to other Binance customers. All these transactions were done off-chain, visible only to Binance.

1013. Tellingly, *all* Binance customers that transacted with **Binance Account No. ***3593** have been designated by NBCTF.

1014. For example, **Binance Account No. ***3593** sent USDT worth of $10,000 to **Binance Account No. ***6082** (an additional Binance account held by Sharif Turkmani that was designated under the same Seizure Order (ASO 10/22) dated February 2022, as part of al-Mutahadun Exchange) and received USDT worth of $1,810 from the same account. These two accounts not only sent each other funds and were operated jointly by Shamlakh and Turkmani – the Nukhba forces team leader – they also used on dozens of occasions the same IP address to access their accounts.

1015. Other designated Binance users that received or sent USDT to **Binance Account No. ***3593**, include **Binance Account No. ***5990** (Ahmed Altorok), **Binance Account No. ***1466** (Alaa Barassi), **Binance Account No. ***7635** (Abdelrahman Murjata)—all designated by NBCTF under ASO 10/22 as being part of al-Mutahadun Exchange network.

1016. **Binance Account No. ***3593** also interacted with PIJ's cryptocurrency financing network. For example, it received a small USDT transfer from **Tron Address ***nheb** which itself received the equivalent of close to $30,000 from a Tron address—**Tron Address ***GS63**—that was designated by NBCTF pursuant to Administrative Seizure Order ASO 34/23 on July 4, 2023, as PIJ property.

193

1017.   OFAC designated Ahmad Shamlakh as an SDGT on January 22, 2024, pursuant to Executive Order 13224, for materially assisting, sponsoring, or providing financial, material, or technological support for, or goods or services to or in support of, Hamas.[133]

1018.   NBCTF issued Administrative Seizure Order (ASO 10/22) designating **Binance Account No. 141143593** on February 22, 2022.

1019.   Access logs show over 100 entries spanning from June 2021 to September 2021, with operations including withdrawal applications, SMS verification code sends and security checks– all from Palestinian IP addresses.

### b.   Binance Account No. ***9428

1020.   **Binance Account No. ***9428** was first registered with Binance in 2021, using email address ███████@gmail.com and operated for over five months without ever completing KYC verification.

1021.   The KYC documents used to register this account belonged to Mohammed A.A. Shamallakh, a then-20-year-old resident of the Gaza Strip.

1022.   As noted above, the same name belonged to two senior Hamas commanders in Gaza, but there is no indication that Binance attempted to perform any due diligence on this account.

1023.   **Binance Account No. ***9428** received 100% of its funding through internal Binance transfers.

1024.   The account was primarily accessed from Gaza but was also accessed from Singapore and Colombia.

---

[133]   Press Release, *U.S., UK, and Australia Target Additional Hamas Financial Networks and Facilitators of Virtual Currency Transfers*, U.S. DEP'T OF TREAS. (Jan. 22, 2024), https://home.treasury.gov/news/press-releases/jy2036.

1025. **Binance Account No. \*\*\*9428's** largest withdrawal was sent to **Binance Account No. \*\*\*6082** (which, as discussed below, belonged to a Hamas Nukhba operative), which also previously funded both **Binance Account No. \*\*\*9428** and the NBCTF-seized **Binance Account No. \*\*\*3593** (also discussed below). This demonstrates circular fund flows within the interconnected terrorist financing network.

### c.  Binance Account No. \*\*\*5910

1026. **Binance Account No. \*\*\*5910** was nominally opened by Mohammed Shamalakh on November 10, 2021.

1027. The identification provided to Binance indicates a Palestinian from Gaza who was 34 years old when he opened the account.

1028. As noted above, the same name belonged to two senior Hamas commanders in Gaza, but there is no indication that Binance attempted to perform any due diligence on this account.

1029. The sole transactions that this account performed were a deposit from another (designated) al-Mutahadun Binance account (**Binance Account No. \*\*\*4404, described below**) and a withdrawal to a (designated) Tron wallet associated with PIJ.

1030. NBCTF designated **Binance Account No. \*\*\*5910** on January 12, 2023 (ASO5/23), as "property of the designated terror organization Al Mutahadun for Exchange or used for the perpetration of a severe terror crime…."

### d.  Binance Account No. \*\*\*5680

1031. **Binance Account No. \*\*\*5680** was registered on April 25, 2021, by Imad Younes Shamlakh, who was later designated an SDGT for his work on Hamas's behalf.

1032.    He provided Binance with a copy of his Palestinian Authority passport and a photo and began using the account the following day.

1033.    The U.S. Treasury Department found that "Imad [Shamlakh] has directly facilitated the transfer of Chinese yuan from bank accounts in China to accounts controlled by Hamas in Gaza. Imad has also facilitated multiple transfers, worth approximately 50,000 Chinese yuan, to accounts in China likely for the benefit of Hamas."

1034.    However, only a small portion of Imad Shamlakh's criminal activity flowed through Binance Account No. ***5680 which processed only four deposits totaling the equivalent of $42,953 and six withdrawals for almost the same amount. This may have included the 50,000 Chinese yuan (app. $7,700) referenced in the U.S. Treasury Department designation, but given the volume of activity in other Al Mutahadun for Exchange accounts at Binance, it is highly probable that most of Imad Shamlakh's criminal activity was conducted through other means.

1035.    Nine of the ten deposits and withdrawals performed by the account were performed off-chain using Binance's internal ledger.

1036.    Binance Account No. ***5680 was designated by NBCTF as part of Hamas's Al Mutahadun for Exchange.

### e.    Binance Account No. ***4404

1037.    **Binance Account No. ***4404** was nominally registered in April 2021by Younes Imad Shamlakh, likely the son of Imad Younes Shamlakh (SDGT).

1038.    For KYC, the account holder submitted a Palestinian passport reflecting his age and a face identity confirmation photo (taken with the Al-Aqsa Dome of the Rock picture in the background).

196

1039. Despite his age and geographical location, Binance helped Shamlakh to transfer the equivalent of more than $2 million within a seven-month period.

1040. In the first week of its activity, **Binance Account No. \*\*\*4404** received (deposits solely made on Binance's internal ledger) the equivalent of almost $200,000 and sent the entire amount almost immediately to other Binance customers. The same pattern repeated in June 2021 – the equivalent of almost $200,000 was deposited into the account (all off-chain) and quickly transferred out. In September 2021, an equivalent of $370,000 was deposited and $374,000 withdrawn.

1041. Since more than 60% of the account's counterparties were other Binance clients, Binance had the ability to substantiate the business purposes of the internal intra-customer transfers, especially given that this ecosystem of customers was situated in Gaza.

1042. In fact, apart from one counterparty, all Binance customers that **Binance Account No. \*\*\*4404** traded with (deposits and withdrawals) were later designated by NBCTF as members of the Shamlakh family's Al Mutahadun for Exchange, including among others his relative Mohammed Shamlakh, owner of **Binance Account No. \*\*\*5910, Binance Account No. \*\*\*3901** and **Binance Account No. \*\*\*6569**, all discussed herein.

1043. **Binance Account No. \*\*\*4404** also received off-chain deposits from **Binance Account No. \*\*\*4344**, a Lebanese individual operating from Türkiye, South Lebanon, Damascus, Raqqa, and New York who collected cash (fiat) funds in Nigeria, converted them to USDT, and sent the funds to other Binance customers off-chain.

1044. **Binance Account No. \*\*\*4404**'s on-chain counterparties included Tron Address \*\*\*XY9D that deposited the equivalent of $100,000 into **Binance Account No. \*\*\*4404** in September 2021. That address also traded directly with Raed Habib – a/k/a "El Turco."

1045. **Tron Address ***XY9D** served as a central hub in the IRGC-Hezbollah cryptocurrency laundering network. Within the course of less than two years (transferring and receiving) it moved the U.S. dollar equivalent more than of $1.2 billion – serving as a bridge between the Hezbollah-IRGC network and Al Mutahadun for Exchange.

### f. Binance Account No. ***6082

1046. **Binance Account No. ***6082** was registered in September 2021 for an individual presenting Israeli identification documents under the name Sharif Turkmani, providing mobile phone number +972–56–7788099, email address shareif.tuorkmani@gmail.com.

1047. The identification document indicates that he was 36 years old when he opened the account. Turkmani served as a squad leader for Hamas's elite Nukhba Forces that led the October 7 Attacks. He was subsequently eliminated by the IDF.

1048. Sharif Turkmani, **Binance Account No. ***6082**, and the e-mail address indicated above, were all identified by NBCTF in its Forfeiture Order (FO 42/22) on December 29, 2022, based on Administrative Seizure Order ASO 10/22 dated February 22, 2022, identifying the account and cryptocurrency address as "the property of the designated terrorist organization Dubai Co. for Exchange or property used for the perpetration of a severe terror crime."

1049. This same individual was registered on **Binance Account No. ***3593** together with Ahmed Shamlakh (SDGT). That account was subject to the same February 2022 ASO 10/22 by NBCTF.

1050. **Binance Account No. ***6082** was active for only 135 days—from September 8, 2021, through January 22, 2022—depositing and withdrawing the equivalent of more than $100,000 in USDT via more than 120 transactions.

1051. A plurality of access activity for the account came from IP addresses in the Gaza Strip, but the account was also accessed from Jerusalem and cities in the eastern part of the Palestinian Territories (Nablus, Hebron, and Tulkarem).

1052. Most notably, **Binance Account No. ***6082** was accessed six times from Kindred, North Dakota, to initiate transactions.

1053. As evidenced by the NBCTF Forfeiture Order and Turkmani's shared use of another designated Binance account with Ahmad Shamallakh (SDGT), **Binance Account No. ***6082** was operated for the benefit of Hamas, including from the United States.

1054. More than 70% of the deposits into, and withdrawals from, **Binance Account No. ***6082** were off-chain. Nearly a quarter of those off-chain deposits and 50% of the off-chain withdrawals involved counterparties designated by NBCTF.

1055. These internal transfers to and from other designated Binance customers included:

- **Binance Account No. ***8133:** Al-Mutahadun for Exchange (ASO 79/21 dated December 29, 2021).

- **Binance Account No. ***7379:** Al-Mutahadun for Exchange (ASO 79/21 dated December 29, 2021).

- **Binance Account No. ***9428:** Al-Mutahadun for Exchange or Dubai Co. or Al Wafeq Co. (ASO 19/23 dated April 21, 2023).

- **Binance Account No. ***5549:** Al-Mutahadun for Exchange or Dubai Co. or Al Wafeq Co. (ASO 19/23 dated April 21, 2023).

- **Binance Account No. ***3593:** Al-Mutahadun for Exchange (ASO 10/22 dated February 22, 2022).

- **Binance Account No. ***6981:** Al-Mutahadun for Exchange (ASO 5/23 dated January 12, 2023).

- **Binance Account No. ***7635:** Al Mutahadun for Exchange or Dubai Co. or Al Wafeq Co (ASO 10/22 dated February 22, 2022).

1056. In December 2021, **Binance Account No. \*\*\*6082** sent the equivalent of almost $2,000 to **Tron Address \*\*\*AkxE**.

1057. **Tron Address \*\*\*AkxE** sent and received large sums from BuyCash and sent the equivalent of over $1.5 million to a crypto address associated with Hezbollah money launderer Tawfiq al-Law, who was designated as an SDGT.

1058. **Binance Account No. \*\*\*6082** also sent and received nearly 30 transfers from the Gaza Brokers—related addresses that facilitated Hamas's cryptocurrency money laundering infrastructure.

1059. That Hamas money laundering infrastructure continues to operate and there are no signs that Binance has attempted to disrupt its operations.

1060. Even when Binance rejected a blockchain transfer from **Binance Account No. \*\*\*6082** to an external address, within ten minutes it allowed Turkmani to retransmit the same transfer to the same counterparty—but this time off-chain to that counterparty's Binance account, indicating a desire to assist its FTO-affiliated customers evade law enforcement efforts to curtail their terrorism financing activities.

### g.  Binance Account No. \*\*\*1135

1061. **Binance Account No. \*\*\*1135** was registered by a 30-year-old resident of Gaza named Jaber Meqbil and was only active for only six months, from June to December 2021.

1062. During that period, the account's total turnover reached almost $1.9 million – deposits and withdrawals differed at a negligible 1.7%. In sum, the account served as a pass-through for money laundering, primarily USDT.

1063. During the first two months of operation (June-July 2021) the account received the equivalent of $115,000. Withdrawals were almost identical – $114,000. This same pattern

continued over the next two months, time and again – until the account stopped all of its operations and eventually NBCTF designated it as being part of Al-Mutahadun for Exchange.

1064.  **Binance Account No. \*\*\*1135** exchanged funds with other Binance costumers who were members of this Hamas network. For example, it sent USDT on 14 occasions to Binance Account No. \*\*\*2088 and received 40 deposits from that same account. The same pattern repeated with **Binance Account No. \*\*\*7379** – 33 deposits and 38 withdrawals.

1065.  **Binance Account No. \*\*\*1135** was accessed mainly from Gaza, but withdrawals were also made from the Netherland and Czechia and the account was accessed at least once from Denver, Colorado.

1066.  Most of **Binance Account No. \*\*\*1135**'s counterparties were other Binance customers, so its main transactional activity occurred off-chain, solely on Binance's internal ledgers.

1067.  After Binance **Account No. \*\*\*1135** was designated by the NBCTF in December 2021, Binance assisted its customers who interacted with **Binance Account No. \*\*\*1135** to continue their activities long after the designation because their connection to the designated account was known only to Binance due to the transactions occurring only off-chain.

1068.  For example, within two weeks in November 2021, another Binance customer – **Binance Account No. \*\*\*6255** – received from **Binance Account No. \*\*\*1135** four off-chain USDT transfers.

1069.  In December 2021, NBCTF designated **Binance Account No. \*\*\*1135** for being used for the perpetration of a severe terror act. Binance knew about the designation, and activity in this account stopped. However, Binance continued to process transactions for **Binance Account**

No. ***6255 and two months later it deposited funds into the account from an address that was later designated as a Tawfiq al-Law address associated with Hezbollah.

1070.   In June 2022, Binance Account No. ***6255 also received two more deposits from PIJ Tron addresses designated by NBCTF on July 4, 2023.

1071.   The same pattern occurred with the following **Binance Account Nos. 20739097, 170988199, 75208331, 290837904, 122907845, 178443019, 181265129, 180106810, 288907780, 74988069, 20739097, 323642202, 13930058, 339811597, 80652416, 40413096, 115894911, 165337224, 335479641, 18980852, 255717767, 353375908, 92334415, 125787593, 39410820, 159368106, 172018104, 287740706, 284508605, 114079050, 359042116, 96490386, 140258245, 171966802, 82348267, 290384432, 181063231, 180785261 and 156626061**.

1072.   All of these customers transacted directly with **Binance Account No. ***1135** (off-chain on Binance's ledger) but continued to operate long after **Binance Account No. ***1135** was designated, and all of them received funds in 2022-2023 from Tron Addresses later identified as belonging to either Hezbollah, IRGC, or PIJ.

### h.   Binance Account No. ***3901

1073.   **Binance Account No. ***3901** was registered in January 2021 using the email address ███████████████ and was at least nominally operated in the name of Yazan Khalil.

1074.   Despite having KYC status "REFUSED" for ID verification with the rejection reason "Photos of IDs displayed on a screen are not accepted," Binance nevertheless processed transactions for the account and it retained full operational capability. The account passed only "Basic" verification but Binance processed the equivalent of more than $600,000 through the account in under a year. This was a result of Binance's special treatment and solicitude for terrorist-related accounts.

202

1075. **Binance Account No. \*\*\*3901** received more than 500 deposits worth the equivalent of more than $300,000 in cryptocurrencies; 24 of them (worth the equivalent of more than $60,000) were from sources designated by NBCTF.[134]

1076. The account executed over 915 withdrawal transactions worth the equivalent of more than $330,000.

1077. **Binance Account No. \*\*\*3901** also sent and received dozens of transfers from the Gaza Brokers–related addresses that facilitated Hamas's cryptocurrency money laundering infrastructure. For example, **Binance Account No. \*\*\*3901** transacted with **Gaza Broker Tron Wallet B-2**.

1078. **Gaza Broker Tron Wallet B-2** received the equivalent of over $2,000 from a BuyCash address.

1079. This Hamas money laundering infrastructure continues to operate even after the events of October 7—in 2025, **Gaza Broker Tron Wallet B-2** continued to receive and send the cryptocurrency equivalent of millions of U.S. dollars from and to Binance customers.

1080. Like many accounts associated with the Al-Mutahadun Exchange and the Shamlakh network, cryptocurrency flowed in and out of **Binance Account No. \*\*\*3901** rapidly, consistent with the account's role as a transit hub or layering mechanism rather than an accumulation point.

1081. For example, on June 8, 2021, Binance processed two sequential transfers from **Binance Account No. \*\*\*9055** to **Binance Account No. \*\*\*3901**—$5,029 in USDT at 11:11:06 UTC, followed just five minutes later by $5,031 in USDT at 11:16:23 UTC. Binance recorded both nearly identical amounts (differing by only $2, or 0.04%) and the five-minute interval between them.

---

[134]    *See, e.g.,* **Binance Account Nos. \*\*\*2525**, **\*\*\*9055** and **\*\*\*7729** – all designated as part of Al Mutahadun for Exchange.

1082.   A few weeks later Binance processed three additional carefully calibrated transfers from **Binance Account No. \*\*\*9055** to **Binance Account No. \*\*\*3901**: $1,999 (12:57:22 UTC), $3,999 (14:48:42 UTC), and $3,099 (18:53:06 UTC)—totaling $9,097 in USDT. Each amount was structured to avoid round numbers and remain below common reporting thresholds, spaced at intervals of 111 and 244 minutes.

1083.   This sequencing is suggestive of automated structuring scripts.

1084.   Over 400 deposits into the account were received from other Binance customers and were therefore off-chain. Over 600 withdrawals resulted from off-chain Binance transfers.

1085.   **Binance Account No. \*\*\*3901** accessed Binance services from the Palestinian Territories (Gaza, Nablus, Ramallah, Hebron, Tulkarem) as well as from foreign jurisdictions including Botswana (Gaborone) and the United States, totaling more than 3,000 login sessions from 175 unique IP addresses across 11 distinct geographic locations.[135] That includes accessing the account from Kindred, North Dakota.

1086.   **Binance Account No. \*\*\*3901** was subject to an Administrative Seizure Order by NBCTF in December 2021 and identified as part of Al Mutahadun for Exchange.

### i.   Binance Account No. \*\*\*2525

1087.   Though registered by a 31-year-old Gaza resident named Saed Aljab in January 2020, **Binance Account No. \*\*\*2525** began operating in March 2021 until it was designated by NBCTF in December 2021 for belonging to Al Mutahadun for Exchange (SDGT), per NBCTF ASO 79/21.

---

[135]   The account was almost exclusively accessed by a single iPhone 11, strongly suggesting it was operated by a single person.

1088. In its nine months of activity, the account exhibited obvious signs of money laundering, receiving deposits equivalent to $4,885,000 and withdrawing almost the same amount – slightly more than the equivalent of $4,879,000.

1089. **Binance Account No. ***2525** received 13 off-chain deposits through Binance's internal ledger from **Binance Account No. ***4404** nominally owned by Yunes Shamlakh. Eleven of them exceed $15,000.

1090. Many other members of the Al Mutahadun for Exchange (Hamas) network sent and received funds to and from **Binance Account No. ***2525** off-chain. For example, in November 2021, the account received the equivalent of $40,000 via off-chain transfers from **Binance Account ***1236**.

1091. **Binance Account No. ***2525** also served as a link between the al-Mutahadun Exchange and BuyCash accounts. Within three hours on December 15, 2021, it received three deposits totaling the equivalent of $60,000 from BuyCash **Tron Address ***znVF.**

1092. It also transacted directly with a NBCTF designated **Tron Address ***M4nS** belonging to PIJ (ASO 34/23).

### j.  Binance Account No. ***7402

1093. **Binance Account No. ***7402** was nominally registered by the younger brother of Binance Account No. ***2525, in February 2021 when the accountholder was 27 years old. This account KYC comprised only a Palestinian passport and a photo.

1094. In its ten months of operation prior to being designated by NBCTF in December 2021 as part of Al Mutahadun for Exchange, **Binance Account No. ***7402** received deposits in excess of $1,300,000 and withdrew slightly less than $1,270,000.

1095.    **Binance Account No. ***9055** transacted with the same BuyCash **Tron Address ***znVF** and with the same NBCTF designated PIJ **Tron Address ***M4nS** (ASO 34/23) as **Binance Account No. ***2525** – registered to his brother.

1096.    Only 12% of the deposits into the account and less than 10% of the withdrawals occurred on the blockchain.

1097.    **Binance Account No. ***7402** interacted with multiple nodes of the Shamlakh (SDGT) network including **Binance Account Nos. ***7300, ***6716, ***4716** – all designated by NBCTF.

### k.    Binance Account No. ***7379

1098.    **Binance Account No. ***7379** was registered in June 2021, by a 29-year-old Gaza resident named Naji Hajaj, based solely on his Israeli/Palestinian ID and a selfie photo.

1099.    The account operated for 6 months before it was designated by NBCTF as part of the Al Mutahadun for Exchange (SDGT).

1100.    During these six months, deposits into, and withdrawals from, the account reached a combined equivalent of more than $1.9 million — $957,000 in and $952,000 out – indicating that the account was used as a pass-through to launder funds.

1101.    Like other Al Mutahadun for Exchange accounts hosted by Binance, even during the first month of its operations in June 2021, **Binance Account No. ***7379** received deposits equivalent to almost $61,000 and quickly transferred out $58,000 – a pattern that continued throughout the duration of the account.

1102.    During the period of its activity, **Binance Account No. ***7379** transacted directly with many other Al Mutahadun for Exchange and Wefaq Co. for Exchange accounts at Binance, confirming that it was part of Hamas's money laundering ecosystem.

206

1103. For example, it sent funds directly to Saeed al-Khudry (discussed above) - **Binance Account No. ***2283**, the brother and successor of an infamous Hamas financier killed in an airstrike in 2019.

1104. **Binance Account No. ***7379** transacted with the account of Sharif Turkmani, a Nukhba Forces squad leader and Binance customer operating **Binance Account ***6082**.

1105. **Binance Account No. ***7379** also received funds from external un-hosted addresses that were funneling USDT into Gaza on behalf of PIJ, including, among others, **Tron Address ***GS63** and **Tron Address ***19M4** (both NBCTF designated in 2023).

**l.    Binance Account No. ***7522**

1106. **Binance Account No. ***7522** was registered by a Lebanese national named Mohamed Ghais and was active from January until December 2021 and processed the equivalent of more than $17.6 million combined throughout — $8.8 million in deposits matched by approximately $8.8 million in withdrawals — within 11 months.

1107. 85% of deposits and 60% of withdrawals involved other Binance customers, most of them members of the Al-Mutahadun for Exchange network (all designated by NBCTF in December 2021.

1108. Within a 36-hour period in September 2021, **Binance Account No. ***7522** sent funds to three NBCTF designated accounts – the equivalent of $50,000 to **Binance Account No. ***4404** (Yunis Shamlakh, discussed above); the equivalent of $54,000 to **Binance Account No. ***7515,** and the equivalent of $30,000 to **Binance Account No. ***0519**.

1109. It also received the equivalent of $30,000 from **Binance Account No. ***9055**, designated by NBCTF at the same time.

1110.    **Binance Account No. \*\*\*7522** also transferred an amount equivalent to $101,100 to **Tron Address \*\*\*XY9D**, a central hub in the IRGC-Hezbollah crypto network, which sent the equivalent of millions of U.S. dollars to BuyCash, Hezbollah, Nobitex, and PIJ addresses.

### m.  Binance Account No. \*\*\*7515

1111.    **Binance Account No. \*\*\*7515** was registered by a Syrian national named Hadi Ghozlan using a passport issued by the Commonwealth of Dominica and operated for eight months.

1112.    The owner was purportedly in the jewelry and gold business and the account was accessed primarily from Türkiye, but also from Ukraine, Austria, the United Kingdom, and Germany.

1113.    During that time the equivalent of more than $52 million moved in and out of the account – exhibiting classic indicia of money laundering.

1114.    More than half of all deposits into the account came from other Binance customers, off-chain and 31% of withdrawals followed the same pattern.

1115.    **Binance Account No. \*\*\*7515** was designated by NBCTF on December 29, 2021, as part of the Al Mutahadun for Exchange network of accounts.

1116.    On August 14, 2021, **Binance Account No. \*\*\*7515** received the equivalent of $100,000 in a single transaction from **Tron Address \*\*\*XY9D** which served as a central hub in the IRGC-Hezbollah cryptocurrency laundering network.

1117.    **Binance Account No. \*\*\*7515** sent the equivalent of $15,000 in USDT to **Tron Address \*\*\*KETX** which directly transacted with **BuyCash Address \*\*\*zt5t** discussed below.

1118.    **Binance Account No. \*\*\*7515** also sent and received funds to and from **Tron Address \*\*\*s3qn** which directly transacted with same **BuyCash Address \*\*\*zt5t**.

1119.    **Binance Account No. \*\*\*7515** sent the equivalent of $31,000 to **Tron Address \*\*\*BJWg** which also directly received funds from (1) the same **BuyCash Address \*\*\*zt5t**, (2) from **Tron Address \*\*\*foQF** which was designated by NBCTF as a PIJ wallet and (3) from **Tron Address \*\*\*GUdC,** which was a Dubai Co. wallet designated by NBCTF.

1120.    **Binance Account No. \*\*\*7515** also sent the equivalent of $100,000 in USDT to **Tron Address \*\*\*VU8B** which also directly received funds from Dubai Co. **Tron Address \*\*\*GUdC** later designated by NBCTF and from a PIJ **Tron Address \*\*\*YKUq** designated by NBCTF on July 4, 2023.

1121.    **Binance Account No. \*\*\*7515** sent 299 TRX to **Tron Address \*\*\*tVuv** which received the equivalent of more than $1,071,000 from four different Tawfiq al-Law-associated addresses (all NBCTF designated under ASO 29/23) across five transactions.

1122.    **Binance Account No. \*\*\*7515** also sent the equivalent of more than $370,000 in USDT to **Tron Address \*\*\*UuqE** – a direct recipient of the equivalent of more than $500,000 in USDT from BuyCash (SDGT) Wallet **\*\*\*zt5t** and the equivalent of $4,700 in USDT from a later NBCTF-designated IRGC-Hezbollah **Tron Address \*\*\*J8DY**.

1123.    Binance Account No. \*\*\*7515 transacted directly with more than a dozen other Tron Addresses which cumulatively received the equivalent of more than $3.3 million directly from BuyCash Wallet **\*\*\*zt5t.**

1124.    **Binance Account No. \*\*\*7515** transacted directly with 10 other Tron Addresses which cumulatively received the equivalent of more than $1,200,000 directly from an address associated with Hezbollah operative Tawfiq al-Law.

1125. **Binance Account No. \*\*\*7515** received the equivalent of more than $24 million from **Binance account \*\*\*4344**, held by Yasser Khechen, a Lebanese national whose account is described below.

1126. In September 2021, within an 11-day period, **Binance Account No. \*\*\*7515** returned the equivalent of more than $1.2 million in USDT in five installments to the same address.

1127. These transfers were all made off-chain, using Binance's internal ledger.

1128. On June 10, 2021, **Binance Account No. \*\*\*7515** transferred (off-chain) the equivalent of $100,000 in USDT to **Binance Account No. \*\*\*4404** using the Binance internal ledger. As discussed herein, **Binance Account No. \*\*\*4404** was later designated by NBCTF for its role as part of the Shamlakh's Al Mutahadun for Exchange.

1129. Even more notably, on September 7, 2021, **Binance Account No. \*\*\*7515** attempted to send the equivalent of $35,000 to **Binance Address \*\*\*QnsZ** on the blockchain. Binance twice rejected the transfer for an unstated reason, but within two hours, Binance processed a transfer for Ghozlan to the same recipient, this time off-chain on the Binance internal ledger.

1130. Even after **Binance Account No. \*\*\*7515** was designated, Binance permitted **Binance Address \*\*\*QnsZ** to continue operating for a year after the designation and in 2023 that account received the equivalent of $373,000 from an address belonging to the Tawfiq al-Law IRGC/Hezbollah network.

### n. Binance Account No. \*\*\*1236

1131. **Binance Account No. \*\*\*1236** was registered in February 2021 by a then 21-year-old Turkish national named Muhammed Abdulrahman. During its ten-month period of operation, the account moved the equivalent of more than $33 million in combined cryptocurrency

throughput within ten months — $16.7 million deposited and $16.8 million withdrawn – with more than 60% of all deposits ($11.2 million) off-chain originating with other Binance users.

1132. NBCTF designated **Binance Account No. \*\*\*1236** on December 2021 (ASO 79/21) as part of the Al-Mutahadun for Exchange network.

1133. **Binance Account No. \*\*\*1236** sent USDT off-chain under Binance internal ledger to other members of the Al-Mutahadun for Exchange Network including:

- **Binance Account No. \*\*\*4404**: the equivalent of $30,000;

- **Binance Account \*\*\*2525**: the equivalent of $40,000;

- **Binance Account \*\*\*7729**: the equivalent of $25,000; and

- **Binance Account \*\*\*7515**: the equivalent of $115,000.

1134. **Binance Account No. \*\*\*1236** also sent USDT to Nobitex. On September 18, 2021, it sent an equivalent of $10,000 to **Tron Address \*\*\*SisA**, a deposit address strongly associated with Nobitex.

1135. **Binance Account No. \*\*\*1236** sent large amounts of USDT to the following Tron addresses that directly transacted with BuyCash wallets: **Tron Addresses \*\*\*JHvs, \*\*\*JVnd, \*\*\*4Fm2, \*\*\*C2gK, \*\*\*cqug, \*\*\*uCxr, \*\*\*ko47, \*\*\*2q1x, \*\*\*2uRR, \*\*\*f4CC**.

1136. **Binance Account No. \*\*\*1236** sent large amounts of USDT to Tron addresses that directly transacted with Hezbollah wallets: **\*\*\*q72b, \*\*\*gXKi, \*\*\*HAes** and to Tron Addresses that transacted with both Hezbollah and BuyCash (Hamas): **\*\*\*2uRR, \*\*\*ko47, \*\*\*C2gK, \*\*\*JVnd**.

1137. **Binance Account No. \*\*\*1236** received off-chain deposits equivalent of $225,052 from **Binance Account No. \*\*\*9055** – a significant node of Hamas's Al-Mutahadun for Exchange network.

1138.  **Binance Account No. ***1236** also received deposits from **Tron Address ***gzTP** totaling the equivalent of more than $240,000.

1139.  **Binance Account No. ***1236** also received 33 deposits from **Tron Address ***n8te** between September and December 2021, totaling the equivalent of more than $4,556,500.

1140.  Binance's willing complicity in Hamas's money laundering apparatus is further illustrated by its willingness to continue moving funds to and from addresses it knew were closely linked to **Binance Account No. ***1236**.

1141.  For example, after **Binance Account No. ***1236** was designated by the NBCTF in December 2021, Binance ignored the fact that **Tron Address ***n8te** was a primary funder of the now designated Binance account and helped other Binance customers to send and receive funds to and from **Tron Address ***n8te** the equivalent to more than $4.6 million.

1142.  Similarly, following **Binance Account No. ***1236**'s designation, **Tron Address ***gzTP** nevertheless continued to process transactions equivalent to more than $240,000 into other Binance accounts. And after January 1, 2022, Binance sent this Tron address the equivalent of more than $24 million on behalf of its customers.

### o.  Binance Account No. ***9055

1143.  **Binance Account No. ***9055** was registered in October 2020 by a then 31-year-old Gaza resident named Fayez Imad Fayez Alkhazendar who submitted KYC documents including his Palestinian passport and photograph, but it only became active in early March 2021 and ceased its activities seven months later in October 2021.

1144.  **Binance Account No. ***9055** was operated solely from Türkiye, where it logged in 2,133 times over the course of those 7 months, receiving deposits and withdrawals of almost identical amounts equivalent to more than $23 million (totaling $46 million).

1145.  In short, the transactional patterns evident in the account unequivocally indicated both money laundering and terror financing.

1146.  From a money laundering perspective, in the first month of its activity, **Binance Account No. \*\*\*9055** received the equivalent of $4.5 million and withdrew almost the same amount – $4.505 million. The next month, the account received the equivalent of $2.7 million and withdrew almost the same amount – $2.69 million. The month after that, the account received the equivalent of $3.31 million and withdrew almost the same amount – $3.4 million. This pattern of using the account as a pass-through continued until **Binance Account No. \*\*\*9055** ceased its activity.

1147.  More than 65% of all deposits ($17.1 million) into **Binance Account No. \*\*\*9055** came from other Binance customers, and 50% of all withdrawals went to other Binance customers, through off-chain transactions visible only to Binance.

1148.  From a terror financing perspective, **Binance Account No. \*\*\*9055** transacted with other nodes of Hamas's Al-Mutahadun for Exchange network, including: **Binance Accounts No. \*\*\*1236, \*\*\*3901, \*\*\*4404, \*\*\*2525, \*\*\*7379** and others. The funds moved rapidly in and out of the account, indicating no legitimate business purpose.

1149.  **Binance Account \*\*\*9055** interacted with Dubai Co. addresses as well. For example, on October 26, 2021 it received the equivalent of almost $7,000 from **Tron Address \*\*\*GUdC**. On the next day, it transferred the equivalent of $12,000 to the same address. When those funds exited **Binance Account \*\*\*9055** on the blockchain, they moved from a Binance omnibus wallet thereby concealing the source of the funds.

1150.  **Binance Account \*\*\*9055** transferred a large amount of TRX to **Tron Address \*\*\*gzTP**, which served as a central node in the IRGC network. This Tron address was the sole

213

recipient of TRX from **Binance Account No. ***9055**, which also sent the equivalent of more than $975,000 in USDT to that same address.

1151. **Binance Account ***9055** also transferred 21,000 USDT to **Tron Address ***XWdB** which directly transacted with designated Tron addresses controlled by BuyCash (affiliated with Hamas) and the PIJ.

1152. **Binance Account ***9055** also transferred 6,119 USDT to **Tron Address ***vnQU** which directly transacted with designated Tron wallets controlled by Dubai Co. and PIJ.

1153. Within one week in June 2021, **Binance Account ***9055** transferred the equivalent of almost $100,000 to **Tron Address ***JAcR** that directly received the equivalent of more than $500,000 from designated Houthi/Ansarallah Tron addresses.

1154. **Binance Account ***9055** also transferred the equivalent of $240,000 to **Tron Address ***YPtq1** that directly transacted with designated Hezbollah, PIJ, and BuyCash (Hamas) Tron addresses.

1155. **Binance Account ***9055** was designated by NBCTF in December 2021 (ASO 79/21) as part of the Al-Mutahadun for Exchange network. It was transacting (directly or with one hop) with BuyCash, Dubai Co., Hezbollah, PIJ, Houthis, IRGC, and Iranian exchange Ramzinex.[136]

### p.  Binance Account No. ***6281

1156. **Binance Account No. ***6281** was registered February 17, 2021, and began transacting three days later. The KYC documentation for the account consisted of a Palestine

---

[136]    Ramzinex is an Iranian cryptocurrency platform that competes with Nobitex. Though much smaller than Nobitex, it has seen an increase in transactional traffic since Nobitex's systems were publicly hacked in June 2025. It was designated by OFAC on June 2, 2026. The U.S. Department of the Treasury found that "Ramzinex has processed over $2.45 billion in transactions, including for transactions linked to the IRGC and a financial institution backed by the Iranian government, and has been used for sanctions evasion."

Authority issued passport in the name of Khaled K.Z. Elden, then 42 years old, and a selfie photo.

1157.    Unlike **Binance Account No. \*\*\*7729** (discussed below) which was registered to his younger brother (who had no listed profession in his KYC documents), Binance Account \*\*\*6281 nominally registered the customer's occupation as "merchant."

1158.    **Binance Account No. \*\*\*6281** was largely accessed from the Palestinian Territories but on a few occasions in October 2021 it was accessed from Türkiye (using the same IP address as his brother).

1159.    On one occasion in August 2021, when the "User forgot password mailbox verification," Binance recorded the log-in as originating with an IP address in Indonesia.

1160.    The first deposits originated from the customer's younger brother Mohammed - **Binance Account No. \*\*\*7729**.

1161.    During its nine months period of operation, **Binance Account No. \*\*\*6281**'s total deposits reached the equivalent of nearly $6 million and slightly less in withdrawals.

1162.    Approximately 44% of all deposits and 22% of withdrawals (in the equivalent of U.S. dollars) transacted by **Binance Account No. \*\*\*6281** were off-chain, using Binance's internal ledger.

1163.    The account transacted with other Binance customers who were part of the Al-Mutahadun for Exchange Hamas network, including **Binance Account Nos. \*\*\*9055, \*\*\*7379, \*\*\*7729** (his brother), **\*\*\*1135, \*\*\*3901, \*\*\*4404, \*\*\*5176, \*\*\*6569** and others.

1164.    Binance Account No. \*\*\*6281 also sent and received USDT to and from Tron addresses that directly transacted with known **BuyCash (Hamas) Wallets \*\*\*zt5t** and **\*\*\*znVF.** The Tron Addresses included **\*\*\*XqPh, \*\*\*ZfnV, \*\*\*PKED**.

215

1165.  NBCTF designated both brothers' accounts in December 2021 (ASO 79/21) as part of Hamas's Al-Mutahadun for Exchange network.

### q.  Binance Account No. ***7729

1166.  **Binance Account No. ***7729** was registered by the 35-year-old brother of Khaled K.Z. Elden, Mohammed, in February 2021 and started transacting on the platform that same day.[137]

1167.  According to the data he presented to Binance, he had no profession and he was the younger brother of the nominal holder of **Binance Account No. ***6281**.

1168.  At its inception until June 23, 2021, **Binance Account No. ***7729** was accessed from Gaza, then for two days from Egypt, and starting June 26, 2021, operated for five months exclusively from Türkiye. Then, in November 2021, the account was again accessed exclusively from Gaza until it ceased activity.

1169.  During its ten months period of operation, **Binance Account No. ***7729**'s deposits totaled the equivalent of more than $8 million, and withdrawals totaled more than $7.9 million.

1170.  **Binance Account No. ***7729** used the internal Binance ledger to send and receive approximately 50% of all the funds that passed through the account.

1171.  **Binance Account No. ***7729** transacted with other Al-Mutahadun for Exchange network customers at Binance off-chain, **Binance Accounts ***9055, ***1236, ***1135, ***7379, ***2283** and many others.

1172.  **Binance Account No. ***7729** regularly transacted with BuyCash. For example, on December 12, 2021, it sent the equivalent of $10,000 directly to **BuyCash Wallet ***znVF**.

---

[137]    The spelling of the customer's transliterated name varies but is indicated here as "Mohammed Khalaf Khamis Zakaria Alden."

1173.  **Binance Account No. \*\*\*7729** also received a series of deposits from **BuyCash Wallet \*\*\*zt5t** totaling the equivalent of $248,060.

1174.  **Binance Account No. \*\*\*7729** transacted directly with other Tron Addresses that directly transacted with BuyCash wallets. These included **Tron Addresses \*\*\*7SxC, \*\*\*B7WA, \*\*\*t4m9, \*\*\*kNmD**.

1175.  **Binance Account No. \*\*\*7729** also transacted directly – off-chain – with other Binance customers that received direct deposits from the Tawfiq al-Law IRGC/Hezbollah network. These included **Binance Accounts \*\*\*2635 and \*\*\*1116**, respectively.

1176.  **Binance Account No. \*\*\*7729** transacted in similar ways with PIJ and Dubai Co. addresses – directly or through one intermediary.

1177.  NBCTF designated both brothers' Binance accounts in December 2021 (ASO 79/21) as part of the Al-Mutahadun for Exchange network.

### r.  Binance Account No. \*\*\*6569

1178.  **Binance Account No. \*\*\*6569** was registered in 2018 by a then 27-year-old Palestinian named Mahmoud M.M. Ayesh, but first became active a year later after the nominal customer identification was completed by Binance on September 29, 2019.

1179.  The KYC Documentation consisted of a passport issued by the Palestinian Authority listing his profession as "Sales Representative."

1180.  **Binance Account No. \*\*\*6569** was primarily accessed from Gaza and other locations in the Palestinian Territories, but multiple withdrawals were executed from Mountain View, California, and Tokyo, Japan.

1181.  The account was active until July 2021.

1182.   From September 2019 until July 2021, **Binance Account No. ***6569** received deposits equivalent to more than $7 million (75% of which were transferred off-chain from other Binance customers) and withdrew almost the same amount (82% off-chain to other Binance customers). Most transactions were in USDT and BTC.

1183.   **Binance Account No. ***6569** transacted off-chain on Binance's internal ledger with many other Binance customers who were part of Hamas's Al-Mutahadun for Exchange network, including B**inance Accounts ***2659, ***0699, ***9055, ***7729, ***4404, ***9997** and others.

1184.   **Binance Account No. ***6569** was involved in 24 USDT off-chain transactions with **Binance Account No. ***3793** who in turn received USDT directly from **IRGC/Hezbollah al-Law wallets ***pvCU and ***YKUq**, **BuyCash (Hamas) Wallet ***zt5t** and PIJ **Tron Addresses ***19M4 and ***M4nS.**

1185.   **Binance Account No. ***6569** was involved in off-chain transactions with **Binance Account No. ***8576** that directly transacted with BuyCash (Hamas) and PIJ.

1186.   **Binance Account No. ***8576** received the equivalent of more than $22,000 from **Binance Account No. ***6569** while also receiving deposits from **BuyCash Wallet ***znVF**, Gaza Broker **Tron Addresses B-1 and B-2, Tron Address ***wirR**.

1187.   NBCTF designated the account in December 2021 (ASO 79/21) as being part of the Al-Mutahadun for Exchange network.

### 6.   Other Hamas Binance Customers

#### a.   Binance Account No. ***4344 (Yasser Youssef Khechen)

1188.   **Binance Account No. ***4344** was nominally registered in April 2020 by a 28-year-old Lebanese national named Yasser Youssef Khechen.

218

1189. KYC documentation for this account included only the customer's Lebanese passport and a shirtless photo.

1190. The account was active only between April 2020 and the end of September 2021 and exhibited obvious signs of money laundering.

1191. For example, from April 2020 to January 2021, the account accumulated cash (fiat currency) collected in the Federal Republic of Nigeria in local Naira currency (NGN) – approximately 4.4 billion NGN equivalent to more than $11,400,000.

1192. Out of a total of 479 successful fiat deposits, 386 (more than 80%) were deposits for the almost identical amount of 9.9 million NGN (equivalent to approximately $25,000). The deposits arrived into the account on a daily basis, often several per day, reaching a high-water mark of 18 deposits per day.

1193. The assets then left the account after stablecoins were purchased with the NGN (mainly USDT, USDC, and BUSD).

1194. **Binance Account No. ***4344** transferred the equivalent of more than $143 million in stablecoins, and the dollar equivalent of more than $8 million were withdrawn in Bitcoin.

1195. In January 2021, **Binance Account No. ***4344** stopped receiving NGN but continued to receive the equivalent of more than $70 million in deposits, primarily in USDT and BTC.

1196. **Binance Account No. ***4344** transferred $24 million to **Binance Account No. ***7515**, belonging to Hadi Ghozlan, a Syrian national holding a Commonwealth of Dominica passport, discussed above. **Binance Account No. ***7515** in turn deposited the equivalent of $1.3 million into **Binance Account No. ***4344**.

1197.  All of these transactions – as well as the fiat deposits – were executed off-chain using Binance's internal ledgers and could not be seen on the blockchain but were, of course, monitored and facilitated by Binance.

1198.  **Binance Account No. ***4344** also transferred 99,999 USDT on September 22, 2021, to Younes Imad Shamlakh – a member of the Shamlakh family that operates a Gaza-based money exchange and money laundering network known as Al-Markaziya (formerly Al-Mutahadun for Exchange). According to the U.S. Department of the Treasury, it serves as "the main end point for funds transferred from the IRGC–QF to Hamas and PIJ in Gaza," channeling tens of millions of dollars annually from the IRGC–QF to designated terrorist organizations.

1199.  Below is a list of major off-chain counterparties that engaged in cryptocurrency transactions in excess of $1 million with **Binance Account No. ***4344**:

Withdrawals: $28,384,475

| Binance Account No. | USDT Amount in US$ |
| --- | --- |
| 21037350 | 7,402,496.00 |
| 11618365 | 5,447,633.63 |
| 19935069 | 3,806,756.57 |
| 40888369 | 3,791,809.00 |
| 71135843 | 2,736,245.00 |
| 36604179 | 1,698,561.80 |
| 79164871 | 1,377,398.00 |
| 41230084 | 1,154,950.00 |
| 10698928 | 968,625.00 |

Deposits: $28,494,898.52

| Binance Account No. | USDT Amount in US$ |
| --- | --- |
| 16199678 | 11,071,913.55 |
| 16229223 | 4,197,793.40 |
| 20119825 | 2,875,737.45 |
| 18701587 | 2,703,785.51 |
| 177857072 | 2,172,416.34 |
| 10803272 | 1,726,694.10 |

220

| 43007515 | 1,308,877.00 |
|---|---|
| 40013060 | 1,306,983.43 |
| 37191721 | 1,130,697.74 |

1200. **Binance Account No. \*\*\*4344** also traded substantially with the designated Iranian exchange Nobitex.

1201. Within a three-day period in September 2021, **Binance Account No. \*\*\*4344** made sixteen transfers to Nobitex addresses – all in the same amount of USDT equivalent of $19,999.

1202. **Binance Account No. \*\*\*4344** sent funds equivalent to $300,000 to Tron Address \*\*\*pvCU identified by NBCTF (ASO 29/23, May 2023) as being part of Tawfiq al-Law's Hezbollah money laundering network.

1203. **Binance Account No. \*\*\*4344** also sent the equivalent of $40,000 in USDT to BuyCash in May and September 2021 to **BuyCash Wallet \*\*\*zt5t**.

1204. BuyCash is a Gaza-based remittance company, currency exchanger, money transfer service, and electronic payment processor that served as a critical financial node for channeling funds to Hamas operations in Gaza. It was designated an SDGT in October 2023 for "having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Hamas."

1205. **Binance Account No. \*\*\*4344** was regularly and most frequently accessed from Lebanon (including known Hezbollah strongholds in southern Lebanon) and more than 2,000 times from Türkiye. The account was also operating in Syria, Nigeria, France, Germany, the United Kingdom, and other locations.

1206. **Binance Account No. \*\*\*4344** also made at least seven withdrawal applications and fiat deposit applications from IP addresses in New York, New York, and Cheyenne, Wyoming.

221

**b.   Binance Account No. ***3382 (Hanad Adam)**

1207.   **Binance Account No. ***3382** was registered under the name Hanad Adam in December 2017, at the time a twenty-three-year-old, using the email address: ██████████@gmail.com. KYC verification was completed for the account four-and-half years later in mid-2022, after years of high-volume activity. Thus, Binance enabled the account to transact for years without any meaningful identity verification, source-of-funds documentation, or enhanced due diligence.[138]

1208.   **Binance Account No. ***3382** was accessed nearly 4,000 times from more than 200 unique IP addresses, with access overwhelmingly concentrated in Canadian cities including Montreal, Ottawa, Edmonton, and the Toronto metropolitan area, as well as from jurisdictions including Algeria, Saudi Arabia, China and Singapore. This indicates either the use of VPN services to mask true geographic locations or the account's use by multiple individuals across different jurisdictions—both patterns consistent with coordinated money laundering networks.

1209.   **Binance Account No. ***3382** displayed many indicia of being involved in money laundering and terror financing.

1210.   For example, **Binance Account No. ***3382** made only two blockchain deposits totaling $6,144.11 in USDT equivalent (one deposit in REQ tokens and one in XRP) yet subsequently executed 89 blockchain withdrawals totaling the equivalent of almost $1.5 million.

1211.   This massive imbalance—withdrawing $1.47 million from an account that received only $6,144 in traceable blockchain deposits—indicates that **Binance Account No. ***3382**

---

138      Adam finally submitted for verification an Alberta, Canada, driver's license issued just nine days earlier (June 14, 2022) and a Telus utility bill (May 11, 2022), both showing an address in Edmonton — with KYC verification completed at the end of June 2022.

functioned as a money laundering conduit, with the true source of the withdrawn funds deliberately obscured through Binance's off-chain internal transfer architecture.

1212.    *One* off-chain funding source for **Binance Account No. ***3382**'s $1.47 million in withdrawals was Binance's internal "Binance Pay" transfer system, which enables cryptocurrency transfers between Binance customers that occur entirely off-chain and are therefore invisible on public blockchains and untraceable to law enforcement and regulatory authorities without Binance's cooperation.

1213.    The account was dormant for an extended period of time after it was first opened, then exhibited explosive withdrawal activity during the six-month period immediately preceding the October 7 Attacks, with July 2023 (the equivalent of more than $400,000 in transactions) and August 2023 (the equivalent of almost $400,000 in transactions) accounting for more than half of all-time withdrawals.

1214.    In January 2021, Adam withdrew 16,974 REQ tokens (Request Network) from Binance to an external Ethereum address. One week later, the exact same amount was re-deposited from that same external address back into Adam's account. Such cycling of funds is not typical for legitimate counterparties.

1215.    Adam's account primarily bought USDT for Canadian dollars from various sellers of USDT, converting mass amounts of fiat currency (Canadian dollars) via Interac e-Transfer (a Canadian bank transfer method) to cryptocurrency—USDT coins.

1216.    By structuring hundreds of small trades, the account effectively converted large amounts of cash collected (in fiat) into cryptocurrency.[139] Individual trade sizes were often just

---

[139]    For example, Canadian dollars flowed into the account equivalent to almost $2 million (USD) and were primarily used to purchase USDT. Most of that fiat currency left via Binance's own accounts, transferring USDT anonymously on the public blockchain.

below reporting thresholds suggesting structuring (or "smurfing") to avoid detection by banks.[140]

1217. The accumulated USDT cryptocurrency was then distributed both on-chain and – off-chain under the auspices of Binance's money laundering architecture.

1218. **Binance Account No. \*\*\*3382** was an important node in the Hamas–PIJ–BuyCash network. It converted collected Canadian dollars into USDT and then distributed the equivalent of millions of dollars in cryptocurrency to multiple BuyCash wallets.

1219. For example, **Tron Address \*\*\*66NL** received more than the equivalent of $350,000 in USDT from **Binance Account No. \*\*\*3382** that was converted from Canadian dollars.

1220. **Tron Address \*\*\*66NL** sent the equivalent of more than $750,000 to three BuyCash addresses.

1221. **Tron Address \*\*\*foQF**, controlled by PIJ, received the equivalent of $8,000 from **Binance Account No. \*\*\*3382**, while also sending the equivalent of more than $1.5 million to **BuyCash Wallet \*\*\*znVF**, and the equivalent of almost $350,000 to **BuyCash Wallet \*\*\*zt5t**.

1222. **Tron Address \*\*\*foQF** was designated by NBCTF on July 4, 2023 (ASO 34/23) as property of PIJ – more than two months before **Binance Account No. \*\*\*3382** became inactive. Had Binance frozen **Binance Account No. \*\*\*3382** once **Tron Address \*\*\*foQF** was designated, more than $950,000 in terror financing funds would not have been transferred—some of it right before the October 7 Attacks.

1223. **Binance Account No. \*\*\*3382** also transacted with the Hezbollah–IRGC's cryptocurrency network. For example, on May 29, 2023, after NBCTF's designation of several

---

[140] Binance's systems did flag certain withdrawal attempts from this account (or a closely related one). For example, from November 19–21, 2021, a series of 10 attempted withdrawals to external (on-chain) wallets were rejected by Binance. Nevertheless, no lasting account suspension followed—the account remained active into 2023.

wallets belonging to the Hezbollah-IRGC money launderer—Tawfiq al-Law, Binance processed a transaction for **Binance Account No. \*\*\*3382** sending the equivalent of more than $18,000 to **Tron Address \*\*\*gLrd**, which, in turn, sent the equivalent of more than $3 million to various al-Law designated wallets. **Tron Address \*\*\*gLrd** also sent the equivalent of more than $75,000 to various Nobitex addresses.

1224.    While on-ramping Canadian dollars and converting them into USDT (and vice versa), Hanad Adam also used his Visa credit card number \*\*\*7865, issued by Toronto Dominion Bank. **Binance Account No. \*\*\*3382** was accessed from across Canada, in Saudi Arabia, Türkiye, Algeria, China, and Secaucus, New Jersey.

### J.    Binance Knowingly and Willingly Assisted PIJ

#### 1.  Binance Account No. \*\*\*5345

1225.    **Binance Account No. \*\*\*5345** belonged to a 25-year-old PIJ operative in Khan Yunis (Gaza) who opened his account in October 2020 when he was 20 years old.[141]

1226.    The operative took an active part in the May 2021 funeral of a Hamas operative killed by Israeli forces. Photographs released at the time by *Reuters* and *Agence France-Presse* show him serving as "pallbearer" during the funeral procession:

---

[141]    Although the accountholder appears to have been a resident of Gaza, Binance actively processed 792 distinct IP address logins for this account over a 4-year period (October 6, 2020 through February 17, 2025)—spanning the October 7 Attacks—including logins that were physically impossible without VPN masking. Binance's authentication systems recorded logins from at least 11 distinct geographic locations (France, UK, Netherlands, Germany, and various cities in the Palestinian Territories). Critically, all 18 European VPN sessions involved financial transactions. Since the same physical device was used to log in from Paris, London, Amsterdam, and Gaza in alternating sessions, the PIJ operative using this account displayed operational security sophistication.

225



1227.  Full KYC verification on this account was never completed.

1228.  Binance listed the account's KYC Status as "REFUSED"–meaning an attempted identity verification was rejected or not approved. But Binance's tiered verification system affirmatively enabled the account to operate unimpeded with only "Basic" verification (email and phone confirmation), processing the equivalent of $768,993 in deposits and $776,416 in withdrawals over three years.

1229.  The account was one (relatively small) node in a network of Hamas and PIJ accounts and crypto wallets.

1230.  The many glaring indicia of money laundering and terror financing exhibited by the account confirm that these criminal activities were perfectly suited to Binance's IT architecture.

1231.  **Binance Account No. ***5345** received funds from 403 unique source addresses in less than three years.

1232. However, critically, a small subset of those addresses contributed most of the deposits, and the account rarely held onto funds for long.[142] For example, deposits made into the account often left within hours via corresponding withdrawals.

1233. On July 30, 2023, four deposits totaling the equivalent of $4,202 arrived between 12:20 and 14:12 UTC, and Binance's platform facilitated three cryptocurrency withdrawals totaling $1,877 during this same two-hour window (occurring at 13:21, 13:28, and 14:17 UTC), demonstrating the rapid movement of funds characteristic of this account.

1234. Moreover, one of these four deposits, 1,000.00 USDT credited at 14:08:04 UTC on July 30th—originated from **Tron Address \*\*\*YKUq**, which had been designated 26 days earlier under NBCTF Administrative Seizure Order 34/23 (effective July 4, 2023) as associated with terrorist financing.

1235. In another instance, on February 18, 2021, **Binance Account No. \*\*\*5345** attempted to send 435 USDT to an "on-chain" crypto wallet three times within an hour, but all three transactions were rejected.

1236. Within minutes after the rejection, Binance's internal transfer system provided an alternative pathway: the account executed a withdrawal for the same amount of 435 USDT to a single **Binance Account No. \*\*\*7896**–off-chain.

1237. This circular flow (in and out of the account for almost the exact same amount) was used to "cycle" funds through Binance to break the visible link to the wallet's prior transactions.[143]

1238. One Tron address, **Tron Address \*\*\*diSX**, sent funds to this account 118 times,

---

[142]    Critically, 277 source addresses (68.7 percent) were used only once—a single-use rate indicating systematic fragmentation designed to obscure fund origins rather than organic transaction patterns and suggesting multi-user operational control characteristic of organizational rather than individual account usage.

[143]    As noted above, Binance collects all data on its customer accounts and is able to run highly sophisticated algorithms to detect fraud, money laundering, and other transactional anomalies.

totaling the equivalent of over $100,000 in USDT.

1239.  That same address also was the *recipient* of 86 withdrawals from the account, totaling almost the exact equivalent in USDT.[144]

1240.  This Tron address is notorious as a temporary holding vault rather than an independent recipient, referred to by a blockchain intelligence firm as serving a "crucial role in the cryptocurrency laundering scheme"[145] and served as the "safe harbor" for **Binance Account No. \*\*\*5345's** last and ultimate withdrawal of assets from the account.

1241.  As of November 4, 2025, the same Tron address (which remains active) received from all its counterparties a total value equivalent to $5,609,316.05 (and transferred out almost the same amount). Notably, 38% of all its deposits (the equivalent of more than $2 million U.S. dollars), came from Binance-controlled omnibus wallets, with at least two transactions coming from Binance as late as November 4, 2025.

1242.  Since all outgoing transactions from Binance that are "on-chain" are routed through these Binance wallets that pool customer crypto assets, blockchain withdrawals of funds deposited into **Binance Account No. \*\*\*5345** were effectively untraceable–except to Binance itself. The same is true for Binance-originating transfers (equivalent of more than $2 million) into **Tron Address \*\*\*diSX**.

1243.  In fact, on July 30, 2023, when **Binance Account No. \*\*\*5345** received the equivalent of $1,000 from a PIJ wallet already designated by NBCTF (Seizure Order 34/23), it withdrew almost the exact same amount (within 14 hours) and sent the cryptocurrency to the Tron

---

[144]    On July 30, 2023, **Binance Account No. \*\*\*5345** also received the equivalent of $1,000 from a designated PIJ wallet – **Tron Address \*\*\*YKUq**.

[145]    *See* Bit OK Inc., *Uncovering a $10 Billion Scheme: BitOK Analysts Investigated Addresses Linked to Hezbollah and Quds Force*, Bit OK Blog (2023), https://bitok.org/blog/hezbollah-quds-crypto-financing (last visited Nov. 17, 2025).

address **Tron Address \*\*\*diSX** (which, again, played a "crucial role in the cryptocurrency laundering scheme"). The transfer was sent through a Binance-controlled omnibus wallet.

1244. Of course, **Binance Account No. \*\*\*5345** also used Binance's internal transfer features (including Binance Pay) extensively, which the account used to interact with dozens of other Binance accounts. Instead of sending a large sum from one Binance account to another, smaller amounts were passed among many accounts. For example, **Binance Account No. \*\*\*5345** engaged in 79 transfers with one particular Binance user (**Binance Account No. \*\*\*6133**) and over 40 transfers each with several other Binance customers, indicating repeated cyclical movement of funds internal to Binance's ledger.

1245. In fact, approximately 70% of USDT deposits into **Binance Account No. \*\*\*5345** (U.S. Dollar equivalent of $558,000 in USDT out of a total of approximately $768,000) were made using internal Binance transfers and therefore not visible on public blockchain. The same pattern persisted with the account's withdrawals, where 71% of the account's USDT withdrawals were executed "off-chain" to other Binance users.

1246. Between 2021 and 2023, another Tron address—**Tron Address \*\*\*YKUq**—made 17 transfers into **Binance Account No. \*\*\*5345**, totaling the equivalent of $25,283 and received 9 withdrawals totaling $14,384.

1247. NBCTF designated this Tron wallet on July 4, 2023, and identified it as belonging to PIJ.

1248. The last transaction from **Binance Account No. \*\*\*5345** occurred on July 30, 2023—only 26 days after NBCTF's designation—indicating coordination within PIJ's network to avoid further use of the account recently tied to the publicly-identified Tron address.

1249. **Binance Account No. \*\*\*5345** also received an internal transfer on March 20,

2021, of 10,000 USDT (the account's single largest deposit) from **Binance Account No. \*\*\*6569,** which was designated by Israel's NBCTF on December 29, 2021 (ASO 79/21) as belonging to Al-Markaziya (formerly Al-Mutahadun for Exchange).[146]

1250.   **Binance Account No. \*\*\*5345** remained active for an additional 20 months without freezing or even enhanced monitoring after **Binance Account No. \*\*\*6569** was designated in December 2021.

1251.   All told, approximately 15% of funds received into **Binance Account No. \*\*\*5345** originated from other Binance accounts designated by NBCTF.

1252.   At the end of July 2023, Binance's compliance function finally instituted a "live monitoring asset freeze" and placed a 24-hour hold on approximately 1000 USDT.

1253.   The freeze notation indicated the case would be transferred to Binance's compliance help desk because a transaction was flagged as suspicious by its automated monitoring system and sent to Binance's compliance team for investigation.

1254.   However, less than one hour after the freeze was activated, Binance processed a withdrawal request by **Binance Account No. \*\*\*5345** for 999.77 USDT, effectively emptying the account.

1255.   After July 2023, **Binance Account No. \*\*\*5345** stopped making withdrawals to crypto wallets on the blockchain, but made withdrawals to internal transfers to other Binance accounts in August.

1256.   The account was primarily accessed from Gaza, but was also accessed from

---

[146]   The U.S. Department of the Treasury also designated Al-Markaziya (formerly Al-Mutahadun for Exchange) as an SDGT in January 2024 for being "directly involved in facilitating tens of millions of dollars from IRGC-QF to Hamas and PIJ." Press Release, *U.S., UK, and Australia Target Additional Hamas Financial Networks and Facilitators of Virtual Currency Transfers*, U.S. DEP'T OF TREAS. (Jan. 22, 2024), https://home.treasury.gov/news/press-releases/jy2036.

London, Paris, and Frankfurt, Germany.

### 2. Binance Account No. ***2659

1257. Another example of an account held for the benefit of PIJ was **Binance Account No. ***2659**. This account belonged to a 22-year-old Palestinian national from Gaza, Mohammad Rafat Abu Kwaik, who opened his account in February 2020.

1258. Binance never completed KYC verification for this account.

1259. It listed the account's KYC Status as "REFUSED"—meaning an attempted identity verification was rejected or not approved. Yet Binance's tiered verification system affirmatively enabled the account to operate unimpeded with only "Basic" verification (email and phone confirmation), processing the equivalent of $33,582 in deposits and $25,738 in withdrawals over 38 months.

1260. One (subsequently designated) Tron address, **Tron Address ***GS63**,[147] contributed nearly one-third of all deposits into **Binance Account No. ***2659**. This address sent the equivalent of $11,059 to the account through 13 separate deposits between October 2021 and February 2023.

1261. Approximately 43.3% of the account's deposits ($14,543 of $33,582) and 32.9% of withdrawals ($8,477 of $25,738) were "off-chain" (internal to Binance's platform and internal ledger).

1262. For example, **Binance Account No. ***2659** engaged in eight deposit transfers (totaling $5,814) and five withdrawal transfers (totaling $2,815) with **Binance Account No. ***6569.** The latter was a hub account within an IRGC–Hamas financing network (subject to

---

[147] This wallet was designated by Israel's NBCTF on July 4, 2023 (ASO 34-23). *See* Nat'l Bureau for Counter Terror Fin., Administrative Seizure Order No. 34/23, (Isr. Jul. 4, 2023), https://nbctf.mod.gov.il/he/Announcements/Documents/%d7%a6%d7%aa%2034-23.pdf.

NBCTF Administrative Seizure Order—ASO 79/21—on December 29, 2021) that provided hundreds of thousands of dollars to multiple suspicious accounts across Binance's platform and was owned by Mahmoud Mohammed Mahmoud Ayesh.

1263. According to NBCTF, **Binance Account No. \*\*\*6569** was one node in a broader IRGC-Hamas financing network.

1264. Binance processed 54 internal transfers involving **Binance Account No. \*\*\*2659** across 14 unique accounts, 33 deposits from 10 sending accounts, and 21 withdrawals to nine receiving accounts. This hub-and-spoke network utilized: (a) internal transfer functionality bypassing blockchain transparency; (b) unique Counter Party IDs for proprietary ledger routing; (c) continued processing for 16 months after NBCTF's December 2021 terrorist financing designation; and (d) systematic transactions with **Binance Account No. \*\*\*6569**.

1265. NBCTF issued an Administrative Seizure Order for **Binance Account No. \*\*\*2659** and identified the email address of the account holder (abukwaik██████████@gmail.com) on April 21, 2023 (ASO19/23), as "Property used for the perpetration of severe terror crime" related to the operations of the designated terrorist organizations—Al Mutahadun for Exchange or Dubai Company for Exchange or Al Wefaq Co. for Exchange.

1266. **Binance Account No. \*\*\*5345** and **Binance Account No. \*\*\*2659** were but two small examples of what the U.S. government would later conclude—that Binance processed the equivalent of tens of millions of dollars for PIJ and other terrorist organizations.

1267. FinCEN, in a consent order signed by Binance, concluded that Binance had processed "significant sums" on behalf of Hamas, PIJ, and other terror groups:

> ***Binance failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist***

*organizations by the United States and United Nations*, as well as high-risk exchanges associated with terrorist financing activity. Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), *Hamas' Al-Qassam Brigades*, Al Qaeda, and the *Palestine Islamic Jihad (PIJ)*.

(Emphasis added.)

1268. FinCEN's investigation **"identified dozens of former Binance users with tens of millions of dollars in transactions with an identified [Palestinian Islamic Jihad] network**." (Emphasis added.)

1269. FinCEN noted that Binance did not file any SARs on the activity (some of which occurred between July 14, 2017, and July 30, 2023), a precautionary step which might have helped insulate Binance from prosecution—but at the risk of diminishing its usefulness to terrorist organizations.

1270. In sum, Binance provided the financial architecture for the IRGC to evade counterterrorism sanctions, sell Iranian oil to China and for the IRGC to launder those proceeds in a variety of ways to transit them to Hamas, Hezbollah, PIJ, and other Iranian proxy terror groups.

1271. Binance facilitated transactions between hundreds, if not thousands of terrorist-linked wallets. And it did more-it provided active assistance to terrorist organizations by helping them to evade regulatory scrutiny and often bespoke assistance by, for example, knowingly processing transfers even when accounts were officially frozen or where their KYC documentation had been rejected.

1272. These special accommodations were not an aberration: they reflected a conscious effort by Binance's senior officers, including Zhao, to assist the IRGC in particular and its proxy terrorist organizations more generally.

1273. Binance's own criminal conduct foreseeably enhanced the IRGC, Hamas, PIJ and Hezbollah's ability to perpetrate the October 7 Attacks and various acts of international terrorism

233

that followed.

## V.   THE FOREIGN TERRORIST ORGANIZATIONS RESPONSIBLE FOR THE OCTOBER 7 TERROR OFFENSIVE

1274.   According to the U.S. State Department, "In 2023, Iran remained the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities in the United States and globally."[148]

1275.   The IRGC financed, trained, armed and equipped Hamas, PIJ and Hezbollah in preparation for the October 7 Attacks. It also helped Hamas to coordinate with PIJ and other Gaza-based terrorist groups, which joined the October 7 Attacks, and with Hezbollah, which was initially expected to attack Israel on the same day, but instead began its assault on October 8.

1276.   Since 2016, the U.S. State Department's *Country Reports on Terrorism* contained the following materially identical statement regarding Iran's support for terrorism. This example is from the most recent 2023 report:

> Designated as a State Sponsor of Terrorism in 1984, Iran continued its support for terrorist activity in 2023, including support for Hizballah, U.S.-designated Palestinian terrorist groups in the West Bank and Gaza including Hamas, the Houthis in Yemen, and Iran-aligned militia groups (IAMGs) in Iraq and Syria. After the October 7 Hamas attacks on Israel, Iran-backed groups took advantage of the regional conflict to further their objectives. Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region. The IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad.[149]

### A.   The IRGC and Its Quds Force Run the "Axis of Resistance"

1277.   The IRGC was established in the immediate wake of the 1979 Iranian revolution.

---

[148]   U.S. DEP'T OF STATE, *Country Reports on Terrorism 2023* at 4 (2023), https://www.state.gov/reports/country-reports-on-terrorism-2023/.

[149]   *Id.*

The IRGC defines itself as an agent of the Supreme Leader, to whom it pledges its unflinching loyalty. The IRGC leadership and the Supreme Leader both frequently speak about the IRGC as the guardian of the principles of the revolution. The IRGC is dedicated to spreading fundamentalist (Shi'a) Islamist principles throughout the world and establishing fundamentalist Islamist governments in nations other than Iran.

1278. The IRGC has its own military branches—an army, air force, and navy—the purposes of which are not to defend Iran's borders, but to protect and advance the Islamic revolution, including through paramilitary operations in the Middle East.

1279. The IRGC also has a domestic militia, the Basij paramilitary force, with approximately 600,000 members.

1280. The IRGC also holds a controlling number of positions in the Iranian government and its economy. IRGC veterans have served as governors of many of Iran's 31 provinces.

1281. The IRGC also controls many companies, spanning a wide range of industries, including petroleum production, construction, nuclear power, banking, and others. The IRGC uses a significant percentage of the proceeds from these ventures to fund terrorism.

1282. As noted above, the IRGC controls the Iranian oil industry and most of its revenues and financial resources derive from the illicit sale of oil to China in violation of U.S. sanctions.

1283. By one U.S. government estimate, the IRGC has between 150,000 and 190,000 personnel—not including the domestic militia.

1284. The IRGC-QF is also one of the IRGC's branches. Among its roles are to establish, fund, equip, and train foreign Islamic revolutionary groups, including Hezbollah, Hamas, PIJ, and others.

235

1285. In essence, the IRGC-QF is charged with cultivating and supporting pro-Iran proxies in foreign countries and coordinating with these groups to conduct terrorist attacks.

1286. According to the U.S. State Department's most recent *Country Reports on Terrorism*, "the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and the Ministry of Intelligence and Security remained Iran's primary actors involved in supporting terrorist recruitment, financing, and plotting across Africa, Asia, Europe, and the Americas."[150]

1287. By using groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously, if implausibly, denying responsibility for their actions.

1288. The leader of the IRGC-QF reports directly to the Supreme Leader.

1289. General Qasem Soleimani was the leader of the IRGC-QF from 1998 until January 2020, when he was killed by the United States. He was succeeded by the current leader, Esmail Qaani (a/k/a Ismail Ghaani).

1290. The IRGC-QF is responsible for providing material support to terrorist organizations around the world. For example, the IRGC-QF provided the Taliban with small arms, ammunition, rocket-propelled grenades, mortars, plastic explosives, and more, intending to kill and wound U.S. and NATO forces in Afghanistan.

1291. The IRGC-QF also supplied weapons and training to Iraqi militias for use against U.S. and Coalition Forces following the U.S.-led invasion of Iraq in 2003, including the use of explosively formed penetrators, improvised rocket assisted munitions, rocket-propelled grenades ("RPGs"), sniper fire, and mortars. The IRGC-QF also provided training in operational and computer security.

---

[150]    *Id.*

236

1292.  Most relevant here, the IRGC-QF is the primary conduit through which Iran provides Hamas, PIJ, Hezbollah, the Popular Front for the Liberation of Palestine ("PFLP"), and Ansar Allah (Yemen's Houthi terrorist organization) with material support in the form of weapons, training, logistics, intelligence, and financing.

1293.  The IRGC-QF also manages the above-mentioned "Axis of Resistance"—a semi-formal alliance among and between Iran, the former Assad regime in Syria, Hezbollah, Palestinian terror groups (e.g., Hamas, PIJ, and the PFLP), Iraqi Shi'a militias, and the Houthis.

1294.  Although the members of the Axis of Resistance have their own interests, they work together under the direction of the IRGC-QF, with its coordination and material/financial support. The members work toward the shared goals of weakening and, ultimately, destroying Israel and imposing costs on the United States (including killing and injuring U.S. citizens) for seeking to maintain its influence in the region—with the goal of spreading the Iranian revolution across the Middle East.

1295.  In October 2007, the U.S. State Department designated the IRGC-QF under E.O. 13224, noting its material support to Hamas, PIJ, the PFLP, and "a long history of supporting Hizballah's military, paramilitary, and terrorist activities" among other terrorist groups.[151]

1296.  In 2017, Congress reaffirmed these findings in the Countering America's Adversaries Through Sanctions Act, Pub. L. 115-44, § 105(a), 131 Stat. 886, 892 (2017):

> The Iranian Revolutionary Guard Corps-Quds Force (in this section referred to as the "IRGC-QF") is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South

---

[151]    Fact Sheet, *Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism*, U.S. DEP'T OF STATE (Oct. 25, 2007), https://2001-2009.state.gov/r/pa/prs/ps/2007/ oct/94193.htm.

237

Asia and was designated for the imposition of sanctions ... in October 2007 for its support of terrorism.

As part of the same Act, Congress also extended these findings to the IRGC itself:

The IRGC, not just the IRGC-QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program.

1297.   In April 2019, the U.S. State Department designated the IRGC in its entirety (including the IRGC-QF) as an FTO stating that "the designation highlights that Iran is an outlaw regime that uses terrorism as a key tool of statecraft and that the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago."[152]

### B.    Hamas

1298.   Hamas is the most significant and deadly Palestinian terror organization.

1299.   Hamas was formed in the Gaza Strip in December 1987 by Sheikh Ahmed Yassin and six others as an outgrowth of the Muslim Brotherhood and has the declared goals of globalizing Islam through violent jihad (holy war), eliminating Israel, and establishing an Islamist state that covers present-day Israel, the Gaza Strip, and the West Bank.

1300.   For example, Hamas's original 1988 charter states that "[t]here is no solution to the Palestinian problem except by Jihad." The document is also replete with xenophobic, antisemitic references and openly calls for a genocidal war of ethnic cleansing against Jews in "Palestine." In October 1988, in an interview with the Kuwaiti newspaper *al-Anbaa*, Khalil al-Quqa, who was a close associate of Sheikh Yassin, said: "Allah gathered the Jews in Palestine not for them to have a homeland, but with the intent that it will become their mass grave." On October 12, 1997, the

---

[152]    Fact Sheet, *Designation of the Islamic Revolutionary Guard Corps*, U.S. DEP'T OF STATE (Apr. 8, 2019), https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

*Jordan Times* quoted Yassin as saying, "Hamas's goal is to establish an Islamic state on the ruins of Israel."

1301.   Because of Hamas's history of conducting terror attacks, as noted above, the United States designated Hamas as a Specially Designated Terrorist ("SDT") in 1995, under E.O. 12947; an FTO in 1997, under 8 U.S.C. § 1189; and an SDGT in 2001, under E.O. 13224. In addition, the United States has designated numerous Hamas leaders and fundraisers as Specially Designated Nationals ("SDNs"), thereby freezing their assets, as a result of their activities for Hamas.

1302.   In 2006, Hamas won the general Palestinian Authority elections, attaining a parliamentary majority, and in 2007 it seized power in Gaza after a violent coup. Its takeover of Gaza resulted in the expulsion of the Palestinian Authority security services from the Gaza Strip in May-June 2007. From that time forward, Hamas has maintained absolute political and military control of the Gaza Strip.

1303.   Since 2007, when Hamas first seized control of the Gaza Strip, it has successfully subordinated the other prominent terrorist organizations that operate in its territory.

1304.   Politically, Hamas was historically governed by a main Political Bureau (or Politburo) of approximately 15 members. But after many of its top leaders were killed in 2024, it shifted to a temporary five-person committee. From 1996 until May 2017, the Chairman was Khaled Mashal. Ismail Haniyeh then served as Chairman from May 2017 until his death in July 2024. In August 2024, Yahya Sinwar was selected as Chairman.

1305.   Hamas's main Political Bureau is elected by a Shura Council, which comprises members from the four local political bureaus, one each for Gaza, the West Bank, prisoners in Israel, and the diaspora.

239

1306. Yahya Sinwar led the Gaza Political Bureau (replacing Ismail Haniyeh) from February 2017 until he was chosen as head of Hamas's main Political Bureau in August 2024 after Haniyeh's death. Following Sinwar's death in October 2024, Hamas formed a five-person temporary committee to govern. Leadership elections originally scheduled for March 2025 were postponed, and Hamas has since maintained collective leadership while not publicly disclosing the identities of its new leadership roster.

1307. For more than 30 years, Hamas's Qassam Brigades have committed murderous attacks within Israel, the West Bank, and Gaza. The Qassam Brigades were founded at the start of the 1990s and, before the October 7 Attacks, numbered more than 30,000 terrorists. The organization was directly subordinate to the top Hamas leadership, particularly in the Gaza Strip.

1308. It was (and is) responsible for perpetrating terror attacks for Hamas, and it has murdered thousands of Israeli civilians and numerous U.S. citizens.

1309. The Qassam Brigades is infamous for its suicide terror attacks. To take just a small set of examples: in 1996, Hamas suicide bombers killed 45 people in two separate bombings of buses on Jaffa Road in Jerusalem. In June 2001, a Hamas suicide bomber attacked the Dolphinarium disco in Tel Aviv, killing 21, the majority of whom were teenagers, and wounding more than 100. In August 2001, a Hamas suicide bombing of a Sbarro pizzeria in Jerusalem killed 16 people, including three Americans, and wounded approximately 130. In December 2001, two Hamas suicide bombers perpetrated an attack on Ben Yehuda Street in Jerusalem killing 11 and wounding approximately 188. In March 2002, a Hamas suicide bomber attacked a Passover seder at a hotel in Netanya, which included many elderly survivors of the Holocaust, killing 30 people and wounding approximately 140. In June 2002, a Hamas suicide bomber blew up bus 32A in Jerusalem killing 19 and wounding approximately 50. In March 2003, a Hamas suicide bomber

240

blew up bus 37 in Haifa, killing 17 and wounding approximately 53. In June 2003, a Hamas suicide bomber blew up bus 14A in Jerusalem killing 17 and wounding approximately 100.

1310. From 2007 through the October 7 Attacks, Hamas also fired thousands of rockets at Israeli civilian targets, killing and wounding scores of civilians, some of whom were U.S. citizens.

1311. In the years leading up to the October 7 Attacks, Hamas also expanded its efforts at hostage-taking to gain leverage in negotiations with the Israeli government. Infamously, Hamas held kidnapped IDF soldier Gilad Shalit hostage for more than five years, until his release in October 2011, in exchange for 1,027 terrorists held by Israel. One of those exchanged terrorists was Yahya Sinwar, who would go on to lead Hamas and mastermind the October 7 Attacks. In 2014, Hamas also kidnapped and murdered three teenagers, including a U.S. citizen.

1312. In 2013, Hamas established a unit—the Nukhba ("elite") Force built in the image of Hezbollah's Radwan Force—to commit attacks in Israeli territory through the attack tunnels (discussed further below). The force, which originally numbered 5,000 operatives, would later lead the assault on Israel on October 7.

1313. The Nukhba Force trained intensively, and its recruits underwent religious indoctrination. Many of its commanders trained in Iran or in Hezbollah camps in Lebanon under the supervision of IRGC leaders like Qasem Soleimani and, after his death in 2020, under his replacement, Esmail Qaani.

1314. Hamas's close relationship with, and coordination with, the IRGC made its kinetic capabilities far more lethal.

1315. On February 13, 2017, Yahya Sinwar was elected head of Hamas's Political Bureau in Gaza (and re-elected in March 2021), effectively becoming Hamas's supreme leader in Gaza.

1316.   Shortly thereafter, in May 2017, Ismail Haniyeh was elected chairman of Hamas's Political Bureau and then relocated to Qatar, the site of Hamas's most important headquarters outside of Gaza. He replaced Khaled Mashal (longtime chairman of Hamas's Political Bureau).

1317.   In August 2017, Yahya Sinwar, until his death in 2024 Hamas's most senior leader in the Gaza Strip, stated: "Hamas continues to train its people for the mission of liberated Palestine, and the Iranian Islamic Republic plays a central role in all that's related to this goal through financial and military aid and providing training for the Izz al-Din al-Qassam Brigades."

1318.   Sinwar also declared, in August 2017, that "[r]elations with Iran are excellent and Iran is the largest supporter of the Izz [a]l-D[i]n al-Qassam Brigades with money and arms."

1319.   Hamas has developed a wide range of mechanisms to receive and transfer that support. According to a FinCEN advisory alert issued in late October 2023, Hamas utilizes a "regional network of complicit money transmitters, exchange houses, and Hizballah-affiliated banks" to move its money around.[153]

1320.   In July 2018, Hamas established a "Joint Operations Room" in Gaza which effectively placed PIJ and other terrorist organizations under its operational control in the Gaza Strip.

1321.   As a result, both during the October 7 Attacks and in the months of conflict in Gaza that followed, PIJ (and other Gaza-based terrorist organizations) largely acted under the direction and command of Hamas's Qassam Brigades while maintaining its unique organizational identity.

1322.   Since at least 2021, the IRGC-QF also oversaw the creation of a "Joint Operations Room" in Lebanon, where senior Hezbollah, Hamas, PIJ, and IRGC officials met and coordinated

---

[153]   FinCEN, Alert on Hamas's Terrorist Financing, FIN-2023-Alert006 (Oct. 20, 2023), https://www.fincen.gov/system/files/2025-09/FinCEN_Alert_Terrorist_Financing_proof1.pdf.

their efforts against Israel, often under the auspices of Muhammad Izadi, the IRGC-QF official who served as the head of the Palestinian Office of the IRGC-QF in Lebanon.

1323. At a press conference held on May 26, 2021, following a relatively contained confrontation with Israel in May 2021 (referred to by Israel as "Operation Guardian of the Walls," and by Hamas as "Operation Sword of Jerusalem"), Sinwar expressly and directly disclosed collaboration among the Axis of Resistance:

> During the war we were in continuous contact with our brothers in the field, and in some of the special areas with the brothers in Lebanon [Hezbollah], and there was a high level of coordination, and we made it clear to our brothers in Lebanon, in Hezbollah and in the Guards [of Iran's Revolution] and other factors, that this [the round of confrontation in May 2021 was] only a message we are sending to the enemy, and this is not a real campaign, and we are sure that if this campaign develops, it will grow and strengthen, we are sure that there will be a real and active intervention of the resistance on all fronts.

> We emphasize, I attended the meeting last night [May 25, 2021] and I was completely satisfied with this decision of Sheikh Hassan Nasrallah [the then-leader of Hezbollah], may our Lord protect him by the will of Allah, the Sovereign of the Worlds, and we are fully certain that any attack on the holy places will be a real regional war against it [against Israel], and I have already described it [this scenario], by the will of Allah, the Sovereign of the Worlds, and we are sure that all of us, our entire [Palestinian] nation, our entire [Arab and Islamic] nation, all the active forces of our [Arab and Islamic] nation, all our resistance forces, and all the struggle and resistance forces will be [active] in the next campaign [against Israel] if Al-Aqsa Mosque will call us [for help] … and if the enemy behaves stupidly, then he will find that things will get significantly worse... the barrages [rockets] launched [from Lebanon] and the [unmanned] aircraft that was launched [from Lebanon] were ***in full coordination between the resistance in Lebanon [Hezbollah] and between the resistance in the Gaza Strip [Hamas] and in joint action***.

> There was also a high level of intelligence coordination, and we passed on to our brothers in Lebanon, in the Lebanese resistance and others [information that was] very useful in the intelligence effort and which also served the resistance [Hamas] in its tactical moves in the Gaza Strip. The activity was a very good activity, and we have a very good horizon for the development of this activity. We clearly warned, we said that this was only a short promo, and if [a significant event] happens, by the will of Allah, the Sovereign of the Worlds, and Al-Sayed Nasrallah was honored and

243

declared, ***there will be a regional war*** if our holy places are harmed, and this will lead to an open conflict, by the will of Allah.[154]

**C.      Palestinian Islamic Jihad (PIJ)**

1324.   PIJ was founded in 1981 by Fathi Shiqaqi and Abd al-Aziz Awda (also known as Sheikh Obdeh).

1325.   PIJ seeks "the establishment of an Islamist Palestinian state and the destruction of the state of Israel. The Islamic Jihad believes Palestinian liberation and the seizure of Jerusalem for the Islamic world would serve as a catalyst for a wider Islamic revolution across the Arab and Muslim world."

1326.   PIJ has long been known for executing terrorist attacks targeting Israeli civilians.

1327.   Because of PIJ's history of conducting terror attacks, the United States designated PIJ as an SDT in 1995 under E.O. 12947; an FTO in 1997 under 8 U.S.C. § 1189; and an SDGT in 2001 under E.O. 13224. In addition, the United States has designated numerous PIJ leaders and fundraisers as Specially Designated Nationals ("SDNs"), thereby freezing their assets, as a result of their activities for PIJ.

1328.   Iran's financial and material support for PIJ has been extensive and longstanding, as confirmed by PIJ's own leaders across decades. As early as 1993, Shiqaqi publicly acknowledged receiving Iranian funding and channeling it to operatives in Gaza and the West Bank.

1329.   In 2012, Iran supplied PIJ with Fajr-5 rockets during a conflict with Israel, and PIJ's deputy chairman publicly thanked Iran for the delivery. That same year, PIJ relocated its

---

[154]      For more details *see* Jonathan D. Halevi, *From Hamas's Point of View: This is How the October 7 Attack Unfolded*, Jerusalem Ctr. for Sec. & Foreign Aff., https://jcpa.org.il/article/from-the-point-of-view-of-hamas-october/ (last visited Nov. 17, 2025). [Arabic text translated into Hebrew, then English.]

headquarters from Damascus to Tehran. By 2013, PIJ's own spokesman confirmed that "all of the weapons in Gaza are provided by Iran" and that "the largest share of this financial and military support is coming from Iran." In 2014, a PIJ delegation met in Tehran with President Hassan Rouhani, Foreign Minister Javad Zarif, and parliament speaker Ali Larijani, with a PIJ representative describing Iran as "the main supporter of the Palestinian nation's cause and goals."

1330.   In the past 15 years, PIJ's forces in Gaza have focused on developing capabilities for rocket attacks. By one estimate, between 2005 and 2015, Hamas, PIJ, and other Gaza-based terrorists fired more than 12,000 rockets into Israel, killing at least 10 Israelis, injuring more than 1,100, and causing more than $50 million in property damage.

1331.   The U.S. State Department's Country Reports on Terrorism from 2016 through 2023 consistently confirmed that Iran provides PIJ with weapons, financing, and training.

1332.   From February 23-24, 2020, PIJ fired nearly 100 rockets toward Israel causing at least a dozen injuries. And from May 10-21, 2021, PIJ, together with Hamas, fired more than 4,000 rockets toward Israel, killing 11 civilians and one soldier.

1333.   PIJ officials were candid about Iran's role in these attacks. In May 2021, PIJ official Ramez al-Halabi stated that the rockets used against Israel bore "an Iranian signature," that PIJ militants were trained by the IRGC, and that Iranian money was used to purchase weapons for armed factions in Gaza and Lebanon.

1334.   From August 5-7, 2022, PIJ fired approximately 1,100 additional rockets at Israel.

1335.   As part of the "Axis of Resistance" and under Hamas's direction as part of the Joint Operations Room in Gaza, PIJ actively participated in the October 7 Attacks and the subsequent attacks on Israeli soldiers in the Gaza Strip in the two years that followed.

1336.   Iranian leaders praised PIJ for its role in the October 7 Attacks. In a telephone call

245

the following day, then-Iranian President Ebrahim Raisi told PIJ's secretary general that the attack was "a huge, unique event in the past 70 years" and congratulated PIJ on what he called an "innovative and victorious operation."[155]

### D.   Hezbollah

1337.   Hezbollah is the dominant political and military power in Lebanon, and one of the world's deadliest terrorist organizations, as well as the world's most heavily-armed non-state actor.

1338.   Hezbollah first emerged during the Lebanese civil war in the early 1980s as a militia comprising Shi'a followers of Iranian Ayatollah Ruhollah Khomeini.

1339.   Hezbollah's aims and goals were published in February 1985 in a letter entitled "The Hezbollah Program."

1340.   The Hezbollah Program states: "We are the sons of the umma–the party of God the vanguard of which was made victorious by God in Iran.…We obey the orders of one leader, wise and just, that of our tutor and *faqih* who fulfills all the necessary conditions: Ruhollah Musawi Khomeini," who was the Supreme Leader of Iran at the time. With respect to the United States, the Hezbollah Program states:

> The US has tried, through its local agents, to persuade the people that those who crushed their arrogance in Lebanon and frustrated their conspiracy against the oppressed (mustad'afin) were nothing but a bunch of fanatic terrorists whose sole aim is to dynamite bars and destroy slot machines. Such suggestions cannot and will not mislead our umma, for the whole world knows that whoever wishes to oppose the US, that arrogant superpower, cannot indulge in marginal acts which may make it deviate from its major objective. ***We combat abomination and we shall tear out its very roots, its primary roots, which are the US. All attempts made to drive us into marginal actions will fail, especially as our determination to fight the US is solid***.

---

[155]   President's phone call with SG of the Palestinian Islamic Jihad Movement, *Official Website of the President of the Islamic Republic of Iran* (Oct. 8, 2023), *available at* https://president.ir/en/147044.

1341. Hezbollah pursues its objectives through violent terrorist activity including suicide bombings, assassinations, hostage takings, hijackings, and, more recently, firing rockets, mortars, and missiles.

1342. Hezbollah assists the IRGC and the IRGC-QF in their terror operations outside of Lebanon.

1343. While the IRGC–QF is responsible for managing Iran's terror campaigns abroad, it has lacked Hezbollah's operational and tactical experience in developing terrorist capabilities and performing terrorist attacks against a modern military force.

1344. Moreover, as an ethnically Persian, Farsi-speaking entity, the IRGC-QF was at a disadvantage in recruiting and training Arabic-speaking recruits, whether Shi'a Iraqis, Yemeni Houthis, or Palestinians.

1345. For that purpose, the IRGC–QF has long directed Hezbollah, Iran's most important terror proxy, which has hard-earned experience in running terror campaigns against the IDF in Lebanon, and which shares ethnic and cultural connections with Iraqis and to a lesser extent Palestinians.

1346. At the IRGC's direction, Hezbollah and the IRGC–QF have worked symbiotically for decades to develop Iran's proxy capabilities throughout the region—with a special emphasis on creating and strengthening Iran's "Ring of Fire" enveloping Israel.

1347. After the 2003 U.S. invasion and overthrow of Saddam Hussein's regime in Iraq, Iran directed Hezbollah to create "Unit 3800." As it later would with respect to October 7, Iran began devoting increasing financial resources to gain influence in Iraq and inflict casualties on American service members in Iraq.

247

1348. Hezbollah's Unit 3800 was established by Hassan Nasrallah, Hezbollah's then-leader (he was killed by Israeli forces in 2024), at Iran's direction to support Iraqi Shi'a terrorist groups targeting Multi-National Forces in Iraq.

1349. Unit 3800 trained and advised various Shi'a militias in Iraq, later termed "Special Groups."

1350. Hezbollah training camps in southern Lebanon and Iran, as well as Hezbollah's expertise in the use of military-grade roadside Improvised Explosive Devices (IEDs), kidnapping, communications, and small-unit operations, were critical to the IRGC's operations in Iraq between 2004 and 2011.

1351. According to U.S. intelligence estimates, following the 2007 arrest of Hezbollah's senior operative in Iraq, the IRGC-QF provided Hezbollah and one of its local trainers up to $3 million in U.S. currency every *month*.

1352. As noted above, Hezbollah was designated as an SDT in 1995 under E.O. 12947; an FTO in 1997 under 8 U.S.C. § 1189; and an SDGT in 2001 under E.O. 13224.

1353. In addition, the United States has designated numerous Hezbollah leaders and fundraisers as SDNs, thereby freezing their assets, as a result of their activities for Hezbollah.

1354. As described below, Hezbollah played a significant role in planning and coordinating the "Big Project"—the IRGC's planned multi-front assault on Israel.

### E.    The IRGC and Hamas Planned and Coordinated the October 7 Attacks

1355. Together, these IRGC-financed and directed proxy groups — Hamas, PIJ, and Hezbollah — were preparing for the "Big Project"—a multi-prong attack financed and coordinated by the IRGC-QF and executed in the field by Hamas, Hezbollah, and PIJ with the goal of annihilating the State of Israel.

1356.  To this end, Hamas held a conference in Gaza on September 30, 2021, under the banner "Ensuring the End of Days—Palestine After Liberation." Its participants included senior Hamas leaders such as Sinwar, whose opening remarks to the conference explained:

> The conference's activities are in accord with our assessment that victory is near. The liberation of Palestine from the sea to the river is at the heart of our strategic vision, it is now closer than ever before. Towards that goal, we are hard at work and are making great efforts both above and below the ground, out at sea and in the skies.... [W]e can see our independence flourishing and are therefore preparing for what will follow.[156]

1357.  On January 5, 2023, an article published in *Palestine*, the official Hamas newspaper, *explicitly mentions the Joint Operations Rooms in Lebanon*, stating that "the people believe in the need to go to war in defense of the Al-Aqsa Mosque and its sanctity" and "have full and complete trust in the wisdom of the resistance leadership and its spearhead, the Al-Qassam Brigades and the joint [operations] room, in determining the nature of the response, its timing and place. There is no doubt that the response will be on the scale of the crime. The campaign may be close, very close."

1358.  On March 19, 2023, two months after publication of the article, then- Hezbollah Leader Hassan Nasrallah met with Saleh al-Arouri, the deputy leader of Hamas in Lebanon, further drawing attention to the close ties between Hamas and Hezbollah.

1359.  A month later, on April 23, 2023, Azat Jamal (Ezzat Jamal), published an article on the official website of the Qassam Brigades stating that not only does the Israeli deterrence (against Hamas) no longer exist, but it will not be able to be restored in the foreseeable future in view of the strengthening of the "Axis of Resistance," which consists of Iran, Hezbollah, the military coalition in the Gaza Strip led by Hamas, the Houthi regime in Yemen, and the military militias in Iraq and Syria.

---

[156]    *See* text reported by THE PALESTINIAN PRESS AGENCY (Sept. 30, 2021), https://safa.ps/post/313372.

1360. The IRGC was integral to the planning, coordination, and financing of the "Big Project."

1361. From April to June 2023, Iranian leaders—including the late Ayatollah Ali Khamenei and then-President Ebrahim Raisi—met publicly with Hamas and PIJ leaders in Iran and Syria to plan and discuss how to accomplish further acts of terrorism against Israel.

1362. On June 19, 2023, Haniyeh also met with a delegation of high-level Iranian security and military officials.[157] Haniyeh, accompanied by al-Arouri and other Hamas figures, also met with the IRGC chief, Hossein Salami, and a number of his aides over a period of three days.

1363. On June 21, 2023, Haniyeh publicly met with then Iranian Supreme Leader Ayatollah Khamenei.[158]

1364. Starting no later than August 2023, IRGC-QF commanders used the Joint Operations Room in Beirut to conduct biweekly planning meetings with Hamas, PIJ, Hezbollah, and other Iranian-backed terror groups. Iran's foreign minister Hossein Amir-Abdollahian attended at least two of these meetings.[159]

1365. On August 13, 2023, Nasrallah met publicly with Hamas and PIJ officials.

1366. Hamas published an article in *Palestine* on August 19, 2023, warning:

> The total war and the concerns of the occupation. With the passage of time, the dangers and threats in the environment of the Israeli occupation entity

---

[157] *See Haniyeh meets with the Secretary General of the Supreme National Security Council in Iran*, AL QUDS (June 19, 2023), https://www.alquds.com/en/posts/76699.

[158] *See Iranian state media confirm meeting between Khamenei, Hamas' Haniyeh in Tehran*, REUTERS (Nov. 5, 2023), https://www.reuters.com/world/middle-east/iranian-state-media-confirms-meeting-between-khamenei-hamas-haniyeh-tehran-2023-11-05.

[159] *See* Summer Said, *Iran Helped Plot Attack on Israel Over Several Weeks*, WALL STREET JOURNAL (Oct. 8, 2023), https://www.wsj.com/world/middle-east/iran-israel-hamas-strike-planning-bbe07b25; *see also 500 Hamas, PIJ terrorists trained for October 7 attack in Iran last month – report*, TIMES OF ISRAEL (Oct. 25, 2023), https://www.timesofisrael.com/500-hamas-pij-terrorists-trained-for-october-7-attack-in-iran-last-month-report/; Emanuel Fabian, *IDF says Iran directly aided Hamas before assault*, TIMES OF ISRAEL (Oct. 25, 2023), https://www.timesofisrael.com/liveblog_entry/idf-says-iran-directly-aided-hamas-before-assault.

have intensified and the concerns become visible about the outbreak of a conflict or a total war... against the background the rapid changes in this arena, and the unprecedented developments in the various arenas in Palestine, Lebanon, Syria, Iraq, Yemen, and Iran, which became more capable of creating a deterrence equation in a confrontation with the enemy, after these fronts succeeded in developing capabilities in the field of training, arming, and intelligence effort... the timing and circumstances of this campaign depends on the leadership of the resistance, which is prepared to choose the timing and the circumstances that serve the great goals that the resistance seeks to achieve, first of all the inflicting the greatest defeat on the Israeli enemy, which will push him to stop his occupation of Palestine in the Arab lands once and for all.[160]

1367. On August 25, 2023, Hezbollah's *Al-Mayadeen* television channel broadcasted an extensive interview with al-Arouri, the deputy leader of Hamas, where he presented his assessment of Hamas's relations with Israel, the preparations for an all-out confrontation against Israel in coordination with the Axis of Resistance, and the expected nature of the campaign:

> ***The all-out war has become an unavoidable issue, and we believe it is necessary; we want it.*** We, the resistance, the axis of the resistance, [Arab and Islamic] peoples, the Palestinian people, the [Islamic] nation want this all-out campaign. We do not talk about it [about the war] in public. We discuss it in closed rooms.
>
> ***We meet with everyone. The components [partners to] the overall campaign, and we all discuss it.*** We discuss its scenarios and its potential, and we are convinced that we can … for sure, defeat them... We are convinced that this [Israeli] entity, honestly, if it starts an all-out conflict, its airspace will be closed, and it will not be able to live without electricity, the sea will be closed to it, without communication, [and in a state of] curfew, the wheels of the economy will stop in an open campaign whose end is unknown. We can do all this [mentioned above]. All resistance forces can do this to change this situation, a real change.[161]

---

160      *See* Jonathan D. Halevi, *From Hamas's Point of View*, Jerusalem Ctr. for Sec. & Foreign Aff. (Oct. 6, 2024), *available at* https://jcpa.org.il/article/from-the-point-of-view-of-hamas-october/.

161      *Id.*

251

1368.    Nasrallah met with al-Arouri again on September 2, 2023. Four days later, al-Arouri gave an interview to *Al Jazeera* again expressing the view that a decisive confrontation with the enemy was imminent.

1369.    On September 2, 2023, Hamas also published an article on the official website of the Qassam Brigades warning of "the possibility that the enemy will launch a new aggression, one of the manifestations of which will be the assassination of the leaders of the resistance [Hamas] inside [Palestine] or outside [Palestine]" and warning that this would lead to "a severe reaction on the part of the Palestinian resistance, and may develop into the entry of other fronts into the front line, such as (Syria, Lebanon), and it is possible that other fronts will join in their wake."

1370.    *The Wall Street Journal* has reported that meetings in the Joint Operations Room in Beirut culminated with an October 2 meeting.

1371.    During that meeting, Iran put its plans into motion, providing the green light for Hamas, PIJ, and the other Iran-backed groups to launch the IRGC-funded pre-planned attack against Israel, using Iranian intelligence, training, and military supplies.[162]

1372.    On October 2, 2023, PIJ publicly mounted a training exercise on the occasion of "Martyrs are the Harbingers of Victory" day, followed two days later by a military parade in commemoration of its 36th anniversary as a terrorist organization in the Gaza Strip. Whether intentionally or not, the flurry of PIJ activity in the days before the October 7 Attacks likely served as a smokescreen concealing Hamas's final preparations for the assault.

---

[162]    *See* Summer Said, *Iran Helped Plot Attack on Israel Over Several Weeks*, WALL STREET JOURNAL (Oct. 8, 2023), https://www.wsj.com/world/middle-east/iran-israel-hamas-strike-planning-bbe07b25; *see also* Jonathan Schanzer, *Iran-Hezbollah Intelligence Center May Help Hamas Target Israel*, FOREIGN POLICY (Sept. 13, 2022), https://foreignpolicy.com/2022/09/13/iran-hezbollah-hamas-israel-beirut-lebanon-intelligence-sha_ring-center; Paul Kirby, *Israel faces 'long, difficult war' after Hamas attack from Gaza*, BBC (Oct. 8, 2023), https://www.bbc.com/news/world-middle-east-67044182; Shay Khatiri, *Why It's Obvious Iran Approved Hamas Attack*, WALL STREET JOURNAL (Oct. 17, 2023), https://www.wsj.com/articles/why-its-obvious-iran-approved-hamas-attack-khamenei-nuclear-deal-f394c477.

1373. When, in the early morning of October 7, 2023, Hamas led the Iranian-financed- and -approved attack against Israel, murdering, kidnapping, and injuring Plaintiffs, among hundreds of others, Hamas apparently did not fully follow the agreed-upon coordinated plan approved by the IRGC because neither Hezbollah nor the IRGC-armed-and-trained Qassam Brigades operatives in Lebanon infiltrated northern Israel in force on October 7 as "the Big Project" had envisioned.

1374. Hezbollah ultimately did attack northern Israel with rockets, mortars and other weapons and forced the dislocation of much of Israel's civilian population in the northern part of the country, but its failure to cross the Israeli border in force on October 7 proved fatal to the success of the overall operation, which was designed to ultimately destroy the State of Israel in a *coordinated* multi-front attack.

## VI.    ZERO HOUR: OCTOBER 7, 2023[163]

1375. The massacres of October 7, 2023, and the ensuing conflict between the State of Israel and Iran and its "Axis of Resistance," were the culmination of a multigenerational terror campaign sponsored by Iran, implemented, coordinated, and directly financed by the IRGC, and spearheaded on the ground by Hamas. They were intended as a first salvo in a final campaign to destroy the State of Israel.

1376. As noted above, in July 2018, Hamas established a Joint Operations Room in Gaza to coordinate with 12 "resistance factions" active in Gaza, including PIJ, PFLP, Al-Aqsa Martyrs Brigades ("AAMB") and Popular Resistance Committees ("PRC"). The Joint Operations Room united the disparate terrorist organizations operating in the Gaza Strip under one command and

---

[163]    A significant portion of the summary of the events of October 7 described in this Section is derived from the published 7 October Parliamentary Commission Report, chaired by Lord Andrew Roberts and compiled by the UK-Israel All Party Parliamentary Group. The Report is available at https://www.7octparliamentarycommission.co.uk/ (last visited June 10, 2026).

worked to coordinate their activities.

1377. As stated above, since at least 2021, senior officials from Hezbollah, Hamas, PIJ, and the IRGC have gathered at the "Joint Operations Room" in Beirut, Lebanon, to plan coordinated attacks against Israel under the IRGC's direction. Muhammad Izadi, who headed the IRGC-QF's Palestinian Office in Lebanon, frequently oversaw these meetings.

1378. As Hamas regrouped after its latest round of fighting with Israel in May 2021, the broad outlines of the "Big Project" came into sharper focus, and Hamas's relationship with Iran took on even greater importance.

1379. According to a report by *The New York Times*, on October 12, 2024, Hamas documents recovered by Israeli forces first hint at the October 7 Attack in January 2022, "when the minutes [of the meeting] show that Hamas leaders discussed the need to avoid getting dragged into minor skirmishes to focus on 'the big project.' Israeli intelligence officers found that Hamas leaders repeatedly used the same phrase in similar contexts …."

1380. This "Big Project" required both a steady stream of weapons and money from the IRGC and other sources, as well as a special budget to plan and execute the attack outside of channels carefully monitored by Israeli intelligence. For this, Hamas—which would command the invasion force on the ground on October 7—needed clandestine financial and logistical support from the IRGC-QF to supplement the substantial financial and logistical support already provided by Iran and others to Hamas.

1381. Hamas documents recovered from Gaza after October 7 reveal the urgency of that need, reflecting the IRGC's separate transfers of funds to Yahya Sinwar and Ismail Haniyeh for their discretionary use and allocation to the Qassam Brigades' "projects": off-budget transfers made by the IRGC to Sinwar's discretionary fund, separate and apart from the regular funding

streams provided to Hamas by the IRGC, dating back to at least 2014.

1382. A June 2022 letter from Hamas political leader Ismail Haniyeh to IRGC-QF commander Muhammad Said Izadi thanks Izadi for "allocating a sum of five million dollars, which is to be sent to me" and asks what funds to send "to the Brothers in Gaza," a reference to the Qassam Brigades.

1383. A September 2022 letter from Haniyeh to Sinwar confirms that when Hamas's funding streams from Türkiye and Qatar were unreliable, Sinwar was directed to work through IRGC-QF commander Izadi to secure more regular payments, underscoring the IRGC's critical role as Hamas's financier.

1384. A December 2022 memorandum from Qassam Brigades Deputy Commander Marwan Issa to Sinwar and senior Hamas leader Khalil al-Hayya committed to seeking from Iran "financial support of at least $7 million per month … in order to mobilize and prepare for these types of confrontations," and requested a three-to-four-month advance payment "in order to expedite the pace of preparations and our side's readiness."

1385. Those preparations were deeply coordinated with and substantially financed by the IRGC, which also mediated between disparate elements within its network of proxy groups including Hezbollah, including through Hamas's "strike force" in southern Lebanon.

1386. By June 2023, just four months before the October 7 Attack, Hamas's Rafah Brigade was describing its relationship with the IRGC as "good and fantastic" and with Hezbollah as "outstanding," with Hezbollah "prepared to collaborate with us in any upcoming campaign."

1387. Binance's role was critical in providing the financial infrastructure through which the IRGC's cryptocurrency financing of Hamas, Hezbollah and PIJ moved.

1388. That financing flowed through the same IRGC network of front companies,

exchange houses, and cryptocurrency facilitators that Binance knowingly serviced throughout the years preceding October 7 and Binance's assistance enhanced the ability of Hamas and its confederates to execute the planned acts of international terrorism on that date and in the years since.

1389. In sum, Binance helped the IRGC and its proxies, including Hamas, PIJ and Hezbollah carry out the October 7 Attacks. The IRGC, which lead the "Axis of Resistance" provided coordination, planning, financing, and logistical support (including weapons) to its proxies that would perpetrate the atrocities on the ground—support that was made possible by Binance's willingness to help the IRGC and its proxies evade counterterrorism laws and regulations. In turn, Hamas and the other Iranian proxies used the resources provided by the IRGC and others via Binance to carry out the October 7 Attacks.

1390. According to *The New York Times*, at a meeting in May 2023, Hamas leaders discussed that they wanted to commit the October 7 Attacks by the end of 2023 because Israel had announced that it was developing a new type of laser that could destroy Hamas rockets more effectively than its current air defense system (the Iron Dome and David Slingshot).

1391. On June 19, 2023, Hamas leader Ismail Haniyeh also met with a delegation of high-level Iranian security and military officials. Haniyeh, accompanied by his deputy Saleh al-Arouri and other Hamas figures, also met with the IRGC chief, Hossein Salami, and a number of his aides over a period of three days. As stated above, by August 2023, IRGC-QF commanders established a pattern of biweekly coordination sessions in the Lebanon Joint Operations Room, bringing together representatives from Hamas, PIJ, Hezbollah, and additional Iranian-backed terror groups with the goal of planning the October 7 Attacks. Iranian foreign minister Hossein Amir-Abdollahian participated in no fewer than at least two of these meetings.

1392. Hezbollah's Hassan Nasrallah held a public meeting with representatives from Hamas and PIJ on August 13, 2023.

1393. Saleh al-Arouri appeared in a comprehensive interview on Hezbollah's Al-Mayadeen television channel on August 25, 2023, in which he articulated Hamas's view of its relationship with Israel, outlined preparations for a coordinated large-scale confrontation involving the Axis of Resistance, and described the anticipated character of such a campaign.

1394. Al-Arouri met with Nasrallah again on September 2, 2023. Within four days, al-Arouri spoke to *Al Jazeera*, reiterating his position that a final confrontation with the enemy was approaching. Hamas posted an article to the Qassam Brigades' official website on September 2, 2023, cautioning about the likelihood that "the enemy will launch a new aggression, one of the manifestations of which will be the assassination of the leaders of the resistance [Hamas] inside [Palestine] or outside [Palestine]" and warning that such action would trigger "a severe reaction on the part of the Palestinian resistance, and may develop into the entry of other fronts into the front line, such as (Syria, Lebanon), and it is possible that other fronts will join in their wake."

1395. According to reporting by *The Wall Street Journal*, the coordination sessions in the Joint Operations Room in Beirut reached a critical point with an October 2 meeting. At that meeting, the IRGC, the ultimate financier and coordinator of the attacks, authorized Hamas, PIJ, and the other Iran-backed groups to execute their pre-arranged assault on Israel, supported by Iranian intelligence, training programs, and military equipment.

### A.      Saturday, October 7

1396. Saturday, October 7, 2023, was the Jewish holiday of Simchat Torah, often celebrated in Israel by families spending time together at home, including IDF personnel who often received a "weekend pass" to go home for the holiday weekend.

257

1397.   It was also the 50th anniversary of the Yom Kippur War, the most devastating war in Israel's history—itself a surprise attack intentionally launched on a Jewish holiday.

1398.   It was on this day that Hamas shattered the dawn with its brutal invasion of southern Israel, resulting in the single deadliest day for the Jewish people since the Holocaust. More than 1,200 men, women, and children were brutally murdered. Many victims were raped, and 251 were taken hostage.

1399.   Hamas and the other IRGC proxies that executed the October 7 Attacks did so with the financial and logistical backing of the IRGC; without that support and IRGC-QF's participation, the events of October 7, 2023, would not have been possible.

### B.      Geography of the Attack

1400.   The attack on Israel started with combined air, sea, and land incursions from the Gaza Strip into the Gaza border communities in Israel, collectively known as the "Gaza Envelope."

1401.   These communities have experienced decades of security threats due to their proximity to Gaza, and yet many advocated for peace.

1402.   One border community, Kibbutz Nir Oz, was home to several prominent peace activists. Nir Oz had the third highest number of civilian deaths of any community attacked on October 7, 2023, and the highest number of people kidnapped to Gaza—including 15 children and 21 people over 70. People from Nir Oz made up a third of the 251 hostages taken on October 7, 2023.

1403.   Hamas targeted these specific towns and villages in the Gaza Envelope: Holit, Sufa, Nir Yitzhak, Pri Gan, Talmei Yosef, Mivtachim, Yesha, Amioz, Magen, Nir Oz, Nirim, Ein Hashlosha, Kissufim, Re'im, Be'eri, Alumim, Nahal Oz, Kfar Aza, Mefalsim, Yachini, Nir Am, Sderot, Netiv HaAsara, Karmia, Zikim Beach, and Ofakim, as well as public spaces and outdoor

festivals, such as the Nova Music Festival near Kibbutz Re'im and the Psyduck music festival located between Nirim and Nir Oz. Ofakim was the easternmost town attacked on the ground that day.

### C.    Hamas's Rocket Barrage Overwhelms Israel's Defense Systems

1404.    The October 7 Attacks began with a first phase of infiltration called the "blinding plan" to ensure minimum resistance to infiltration. This phase involved a coordinated rocket bombardment of unprecedented size, aimed in the direction of civilian targets in the Gaza Envelope and elsewhere in Israel, including the cities of Ashkelon, Tel Aviv, and Jerusalem.

1405.    Hamas terrorists began heading toward the border fence at roughly 6:15 a.m.

1406.    At 6:29 a.m., rocket alerts sounded in over 30 Israeli communities as rockets were launched from Gaza toward Israel. The rockets were primarily short-range unguided "Qassam" and "Quds" rockets manufactured in Gaza, along with (1) Russian-designed BM-21 "Grad" 122mm rockets, with Chinese-made extended-range versions, (2) Iranian Fajr-5 derivatives (M75) with 75 km range, (3) long-range rockets including Syrian-made "Khaybar" rockets (100 km range) and A-120 missiles (120 km range), and (4) SH-85/Ayyash 250 rockets with 220 km range. Hamas forces also fired hundreds of Katyusha-style 107mm unguided rockets from multi-launch rocket systems at the communities and army bases around Gaza, together with 120mm mortar rounds, many of which landed on and around Route 232 throughout the day.

1407.    Nearly 4,000 rockets and mortars were fired on Saturday, followed by further barrages on October 8 and 9. Many of these rockets as well as 60mm mortar rounds with Iranian-made AZ111 mortar round fuses and M112 demolition charges were supplied by IRGC together with financing, technical advice and components.

1408.    The Iron Dome intercepted missiles, unintentionally masking the sound of snipers

259

systematically eliminating cameras along the border fence. Simultaneously, 100 remotely operated drones targeted watchtowers equipped with machine guns and cameras that are connected to the border's thermal imaging sensors and to optical and radar detection systems. Hamas also dropped incendiary explosives from drones, fired RPGs, and used sniper fire to attack several Sentry Tech systems along the border.

### D.    Hamas Attacks by Ground, Air, and Sea

1409.    Thus began the first wave of the ground attack, during which approximately 30 breach points in the security fence were assaulted simultaneously. Trained terrorists began blowing holes in the security fence using a wide range of explosives and munitions. Video footage from a fence infiltration near Kibbutz Be'eri captured terrorists fixing explosives and propping an anti-tank mine against the fence. Other methods to breach the fence included detonating a strip-and-frame charge explosive; this was one of the many weapons Hamas specially created for the attack and was also designed to be affixed to home safe room doors in Israeli border communities. IEDs were used to target and breach both wire fences and concrete walls. Tractors were deployed to dismantle sections of the barrier. Cutting charges and shaped explosives were used to sever metal beams and posts.

1410.    With the surveillance systems around the border down, and Israel's defenses blinded, it took mere minutes for Hamas terrorists to cross into Israel. Specialized engineering teams were dedicated to breaking through barriers using tools like Bangalore Torpedo-type charges, linear shaped charges, and other explosives, many of which were provided by the IRGC. Folding bridges were prepared to overcome obstacles, like concrete walls, enabling motorcycles and vehicles to cross.

1411.    Most Hamas Nukhba commandos and regular Qassam Brigades troops crossed the

border and drove to targeted communities in white Toyota pick-up trucks and on motorcycles. At Sderot and a few other places they also arrived in Israel in cars stolen or hijacked that morning. Advance teams of Hamas commandos arrived at some targets in powered two-man paragliders. At Zikim, north of the Gaza Strip, they came by sea in rigid inflatable boats. A small number of Hamas vehicles used in the October 7 Attacks were "technicals"–pickup trucks mounted with heavier weapons.

1412.   Some terrorists wore fatigues to resemble Israeli army uniforms or were dressed like Israeli police to confuse Israeli security forces and civilians. Some carried radios for communication and zip ties to restrain hostages. Some wore "Go-Pro" or other body cameras that allowed them to capture video footage of the horrific acts they committed that day.

1413.   By the end of the day, the border had been breached in 119 locations – equivalent to nearly three breaches per mile. Breaches were as big as bulldozed holes in the fence and as small as a gap between two concrete slabs.

1414.   The ground invasion was accompanied by airborne and naval breaches. Video footage of the early morning rocket attacks shows motorized paragliders crossing into Israel above the fence and below the rocket fire. In addition, photos captured paragliders over Kfar Aza airspace at 6:32 a.m. and Moshav Netiv HaAsara at 6:34 a.m. At approximately 6:40 a.m., motorized paragliders could be seen airborne in the distance from the Nova Music Festival site.

1415.   During the morning's first rocket attacks, which also targeted Israeli naval facilities, four dinghies with 35 armed terrorists exited the Gaza fishing zone and entered Israeli coastal waters. Four fast boats of Hamas naval commandos approached, carrying 35 terrorists of the Naval Nukhba. At the same time, Hamas terrorists fired anti-tank missiles at the Israeli Navy's observation posts. The Israeli Navy's 916th Patrol Squadron sunk three of the approaching Hamas

261

vessels. The fourth landed on Zikim Beach at about 6:45 a.m., offboarding an estimated 11 terrorists. The Israeli Navy alerted the rapid response unit of Kibbutz Zikim that there was an active infiltration situation at 6:34 a.m. Hamas frogmen found in the area were neutralized by the Navy's Snapir unit–the harbor security force.

### E.    Hamas Infiltrates Civilian Communities, IDF Outposts, and Highways

1416.    Kibbutz Kfar Aza was the first civilian community Hamas infiltrated, with motorized paragliders entering the airspace of the community at 6:32 a.m.; the last of these communities Hamas infiltrated was Moshav Yated, which Hamas reached at approximately 9:15 a.m.

1417.    In the communities where the attackers were able to breach the fences and overwhelm any organized internal defense, the terrorists went from house to house killing civilians who hid in the bomb shelters and "safe rooms" Israel requires for private buildings and newer family homes, respectively. These safe rooms are designed solely to protect against rockets, mortars, or aerial bombardment. They are not secure rooms intended to keep intruders out. In fact, they are meant to allow rescuers access in the event of a bombing and, therefore, do not have locks on the doors.

1418.    Over the course of the day, many residents fought to keep the door handles of their safe rooms closed from terrorists, and many were killed after being shot through the door or after the terrorists threw grenades inside. Other residents were burnt alive or died from smoke inhalation when terrorists purposely set fire to the houses, knowing that civilians were hiding in their safe rooms.

1419.    Additionally, buildings built before 1992 were not legally required to include internal shelters. Therefore, residents living in those pre-1992 buildings were forced to run to

community shelters. In Ofakim, terrorists specifically targeted older neighborhoods, knowing that residents would be running from their homes to these shelters. Many were killed while attempting to reach or return from the shelter.

1420. The Israeli villages that were under the control of the terrorists for several hours experienced high numbers of atrocities, such as torture, rape, and the mutilation of the dead. There was widescale damage from the attacks and purposeful destruction of property, including arson attacks.

1421. According to the U.S. Secretary of State, after reviewing some of the footage and pictures from the day: "It's hard to find the right words. It's beyond what anyone would ever want to imagine, much less, God forbid, experience…. A baby, an infant, riddled with bullets. Soldiers beheaded. Young people burned alive. I could go on, but it's simply depravity in the worst imaginable way."[164]

1422. The worst affected communities were Kibbutz Kfar Aza, Kibbutz Be'eri, and Kibbutz Nir Oz. At Be'eri over 100 civilians were killed, and 62 at Kfar Aza.

1423. 231 of the 251 hostages were taken from these communities. Nir Oz suffered the most kidnappings with 75 hostages taken alive to Gaza and a further seven bodies kidnapped.

1424. The attacks on the kibbutzim and moshavim were aided by the simultaneous attack on the Israeli military outposts and bases in the area, which as part of their official functions act as a first line of defense in the area. This prevented Israeli forces from coming to the aid of the civilian communities.

1425. Hamas also attacked military posts at key crossing sites, including at the Erez

---

[164] Shannon C. Crawford, *Blinken describes images of Hamas attack victims, pledges US support on trip to Israel*, ABC NEWS (Oct. 12, 2023), https://abcnews.go.com/International/blinken-meets-hamas-attacksurvivors-pledges-us-support/story?id=103925374.

checkpoint, in the north of Gaza, and the Kerem Shalom crossing, located near Israel's border with Egypt. They attempted to take over the base in Zikim, the site of the amphibious landing.

1426. Further adding to the chaos of the day was the deliberate sabotage of communication networks by the terrorists as part of the border breach and hits on observation outposts. It took hours for the Israeli response units to fully understand what was happening.

1427. Hamas also took strategic control of the main highway, Route 232. Route 232 is the main north-south highway in the Gaza Envelope, running parallel to the Gaza border and connecting over 20 rural communities. On October 7, 2023, Hamas strategically seized control of this critical artery, murdering nearly 300 people along a 33-mile stretch. The highway became a killing zone as Hamas set up ambushes at 37 separate locations along the road, targeted civilians at major intersections and junctions, attacked roadside rocket shelters filled with Nova Music Festival escapees, and ambushed responding security forces and medical personnel.

1428. By 7:30 a.m., Shahar HaNegev junction (the intersection between Route 232 and Highway 34) was under full terrorist control. The main intersections along Route 232, including the Re'im intersection and Gamma Junction, were taken in the next 10 minutes. This created chokepoints which prevented the entry of security and emergency services who tried to respond to the attack, as well as preventing civilians from escaping. By doing so, the terrorists effectively created a confined killing zone, which enabled maximum bloodshed.

F.    **The Terrorists Committed Successive Waves of Attacks on Compromised Communities**

1429. The first wave of attacks was led by Hamas's elite Nukhba Forces, followed over the next two to three hours by Hamas "regular" corps of terrorists, the Qassam Brigades, together with other Palestinian militias and terror groups, including Al-Quds Brigades (Palestinian Islamic Jihad), the Abu Ali Mustafa Brigades (Popular Front for the Liberation of Palestine), the Jihad

Jibril Brigades (Popular Front for the Liberation of Palestine-General Command), the National Resistance Brigades (Democratic Front for the Liberation of Palestine), the Nassar Salah Al-Din Battalions (Popular Resistance Committees), the Al-Aqsa Martyrs Brigades, the Holy Warriors' Battalions (Mujahideen), and the Al-Ansar Brigades (Al-Ansar Movement). Several of these groups also received financial and material support from the IRGC.

1430. Then, in midmorning, there was a third invasion from Gaza by several thousand Gazan civilians instructed or encouraged by Hamas officials to engage in looting and kidnapping.

### G. Attack on the Nova Music Festival

1431. In the early morning hours of October 7, 2023, between 3,000-4,000 young people were celebrating at the Nova Music Festival in Kibbutz Re'im in southern Israel. The event, scheduled to coincide with the end of the Sukkot holiday, was in full swing—DJs played electronic music on two stages as attendees danced under colorful tarpaulins or rested in tented camping areas.

1432. At approximately 6:29 a.m., the sky filled with rockets launched from Gaza. The music initially drowned out the sound of incoming fire. Festival organizers and police called for an evacuation, but terrorists were setting up ambush points along the escape route and were preparing to invade the festival itself.

1433. By 8:00 a.m., pickup trucks carrying Hamas Nukhba commandos arrived at the festival grounds from both the north and south. The small contingent of police officers, armed only with pistols, were quickly overwhelmed by terrorists with assault rifles, machine guns, and RPGs.

1434. With the site under their control, Hamas gunmen began methodically hunting for survivors, targeting those trying to flee. Some attendees abandoned cars and ran across open fields, where they were pursued by gunmen on motorcycles and in trucks. Others hid under festival stages,

inside portable toilets and in trash containers. Many fled to nearby concrete rocket shelters along Route 232, which became death traps when terrorists threw grenades inside.

1435.  About 20 people crowded into an ambulance for protection. Hamas terrorists discovered them, fired at the vehicle, and then launched a thermobaric RPG inside, killing 18 of the 20 people.

1436.  Those who managed to escape the festival tried to take refuge in roadside concrete shelters along Route 232. At the Be'eri shelter, with its distinctive mural of a girl blowing bubbles, Hamas terrorists fired hundreds of rounds into the crowded space and tossed grenades inside.

1437.  At the Re'im west shelter, Hersh Goldberg-Polin lost part of his arm to a grenade explosion and was later taken hostage, dragged by his hair into a pickup truck while bleeding heavily.

1438.  Military and police reinforcements arrived only around noon, about four hours after the initial assault began. By then, the terrorists had killed 375 people, making it the deadliest concert attack in history.

1439.  First responders discovered scenes of unimaginable brutality. Bodies were strewn across the festival grounds—in the bar, medical tent, camping area, dancing space, parking lots, and portable toilets. Evidence indicated many victims had been raped and sexually assaulted before being killed, with women found tied to trees and stripped of clothing. Many bodies showed signs of deliberate mutilation or had been intentionally burned.

1440.  The 375 victims represented a cross-section of Israeli society: young people from cities and kibbutzim, Arab Israelis, Bedouins, foreign nationals, security guards, and first responders.

### H.    Hostage-Taking into Gaza

1441.    Hamas abducted 251 hostages on October 7, 2023, into Gaza. Of these, 210 people were taken alive; 41 bodies were abducted after they had been killed. Their families were placed in a nightmarish state of limbo, not knowing the fates of their loved ones, what they were experiencing, or whether they would ever see them again. The hostages simply vanished.

1442.    Evidence indicates that hostage-taking was a premeditated part of the attack plan, with Hamas having prepared a manual titled "How to take captives" that included instructions on separating hostage groups and methods of controlling them.

1443.    Among the 210 living hostages, 176 held Israeli nationality (51 with dual citizenship from 14 different countries), while others were Thai, Philippine, Nepalese, and U.S. nationals. The vast majority (197) were civilians, while 13 were military personnel. Nearly half of those taken (102) were women and children, including 35 children under 18 years old. The youngest hostage was Kfir Bibas, only nine months old, and the oldest was 85-year-old Shlomo Mantzour.

1444.    The hostages were taken from multiple locations, with the largest numbers coming from Kibbutz Nir Oz (75), the Nova Music Festival (34), Kibbutz Be'eri (27), and Kibbutz Kfar Aza (20). The abductions involved breaking into family homes across seven kibbutz communities, impacting 44 families. Many hostages were forced to witness their family members being murdered before they were taken.

1445.    Documentation through videos, CCTV footage, and bodycams worn by terrorists revealed that many hostages suffered abuse during their abduction, including physical assault, verbal abuse, sexual assault, and degrading treatment. Footage showed hostages bound, partially undressed, beaten, and threatened. According to testimony from released hostages, this abuse

continued during captivity and included sunlight deprivation, starvation, binding, beatings, sexual abuse, and other degrading and terrorizing treatment.

## I.     The Tunnel System

1446.   Hamas used the Gaza tunnel system that it built beneath, into, and through various properties to transport and hide many of the hostages they captured during the October 7 Attacks.

1447.   In the days leading up to October 7, Yahya Sinwar was seen fleeing into the tunnels with his family. It is from there that Sinwar ordered the October 7 Attacks to begin.

1448.   Yocheved Lifshitz, an 85-year-old hostage who was released after several weeks in captivity, described the vast network of tunnels as looking like a spider web.

1449.   Aviva Siegel, a resident of Kfar Aza who was taken hostage in Gaza for 51 days, described being pushed down into a tunnel during the October 7 Attacks. She described being locked in a tunnel with another hostage and left for days on end without food.

1450.   Sapir Cohen, a young woman taken hostage in Gaza for 55 days, recalled being moved from homes above-ground to the tunnels, which were filled with mold, lice, and bed bugs.

1451.   Qaid Farhan Alkadi, a Bedouin Arab Israeli, was rescued by the IDF from a tunnel under southern Gaza after 326 days in captivity.

1452.   In July 2024, the bodies of five hostages—Ravid Katz, Oren Goldin, Maya Goren, Sgt. Kiril Brodski, and Staff Sgt. Tomer Yaakov Ahimas—were recovered from a tunnel located underneath an Israeli-designated humanitarian zone in the southern Gaza city of Khan Yunis.

1453.   In August 2024, the bodies of six hostages—Israeli American Hersh Goldberg-Polin, Ori Danino, Eden Yerushalmi, Almog Sarusi, Alexander Lobanov, and Carmel Gat—were recovered by the IDF in a tunnel underneath the southern Gaza city of Rafah after having been executed at close range. The IDF reported that the hostages had been held there for days prior to

268

their murders.

### J.        Hamas's Use of Hostages as Bargaining Chips

1454.   Hamas used the hostages to effect multiple goals. It placed them as human shields—for example, Israel located members of Hamas's leadership in Gaza but could not strike without risking injury to the hostages they kept with them as personal shields.

1455.   Through the kidnappings, Hamas also attempted to influence Israeli and U.S. policy in other ways by presenting taped messages by hostages to the media to intimidate and demoralize the Israeli government and civilian population and to affect the conduct of both the Israeli and American governments in the way they approached the conflict.

1456.   Most critically, Hamas used the hostages as bargaining chips.

1457.   During the weeklong truce in late November 2023, 105 hostages were released (and four were released before that) in exchange for hundreds of Palestinian terrorists held in Israeli prisons.

1458.   Hamas then released 33 Israeli women, children, civilian men over 50, and those deemed "humanitarian cases" during the hostages-for-terrorists exchange and ceasefire which took effect from January 19 to March 18, 2025. Eight more hostages were returned dead, including Ariel and Kfir Bibas, aged four and nine months, respectively, as well as their mother Shiri. During the first phase, Hamas also released five Thai nationals.

1459.   On October 13, 2025, the final 20 living hostages held by Hamas were released from Gaza after 737 days in captivity. This release occurred under the first phase of a ceasefire agreement brokered by the United States between Israel and Hamas. One additional living hostage, Edan Alexander, an American-Israeli citizen who served in the Israeli military, had been released separately in May 2025 following negotiations between Hamas and the Trump administration,

after 583 days in captivity.

1460. In total, 168 hostages returned alive to Israel, including eight rescued by Israeli security forces, five released outside of ceasefire agreements, and the others released through negotiated exchanges and ceasefire agreements.

1461. Additionally, the bodies of 85 hostages have been repatriated to Israel. Eight hostages' bodies were returned in the January 2025 ceasefire deal, and 27 during the Gaza peace plan. Forty-nine hostages' bodies were recovered through Israeli military operations; the body of the last hostage was recovered by Israeli security forces from a cemetery in northern Gaza on January 26, 2026.

### K.    Hezbollah Opens a Second Front

1462. The horrors inflicted on October 7 and the hostage crisis that followed were not the full extent of Iran's Axis of Resistance's assault on Israel. On October 8, 2023, Hezbollah, which works under the direction of the IRGC (which also funds it), opened a second front along Israel's northern border, launching the sustained campaign of violence that the IRGC-QF, Hamas, and Hezbollah had long planned as part of the Big Project.

1463. Fighting continued inside Israeli territory on October 8 as Israeli forces fought the remaining Nukhba Force operatives even after the main assault had stalled.

1464. At the same time, Hezbollah joined the fray by firing anti-tank guided munitions (ATGMs), rockets, drones, missiles, and other standoff weapons at Israeli military and civilian targets, killing and wounding many, including Omer Balva, whose estate and family are Plaintiffs, and forcing more than 50,000 Israelis to flee their homes.

1465. Between October 7, 2023, and August 18, 2024, the average Hezbollah strike occurred about 3 km into Israel. Between August 18 and the beginning of September, the average

depth of a Hezbollah strike was approximately 4 km into Israel. During the week of September 22, the average depth of a Hezbollah strike was 28 km into Israel.

1466. Instead, for approximately 13 months, Hezbollah (and to a lesser extent Hamas's forces in Lebanon) struck northern Israel on a daily basis "in solidarity" with its fellow Iranian proxies, Hamas and PIJ. Likewise, the Houthis in Yemen launched missiles and drones at Israel periodically, until a ceasefire between Israel and Hezbollah came into effect on November 27, 2024, which subsequently collapsed in early 2026, when Hezbollah resumed firing into Israel in retaliation for the killing of Iranian Supreme Leader Ali Khamenei in a joint U.S.-Israeli attack on Iran.

## L.    Israel's Response to October 7 in Gaza

1467. In response to the October 7 Attacks, Israeli ground operations in the northern Gaza Strip began on October 27, 2023, with advances along three axes: a southward drive along the western coast toward al Shati camp, a southwestward drive into Beit Hanoun, and a westward drive from Juhor ad Dik to the western coast, thereby cutting the Gaza Strip in half and isolating the northern Strip from the southern Strip.

1468. Over approximately 22 months of active combat operations (interrupted by temporary ceasefires in late 2023 and early 2025), Israeli forces engaged in violent confrontations with Hamas and other terrorist groups seeking to inflict casualties on Israeli forces in the Gaza Strip.

1469. To date, more than 900 IDF soldiers, including several dual U.S.-Israeli citizens, have been killed and many more injured (often severely). As described above, many of those held by Hamas and its co-conspirators, some of them U.S. citizens, were murdered by their captors.

1470. Hamas specifically prepared for Israeli incursions, and ambushing and killing as

271

many Israeli soldiers as possible was part of the larger October 7 plan.

1471.  Hamas used its attack tunnels to evade capture and ambush Israeli forces.

1472.  During Israeli counterstrikes, Hamas leaders took refuge in their tunnels to hide from the attacks, regroup, and rearm.

1473.  Israel's military response to the October 7 Attacks also reached Iran and Lebanon, targeting the IRGC and Hezbollah commanders who, as stated above, planned and directed the massacre alongside Hamas. In a series of precise, intelligence-driven strikes, Israel eliminated the principal architects of the October 7 Attacks.

1474.  On January 2, 2024, Saleh al-Arouri, who, as stated above, met with the IRGC chief Hossein Salami in Tehran in June 2023, coordinated with Nasrallah through September 2023, and publicly signaled the coming assault on *Al-Mayadeen* and *Al Jazeera*, was killed in an Israeli drone strike on a Hamas office in the Dahieh suburb of Beirut.

1475.  On July 31, 2024, Ismail Haniyeh, who, as stated above, met with Iranian security and IRGC officials (including Hossein Salami) in Tehran in June 2023, was assassinated in Tehran inside an IRGC guesthouse where he was staying.

1476.  On September 27, 2024, Hassan Nasrallah, who, as stated above, held meetings with Hamas and PIJ representatives in August 2023 and met with al-Arouri in September 2023, was killed in a targeted Israeli airstrike on Hezbollah's Beirut headquarters.

1477.  On October 16, 2024, Yahya Sinwar, who ordered the October 7 Attacks to begin from the tunnel network beneath Gaza, was killed by Israeli forces in Rafah.

1478.  On June 13, 2025, General Hossein Salami, commander-in-chief of the IRGC, who, as stated above, met personally with Haniyeh and al-Arouri in Tehran in June 2023, was killed in targeted Israeli strikes on Iran.

1479. On June 21, 2025, Muhammad Izadi, who, as stated above, headed the IRGC-QF's Palestinian Office in Lebanon and frequently oversaw the Beirut Joint Operations Room planning sessions, was killed in a precision Israeli airstrike on the apartment in which he was staying in Qom, Iran.

## VII.    PLAINTIFFS

### A.    The Siman Tov Family

1480. Carol Siman Tov was a citizen of the United States, a resident of the State of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when she was brutally murdered by Hamas.

1481. Plaintiffs Koren Siman Tov Hazoutte, Amit Vahaba Siman Tov, and Ranae Butler bring this action as personal heirs-at-law, on behalf of the Estate of Carol Siman Tov.

1482. Yahonatan Siman Tov was the son of Carol Siman Tov. Yahonatan Siman Tov was a citizen of the United States, a resident of the State of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when he and his wife, Tamar Kedem Siman Tov, his five-year-old twin daughters, Arbel and Shahar, and his two year old son, Omer, were all brutally murdered by Hamas.

1483. Plaintiffs Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, and Ranae Butler bring this action as personal heirs-at-law on behalf of the Estate of Yahonatan Siman Tov.

1484. Arbel Siman Tov and Shahar Siman Tov were citizens of the United States, residents of the State of Israel, and were present on October 7, 2023, at Kibbutz Nir Oz when they were brutally murdered by Hamas.

1485. Gad Kedem brings this action as personal heir-at-law, on behalf of the Estates of Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov.

1486. Reuma Kedem brings this action as personal heir-at-law, on behalf of the Estates of Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov.

1487.   Carol Siman Tov, Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov are hereinafter collectively referred to as "The Siman Tov Family."

1488.   On October 7, 2023, in the early morning hours, Carol Siman Tov was alone in her home in Kibbutz Nir Oz when Hamas terrorists broke through her door, violently invading her home. They mercilessly executed her, ending her life in an act of unimaginable cruelty. She was 70 years old. She was the mother of Ranae Butler, Yahonatan Siman Tov, Koren Siman Tov Hazoutte, and Amit Siman Tov Vahaba. She was a proud and active grandmother of 11 grandchildren whom she loved dearly, lived near, and spent time together daily.

1489.   On October 7, 2023, at approximately 6:30 a.m., Yahonatan Siman Tov was at home in Kibbutz Nir Oz, together with his wife, Tamar, their five-year-old twin daughters, Arbel and Shahar, and their two-year-old son, Omer, when hundreds of Hamas terrorists armed with machine guns, grenades, and other weapons breached Kibbutz Nir Oz with the intent to assassinate, brutally attack, and ruthlessly abduct as many civilians as possible. Out of the approximately 400 residents of this close community, over one quarter, 117, were murdered or abducted, and at least two women were brutally raped according to interrogations of arrested Hamas terrorists.

1490.   The family fled to their saferoom, but the door did not lock, providing no protection from the horde of Hamas terrorists swarming their home. Desperately, Yahonatan and Tamar exhausted all efforts to protect their children and blocked the door by leaning on it; however, without weapons, they were defenseless as Hamas terrorists savagely barraged them with machine guns through the saferoom door.

1491.   Despite their fatal wounds, Yahonatan and Tamar valiantly managed to shield their young children from the brutal gunfire attack. As these brave parents succumbed to their fatal

274

gunshot wounds—first Yahonatan, then Tamar—the relentless terrorists set their home ablaze, leaving the children to tragically suffocate from smoke inhalation while clinging to their parents' lifeless bodies.

**Trudi Daub**

1492.    Plaintiff Trudi Daub ("Trudi") brings this action individually. She is a citizen of the United States, and the sister of Carol Siman Tov, the aunt of Yahonatan Siman Tov, and the great-aunt of Omer, Arbel, and Shahar Siman Tov, all of whom were viciously attacked and brutally murdered by Hamas.

1493.    Trudi was living and present in New Jersey on October 7, 2023.

1494.    In the morning hours, Trudi received a phone call from a brother-in-law, her sister Terry's husband, about an attack and fighting in Kibbutz Nir Oz.

1495.    At that time, no one in the family could get in touch with her sister Carol and though they suspected she was in her safe room, dread creeped through Trudi.

1496.    Hours passed and, still, no one could get in touch with her sister. Trudi knew, at that point, that something had happened to her.

1497.    At approximately 2:00 p.m., Trudi's sister, Terry, called both her and their brother, David, to give the horrific news that their sister, Carol, had been murdered.

1498.    One hour later, Trudi's niece, Carol's daughter, called Trudi with the news that Trudi's nephew, Yahonatan, Yahonatan's wife, Tamar, and their beloved 5-year-old twin girls and 2-year-old son, had all been murdered in Kibbutz Nir Oz.

1499.    Trudi Daub has been devastated by the sudden and immense loss of family.

1500. Though Trudi and Carol lived 6,000 miles apart, they had a good relationship prior to Carol's murder, speaking on the phone regularly about their lives and family, and with occasional visits from Carol so the sisters could spend time together.

1501. Trudi, her brother, David, her sister, Terry, and her entire family have been altered forever with the senseless, overwhelming loss.

1502. Trudi asks herself regularly how this could have happened and cannot stop imagining the horrors and brutality her sister, her nephew and his wife, and her little grand nieces and nephews were subjected to.

1503. To date, Trudi has not made any progress in accepting the situation and suffers daily with endless visions of her family being murdered, unable to escape.

1504. Since the attack, Trudi has been unable to sleep well and needs her television on all night to help block out unbidden thoughts of her stolen family.

1505. Trudi cries all the time and tries to forget what happened to her sister and her family, but she cannot escape reality – the horror and extreme loss of loved ones.

**David Daub**

1506. Plaintiff David Daub brings this action individually. He is the brother of Carol Siman Tov. He is a citizen and resident of the United States.

1507. The loss of his sister and her family has caused profound and enduring emotional suffering. He has tried to suppress the memories of that day, as speaking or thinking about it brings him unbearable pain. On the morning of the attacks, he awoke to news broadcasts covering the events continuously. He remained seated for hours, watching in disbelief while messaging his sisters to check on their safety. Only later did he receive confirmation from another family member that his sister and her family had been killed.

276

1508. The shock left him immobilized. He cried for hours and was unable to function for several days, eventually taking a week off from work to process the tragedy. During the first year after the attacks, he struggled with persistent insomnia, replaying in his mind the terror and suffering his loved ones endured. He continues to imagine himself there with them, wishing he could have protected them.

1509. The absence of closure has compounded his grief. He has been unable to attend any memorial services or visit his sister's memorial site, finding the pain too overwhelming. He avoids discussing the events with others, choosing instead to suppress his emotions as a means of coping.

1510. Since the attack, his physical health has deteriorated. He has gained significant weight, developed diabetes, and experiences chronic fatigue and emotional numbness. The loss of his sister—who had been planning to visit him for Thanksgiving the following month—has left a deep void in his life. He carries that absence daily, managing his grief by living as though nothing happened, the only way he can endure the pain.

**Ram Butler**

1511. Plaintiff Ram Butler is a citizen of the United States, a resident of the State of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when he was brutally attacked by Hamas.

1512. Plaintiff Larry Butler, father of Ram Butler, is a citizen of the United States, a resident of the State of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when he was brutally attacked by Hamas.

1513. Plaintiff Claris Butler is the wife of Plaintiff Larry Butler and the mother of Plaintiffs Ram Butler and Shachar Butler. Plaintiff Claris Butler is a citizen and resident of the State of Israel and was present on October 7, 2023, at Kibbutz Nir Oz when she was brutally attacked by Hamas.

1514. Plaintiff Shachar Butler is the son of Larry and Claris Butler, the brother of Ram Butler and Ranae Butler, and the husband of Ninna Butler. Shachar Butler is a citizen of the United States and resident of the State of Israel and was present on October 7, 2023, at Kibbutz Nir Oz when he and his family were brutally attacked by Hamas.

1515. Plaintiff Ninna Butler is the wife of Shachar Butler and a citizen and resident of the State of Israel. She was present on October 7, 2023, at Kibbutz Nir Oz when her family was brutally attacked by Hamas.

1516. Plaintiff Shachar Butler also brings this claim as the legal guardian of his three minor children E.B., M.B., and Y.B., who are all citizens and residents of Israel. They are also the children of Ninna Butler and were present on October 7, 2023, at Kibbutz Nir Oz when their family was brutally attacked by Hamas.

1517. Larry Butler, Ram Butler, Claris Butler, Shachar Butler, Ninna Butler, E.B, a minor child, M.B., a minor child, and Y.B., a minor child, are hereinafter collectively referred to as "The Butler Family."

1518. At approximately 6:30 a.m., on October 7, 2023, sirens began wailing throughout Kibbutz Nir Oz, waking Ram Butler immediately. Ram received a call from his close friend and neighbor who informed him that he was not at home and that his young son was by himself. Ram quickly left to retrieve the child from his home and brought him back to Ram's saferoom for shelter.

1519. Ram heard the front door open and saw his father, Larry Butler, enter. Ram and Larry soon became aware of the storm of destruction that was taking place around them. They began to hear nearby gunshots and the whistling of RPGs piercing through the air followed by the sound of shattering glass and blood-curdling screams.

278

1520. Along with the neighbor's child, Ram and Larry locked themselves in the saferoom. They tried to comfort the child who was under their care, urging him to hide under the bed in the safe room, both clinging desperately to hope amidst unimaginable horror.

1521. An overwhelming dread and concern weighed heavily upon Ram and Larry.

1522. Claris Butler - Larry's wife and Shachar and Ram's mother - was home alone, and they could not leave to help her or reach her by phone.

1523. Fortunately, when Claris woke to the piercing sound of the sirens at approximately 6:30 a.m., members of the Kibbutz Nir Oz Security Team advised her to lock the windows and doors, stay inside, and take refuge in her safe room. Her blood ran cold as she saw from her window hundreds of armed terrorists storming the kibbutz, intending grave harm against her and her community.

1524. Also in extreme peril was Larry's son and Ram's brother, Shachar Butler, who was serving as the head of the Kibbutz Nir Oz Security Team. When Shachar could not be reached by phone, they feared something terrible had happened to him and his family.

1525. Shortly after rocket sirens pierced the skies over southern Israel, Shachar called his fellow Security Team members in Nir Oz, and realized terrorists had infiltrated the kibbutz. He rushed outside to get his combat gear from his car and saw pickup trucks with terrorists inside, racing towards him. Shachar then rushed back into his home, slamming the windows shut and locking the doors.

1526. The terrorists began hurling grenades at Shachar's house, knocking out the electricity. To protect his wife and young children and prevent the terrorists on his patio from breaking in, Shachar left the saferoom. A firefight ensued between him and the terrorists through the windows of the house.

279

1527.  As the shooting persisted, Shachar was hit by a bullet. Realizing that he had been injured, he called Ninna from outside the saferoom. Ninna then opened the saferoom door and pulled him inside. She began applying pressure on his gunshot wound while he was lying on the floor, holding the saferoom's door handle. Whenever the terrorists' voices outside faded, they changed positions while still guarding the door and caring for the children.

1528.  Shachar, Ninna, and the children spent hours in the saferoom, with the older children having no choice but to use the diapers of the youngest child. Shachar and Ninna knew that houses across Nir Oz had been set on fire, so they prepared sheets covered with urine to block smoke and fire from entering the saferoom.

1529.  Eventually, Shachar, Ninna, and their three children were evacuated by security forces to the kindergarten in Nir Oz, and Shachar was taken to the hospital. The sights of scorched earth and burnt houses around them were heartbreaking. They met with other Nir Oz survivors and waited for more to arrive, but many never did. As the night wore on into the next day, the devastating understanding seeped in; numerous members of Nir Oz had been murdered or abducted. They lost close friends and family members, and their community was shattered.

1530.  Shachar returned to Nir Oz from the hospital on the morning of October 8, 2023, while terrorists were still hiding throughout the region.

1531.  Israeli security forces later found a map of Nir Oz on the only terrorist whose body remained on the kibbutz. The map marked the location of Shachar's house and identified him as the head of the security team, enabling the terrorists to target and wound him at the start of the attack.

1532.  At approximately 11:00 a.m., the chaos continued as Hamas terrorists shattered Ram's kitchen window, followed by frantic banging on the safe room door. Inside, Ram and Larry

braced themselves for the terrorists to infiltrate the room and kill them. They quickly moved the neighbor's son into a closet, covering him with clothes to conceal him from the terrorists.

1533.    Hamas terrorists just outside the safe room were violently screaming, "Jews, open the door. We will kill you!"

1534.    After an intense few minutes, the terrorists momentarily left, but the assault was far from over. The terrorists returned several more times, firing machine guns at the saferoom door and relentlessly attempting to force their way in. Meanwhile, the assault on Kibbutz Nir Oz continued to escalate.

1535.    Terrorists burst into the home of Claris Butler, maniacally tearing through her home, and destroying everything in sight. From the safe room, she could only hear the chaos ensuing, her body paralyzed with fear as she imagined her impending death.

1536.    Terrorists then viciously set fire to her home and horrifyingly imprisoned her for hours in the burning home. Thick smoke filled the air, causing her to lose consciousness at least twice, and severely burning and blistering her feet.

1537.    Despite the harrowing circumstances, Claris managed to survive by intermittently cracking open a window in the safe room.

1538.    Panic ensued as terrorists set fire to the home where Larry and Ram were sheltering with their neighbor's child. Thick, suffocating smoke ominously began to fill the home. Gratefully, at this critical moment, IDF forces arrived and rescued them at approximately 3:00 P.M. Immediately, they implored the soldiers to quickly check on Claris.

1539.    As Larry and Ram exited the home, they were confronted by the severity of the attack—hundreds of gravely wounded and bleeding residents were being carried to safety and their beloved community was reduced to charred and ruined homes.

1540.   Accompanied by four soldiers, Ram traveled to Shachar's home and discovered it had been riddled with bullet holes and grenade shrapnel during the fierce battle that raged throughout the day. Upon reaching the safe room, they discovered that Shachar had suffered a severe gunshot wound. His young children (E.B., M.B., and Y.B.) were forced to witness their father suffering and in agonizing pain, and they all feared for his life.

1541.   Relieved that his brother and family were alive, Ram rushed to his mother's home.  Upon arriving, Ram was elated to discover that although her home was reduced to ashes, the safe room did not burn down, and his mother, Claris Butler, had survived despite suffering severe smoke inhalation and third-degree burns to her body.

1542.   This joy was quickly replaced by inconsolable agony as The Butler Family learned of the murders of their extended family: Carol Siman Tov, Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shachar Siman Tov, and Omer Siman Tov. This overwhelming grief was compounded by the loss of generations of lifelong friends in their community. The magnitude of the October 7 Attack crystallized in front of them.

**Ranae Butler**

1543.   Plaintiff Ranae Butler brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the daughter of Carol Siman Tov and Larry Butler, the sister of Yahonatan Siman Tov, Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, Shachar Butler and Ram Butler, and the aunt of 14 nieces and nephews, all of whom were viciously attacked by Hamas, and three of whom were brutally murdered by them.

1544.   On the morning of October 7, 2023, at approximately 6:30 a.m., Ranae Butler was in her Tel Aviv home when the piercing sound of sirens rang throughout Israel. Immediately, she took cover and then tried to contact her family who lived in the close-knit

community of Nir Oz in which she grew up; she needed to ensure they were all safe from the heavy rocket attack. Her brother, Yahonatan Siman Tov, only briefly replied, "Stay safe," without providing an update regarding his safety.

1545.   Dread overtook her as she could not reach her mother, Carol Siman Tov. Larry, her father, quickly informed her that there were terrorists in the kibbutz and that people had been abducted. He told her not to call, fearing the terrorists would hear him speak on the phone. Her sisters communicated later in the day with calls for help for Nir Oz.  Later, one of her sisters texted Ranae, "We love you," which felt like a chilling goodbye message.

1546.   Ranae was consumed with fear for the safety of her family. Her body trembled involuntarily as she watched the horrific news reports and witnessed the barbaric attack in real-time on social media and news channels.

1547.   On the evening of October 7, 2023, Ranae received a devastating call from her brother-in-law informing her of the catastrophic loss of six of her family members who had been murdered. Amid the overwhelming grief, a small, heart-wrenching sense of relief emerged—since her mother, Carol Siman Tov, had been murdered, she would never have to face the unbearable loss of her son, Yahonatan Siman Tov, her beloved daughter-in-law, Tamar Kedem Siman Tov, and their three innocent young children, Arbel, Shahar, and Omer Siman Tov.

1548.   On October 8, 2023, Ranae boarded a bus to Eilat, desperate to be with her remaining family. She arrived with her heart broken at the losses, but she was determined to be a source of love and comfort for the young nieces and nephews who had survived the horrors. She held back her massive grief and tried to be strong for them. As she embraced her

283

family tightly, the stench of fire and smoke filled her lungs; the smell of their clothes seemed to carry the essence of the inconceivable suffering that would forever scar them.

1549. Ranae barely slept or ate in the days that followed. She experienced an inner trembling that lasted for about three days, with her mind consumed by the relentless coverage of the tragedy on the news, unable to escape the haunting reality of the devastation to her family and community.

**The Hazoutte Family**

1550. Plaintiff Koren Siman Tov Hazoutte is the daughter of Carol Siman Tov and the sister of Yahonatan Siman Tov, Amit Siman Tov Vahaba, and Ranae Butler. She is a citizen of the United States, resident of the State of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when her family was brutally murdered by Hamas.

1551. Plaintiff Guil Hazoutte is the husband of Koren Siman Tov Hazoutte, and a citizen and resident of the State of Israel. He was present on October 7, 2023, at Kibbutz Nir Oz when his family was brutally attacked by Hamas.

1552. Plaintiff Koren Siman Tov Hazoutte also brings this claim as the legal guardian of her four minor children Y.H., B.H., A.H., and M.H., who are all citizens of the United States and residents of Israel. They are also the children of Guil Hazoutte, and they were present on October 7, 2023, at Kibbutz Nir Oz when their family was brutally attacked by Hamas.

1553. Koren Siman Tov Hazoutte, Guil Hazoutte, Y.H., B.H., A.H., and M.H. are hereinafter collectively referred to as "The Hazoutte Family."

1554. At the sound of the first rocket sirens slicing through the skies at 6:30, Koren and Guil were jolted awake and rushed into their safe room with their young children.

284

1555. As the sirens persisted, Koren and Guil began receiving horrifying WhatsApp messages from other kibbutz members, informing them that terrorists disguised as soldiers were walking around Nir Oz.

1556. Koren repeatedly tried to contact her beloved mother, Carol Siman Tov to no avail. Shortly after, Koren and Guil began hearing incessant gunfire accompanied by violent shouts in Arabic growing ever nearer. Eventually, the terrorists managed to break into the Hazoutte family home.

1557. Sensing imminent danger and terrified for their lives, Guil positioned himself at the door, guarding the handle. Koren stood beside him, her back against the wall, protecting their dog with one hand and shielding Y.H., B.H., A.H., and M.H. with the other.

1558. The terrorists shot twice at the saferoom's door, but due to the home's structure, the bullets ricocheted. The terrorists then decided to use the bathroom and eat from their fridge while the Hazoutte Family was locked inside the saferoom.

1559. When the IDF soldiers eventually arrived to rescue them from the safe room, the house was in total chaos, and the floor was covered with their belongings. Koren and Guil immediately told the soldiers to check on Yahonatan Siman Tov, Tamar Kedem Siman Tov, and their children.

1560. When the soldiers returned, they described what they had witnessed as "very bad" without elaborating. Koren, Guil, and their children were taken to an assembly point, where they saw other kibbutz members arriving covered with smoke, barefoot, in their pajamas and underwear, parched, and shock stricken.

1561. Koren, a certified nurse, treated wounded kibbutz members who kept pouring in with the little first aid she had.

1562. As time passed and they still hadn't seen Carol Siman Tov or the Siman Tov family arrive at the assembly point, Amit and Koren collapsed into each other's arms, overwhelmed with concern and uncertainty.

**The Vahaba Family**

1563. Plaintiff Amit Siman Tov Vahaba is the daughter of Carol Siman Tov and the sister of Yahonatan Siman Tov, Koren Siman Tov Hazoutte, and Ranae Butler. She is a citizen of the United States, resident of the State of Israel, and was present on October 7, 2023, at Kibbutz Nir Oz when her family was brutally murdered by Hamas.

1564. Plaintiff Yishai Vahaba is the husband of Amit Siman Tov Vahaba, a citizen of the United States and resident of the State of Israel. He was present on October 7, 2023, at Kibbutz Nir Oz when his family was brutally attacked by Hamas.

1565. Plaintiff Amit Siman Tov Vahaba also brings this claim as the legal guardian of her four minor children, G.V., No.V., Ne.V., and S.V., who are all citizens of the United States and residents of Israel. They are also the children of Yishai Vahaba, and they were present on October 7, 2023, at Kibbutz Nir Oz when their family was brutally attacked by Hamas.

1566. Amit Siman Tov Vahaba, Yishai Vahaba, G.V., No.V., Ne.V., and S.V. are hereinafter collectively referred to as "The Vahaba Family."

1567. Amit and Yishai were awakened to the blaring sounds of rocket sirens and grabbed their minor children on their way to their saferoom.

1568. Shortly thereafter, Amit and Yishai received a bloodcurdling voice message from a friend on the kibbutz, informing them that terrorists had overrun it. Like Koren, Amit also tried, unsuccessfully, to reach her mother Carol.

1569. At approximately 9:00 a.m., the Vahaba Family heard the terrorists just outside their door, callously shouting in Arabic. Soon after, the power went out, leaving them petrified in the dark. The sound of their kitchen windows shattering was gut-wrenching, and they realized they were now fighting for their lives.

1570. The terrorists kicked down the main door and tried to break into the Vahaba Family's saferoom. For 45 minutes, Yishai and Amit struggled with them over the saferoom door handle.

1571. Yahonatan Siman Tov, his wife Tamar Kedem Siman Tov, and their three young children lived in vicinity of the Vahaba family. Amit and Yishai knew, via WhatsApp messages, that terrorists had also reached the Siman Tov Family's house, and their inability to communicate with them left them paralyzed with fear and concern.

1572. At 11:00 a.m., a second group of terrorists entered the Vahaba family's home. The terrorists shot several times at the saferoom door, causing the metal door handle to heat up. The terrorist eventually set fire to the family's house, and the smell of gunpowder and thick smoke filled the air, leaving the Vahaba Family gasping for air.

1573. The heat was so intense that G.V., No.V., Ne.V., and S.V. could not bear it anymore. Desperate to save their children, but aware of the tremendous risk they were taking, Amit and Yishai opened a crack in the saferoom window and allowed the children to sit under it in turns.

1574. When Israeli security forces arrived at the Vahaba family's home at approximately 3:30 p.m., Amit and Yishai pleaded with them to go and rescue the Siman Tov Family, with whom they had lost contact in the morning.

1575.   The Vahaba Family was evacuated to the assembly point, where they met other kibbutz members who had survived the massacre. Amit and Yishai were anxious to see Yahonatan Siman Tov, Tamar Kedem Siman Tov, and their three children. But as time passed, the horrifying heart-breaking realization gradually sank in—the entire Siman Tov Family had been wiped out by terrorists.

1576.   Yishai went to Carol's home to check on her and returned with a devastated expression on his face. Amit asked if her beloved mother had been abducted to Gaza. She then saw tears fill Yishai's eyes, and he shook his head, signaling no.

1577.   As a direct and foreseeable result of the October 7 Attack, Carol Siman Tov, Yahonatan Siman Tov, Arbel Siman Tov and Shahar Siman Tov suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss, which the representatives of their Estates seek to recover damages in this action.

1578.   Plaintiff Trudi Daub suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on and the death of her family members Carol Siman Tov, Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov.

1579.   As a direct and foreseeable result of the October 7 Attack, Plaintiffs Larry Butler, Ram Butler, and Claris Butler, suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1580.   Plaintiff Ranae Butler suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on and the death of her family members Carol Siman Tov and Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov,

288

Shahar Siman Tov, and Omer Siman Tov, and the attack on Koren Siman Tov Hazoutte, Amit Siman Tov Vahaba, Larry Butler, Shachar Butler, Ram Butler, and Claris Butler.

1581. As a direct and foreseeable result of the October 7 Attack, Shachar Butler suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1582. Plaintiffs Ninna Butler, E.B., M.B., and Y.B. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack in which Shachar Butler sustained a gunshot wound in confrontations with Hamas terrorists.

1583. Plaintiff Koren Siman Tov Hazoutte suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on, and the death of, her family members Carol Siman Tov and Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov, and the attack on Amit Siman Tov Vahaba.

1584. Plaintiff Amit Siman Tov Vahaba suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the attack on, and the death of, her family members Carol Siman Tov and Yahonatan Siman Tov, Tamar Kedem Siman Tov, Arbel Siman Tov, Shahar Siman Tov, and Omer Siman Tov, and the attack on Koren Siman Tov Hazoutte.

1585. Plaintiffs Guil Hazoutte, Y.H., B.H., A.H., and M.H suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack.

289

1586. Plaintiffs Yishai Vahaba, G.V., No.V., Ne.V., and S.V. suffered several mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7 Attack.

### B.    The Dan Family

1587. Carmela Dan was a citizen of the United States and a resident of the State of Israel when she was murdered by Hamas.  She was murdered 10 days before she turned 80 years old. Seeing she was still missing and her family tragically believed was taken hostage, her family celebrated her birthday, calling for her release, together with the release of 4 other members of her family, including three minors, her grandchildren.

1588. On the morning of October 7, 2023, at approximately 6:30 a.m., Carmela Dan and her minor granddaughter, N.D., were awakened by the blaring sound of rocket sirens in Kibbutz Nir Oz. Carmela's 12-year old granddaughter, N.D., who insisted on spending the night with her grandmother, was diagnosed with autism. The two shared a very special bond and a close relationship, with N.D. often visiting her grandmother and staying overnight.

1589. The evening earlier, the entire family were celebrating Simchat Torah at Galit Dan's new home in Kissufim. Galit had left Nir Oz only a month or two earlier. Galit is the younger of Carmela's daughters. After the holiday dinner, N.D. insisted on sleeping over at Carmela's house, and Hadas Kalderson, Carmela's eldest daughter, drove Carmela and N.D. to Carmela's home in Nir Oz.

1590. Hadas's two minor children were spending the holiday with their father, Ofer Kalderon, in Nir Oz. Her son Rotem was staying in his own apartment at Nir Oz, and her eldest daughter, Gaia, was staying in Tel Aviv.

1591. They all went to sleep in their respective homes.

1592. In the early morning of October 7, Galit Dan was at home in Kibbutz Kissufim with her youngest daughter and her partner when the sirens began wailing. They went to their safe room.

1593. At 6:30 am, sirens also went off in Nir Oz. Carmela and N.D. began hearing a barrage of gunfire from outside the house. Horrified and frightened, Carmela texted Galit that terrorists had entered her home and were ravaging and looting it.

1594. N.D. wrote her mother and told her she heard a loud "boom" and that she was terrified. There is an audio recording N.D. sent her mother Galit, horrified.

1595. Carmela was alive and communicated by WhatsApp messages with her children, until noon.

1596. The terrorists were in Carmela's house for many hours. Terrorists left Nir Oz at 12:30. Terrorists came into Carmela's house several times, looting for the first time. Carmela wrote that her house had been looted. She heard it happen and there were large explosions that they don't know the source of, maybe grenades.

1597. The electricity was cut off in Kibbutz Kissufim, and there was no cellphone reception, and slowly the battery ran out leaving Galit unaware of the atrocities that unfolded in Kibbutz Nir Oz. Galit spent 22 hours in her safe room in Kibbutz Kissufim before being rescued by security forces.

1598. When the IDF arrived at Kibbutz Nir Oz, Carmela and N.D. were reported missing. Terrorists had long left Nir Oz, after they were able to commit their merciless massacre, without any interference by IDF or other forces.

1599. Initially, Carmela and N.D. were believed to have been taken hostage into Gaza. Galit clung to the hope that they were both still alive. On October 16, 2023, she appeared on TV to plead for their release and looking straight to the camera, sent them a heart-breaking message,

291

promising them "Ima [mother], [N.D], I love you, we are fighting for you, please be well." Her message pierced the heart of an entire Nation.

1600.    On October 18, 2023, while Galit was evacuated to a hotel near the Dead Sea, Israeli officers arrived to inform her of the devastating news. The bodies of Carmela and N.D. had been identified. They were found dead in Carmela's saferoom, embraced. They were inseparable in death, as in life.

1601.    Hadas Kalderon is Carmela's eldest daughter. She was home alone in Kibbutz Nir Oz at the time of the October 7 attack and spent 8 hours trapped in her safe room, without any food or water. She held the handle of her saferoom severely bruising her wrist. Alone, with only a handle between her and terrorists who penetrated her home several times and attempted to forcefully open the door. Luckily enough, they did not succeed.

1602.    Hadas' two minor children, S.K. and E.K, spent the night between October 6 and 7 at their father's house. Ofer and Hadas Kalderon had been living separately in Nir Oz, since two years before October 7, 2023 attack.

1603.    Hadas and Ofer were in contact during the attack. Ofer told Hadas they left the safe room because they had no choice, and they were hiding in the bushes. Hadas urged Ofer to go back to the saferoom with the kids. Infamously, there is a video made by the terrorists themselves, with one of them impersonating a freelance journalist, where E.K is seen taken away by the attackers, men grabbing on to the arms of the helpless 12-year-old, his shoulders shoved up from terrorist's grip.

1604.    Hours later, only after being rescued by Israeli security forces did Hadas and Rotem realize, to their horror, that Ofer, S.K., and E.K. had been taken hostage by Hamas. The video of E.K. had been posted on social media hours after the attack.

1605. Hadas immediately began waging a public fight to secure the release of her two children and the father of her children from Hamas captivity. S.K. and E.K. were released in the first hostage deal on November 27, 2023. Their father, Ofer, remained in Hamas captivity for 484 days and was finally released on February 1, 2025.

1606. Dor Dan is Carmela's youngest child. At the time of the attack, Dor was at his home in Harish with his family. Since Dor keeps Shabbat, he only learned about his family and the attack on Southern Israel through WhatsApp on Shabbat evening of October 7, 2023.

1607. For 11 long days, he did not know if his mother was dead or alive, captive in Gaza with his niece, or dead somewhere in the kibbutz. On October 18, 2023, Dor was informed that they had both been murdered. The circumstances of how exactly they died or where they were found, was only revealed months later, as Galit tracked and found the officer who rescued their bodies from the debris of Carmela's house.

1608. Galit Dan, an educator, is teaching again. She moved to a new house near Karmei Gat. Her youngest daughter's new school dedicated a library to N.D, who was an avid Harry Potter fan. The family continues to struggle with the loss of her child, and older sister to T.D.

1609. Hadas spent 50 days fighting for her children's and their father's release. She was first evacuated from Nir Oz to Eilat and then relocated to Tel Aviv until her children were released. She even missed her own mother's and beloved niece's funeral as she exhausted her efforts to get her daughters and their father freed.

1610. Rotem who survived cancer several years before the attack, was with her often in Tel Aviv. After E.K and S. K were finally released, Hadas moved back to Eilat, to dedicate fully to their rehabilitation. However, Ofer's captivity did not allow her to retire. She relocated with her

children with the Nir Oz community to Karmei Gat. She continued the struggle, relentlessly until Ofer Kalderon was able to embrace their four children, and he too is now in rehabilitation.

1611.   Plaintiff Hadas Kalderon brings this action individually and also as an heir-at-law for the Estate of Carmela Dan.  She is a citizen and resident of the State of Israel. She is a surviving daughter of Carmela Dan.

1612.   Plaintiff Galit Dan brings this action individually and also as an heir-at-law for the Estate of Carmela Dan.  She is a citizen and resident of the State of Israel. She is a surviving daughter of Carmela Dan.

1613.   Plaintiff Dor Dan brings this action individually and also as an heir-at-law for the Estate of Carmela Dan.  He is a citizen and resident of the State of Israel. He is a surviving son of Carmela Dan.

1614.   As a direct and foreseeable result of the October 7, 2023, attack, Carmela Dan, a US citizen, experienced conscious pain and suffering, extreme mental anguish, wrongful death, and economic loss.

1615.   As a direct and foreseeable result of the October 7, 2023 Attack, Plaintiffs Hadas Kalderon, Galit Dan, and Dor Dan have each experienced severe mental anguish and extreme emotional distress. They were all brutally deprived of seeing their mother enjoy her final years.

C.   **The Shani Family**

1616.   Ori Mordechai Shani was a citizen of the United States and a citizen of Israel when he was murdered by Hamas.  He was 22 years old.

1617.   Ori Mordechai Shani was serving in the rank of Captain in the IDF.

1618.   On October 7, 2023, Ori Mordechai Shani was stationed at the Kissufim Outpost near the border fence between Gaza and Kibbutz Kissufim, along with five other soldiers.

294

1619. At approximately 6:30 a.m., dozens of Hamas terrorists ripped through the border fence and stormed through the gaping barrier with machine guns and other weapons. In that moment, Ori and his team became the first line of defense against the unprecedented, barbaric massacre that would soon ensue.

1620. Ori and his team battled tirelessly to fend off the terrorists for three hours, but they were far outnumbered and quickly ran out of ammunition.

1621. Utterly overwhelmed and in desperate need of more ammunition, Ori and his team realized their only hope was to retreat from the border fence and navigate back to their nearby military base near Kibbutz Kissufim, where they could gather more weapons and reinforcements.

1622. Ori and his team arrived at their military base at approximately 4:00 p.m. An hour later, after Ori and his team replenished their ammunition and set back out to battle, terrorists fired a barrage of mortars directly at them. Ori shouted to his team members to take cover, but it was too late.

1623. One of the mortar shells directly struck Ori and another member of his unit. After nearly nine and half hours of fighting for their lives and defending their country, they were both killed instantly.

1624. Plaintiff Miryam Shani brings this claim individually, as the legal guardian of R.S., the minor child of Ori Mordechai Shani and Miryam Shani, and as an heir-at-law to the Estate of Ori Mordechai Shani. She is a citizen and resident of the State of Israel. She is the surviving wife of Ori Mordechai Shani.

1625. Plaintiff Shulamit Shani brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is the surviving mother of Ori Mordechai Shani.

1626. Plaintiff Yehoshua Shani brings this claim individually. He is a citizen and resident of the State of Israel. He is the surviving father of Ori Mordechai Shani.

1627. Plaintiff Yishai Shani brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is a surviving brother of Ori Mordechai Shani.

1628. Plaintiff Zofiya Zaguri brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is a surviving sister of Ori Mordechai Shani.

1629. Plaintiff Nava Rotshten brings this claim individually. She is a citizen and resident of the State of Israel. She is a surviving sister of Ori Mordechai Shani.

1630. Plaintiff Malachi Shani brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is a surviving brother of Ori Mordechai Shani.

1631. Plaintiff Elysha Shani brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is a surviving brother of Ori Mordechai Shani.

1632. Plaintiff Batzion Goldshtain brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is a surviving sister of Ori Mordechai Shani.

1633. Ori's murder has shattered his entire family. Shulamit Shani now walks through life with a profound emptiness and suffers mentally, knowing she will never see her son again.

1634. Once a joyful individual, Miryam Shani now carries her grief everywhere she goes and struggles to raise R.S. all by herself. She now lives off of a single income and frequently relies on her parents to get through the day and care for her child.

1635. As a direct and foreseeable result of the October 7 Attack, Ori Mordechai Shani suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss.

1636. Plaintiffs Shulamit Shani, Yehoshua Shani, Yishai Shani, Zofiya Zaguri, Nava Rotshten, Malachi Shani, Elysha Shani, Batzion Goldshtain, Miryam Shani, and R.S. suffered severe mental anguish and extreme emotional distress, loss of solatium, loss of services, and economic loss as a direct and foreseeable result of the October 7, 2023, Attack on and the death of their family member Ori Mordechai Shani.

### D.    The Tali Gilberg Family

1637. Plaintiff Tali Gilberg is a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.

1638. On the morning of October 7, 2023, Tali Gilberg awoke at approximately 6:00 a.m. in her apartment on Kibbutz Erez, which is located less than one mile from the Gaza Strip.

1639. Approximately thirty minutes later, Tali began hearing rockets flying overhead, followed by red-alert sirens. Being in such close proximity to Gaza, rocket attacks were somewhat routine in the area. However, by 6:50 a.m., Tali heard gunshots in the distance from her apartment.

1640. At approximately 7:00 a.m., Tali received messages from other kibbutz members informing residents to secure their homes and remain in their bomb shelters. Not yet understanding the extent of the attacks, she contacted a friend who was serving in the IDF stationed at the Erez Crossing. He warned Tali that Hamas terrorists had infiltrated Israel and had reached the nearby city of Sderot.

1641. Tali was alone in her apartment, forced to remain in utter silence, while listening to the constant sound of RPG and small-arms fire in the distance. She soon met another resident of the apartment complex who remained with her in the bomb shelter for several hours.

1642. At approximately 7:00 p.m., Tali learned that a friend in Kibbutz Erez as well as several other acquaintances had been viciously murdered that day by Hamas. Fearing for her own

297

safety, she felt compelled to leave her home, even though the IDF had not given residents permission to safely evacuate. She decided to drive north to Herzliya.

1643. Tali was anxious and helpless, realizing the grave risk of driving in the embattled area alone, after dark, and with no protection. She frantically drove for hours, knowing that terrorists may be hiding all around her, waiting for the perfect opportunity to attack her. Eventually, she reached her friend's home in Herzliya.

1644. Tali is traumatized and haunted by the events of October 7, 2023. Despite having moved to Tel Aviv since the attack, she still struggles with psychological triggers, including the sounds of motorcycles, the sight of pickup trucks like the ones driven by terrorists on October 7, and the many hostage posters posted all over Israel.

1645. Tali has also been vocal in sharing her story since October 7, speaking with various international news organizations. As a freelance video editor, Tali also worked on a documentary outlining the events of October 7. While these experiences have been empowering for her, reliving the trauma of October 7 has adversely affected her mentally, and she no longer feels safe and secure in the country she calls home.

1646. As a direct and foreseeable result of the October 7, 2023 attack, Plaintiff Tali Gilberg has suffered severe mental anguish and extreme emotional distress, and economic loss.

### E.    The J.K. Family[165]

1647. Plaintiff J.K. is a citizen of the United States and is a resident of the State of Israel.

1648. J.K. served as a radio operator in the Nahal Brigade of the IDF.

---

[165]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to J.K. and his family by their initials rather than disclosing their full names for fear of retribution against them.

1649. On September 25, 2024, J.K. was deployed north to the Israel-Lebanon border. For one month, his team secured roadblocks and prepared for and conducted military operations inside the Lebanese villages of Blida and Aitaroun, both of which are located within a three-mile radius from the border of Israel.

1650. On October 26, 2024, J.K. and his team were stationed in Aitaroun preparing for their withdrawal from Lebanon. At approximately 2:45 P.M., J.K. received a radio call reporting that an IDF platoon was ambushed in a building by Hezbollah operatives, and there were numerous injuries and casualties.

1651. J.K. and his team quickly collected their gear and rushed to assist the ambushed platoon. Upon arrival at the scene, his team positioned themselves across the street from the building and began evacuating injured soldiers, as well as retrieving the bodies of fallen soldiers.

1652. J.K. and his team then went inside the building. Unfortunately, upon entering the building's courtyard, they failed to notice a Hezbollah terrorist hiding in the rubble.

1653. The terrorist hurled a grenade at the team, and it landed just mere steps away from J.K. followed by a large explosion. J.K. immediately felt the strong impact of the blast with shrapnel lodging in his right shoulder, right arm, chest and lower body.

1654. J.K. was able to exit the building and was immediately assisted by his comrades. He was in excruciating pain, but he remained conscious as he was evacuated out of Lebanon and taken to an Israeli hospital.

1655. After spending one week in the hospital, J.K. was transferred to another facility where he underwent five weeks of rehabilitation. To this day, he suffers from a debilitating knee injury and experiences considerable pain in his lower body with several pieces of shrapnel still lodged in his body.

299

1656. Currently, J.K. is on medical leave from the IDF and is undergoing physical therapy and hydrotherapy. These sessions are often intense and physically draining for J.K., and he feels constant fatigue and pain.

1657. J.K. has not been able to return to his job as a building engineer, which involves significant walking and movement, and he cannot travel the long commute from his home in the Golan Heights region to the city of Haifa, where he works, due to his injuries, physical limitations, and constant pain.

1658. As a direct and foreseeable result of the October 7, 2023, attack and the events that followed on October 26, 2024, Plaintiff J.K. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1659. Plaintiff Me.K. brings this action individually. She is a citizen and resident of the State of Israel. She is the wife of J.K.

1660. Plaintiff A.K. brings this action individually. He is a U.S. citizen and a resident of the State of Israel. He is the father of J.K.

1661. Plaintiff Ma.K. brings this action individually. She is a U.S. citizen and a resident of the State of Israel. She is the mother of J.K.

1662. Plaintiffs J.K. and Me.K. also bring this action as co-legal guardians of their minor children N.P.K., C.K., and S.M.K., all of whom are U.S. citizens and residents of Israel. N.P.K. is the son of J.K., and C.K. and S.M.K. are the daughters of J.K.

1663. Plaintiff D.N. brings this action individually. She is a U.S. citizen and a resident of the State of Israel. She is the sister of J.K.

1664. Plaintiff Y.K. brings this action individually. He is a U.S. citizen and a resident of the State of Israel. He is a brother of J.K.

300

1665. Plaintiff D.K. brings this action individually. He is a U.S. citizen and a resident of the State of Israel. He is a brother of J.K.

1666. Plaintiffs Me.K., A.K., M.K., N.P.K., C.K., S.M.K, D.N., Y.K., and D.K. experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the subsequent October 26, 2024 attack in which J.K. was injured.

### F.      The Strauss Family

1667. Plaintiff Shalom Strauss is a citizen of the United States and a resident of the State of Israel.

1668. Plaintiff Yael Strauss is a citizen and resident of the State of Israel.  She is the wife of Shalom Strauss.

1669. Plaintiffs Shalom Strauss and Yael Strauss bring this action on behalf of their three minor sons, Z.S., Y.S., and D.S., all of whom are citizens of the United States and residents of Israel.

1670. Shalom Strauss, Z.S., Y.S., and D.S. are hereinafter collectively referred to as "The Strauss Family."

1671. In the early hours of October 7, 2023, Shalom Strauss was fast asleep when the piercing wail of sirens shattered the morning silence, echoing ominously outside the Strauss Family home in Kibbutz Nir Yitzhak. He immediately jolted out of bed and rushed with his children to their safe room for protection. Shalom Strauss's wife, Yael Strauss, had not yet arrived home from her work as a nurse at a hospital in the city of Be'er Sheva, and Shalom was caring for their three minor children.

1672. The Strauss Family huddled together anxiously in their safe room, waiting for the rocket sirens to subside. However, their anxiety would soon transform into immense fear when

they heard gunfire coming from just outside their safe room.

1673. At approximately 8:30 a.m., the Strauss Family were horrified to learn via WhatsApp that terrorists had invaded their kibbutz and were hunting down residents. Shalom had the difficult task of explaining these unprecedented events to his minor children and instructed them to hide under the bed in the safe room. The gunfire continued to persist all day as the Strauss Family patiently waited for the IDF to arrive and rescue them.

1674. In the early hours of October 7, 2023, Hamas terrorists drove to the front gate of Kibbutz Nir Yitzhak and set up sniper positions all around the area before entering the kibbutz. The kibbutz security and response teams fought back. Tragically, six team members were killed by the terrorists. The terrorists then unleashed horror on the residents of Kibbutz Nir Yitzhak, setting fire to homes, vehicles, various kibbutz infrastructure, and anything of value to the Israeli residents living there. Altogether, five Israeli citizens were taken hostage from Nir Yitzhak, and eight Nir Yitzhak residents were killed that day.

1675. Throughout that dreadful day, Yael Strauss was overwhelmed with stress knowing that the lives of her husband and sons were at serious risk while she was unable to leave the hospital. She was gripped with fear and anxiety that she would need to identify the bodies of her own husband and children. These intense feelings were further compounded by the magnitude of casualties arriving at the hospital from the many areas in Southern Israel under attack by Hamas.

1676. After approximately twelve hours of nerve-wracking waiting, the IDF arrived on the kibbutz and began evacuating residents from their homes. The Strauss Family were instructed to hide in a kindergarten on the kibbutz with other families for the night.

1677. The Strauss Family were horrified at the sight of the destruction and what remained of their kibbutz - homes were ravaged with bullet holes and destruction and chaos prevailed. After

spending the night in one of the kibbutz's kindergartens, the family evacuated south to the city of Eilat. Shalom was given one hour to pack belongings for himself, his children, and his wife for an undetermined amount of time.

1678. Yael was anxious to reunite with her family as she had not seen them since the day before the attacks. It was too risky for her to travel South from Be'er Sheva. The Strauss Family was finally reunited on October 8, 2023.

1679. The Strauss Family remained in Eilat for two months where they tried their best to create a normal routine - the children attended school; and Yael Strauss gained employment at a hospital in Eilat. Shalom is employed part-time on their kibbutz, so he would return weekly.

1680. Eventually, the family made a full return to their home on Kibbutz Nir Itzchak. This was emotionally difficult for them as much of the kibbutz was still destroyed, and more than half the evacuees have yet to return.

1681. The events of October 7, 2023 continue to traumatize the family. In the days following the attacks, they were overwhelmed with sadness to learn of the people they knew, both children and adults, who had been brutally murdered by terrorists and taken hostage into Gaza. Tragically, a best friend of D.S. was taken hostage into Gaza on October 7, 2023. This has caused D.S. significant emotional difficulty, and he now suffers from increased anxiety. Furthermore, whenever he sees his friend's photo on a hostage poster, he panics and breaks down in tears.

1682. Since October 7, Shalom has continued to struggle both physically and mentally. His sense of security and safety for himself and his family has been shattered.

1683. As a direct and foreseeable result of the October 7, 2023, attack, Plaintiffs Shalom Strauss, Z.S., Y.S. and D.S. have suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

303

1684. Plaintiff Yael Strauss has suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack on her husband and children.

### G. The S.S. Family[166]

1685. Plaintiff S.S. is a citizen of the United States and a resident of the State of Israel.

1686. S.S. was a Reservist in the IDF. His brigade was one of the first military forces to enter Gaza.

1687. On October 7, 2023, S.S. was urgently called up to reserve duty. With little information about the horrors unfolding, he hugged his wife and young child and set out for the Shizafon military base in southern Israel.

1688. Upon his arrival, military officials briefed S.S. on the ongoing Hamas massacre of Israeli communities along the Gaza envelope. They assigned him to the 198th Battalion, one of the first teams to enter the Gaza Strip as part of Israel's defensive.

1689. After three weeks of intense training, S.S. and his team set out into the Hamas-controlled Gaza Strip. Their mission was to capture Hamas strongholds in Jabalia, a city in Northern Gaza.

1690. After reaching Jabalia, on the morning of November 8, 2023, S.S. and his team began preparing for a long day of battle. At approximately 10 a.m., one of his teammates spotted a terrorist lurking in the building across from their position.

1691. As the team quickly filled into the alley beside the building, S.S. and his combat partner provided cover in the back.

---

[166] Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to S.S. and his family by their initials rather than disclosing their full names for fear of retribution against them.

1692.   Suddenly, S.S. heard a massive explosion, and the air immediately filled with suffocating smoke. A terrorist had thrown a grenade at S.S. and his team from the second floor of the building.

1693.   As S.S. retreated with his team members, he heard his company commander screaming out for help from the fog of the explosion. The commander had been critically wounded in the explosion along with approximately five other soldiers from the unit.

1694.   S.S. and his other team members sprinted back to their original position to grab the medic who immediately rushed out to begin treating the wounded soldiers.

1695.   Forced into a leadership role, S.S. quickly reorganized the team. Under heavy fire, S.S. led his team back out into the alley to fend off the terrorists while the medic treated the wounded team members in a small hidden storage area in the alley.

1696.   S.S. and his team later located the wounded team members being treated in the hidden storage room. When they arrived, they found that the medic had been shot – twice in the chest, once in the arm, and once again in the leg.

1697.   Now forced to act as both an interim medic and company commander, S.S. led his team in simultaneously fighting off terrorists and treating their fellow wounded soldiers.

1698.   S.S. survived unscathed, and he and his team were able to evacuate the wounded soldiers. The team quickly attempted to reposition to continue with their mission. Barely ten minutes later, they were hit with a barrage of gunfire.

1699.   S.S. was struck by a searing pain in his hand — he was one of three soldiers hit by the gunfire. One was killed instantly; the other would later succumb to his wounds.

1700.   With blood gushing from his hand, S.S. was evacuated to an Israeli hospital, where he underwent two surgeries.

1701. The bullet had torn multiple tendons in S.S.'s hand, fractured his scaphoid bone, and caused significant nerve damage.

1702. To this day, S.S. continues to experience limited mobility, pain, and nerve sensitivity in his hand. This prevents him from engaging in countless aspects of his daily life — from playing with his young children to playing sports that he once loved.

1703. On top of his physical injuries, S.S. continues to suffer mentally following his near-death experience and traumatic attempt to rescue his fellow soldiers. These physical and emotional injuries have also negatively impacted S.S.'s career, as he has been unable to return to work.

1704. Plaintiff S.S. brings this action individually, and as the co-legal guardian of his minor child I.S. I.S. is a citizen of the United States and a resident of the State of Israel.

1705. Plaintiff Yo.S. brings this action individually, and as the co-legal guardian of her minor child I.S.  She is a citizen of the United States and a resident of the State of Israel. She is the wife of S.S.

1706. Plaintiff Ch.S. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the mother of S.S.

1707. Plaintiff As.S. brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the father of S.S.

1708. Plaintiff Am.S. brings this action individually.  He is a citizen of the United States and a resident of the State of Israel. He is a brother of S.S.

1709. Plaintiff Ta.S. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is a sister of S.S.

1710. Plaintiff Na.S. brings this claim individually.  He is a citizen of the United States and a resident of the State of Israel. He is a brother of S.S.

306

1711.   Plaintiff Av.S. brings this claim individually.  She is a citizen of the United States and a resident of the State of Israel. She is a sister of S.S.

1712.   Plaintiff Ay.S.S. brings this claim individually.  She is a citizen of the United States and a resident of the State of Israel. She is a sister of S.S.

1713.   As a direct and foreseeable result of the October 7, 2023, Attack, Plaintiff S.S. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1714.   Plaintiffs Yo.S., I.S., Ch.S., As.S., Am.S., Ta.S., Na.S., Av.S., and Ay.S.S. suffered severe mental anguish, extreme emotional distress, loss of solatium, loss of services and economic loss as a direct and foreseeable result of the October 7, 2023, attack on their family member S.S.

**H.    The Shain Family**

1715.   Plaintiff Binyamin Shain is a citizen of the United States and a resident of the State of Israel

1716.   Plaintiff Zlil Chen is a citizen and resident of the State of Israel.  She is the domestic partner of Binyamin Shain.

1717.   On the evening of October 6, Binyamin Shain and Zlil Chen, filled with anticipation for the NOVA Festival, decided to gather all 27 friends who were going to the NOVA festival and host a holiday dinner for everyone in their apartment to celebrate the Jewish holiday of Simchat Torah. Enjoying their time together and eager to continue the celebration, they set off for the NOVA Festival.

1718.   On the morning of October 7, 2023, at approximately 6:30 am, Binyamin and Zlil were among hundreds of party-goers who were jolted out of the NOVA Festival's serene atmosphere by the rockets streaking through the pastel sunrise.

307

1719.   Binyamin, Zlil, and their friends immediately dropped to the ground for cover, praying they would not be struck by the incoming rockets. Witnessing his panicking partner and friends, Binyamin realized he either had to act or lose control entirely. From that moment on, he led the group through this terrifying journey.

1720.   Plaintiff Dvorit Shain is a citizen of the United States and a resident of the State of Israel.  She is the mother of Binyamin Shain.

1721.   On the morning of October 7, Dvorit woke up to loud explosions overhead. She quickly turned on the TV, only to be shocked by the news that the country was under attack. Reports emerging from the south described the chaos at the NOVA Festival, where attendees were desperately fleeing for their lives. Worried for her son's safety, she immediately called Binyamin. At first, he answered calmly, telling her there were sirens and that they were packing the car to return home.

1722.   Panic spread rapidly as machine gunfire erupted around Binyamin and Zlil. Terrorists began shooting into the crowd indiscriminately, causing thousands of people to flee for safety, blocking every exit in a frantic attempt to escape. Two of Binyamin and Zlil's close friends managed to break free from the festival grounds only to be brutally murdered just outside the gates on Road 232.

1723.   The group of 27 friends who had begun this journey together separated as they tried to navigate a path through the chaos. That day, each would experience their own harrowing story, some of survival, and others, tragically, of loss.

1724.   Panic consumed Dvorit as she realized terrorists breached the border from Gaza. She soon phoned Binyamin again. This time, his voice was filled with terror as he said, "Mom, I

can't talk. We're running in the fields. I have to go!" At that moment, Dvorit froze, paralyzed by fear, realizing that her son's life was in imminent danger.

1725.   Binyamin, Zlil, and three of their friends managed to get into a car. Desperate to escape, Binyamin broke two posts to access a dirt road, hoping to find an alternate route out. This path led them onto Road 232—a place he would later realize, hauntingly, was where his two friends, had been murdered just minutes before.

1726.   With both directions of the road blocked, security directed them onto an agricultural path. After driving only a short distance, they encountered yet another traffic jam. Moments later, gunfire broke out nearby, forcing them to jump out of the car and seek cover behind it. The shooting was relentless, with bullets tearing through the trees above them, hitting anything in their path. Paralyzed by fear, they could only hope they would not be caught in the storm of bullets.

1727.   The group reconvened and ran to hide in a nearby riverbed, hoping to find refuge. Binyamin considered heading to Kibbutz Be'eri but quickly learned from others that it had been invaded by terrorists who were massacring and kidnapping civilians. With no reliable information about where they could find safety, Binyamin led the group eastward, trying to distance them from the Gaza border and the terrorists.

1728.   An hour into their eastward journey, Binyamin received a desperate call from an old friend, crying for help and severely bleeding from injuries sustained while escaping gunfire by jumping from a 50-foot cliff. His fall had been broken by barbed wire, saving his life but leaving him with severe wounds on his arm. Despite the long distance between them, the injured friend knew he could rely on Binyamin. Under the blazing sun, with no water, food, or sleep, Binyamin guided him through first aid over the phone, tracked his live location, and coordinated with

309

someone who could pick him up and take him to Moshav Patish—an area where other survivors had found refuge.

1729.  Following an arduous 10 miles and about 6-hour ordeal, exhausted and haunted by moments when their lives seemed to hang by a thread, they finally arrived at Moshav Patish. Upon arrival, Binyamin and Zlil were horrified seeing the severe injuries of fellow survivors, including their friend Natan, whose arm bore a deep, ragged tear. Though relieved to have reached a semblance of refuge, the distant sounds of gunfire, explosions, and sirens reminded them that true safety was still elusive.

1730.  Dvorit sat helplessly, waiting for any sign of life from Binyamin and Zlil. The uncertainty of her son's fate was torturous as reports of civilians being murdered and kidnapped flooded in. She could only pray that her son and his partner were not among the victims.

1731.  Finally, after about five agonizing hours, Dvorit's phone rang. Binyamin told her that after hours of running through fields, they had reached Moshav Patish. Though relieved to hear his voice and learn that the terrorists hadn't caught them, Dvorit remained terrified, knowing that danger still loomed nearby.

1732.  After hours of uncertainty and unrelenting tension, a bus finally arrived to take Binyamin and Zlil to Be'er Sheva, where her mother awaited them. As the bus drove away, just when they thought that the worst was over, they encountered gunfire from an exchange between police and a suspicious vehicle. Forced to travel through the Hamas-ravaged town of Ofakim, they passed the lifeless, battered bodies of local civilians, witnessing firsthand the devastation—a horrific scene forever etched into their memories.

1733.  Initially, Binyamin and Zlil believed the attack was focused solely on the NOVA Festival. However, the devastating scenes during that ride revealed the staggering scale of the

310

October 7 attacks—a reality they still struggle to fully comprehend. With immense relief, Binyamin and Zlil finally reached Be'er Sheva and, eventually, home. Only that night did the exhaustion overwhelm them— they had been awake for 40 hours, walked the equivalent of a half marathon, and survived an unspeakable tragedy.

1734.   In the days that followed, Binyamin and Zlil felt as though everything was on the verge of collapsing. They slowly learned which friends were missing and which had been killed. Wracked with anxiety and dread, they attended a different funeral each day, mourning the brutal massacre they had witnessed.

1735.   Traumatized by what had happened to Binyamin and Zlil, Dvorit is haunted by relentless "what ifs." The thought of her son running for his life while she was powerless to help triggers overwhelming panic and anxiety that continues to disrupt her daily life. The recurring sound of his panicked voice as he fled for safety is unbearable, especially knowing that some of their friends were brutally murdered.

1736.   Binyamin experiences nightmares to this day and cannot leave the house without fearing that something extreme might happen. The trauma has made him feel uncomfortable even hiking in nature, fearing that danger could emerge suddenly from the trees. When parking, he now searches for the closest spot to the entrance, seeking a quick exit in case of an attack.

1737.   Zlil still cannot erase from her mind the terrified faces of her friends and the chaos of the panic attacks. Once a spontaneous and adventurous woman—something she deeply cherished about herself—she now refuses to leave the house without meticulously planning every detail. The terrorists stole her joy for life, transforming her from a curious and carefree young woman into someone perpetually on edge, scanning for potential threats. The haunting thought that someone, somewhere, may be seeking to harm her simply for who she is continues to dominate

311

her mind. While she is making efforts to rebuild her life, Zlil has been unable to fully return to her career as a chemical engineer. She struggles to work full-time, finding it overwhelming to commit to the responsibilities she once managed with ease.

1738. Since the October 7 Massacre, Binyamin and Zlil are no longer the same people. They once found joy in organizing celebrations for their friends, being the first two to buy tickets to the NOVA Festival and encouraging the group of 27 to join them. Now, burdened by the guilt that not all 27 made it back home, they can no longer bring themselves to gather their friends together. As part of their attempt to recover, they have tried attending other parties to recapture some of the joy they once felt, but the music only triggers flashbacks of that day. The terrorists took from them the freedom to do what they loved most.

1739. Plaintiff Russel Shain brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is the father of Binyamin Shain.

1740. Plaintiff Michal Lukman brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is the sister of Binyamin Shain.

1741. Plaintiff Ariel Shain brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is the brother of Binyamin Shain.

1742. Plaintiff Shay Shain brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is the sister of Binyamin Shain.

1743. As a direct and foreseeable result of the October 7, 2023, attack, Plaintiff Binyamin Shain suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1744. Plaintiffs Zlil Chen, Dvorit Shain, Russel Shain, Michal Lukman, Ariel Shain, and Shay Shain experienced severe mental anguish and extreme emotional distress as a direct and

foreseeable result of the October 7, 2023, attack on the NOVA Festival and Binyamin Shain and Zlil Chen.

**I.      The Leshem Family**

1745.   Plaintiff Zion Leshem is a citizen of the United States and a resident of the State of Israel.

1746.   Plaintiff Rivka Leshem is a citizen and resident of the State of Israel. She is the wife of Zion Leshem.

1747.   Plaintiff Zion Leshem also brings claims on behalf of his minor children, M.E.L., L.A.L., M.D.L., T.B.L., and T.N.L., as their legal guardian.  All of these children are citizens and residents of Israel.

1748.   Plaintiff Yehuda Gur Aryeh Leshem is a citizen and resident of the State of Israel. He is the son of Zion Leshem and Rivka Leshem.

1749.   Plaintiff Chemda Rachel Leshem is a citizen and resident of the State of Israel.  She is the daughter of Zion Leshem and Rivka Leshem.

1750.   Zion Leshem, Rivka Leshem, Yehuda Guy Leshem, Chemda Rachel Leshem, M.E.L., L.A.L., M.D.L., T.B.L. and T.N.L. are hereinafter collectively referred to as "The Leshem Family".

1751.   The weekend of October 7, 2023 was supposed to be a momentous time on Moshav Naveh where the Leshem Family resided with its residents celebrating the Jewish holiday of Simchat Torah - one of the most joyous holidays in the Jewish calendar. In the early hours of October 7, 2023, Zion Leshem arrived at the moshav synagogue, along with 150 other men from the community for morning prayers. The rest of the Leshem Family remained at home and planned to meet Zion at a later point in day to celebrate the holiday. Shortly after, incessant rocket sirens began blaring across the skies of Moshav Naveh.

1752. The Leshem Family was forced to seek shelter in a safe room for over ten hours. They did not have access to electricity, cell-phone service or any contact with the world outside of their community. The Leshem Family soon learned that a battle had taken place on the outskirts of Moshav Naveh, between a Hamas terrorist battalion and Israeli soldiers. A map and other materials would later be recovered from the terrorists, showing they had planned to hunt and murder the residents of Moshav Naveh.

1753. After hours of uncertainty, the Leshem Family were warned that terrorists could breach their moshav at any moment, and they needed to remain hidden.

1754. Eventually, security officials instructed the Leshem Family to evacuate the moshav and travel to Jerusalem. They packed for nine family members in a matter of minutes and for an unspecified amount of time. It would be two months before they were allowed to return to their home on the moshav.

1755. As regular roads were closed with lifeless bodies scattered everywhere, the Leshem Family had to use an alternative route which dangerously ran south along the Egyptian border. Mentally, Zion Leshem was in a state of near-delirium, as he was exhausted and even had trouble recalling the date. Being forced to drive a vehicle in this state, coupled with the sight of many lifeless bodies, will be etched in Zion's mind forever. After a long five-hour drive, the Leshem Family reached Jerusalem, where they were housed in a hotel with thousands of other evacuees.

1756. As many of the hotel workers were Arabs, Zion stated that he felt a general sense of unease and animosity coming from these workers. Moreover, the October 7 attacks further heightened the religious and ideological differences between Jews and Arabs in Israel, which could be felt at the hotel. The Leshem Family stayed at the hotel for two months before returning home.

314

1757. Since the October 7 massacre, Zion could not resume his normal life. Instead, his main focus is to protect his wife, seven children, and community by raising money to purchase various types of equipment for the moshav including protective ammunition, computers and communications technology. Zion now volunteers on the moshav security team. He is in training seven days a week, and this has been his only job and occupation since the attacks. He sleeps with his M-16 Rifle next to him in the event that an attack occurs in the middle of the night.

1758. Before October 7, Zion lived a calm and quiet life. However, the events of October 7, 2023 have shattered any sense of normalcy for his life and the lives of the other members of the Leshem Family, and their lives will never be the same.

1759. The stress and anxiety experienced by Zion on October 7and the immediate days afterwards, was overwhelming.

1760. Plaintiff Zvi Leshem is a citizen of the United States and a resident of the State of Israel. He is the father of Zion Leshem.

1761. Plaintiff Julie Leshem is a citizen of the United States and a resident of the State of Israel. She is the mother of Zion Leshem and the wife of Zvi Leshem.

1762. As a direct and foreseeable result of the October 7, 2023 attack, Plaintiffs Zion Leshem, Rivka Leshem, Yehuda Guy Leshem, Chemda Rachel Leshem, M.E.L., L.A.L., M.D.L., T.B.L. and T.N.L. suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

1763. Plaintiffs Zvi Leshem and Julie Leshem suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack on the Leshem Family in Moshav Naveh.

315

**J.      The E.H. Family[167]**

1764.   Plaintiff E.H. is a citizen of the United States and a resident of the State of Israel.

1765.   E.H. served as a non-combat air control operator in the IDF at the time of the October 7, 2023, attack.

1766.   On that ominous day, at approximately 6:30 a.m., E.H. and her fellow soldiers at Re'im Base in Southern Israel were abruptly jolted awake by the deafening sound of rockets fired from the Gaza Strip, their sense of calm violently shattered. They followed protocol and rushed to the nearest bomb shelter where they received the terrifying information that scores of Hamas terrorists had breached the base.

1767.   The brutal assault was launched on the Jewish holiday of Simchat Torah, a time when many soldiers were on leave, leaving only a minimal number of soldiers to secure the base. Ultimately, 19 IDF soldiers were slaughtered at Re'im Base by the overwhelming onslaught of at least 120 Hamas terrorists.

1768.   At the time of the October 7 attack, the emergency squad on Re'im Base consisted of nothing more than a commander and four non-combat soldiers.

1769.   In an inhumane display of violence and degradation, Hamas terrorists seized the central area of the base, tearing down the Israeli flag and replacing it with the Hamas flag. They mercilessly set fire to operations rooms and strategic infrastructure, while some structures were struck by mortar shells.  E.H. was horrified to later learn that the terrorists relentlessly and indiscriminately wreaked havoc in every corner of the base in an attempt to create total and utter destruction.

---

[167]      Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to E.H. and her family by their initials rather than disclosing their full names for fear of retribution against them.

1770. E.H. and her fellow soldiers tried to shut all the doors to the bomb shelter. Having no weapons or other means to defend themselves, they turned off the lights and hid from the heavily armed Hamas terrorists.

1771. E.H. and her fellow soldiers would endure the extreme trauma of being surrounded for the next 10 excruciating hours by Hamas terrorists just outside their safe room. She heard several of the terrorists yelling in Arabic, and the sound of rockets and machine guns blaring through the air. At one point, one of the bomb shelter's doors flew open on impact of a nearby blast and shrapnel pierced through the wall.

1772. The intense fighting at Re'im Base went on for hours before the terrorists were subdued. E.H. could hear the menacing sounds of gunshots outside the safe room, getting closer and closer.

1773. At approximately 4:30 p.m., security forces finally arrived to rescue E.H. and her fellow soldiers. Amid the chaotic fighting, the forces were initially unable to locate them. E.H. knew she had no choice but to act when she stepped outside the safe room into the mayhem, bravely trying to guide the forces.

1774. When stepping outside the safe room, E.H. witnessed the gruesome sight of the devastation caused by the terrorists' invasion and a wave of shock washed over her. She was left appalled, unable to process the full extent of what had happened. She saw lifeless bodies lying on the ground and scenes of violence that haunt her to this day.

1775. Israeli army forces finally located E.H. and her fellow soldiers, pulling them from the bomb shelter as intense fighting raged around them, with the base still infested with terrorists.

1776. E.H. and her fellow soldiers were taken to an area of the base that had, by that point, been cleared of terrorists. Despite the chaos and horror, and without hesitation, E.H. immediately

317

took on her military duties as an air control operator, replacing a fellow soldier who had completed a 10-hour shift.

1777.    E.H.'s skills as an air control operator were essential at the time of the attack, with helicopters constantly flying in to bring reinforcements and evacuate the wounded. Despite the traumatizing ordeal she had endured just several hours earlier, she tirelessly continued to perform her military duties alongside her fellow soldiers.

1778.    E.H. was on shift until 3:00 a.m. on October 8, 2023, and her base was only fully cleared of terrorists at approximately 7:00 p.m. that day.  She remained on base until October 10, 2023, while performing all of her military duties and doing everything in her power to assist as many people as possible.

1779.    During that time, IDF soldiers and civilians continued reporting drone threats and requesting help.  E.H. felt morally and humanely obligated to address reports and calls for help – even when she was unable to assist – simply because she understood that people were in dire distress and needed support.

1780.    E.H. is devastated and overwhelmed by what she had lived through during the October 7 rampage. She now feels distant from her inner circle, including her immediate family. She is currently trying to cope with the life-changing ordeal she experienced on the day of the attack and in the days that followed.

1781.    E.H.'s ability to work has also been severely compromised, as she struggles to interact with others and build trust-based relationships. Being in the vicinity of Arabic-speaking colleagues makes her very unsettled and anxious, as she is constantly tormented by flashbacks of Hamas terrorists shouting in Arabic and images of wreckage she had witnessed on October 7.

1782. E.H.'s inability to assist her fellow soldiers while she was confined to the safe room took a terrible toll on her. It took months before she could sleep through the night, and she still occasionally experiences nightmares and crying spells. Mental images from that day, alongside a sense of anxiety and despair, constantly accompany her.

1783. E.H.'s anxiety is triggered by crowded spaces and exposure to loud noises. She no longer believes that she is capable of leading a normal life and establishing a family.

1784. As a direct and foreseeable result of the October 7, 2023, attack, Plaintiff E.H. has suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

1785. Plaintiff De.G. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the mother of E.H.

1786. Plaintiff Mi.H. brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the father of E.H.

1787. Plaintiff Yo.H. brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the brother of E.H.

1788. Plaintiffs De.G., Mi.H., and Yo.H. each experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack on their family member E.H.

**K.     The Guedalia Family**

1789. Joseph Guedalia was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas.

1790. Joseph Guedalia served in the elite Duvdevan Unit in the IDF.

319

1791.  Joseph and his wife, Senai Guedalia, were a young couple who had met at a Jewish summer camp and dreamed of building a life together. Married for just one year, they lived in a small apartment in Jerusalem with their whole future ahead of them.

1792.  On October 6, 2023, during the Jewish holiday of Simchat Torah, Joseph and his family gathered in Jerusalem for their cherished tradition of dancing, dining, and celebrating together.

1793.  The following morning, on October 7, 2023 at approximately 8:00 am, Joseph received a call from his commander ordering him to report to base immediately, citing reports of civilians being killed in the south. Moments later, the shocking sounds of rocket sirens and explosions filled the air. Rockets targeting Jerusalem with such intensity was unusual, leaving Joseph certain that something horrific was unfolding.

1794.  As one of the first from his team to arrive, Joseph immediately set out for Kfar Aza where 64 community members had been killed, 19 kidnapped, and hundreds more injured or raped by Hamas terrorists. Determined to act swiftly, he gathered his team and headed south.

1795.  By the time Joseph arrived at approximately 11:00 am, Kfar Aza had become a battlefield. Joseph and his team repeatedly braved enemy fire, rescuing injured civilians from rooftops, roadsides, bushes, and transporting them to safety. On their third entry into Kfar Aza, they decided to enter through the back to cover areas they hadn't yet reached. Tragically, this route led directly into the terrorists' point of entry.

1796.  Fully aware of the dangers, Joseph and his team began driving through the houses, determined to save lives. Spotting an abandoned RPG on the ground, they decided to secure it before the terrorists could. It was a trap. Their vehicle came under heavy small-arms and RPG fire. Forced to flee the vehicle, they jumped out just as the terrorists threw a grenade at them.

1797.   In the chaos, Joseph ran toward the back entrance to Kfar Aza where a group of terrorists ambushed him near the fence. Alone, he managed to eliminate the terrorists but sustained a fatal gunshot in the exchange ultimately leading to his death.

1798.   Moments later, a backup team from his unit arrived and found one of Joseph's team members, severely injured. He directed them to search for Joseph. When they found him lifeless, they discovered terrorists attempting to drag his body toward Gaza. The team opened fire and recovered his body. Joseph's body was transported to an army base designated for fallen soldiers.

1799.   Plaintiff Asher Guedalia brings this claim individually.  He is a United States citizen and a resident of the State of Israel. He is the surviving brother of Joseph Guedalia.

1800.   Asher Guedalia was serving as a reserve soldier in the special forces unit in the IDF.

1801.   On the morning of October 7, Asher and his brother Joseph had planned to continue their holiday celebrations. However, air raid sirens in Jerusalem jolted Asher awake. As a reserve combat soldier, he immediately reported to his unit and was deployed to the south.

1802.   By 10 a.m., Asher and his team had arrived in the south. They received reports of terrorists ambushing an area near the Ma'on Junction. While attempting to locate the terrorists, his commander was shot at and struck down. Asher witnessed the incident from across the junction. Under heavy fire, he rushed to evacuate his commander while his team eliminated the terrorists. Tragically, despite his efforts, the commander was pronounced dead.

1803.   Amid his shock and overwhelming grief, Asher knew he had to press on with the mission. Alongside his team, he cleared areas in Kibbutz Re'im and assisted forces responding to injured civilians amidst ongoing clashes. Passing through the NOVA Festival site was a harrowing

321

experience—scenes of unimaginable cruelty and devastation seared into his memory – burned cars, mutilated and charred bodies, and shattered remnants of what had once been a joyous celebration.

1804.    Asher returned to base around 9:00 p.m. to prepare for further operations. Exhausted and emotionally drained, he tried to locate a teammate who hadn't returned to base, only to learn he had been killed. The realization shattered him—he had now lost two team members. Notifying one of their wives was a heart-wrenching task that left him paralyzed with grief.

1805.    At that point, Asher hadn't even considered that his brother Joseph was near the fierce battles against Hamas in the southern border because he usually operated in the West Bank. However, during his deployment to the border to counter potential terrorist infiltrations, he heard rumors that his brother's unit had suffered losses in Kfar Aza. Desperately seeking information, he reached out to mutual friends, but their fragmented responses only deepened his anxiety.

1806.    Asher couldn't sleep that night. Taking over night shifts from his teammates, he was stormed by horrifying thoughts about his brother fighting in Kfar Aza. The following morning, a phone call confirmed his worst fear—Joseph had been killed. Determined to be the one to deliver the heartbreaking news to their family, Asher worked tirelessly to coordinate his arrival with IDF officials to the family house.

1807.    Before heading to his parents' home, a devastating realization fell upon Asher: his brother would leave no children, no legacy behind. The weight of this truth shattered him completely. The two brothers were more than siblings—they were best friends. Living close to one another in Jerusalem, they shared hobbies like sports, studies, and technology, building dreams and inspiring each other. For Asher, Joseph is irreplaceable—a true partner in life. Losing him has left a void that can never be filled.

1808. Since the attack, life has fundamentally changed for Asher. Losing his brother felt like losing a part of himself; the man he was before October 7 no longer exists. The grief and trauma have reshaped his perspective and priorities. He now struggles to find meaning and purpose. Before the attack, Asher worked in a startup, managing a machine learning division. The company was on the verge of a major breakthrough, promising significant financial gains. But after October 7, the weight of the painful loss and the haunting memories, prevented him from working as he once could.

1809. Plaintiff Senai Guedalia brings claims individually and also as heir-at-law on behalf of the Plaintiff Estate of Joseph Guedalia. She is a citizen of the United States and a resident of the State of Israel. She is the wife of Joseph Guedalia.

1810. After two agonizing days of uncertainty, worry, and fear, Senai Guedalia was notified of her husband's fate. On October 9, 2023, at approximately 6:00 pm, IDF officials knocked on her door to deliver the message that would change her life forever—Joseph was brutally murdered by Hamas terrorists.

1811. The loss of Joseph has devastated Senai's life. She suffers from sleepless nights and declining physical health and is unable to eat regularly despite feeling hunger. Social settings, once a source of comfort, have become unbearable as she can no longer tolerate large crowds. Severe anxiety overwhelms her multiple times a day, disrupting her ability to function. As a result, Senai has been forced to drastically reduce her workload in her social work studies, unable to manage the demands she once handled with ease.

1812. Above all, the most profound loss for Senai is her stolen future. As a young couple, Senai and Joseph dreamed of building a home, having children, and creating a family together. That dream was cruelly taken from her, leaving a deep void and grief.

1813.   Plaintiff David Guedalia brings this claim individually.  He is a citizen of the United States and a resident of the State of Israel. He is the surviving father of Joseph Guedalia.

1814.   Plaintiff Dina Lea Guedalia brings this claim individually.  She is a citizen of the United States and a resident of the State of Israel.   She is the surviving mother of Joseph Guedalia.

1815.   On October 9, 2023, Plaintiffs David Guedalia and Dina Lea Guedalia were supposed to celebrate their wedding anniversary. Instead, a knock on the door would change their lives forever. David opened the door to find his son, Asher, standing there with a pained expression, accompanied by two somber IDF officers. Unable to accept the reality of what was happening, David repeatedly asked, "Who? Who was killed?" Overwhelmed, he sat paralyzed on the stairs, breaking down completely. Moments later, Dina arrived home, smiling and wishing him, "Happy anniversary." David looked at her and said, "Our son was killed."

1816.   A year later, David and Dina couldn't bring themselves to say the words "Happy anniversary," and they will likely never celebrate their wedding anniversary again. David is haunted by recurring nightmares of the moment he opened the door: the devastated look on Asher's face and the officers delivering the crushing news. Every time he enters his home, he is confronted with the memory—seeing the officers standing in the doorway and the stairs where he broke down. The trauma grips him daily, causing him immense emotional pain. He struggles to work and manage the daily and weekly responsibilities that once shaped his life.

1817.   Plaintiff Shira Ephrat brings this claim individually. She is a United States citizen and a resident of the State of Israel. She is a surviving sister of Joseph Guedalia.

1818.   Plaintiff Yael Guedalia brings this claim individually.  She is a United States citizen and a resident of the State of Israel. She is a surviving sister of Joseph Guedalia.

324

1819. Plaintiff Ester Guedalia brings this claim individually. She is a United States citizen and a resident of the State of Israel. She is a surviving sister of Joseph Guedalia.

1820. Plaintiff Micha Guedalia brings this claim individually. He is a United States citizen and a resident of the State of Israel. He is a surviving brother of Joseph Guedalia.

1821. Plaintiffs David Guedalia and Dina Lea Guedalia bring a claim on behalf of E.G., their minor child, who is a United States citizen and a resident of the State of Israel. She is a surviving sister of Joseph Guedalia.

1822. As a direct and foreseeable result of the October 7 Attack, Plaintiff Estate of Joseph Guedalia suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss.

1823. As a direct and foreseeable result of the October 7, 2023, Attack, Plaintiff Asher Guedalia suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1824. Plaintiffs Senai Guedalia, Asher Guedalia, Micha Guedalia, Esther Guedalia, Yael Guedalia, Shira Ephrat, Dina Lea Guedalia, David Guedalia, and E.G. experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack on and the death of their family member Joseph Guedalia.

## L.    The Berkowitz Family

1825. Eyal Berkowitz was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas. He was 28 years old.

1826. Eyal Berkowitz was serving in the elite Maglan commando unit in the IDF.

1827. Upon learning about the unprecedented October 7, 2023, attack on southern Israel, Eyal, a newlywed and promising medical student, was called up for reserve duty. Without

325

hesitation, driven by his dedication to his comrades and his reeling country, he left everything behind and rushed to the frontlines to join the fight against Hamas terrorists in the Gaza Strip.

1828. On December 7, 2023, Eyal and his fellow soldiers set out on a courageous mission to retrieve the bodies of two Israeli hostages who, in an act of savagery, had been abducted during the October 7 attack. These hostages were violently hauled into the Gaza Strip and were ultimately executed by Hamas terrorists.

1829. Eyal and his comrades were on their way to the Jabaliya area in the Gaza Strip, where intelligence indicated that the massacred bodies of the Israeli hostages were being held. As Eyal's convoy was advancing, a roadside explosive, planted by Hamas terrorists, was detonated. Eyal and several of his fellow soldiers were critically wounded.

1830. Teetering on the brink of survival, Eyal was airlifted to an Israeli hospital, where medical staff fought to save his life. Despite their relentless efforts, Eyal succumbed to his wounds just hours later, leaving behind a mother, a father, five siblings, and a wife.

1831. Plaintiff Michal Berkowitz brings this claim individually and also as the heir-at-law for the Estate of Eyal Berkowitz. She is a citizen and resident of the State of Israel. She is the surviving wife of Eyal Berkowitz.

1832. Plaintiff Shmaya Berkowitz brings this claim individually. He s a citizen of the United States and a resident of the State of Israel. He is the surviving father or Eyal Berkowitz.

1833. Plaintiff Rivka Berkowitz brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is the surviving mother of Eyal Berkowitz.

1834. Plaintiff Erez Berkowitz brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is a surviving brother of Eyal Berkowitz.

326

1835. Plaintiff Tzur Berkowitz brings this claim individually. He is a citizen of the United States and a resident of the State of Israel. He is a surviving brother of Eyal Berkowitz.

1836. Plaintiff Tamar Berkowitz brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is a surviving sister of Eyal Berkowitz.

1837. Plaintiff Einav Berkowitz brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is a surviving sister of Eyal Berkowitz.

1838. Plaintiff Reut Zipora Shtern brings this claim individually. She is a citizen of the United States and a resident of the State of Israel. She is a surviving sister of Eyal Berkowitz.

1839. The death of Eyal Berkowitz has had a devastating effect on his family. Plaintiff Michal Berkowitz is grief-stricken by the loss of her husband. As a certified nurse, her ability to work and concentrate has been severely compromised, and the painful absence of Eyal Berkowitz accompanies her at all times. Since the death of her beloved husband, Michal Berkowitz has been experiencing insomnia, mood swings and exhaustion. At times, she struggles with daily tasks, like merely getting out of bed.

1840. As a direct and foreseeable result of the October 7 attack, Eyal Berkowitz experienced conscious pain and suffering, extreme mental anguish, wrongful death, and economic loss.

1841. Plaintiffs Shmaya Berkowitz, Rivka Berkowitz, Erez Berkowitz, Tzur Berkowitz, Tamar Berkowitz, Reut Zipora Shtern, Einav Berkowitz, and Michal Berkowitz have each experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack and the death of their family member Eyal Berkowitz.

M.    The Aharoni Family

1842. Plaintiff Shanee Aharoni is a citizen of the United States and a resident of the State of Israel.

327

1843.    Shanee Aharoni was eager to celebrate her birthday with her friends on the weekend of October 7, 2023. She made plans to meet up with them as soon as she finished her shift working as a cashier at the NOVA Festival in southern Israel.

1844.    On October 6, 2023, at approximately 9:00 p.m., Shanee arrived for her shift. She was scheduled to work until 6:00 a.m. the next morning. When 6:00 a.m. arrived, her boss asked her to stay an extra hour. That extra hour would change the course of her life forever.

1845.    At approximately 6:30 a.m., a massive barrage of rockets streaked through the sky over the NOVA Festival complex.  Shanee gathered her friends and other partygoers into her ticket booth and tried to keep everyone calm, including herself.

1846.    After nearly 40 terrifying minutes huddled in the booth, Shanee heard gunfire and screams echoing from the festival crowds.

1847.    Shanee desperately struggled to make sense of the chaos unfolding around her. Armed terrorists fired into crowds of young partygoers, bodies falling to the ground in every direction.  Shanee watched, paralyzed in horror, as one of the terrorists shot her friend in the leg.

1848.    Shanee quickly snapped out of her panicked daze. She didn't know how many terrorists there were or how many people had already been shot – she just knew she had to escape.

1849.    Shanee, along with her friend Carmel and her boyfriend, ran to the parking lot, hoping to drive to safety. However, they soon realized that they were boxed in as all the cars were stuck in a massive traffic jam. They would later discover that the traffic jam was also a product of the Hamas attack, as terrorists murdered partygoers in their cars all along the highway.

1850.    With no other way to escape, Shanee and her friends started to run. As they sprinted for their lives, Shanee realized that terrorists were flying in on parachutes, raining bullets on the crowd before continuing their carnage by foot.

1851. Echoes of blood-curdling screams and gunfire drowned out all of Shanee's thoughts as she raced through the desert terrain as fast as she could. She witnessed fellow partygoers gunned down beside her, people tripping over lifeless bodies as they desperately tried to escape.

1852. Shanee and her friends finally arrived to an area where they could hide. Scanning the landscape, now full of dead bodies, they located a public bomb shelter with roughly 30 people packed inside. Shanee did not feel comfortable entering the bomb shelter, so they continued on and found a few cars to hide underneath instead.

1853. That decision saved their lives. Soon after, Shanee watched in horror as a man who had been ushering people into the bomb shelter then threw grenades into the shelter murdering everyone inside.

1854. Shanee and her friends got out from underneath the cars and started to run again. They came across an abandoned car with a set of car keys. With no time to spare, they jumped in and drove off as fast as they could.

1855. As they sped away from the NOVA Festival grounds, Shanee fought to keep her composure. They weaved through roads lined with lifeless bodies and abandoned vehicles, praying with each turn that they didn't run into the terrorists' hands.

1856. At approximately 2:00 p.m., Shanee made it to her mother's house in central Israel alive. However, her life would never be the same.

1857. Hamas terrorists murdered approximately 20 of Shanee's friends that day. What was supposed to a celebration of Shanee's birthday turned into a massacre of her closest friends and a trauma that would scar her for the rest of her life.

1858. In the weeks following the attack, Shanee's mental state quickly deteriorated. For the first two weeks, she barely uttered a single word.

1859. Once a motivated, independent young woman working in the high-tech sector, Shanee could no longer hold down a job and live alone in her apartment. She lost a significant amount of weight as she struggled to eat. She began to self-isolate, unable to socialize or leave her home. She cried constantly and had frequent outbursts of anger.

1860. The continuous blaring of rocket sirens in central Israel triggered Shanee's trauma response. As a result, as of September 28, 2024, she has now moved in with her sister in the United States.

1861. Shanee continues to suffer from extreme physical and mental side effects. She experiences frequent stress-vomiting spells and can barely sleep through the night without waking up from traumatizing night terrors. She is unable to partake in any social situations, or even neutral situations where other people are present.

1862. Plaintiff Galit Aharoni is a citizen of the United States and resident of the State of Israel. She is the mother of Shanee Aharoni.

1863. Plaintiff Yaniv Aharoni is a citizen of the United States and a resident of the State of Israel. He is the father of Shanee Aharoni.

1864. Plaintiff Roy Aharoni is a citizen of the United States and a resident of the State of Israel. He is the brother of Shanee Aharoni.

1865. Plaintiff Etay Aharoni is a citizen of the United States and a resident of the State of Israel. He is the brother of Shanee Aharoni.

1866. Galit Aharoni experienced severe emotional distress on October 7, 2023, fearing for her daughter's life. Since October 7, 2023, her life has revolved around helping her daughter through her trauma. She will soon be relocating to the United States to help support Shanee Aharoni.

330

1867.   Plaintiff Lenoy Aharoni is a citizen and resident of the United States. She is the sister of Shanee Aharoni.

1868.   On October 7, 2023, Plaintiff Lenoy Aharoni experienced extreme fear and anguish as she worried about the safety of her sister. In the aftermath of the attack, Lenoy opened her home in the United States to Shanee so they could remain together and support one another through the healing process.

1869.   As a direct and foreseeable result of the October 7, 2023, attack, Plaintiff Shanee Aharoni suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1870.   Plaintiffs Galit Aharoni, Yaniv Aharoni, Roy Aharoni and Etay Aharoni suffered severe mental anguish and extreme emotional distress, loss of solatium, loss of services, and economic loss as a direct and foreseeable result of the October 7, 2023, attack on their family member Shanee Aharoni.

### N.    The N.P. and E.P. Family[168]

1871.   Plaintiff N.P. is a citizen of the United States and a resident of the State of Israel.

1872.   Plaintiff E.P. is a citizen of the United States and a resident of the State of Israel.

1873.   N.P. and E.P. are twin brothers, and they both serve in the canine special force's unit in the IDF.

1874.   On October 7, 2023, N.P. was at home in Modi'in on a short vacation from duty celebrating the Jewish holiday of Simchat Torah with his family. Woken by the shocking and terrifying news of what was unfolding in the south, N.P. soon received a call from his commander, explaining that civilian communities were under attack.

---

[168]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to N.P., E.P. and their family by their initials rather than disclosing their full names for fear of retribution against them.

1875. After a quick preparation at base, N.P. headed south with his K-9 partner, Cheetah, to Kibbutz Be'eri—one of the most severely attacked communities. The devastation at Be'eri included 101 members brutally murdered, 31 kidnapped, and hundreds more injured, including men, women, children, and the elderly.

1876. Heading toward the mission with little information about what lay ahead, N.P. and his team passed horrifying scenes that revealed the full scale of the catastrophe. From the window of his vehicle, he saw mutilated and burned bodies, cars engulfed in flames, and scenes of unimaginable destruction. At that moment, it became clear to him: he had entered a full-blown war zone. These haunting images remain etched in his memory to this day.

1877. Around midday, N.P. entered Kibbutz Be'eri and began the evacuation process. Determined to help as many people as possible, N.P. and Cheetah went from house to house, rescuing civilians who were injured or trapped in their homes. The chaos was overwhelming, but N.P. remained committed to his mission, doing whatever he could to save lives.

1878. During a mission to rescue members of Kibbutz Magen, E.P. drove south, passing rows of lifeless bodies. At first, he couldn't process what he was seeing—entire families brutally murdered. Inside the kibbutz, the atrocities became even more horrifying with bodies scattered on the streets. At one point, while searching, he knelt without realizing there was a body right next to him. The chaos and carnage were beyond what his mind could grasp.

1879. The horrors he witnessed haunt N.P. to this day, affecting his daily life. The smell of burning flesh often invades his senses unexpectedly, triggering painful memories. Despite his need to recover, knowing there were still hostages in captivity and entire communities displaced from their homes, he believed there was no time to prioritize his own needs.

1880. On January 24, 2024, N.P. was operating in Khan Younis in southern Gaza. His mission, alongside Cheetah, was to detect bombs planted by terrorists. After a long day of operations, as the sun began to set, N.P.'s commander ordered the team to rest in a safe zone. While searching for a suitable place, N.P. and his team inadvertently entered an exposed area. Rushing to take cover, they entered a house without sending Cheetah to thoroughly search it first.

1881. Within seconds of entering the house, a massive explosion erupted. N.P. lost consciousness immediately. When he awoke, barely disoriented, he found himself buried under debris, utterly alone. Upon realizing he was alive his first instinct was to check if he had lost any limbs. His second thought was of Cheetah. Realizing she was gone, he forced himself to push aside his grief and focus on surviving.

1882. Trapped under heavy concrete, N.P. tried desperately to free himself but found it impossible to move. After several failed attempts, he decided to wait for a rescue team. Suddenly, a fire broke out in the house, quickly spreading toward him. Realizing time was running out, N.P. used every ounce of strength to try and free himself while screaming for help. As the fire drew closer, N.P. could feel the heat searing his legs, burning his uniform.

1883. At last, a rescue team arrived and began working to pull him from the rubble. The flames continued to spread, and the team struggled to free him, their gloves beginning to burn from the intense heat. Just as the situation seemed hopeless, a second rescue team arrived. Together, they managed to pull N.P. out of the wreckage and rushed him to receive medical treatment.

1884. Struggling to breathe due to smoke inhalation and trauma, N.P. was sedated and intubated to open his airway. A rescue helicopter transported him to a hospital in Israel, where doctors performed emergency surgery to remove shrapnel lodged in his pelvis.

1885.   When N.P. woke up the following day, his ordeal was far from over. He underwent a series of painful procedures, including skin grafts to treat third-degree burns on various parts of his body, with the most severe damage on his legs. From that point on, he began an agonizing journey of recovery.

1886.   As E.P. prepared to go back into Gaza for another mission, his commander informed him of the devastating news—his twin brother, N.P., had been severely injured. Overwhelmed with panic and dread, E.P. rushed to the hospital. The hour-long drive was consumed by spiraling thoughts and fears. Upon arriving, as the first family member there, he was met with the horrifying sight of his brother, sedated and intubated in intensive care, his body covered in burns and blood, connected to an array of machines. Urged to step back, he refused to leave his brother's side, demanding answers from the medical team. But the absence of clear information only deepened his torment.

1887.   On the evening of January 24, 2024, the Peles family was at home when a phone call shattered their world. Hi.P., E.P. and N.P.'s mother, answered to hear the calm but detached voice of an IDF official. Speaking in a calm but detached manner, the official informed her that N.P. had been seriously injured and was in intensive care at Soroka Medical Center. Unable to accept this devastating news, Hi.P. tried to convince herself it was a scam.  However, as the official repeated the message multiple times, the reality sank in, leaving her overwhelmed with uncontrollable crying, screaming, and searing pain throughout her body.

1888.   E.P. met his family as they arrived at the hospital. Hi.P. was so overcome with grief and fear that she could barely walk, needing support to enter. Their father, Li.P., broke down in tears—a sight E.P. had never seen before. Despite his own pain, E.P. felt like he had to be the strong one, trying to emotionally support his family while inwardly falling apart.

1889. After several weeks of caring for his family and his injured brother, E.P.—torn between his family's pleas for him to stay and his unwavering sense of duty—ultimately returned to the frontlines. One of the most harrowing moments for E.P. occurred during a mission when, inside an APC (armored personnel carrier), he spotted a terrorist through the camera sprinting toward them with an explosive device. Time seemed to stretch endlessly. Trapped and unable to defend himself, all he could think about was his family—how they would cope if he didn't survive. For a few agonizing seconds, E.P. braced for the inevitable explosion that, miraculously, never came. While the immediate danger passed, the mental weight of those moments and the haunting thoughts of his family remain ever-present.

1890. After nearly a month of being bedridden, N.P. could not perform simple tasks like getting out of bed without excruciating pain. His recovery extended to two and a half months in the hospital, where physical therapy felt like relearning how to walk. To this day, N.P. continues to struggle with basic tasks, having lost much of his strength and flexibility, which now severely limits the physical freedom he once enjoyed.

1891. After being discharged from the hospital, N.P. was haunted by nightmares replaying the harrowing moments when he was trapped in a burning building, unable to escape or save anyone. He is tormented by feelings of how he is still alive, repeatedly questioning how even the smallest change in events could have altered his fate. N.P. continues to carry this heavy burden, knowing it will remain with him for life.

1892. Since the October 7 massacre, and the bomb planted by Hamas terrorists, N.P. is no longer the same person. He bears significant scars on his legs and arms from the burns and must undergo ongoing treatments, such as laser therapy and the application of special creams. He must always wear protective bandages to ensure his skin remains covered. Additionally, nerve damage

in his leg has left him with permanent numbness, preventing him from regaining his full physical abilities. He can no longer serve as an active combat soldier.

1893.   N.P. knows this struggle will accompany him for the rest of his life. He continues to grapple with the trauma of the events he endured, the horrifying scenes of October 7, and the lingering pain over the loss of Cheetah and the guilt of leaving her behind.

1894.   Since the October 7 attack, E.P. is no longer the same person. The trauma of the sights of lifeless bodies in Kibbutz Magen, the constant danger in Gaza, his twin brother's injury, and his family's suffering—continues to weigh on him. He has become hypersensitive to every loud noise or sudden movement. At times, his heart races uncontrollably, triggering anxiety attacks without warning. Every day, he carries the heavy burden of how much life has changed since October 7.

1895.   Plaintiff Hi.P. brings this action individually.  She is a citizen of the United States and a resident of the State of Israel. She is the mother of N.P. and E.P.

1896.   Hi.P. has struggled deeply to regain any sense of normalcy. Constant questions and intrusive thoughts haunt her—replaying the moment of N.P.'s injury and imagining the horrors he endured, along with the devastating "what-ifs." The phone call from the IDF echoes in her mind like a broken record, often reducing her to tears.

1897.   Plaintiff Li.P. brings this action individually.  He is a citizen of the United States and a resident of the State of Israel. He is the father of N.P. and E.P.

1898.   Li.P. stopped working for several months to dedicate himself fully to supporting N.P. and the rest of his family. Despite his efforts, the harrowing memories of those days resurface often, triggering sleepless nights filled with fear and anxiety. Adding to the family's anguish was

their worry for E.P., who was still serving in the same military unit as N.P., and shortly after his brother's injury returned to the front lines.

1899.    Plaintiffs Li.P. and Hi.P. also bring this action on behalf of their minor daughter, D.P.  D.P. is a citizen of the United States and a resident of the State of Israel. She is the sister of N.P. and E.P.

1900.    For D.P., N.P. has always been her role model—the person she looked up to for strength and confidence. The thought of losing him shattered her sense of security. She now struggles with heightened anxiety and often finds herself unable to sleep. After being away from school for several weeks, the trauma has made it difficult for her to fully return to her studies or achieve the academic performance she once excelled at.

1901.    Plaintiff Ro.P. brings this action individually.  He is a citizen of the United States and a resident of the State of Israel. He is the brother of N.P. and E.P.

1902.    The attack on N.P. completely upended the family's lives. For months, they remained by his side, unable to work or attend school, consumed by the constant worry over his condition. Even now, N.P. is still undergoing extensive treatment and has not fully recovered. His injuries continue to define their daily lives, fueling ongoing trauma and anxiety for the entire family.

1903.    As a direct and foreseeable result of the October 7, 2023 Attack, and the events that followed, Plaintiffs N.P. and E.P. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

1904.    Plaintiffs Li.P., Hi.P., E.P., D.P., and Ro.P. experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the subsequent January 24, 2023 attack in which N.P. was injured.

337

**O.    The Lilintal-Huri Family**

1905.   Plaintiff Moshe Yehuda Lilintal is a citizen of the United States and a resident of the State of Israel.

1906.   Plaintiff Esther Perel Lilintal is a citizen of the United States and a resident of the State of Israel. She is the wife of Moshe Yehuda Lilintal.

1907.   Plaintiff Elia Natan Lilintal is a citizen of the United States and a resident of the State of Israel. He is the son of Moshe Yehuda Lilintal and Esther Perel Lilintal.

1908.   Plaintiff Yaakov Lilintal is a citizen of the United States and a resident of the State of Israel. He is the son of Moshe Yehuda Lilintal and Esther Perel Lilintal. He brings this action individually and as co-legal guardian of his minor children T.L., N.R.L., S.L., and E.S.L., citizens and residents of Israel.

1909.   Plaintiff Chana Lilintal Bialistoki is a citizen and resident of the State of Israel. She is the wife of Yaakov Lilintal. She brings this action individually and as co-legal guardian of her minor children T.L., N.R.L., S.L., and E.S.L., citizens and residents of Israel.

1910.   Plaintiff Yeshayahu Lilintal is a citizen of the United States and a resident of the State of Israel. He is the son of Moshe Yehuda Lilintal and Esther Perel Lilintal. He brings this action individually and as co-legal guardian of his minor children Y.M.L., T.L., and S.L., citizens and residents of Israel.

1911.   Plaintiff Tamar Lilintal is a citizen and resident of the State of Israel. She is the wife of Yeshayahu Lilintal. She brings this action individually and as co-legal guardian of her minor children Y.M.L., T.L., and S.L., citizens and residents of Israel.

1912.   Plaintiff Daniel Lilintal is a citizen of the United States and a resident of the State of Israel. He is the son of Moshe Yehuda Lilintal and Esther Perel Lilintal. He brings this action

338

individually and as co-legal guardian of his minor children, J.M.L. and A.L., citizens and residents of Israel.

1913.   Plaintiff Gal Lilintal is a citizen and resident of the State of Israel. She is the wife of Daniel Lilintal. She brings this action individually and as co-legal guardian of her minor children, J.M.L. and A.L, citizens and residents of Israel.

1914.   Plaintiff Chaim Tuvia Lilintal is a citizen of the United States and a resident of the State of Israel. He is the son of Moshe Yehuda Lilintal and Esther Perel Lilintal. He brings this action individually and as co-legal guardian of his minor child M.L., a citizen and resident of the State of Israel.

1915.   Plaintiff Talya Lilintal is a citizen and resident of the State of Israel. She is the wife of Chaim Tuvia Lilintal. She brings this action individually and as co-legal guardian of her minor child M.L., citizen and resident of the State of Israel.

1916.   Plaintiff Chana Lilintal Huri is a citizen of the United States and a resident of the State of Israel. She is the daughter of Moshe Yehuda Lilintal and Esther Perel Lilintal.

1917.   Plaintiff Evyatar Saadya Shalom Huri is a citizen and resident of the State of Israel. He is the husband of Chana Lilintal Huri.

1918.   Moshe Yehuda Lilintal, Esther Perel Lilintal, Elia Natan Lilintal, Yaakov Lilintal, Chana Lilintal Bialistoki, T.L, N.R.L., S.L., E.S.L., Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel Lilintal, Gal Lilintal, J.M.L., A.L., Chaim Tuvia Lilintal, Talya Lilintal, M.L., Chana Lilintal Huri and Evyatar Saadya Shalom Huri are hereinafter collectively referred to as "The Lilintal Family."

1919.   On October 7, 2023, the members of the Lilintal Family were ruthlessly attacked by Hamas in different locations along the Gaza border.

**Lilintal Family in Moshav Naveh:**

1920.  Plaintiffs Esther Perel Lilintal, Moshe Yehuda Lilintal, Chana Lilintal Huri and Evyatar Saadya Shalom Huri lived on Moshav Naveh, a small agricultural community in Southern Israel. On October 7, 2023, Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel Lilintal, Gal Lilintal, J.M.L., and A.L. were visiting for the Jewish holiday of Simchat Torah.

1921.  Esther's love for hosting was shared by her children. Nearby, Chana and Evyatar were delighted to host Evyatar's parents and sister in their cozy trailer home.

1922.  On October 7, 2023, at approximately 6:30 a.m., Esther was shaken awake by the sounds of sirens and missiles exploding overhead. Living near the Gaza border, she was no stranger to rocket attacks, but this time the volume and magnitude of the explosions were extremely unusual. She felt a pit form in her stomach.

1923.  Esther and Moshe hurriedly gathered all 12 of their family members from their respective rooms and ran to the shelter. Chana and Evyatar joined them shortly after, along with Evyatar's parents and sister.

1924.  Sounds of explosions and gunfire erupted outside. Terror swept over the family as they squeezed together in the tiny safe room. Between the 16 family members, there was barely room to breathe.

1925.  Still struggling to grasp the reality of their own situation, the family soon learned that the terrorists had infiltrated into Moshav Naveh's neighboring communities. Esther, Yeshayahu, and Chana were forced to hide their own horror in order to calm the frantic children — silencing their sobs so that they could remain undiscovered by the terrorists lurking outside.

1926.    It had been over 24 petrifying hours before the Lilintal family members in Moshav Naveh were finally evacuated and received word that their family members in neighboring communities were safe.

1927.    Esther, Moshe, Chana, and Evyatar were evacuated to a hotel in Jerusalem. They have yet to return to their homes, or their lives as they knew them.

1928.    Since October 7, life has not been the same for Yeshayahu, Tamar, and their children. Their 3-year-old daughter T.L., who was potty-trained before the October 7 Attack, is now back in diapers and has developed a disabling stutter. All of their children are still unable to sleep through the night. Chana is haunted by the horrors of that day on a daily basis. She experiences extreme anxiety in crowded areas – her heart begins pounding and she often feels like she is going to faint.

1929.    Chana and her husband no longer sleep in their bedroom – they now sleep in their safe room every night, desperate for a sense of security.

1930.    Esther continues to struggle with disrupted sleep that routinely makes her late to work – a rare occurrence for her prior to the October 7 attack. She and her husband, Moshe, socialize far less than they used to, and they rarely leave their immediate community.

**Chaim Tuvia Lilintal and Family in Kibbutz Kerem Shalom:**

1931.    Chaim Tuvia Lilintal, Talya Lilintal and M.L. lived in Kerem Shalom.  Chaim invited his friends to stay with him and his family for the holiday of Simchat Torah.

1932.    At approximately 6:30 a.m., Chaim jerked out of bed to the sound of piercing sirens. Within seconds of rushing his family and friends into a safe room, gunfire rang out from directly outside the house.

1933. Cautiously, Chaim peered out the safe room window. To his horror, he watched as a barrage of terrorists gunned down the soldiers guarding the gate of their Kibbutz community.

1934. Suddenly, Chaim's phone rang. It was a member of the Kibbutz security team. The wife of one of the kibbutz security team members had been left alone in her home, completely defenseless. They were desperately searching for someone to go save her.

1935. While his heart pounded out of his chest, Chaim swallowed his fear, grabbed his pistol, and set out with his friend to rescue the woman. Miraculously, he reached her and brought her safely back to his safe room. The woman stayed with them for the entire duration of the attack.

1936. On Sunday morning, as the fighting raged on in the Kibbutz, Chaim decided it was time to take action to protect his family and community. He reached out to the Kibbutz security team and asked to join them. He fought alongside the security team for the rest of the day as they defended the Kibbutz community.

1937. Against all odds, Chaim survived and so did his family, friends, and the woman he had rescued. They were finally reunited on Sunday evening. The relief and jubilance of knowing that their family was still intact was fleeting, as they took in the destruction around them.

1938. Chaim, Talya, M.L., and their friends were evacuated south, but Chaim had more work to do. While Talya and M.L. moved in with their friends in Beer Sheva, Chaim returned to the kibbutz to continue defending what was left of their community. The family was soon reunited again — this time, in attendance of several funerals in Jerusalem for their friends who did not make it out alive.

**Yaakov Lilintal and Family in Kibbutz Kerem Shalom:**

1939. Yaakov Lilintal, Chana Lilintal Bialistoki and their children lived in Kibbutz Kerem Shalom. Like his mother, sister, and brother, Yaakov was overjoyed to host family for

342

Simchat Torah. They were joined by Chana's parents, grandmother, and brother. It was a full house, packed with excitement and anticipation for the holiday.

1940.   At approximately 6:30 a.m., the whole family jolted awake to several blaring rocket alert sirens. Yaakov's stomach churned as he hurried his family into their safe room. Suddenly, the sounds of the sirens were met by sounds of explosions and a barrage of gunfire.

1941.   Chana's family began to panic. With little information about what was happening outside, Yaakov and Chana quieted their own fears and desperately tried to calm their family and young children.

1942.   With no clear picture of the threat outside and with his family's lives on the line, Yaakov called the kibbutz security coordinator. The coordinator told him to remain in the safe room with his family for the time being, and that they may ask him to join the emergency response team if they could get him proper gear.

1943.   Later that evening, Yaakov received a call from the kibbutz coordinator. He shared devastating news – several members of the emergency response team had been murdered and injured, and families were being massacred by terrorists in their homes.

1944.   The coordinator begged Yaakov to help one family in particular. Terrorists had broken into their home and attacked the father, critically injuring him. The kibbutz team was able to evacuate the father to a hospital, but the rest of the family needed a place to stay.

1945.   Yaakov did not hesitate to take in the family. Altogether, the 17 of them packed into the tiny safe room. By that time, there was no more electricity or cell service. Petrified, they remained in the shelter as the violence raged on overnight.

1946.   On the evening of October 8, they were finally given clearance to evacuate. Yaakov and his family quickly packed up their belongings and rushed to their cars, where they were

343

escorted out of the area by the military. Yaakov braced for the possibility that they would never see their home again.

1947. Yaakov and his family initially moved in with Chana's parents in Jerusalem, before relocating to a hotel in Eilat with other displaced families.

1948. Life in the hotel was extremely difficult. As a family of six in a small room, there was no privacy and no sense of routine. Their lives had been completely disrupted.

1949. During their time in the hotel, Yaakov's children began suffering from trauma-related symptoms. Previously confident, they grew extremely wary of strangers and unable to separate from their parents. They struggled with severe insomnia, which in turn kept Yaakov and Chana awake at night. They constantly feared that terrorists were hiding under their beds or in their rooms. The suffering escalated to the point that Yaakov's son told him that he wanted to die.

1950. This unbearable hotel life dragged on for three months. Yaakov and his family then relocated to Kibbutz Ashalim, alongside other displaced families.

1951. Finally, the family decided to move back to Kerem Shalom. However, when they returned, they barely recognized their home. The vast majority of the kibbutz remained in shambles. With their house still uninhabitable, they moved into a trailer.

1952. Yaakov and Chana continue to grapple with the murder of several of their close friends. The grief is overwhelming at times.

1953. T.L., N.R.L., S.L., and E.S.L. continue to suffer from the same severe insomnia, fear of strangers, and loud noises as they did during their time in the hotel.

1954. The temperament of T.L. has changed dramatically. Previously an easygoing child, he is now socially withdrawn, aggressive and volatile, often lashing out at his siblings.

1955.    The trauma of this experience is deeply ingrained in the children's development. The first words of two-year-old N.R.L. included the terms "terrorist," "hostage," and "alarm." Hearing these words out of her toddler's mouth has shattered Chana's heart.

1956.    Chana struggles to find any motivation these days. Managing her children's trauma on top of her own has emotionally devastated her. She feels as if her entire family and community life fell apart overnight.

1957.    Yaakov Lilintal, Chana Lilintal Bialiastoki, T.L., N.R.L., S.L., and E.S.L. all continue to experience extreme mental suffering.

**E.N.L. in Kibbutz Sufa:**

1958.    In the early morning hours of October 7, 2023, E.N.L. and his girlfriend returned home to Kibbutz Sufa, a tight-knit agricultural community near the Gaza border. They had spent the night ringing in the Simchat Torah holiday with E.N.L.'s parents in Moshav Naveh, and were just getting to sleep at approximately 4:30 a.m.

1959.    Two hours later, they were startled awake by wailing sirens warning of incoming rockets. As the security coordinator of the kibbutz, E.N.L. immediately sent a message to kibbutz residents instructing them to take shelter, and ran to his safe room with his girlfriend.

1960.    At approximately 6:45 a.m., E.N.L. received a call from the operations room of the Amitai battalion of the IDF, with whom he was in frequent contact as security coordinator for the nearby kibbutz. They said terrorists had infiltrated Kibbutz Sufa. E.N.L.'s heart started to pound, but he didn't have time to panic – he needed to keep a clear head to protect his community.

1961.    At approximately 6:55 a.m., gunfire erupted outside of E.N.L.'s home. He urgently called the IDF company commander for information, but no one picked up.

345

1962. When E.N.L. finally got in touch with the battalion's operations officer, his fears were confirmed – the company commander was injured, the medic was injured and all of the troops were already overwhelmed. No one was coming to help Kibbutz Sufa. His final words to E.N.L. were "Good Luck."

1963. E.N.L. understood he had to take matters into his own hands if he wanted to survive. He held his panicking girlfriend and told her to remain in the safe room, and gave her a walkie talkie so that she could communicate with him.

1964. With only his standard-issue firearm and the precarious cover of his bathroom window, E.N.L. desperately tried to fend off the infiltrating terrorists as they ravaged through the Kibbutz, attempting to break into his and his neighbor's homes. He engaged in two intense fire-fights – and narrowly survived them both.

1965. Trembling after two near-death experiences, E.N.L. had no choice but to fight his fear and press on. Quickly, E.N.L. gathered four members of the rapid response team. Together, they pushed their horror aside to protect their community.

1966. Suddenly, E.N.L. spotted approximately 20 Hamas terrorists attempting to infiltrate the Kibbutz fence. He and his team dove for cover beneath some bushes and started firing at the incoming terrorists to stop the invasion.

1967. E.N.L. realized that the bushes left them too exposed. He sprinted towards a large concrete enclosure for cover, but the terrorists spotted him.

1968. The terrorists threw three grenades directly at E.N.L. As he closed his eyes and braced for his death, the grenade exploded just out of his vicinity.

1969.   Moments later, E.N.L. watched in horror as Hamas terrorists gunned-down his friend in plain sight. Choking back tears, he desperately tried to refocus on keeping himself and his remaining three teammates alive.

1970.   The battle between E.N.L. and his three remaining team members against swathes of incoming Hamas terrorists raged on until approximately 1:30 p.m., when six IDF soldiers arrived and took over their positions. By approximately 2:00 p.m., the IDF had arrived in full force, and by 6:00 p.m., the Kibbutz had been secured. For the first time in over 12 hours, E.N.L. could breathe.

1971.   In the following days, E.N.L. and the remaining Kibbutz Sufa residents were evacuated to Eilat, and then moved into temporary housing in Ofakim shortly after. E.N.L. desperately wants to move back home – but to this day, he has not been able to.

1972.   Since the attack, E.N.L. is not the same. He still has not fully regained his hearing following the grenade explosion. He now barely leaves his home and has lost the drive and ambition that were once central to his personality. He struggles to remember some of the events and emotions of the day as the trauma has erased them from his memory.

**For All:**

1973.   As a direct and foreseeable result of the October 7, 2023 Attack, the Lilintal Family (Plaintiffs Moshe Yehuda Lilintal, Esther Perel Lilintal, E.N.L., Yaakov Lilintal, Chana Lilintal Bialistoki, T.L, N.R.L., S.L., E.S.L., Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel Lilintal, Gal Lilintal, J.M.L., A.L., Chaim Tuvia Lilintal, Talya Lilintal, M.L., Chana Lilintal Huri, and Evyatar Saadya Shalom Huri) suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

347

1974.   Plaintiff Rachel Gur brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the daughter of Moshe Yehuda Lilintal and Esther Perel Lilintal.

1975.   Plaintiff Yoseph Lilintal brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the son of Moshe Yehuda Lilintal and Esther Perel Lilintal.

1976.   Plaintiffs Rachel Gur and Yoseph Lilintal each suffered severe mental anguish, extreme emotional distress, loss of solatium, loss of services, and economic loss, as a direct and foreseeable result of the October 7, 2023, Attack on their family members Plaintiffs Moshe Yehuda Lilintal, Esther Perel Lilintal, E.N.L., Yaakov Lilintal, Chana Lilintal Bialistoki, T.L, N.R.L., S.L., E.S.L., Yeshayahu Lilintal, Tamar Lilintal, Y.M.L., T.L., S.L., Daniel Lilintal, Gal Lilintal, J.M.L., A.L., Chaim Tuvia Lilintal, Talya Lilintal, M.L., Chana Lilintal Huri, and Evyatar Saadya Shalom Huri.

### P.    The Lamdan Family

1977.   Plaintiff Yosef Lamdan is a citizen of the United States and a resident of the State of Israel.

1978.   Plaintiff Maya Lamdan is a citizen of the United States and resident of the State of Israel.  She is the daughter of Yosef Lamdan.

1979.   Plaintiff Sylvia Arad is a citizen of the United States and resident of the State of Israel.  She is the mother of Yosef Lamdan and the grandmother of Maya Lamdan.

### Yosef Lamdan

1980.   On the morning of October 7, 2023, at approximately 6:15 a.m., Yosef Lamdan and his wife, Einav Vered, were training with his triathlon team in the vicinity of Kibbutz Sa'ad, approximately three miles from the Israel-Gaza border. Yosef is the team's coach, and on that

348

fateful morning, he was leading 24 participants, including twelve women and five children. While the team rode their bicycles ahead, Yosef followed along in his car to ensure their safety.

1981.  Within minutes of beginning their ride, the group could hear a barrage of machine-gun fire close to their location. There was no proper shelter near them, so the team positioned itself on a partly covered area on the road, waiting for the attack to stop. At this point, Yosef bravely left the group to drive one parent, their child, and another participant to their car close by. He decided to return to the group in order to help lead them to safety.

1982.  Eventually, Yosef was able to locate a proper bomb shelter nearby, and he transported team members by car to the shelter, prioritizing women and children. Just when the team reached the proper shelter, a vehicle carrying terrorists stormed it and began shooting at the group with machine guns. Yosef instinctively led the group to protection and was the last person to enter inside the tightly spaced shelter, putting his team's safety before himself.

1983.  In the midst of running for cover from the gunfire, Yosef fell and injured his ankle. Nonetheless, his focus remained on leading his team out of the crossfire to safety.

1984.  The team began to realize the true severity of the attacks in Israel as they began to meet attendees from the nearby NOVA Music Festival, who had managed to escape the deadly scene. Some party-goers managed to evacuate the festival with the dead bodies of attendees who had been murdered. Yosef assisted in transferring the injured and dead bodies from vehicles to arriving ambulances and the bomb shelter. He also coordinated the evacuation of his team out of the area.

1985.  Yosef has since returned to his home on Kibbutz Mefalsim. However, his family has not yet joined him at their home, as it is still too emotionally difficult for them to return. As a result of his injuries on October 7, 2023, Yosef has experienced difficulty walking normally, and

he can no longer physically participate in team practice, which has affected his position as team leader and coach. This has greatly affected his quality of life, and he also struggles with performing daily functions and is currently undergoing physical therapy.

1986.  Prior to October 7, Yosef lived an active lifestyle, which was an important outlet for stress relief, and his inability to live an active lifestyle has impaired his mental health.

1987.  Since October 7, Yosef has not been able to be as supportive to his family as he would like. He has continued to act as an emotional crutch for the triathlon team members and other survivors, which has taken much of his time away from his family, while living with his own trauma. Often times, his daughter, Maya, will only see her father when they meet at funerals. Yosef now lives a very secluded life, which further exacerbates his mental and physical difficulties.

**Maya Lamdan**

1988.  On the morning of October 7, 2023, Maya Lamdan was staying with a friend at Kibbutz Nahal Oz, a short distance from her home in Kibbutz Mefalsim. At approximately 6:20 a.m., Maya was awoken by sirens, and she and her friend immediately sought refuge in her friend's safe room.

1989.  While the sirens only lasted for 10 minutes, it felt like hours, and Maya knew this was not a normal attack. At approximately 7:00 a.m., nearly 30 terrorists descended upon Kibbutz Mefalsim.

1990.  Maya and her friend remained in the safe room for nearly twelve hours. At approximately 5:00 p.m., the power went out in the safe room, and Maya and her friend decided to go to another friend's house nearby. Maya then learned the scale of the massacre within the kibbutz.

350

1991.    While the kibbutz security team was able to ward off some of the terrorists, Maya learned that several civilians were murdered and taken hostage just steps away from them. Horrible devastation would further settle in when she saw a video posted of a very close friend being kidnapped by terrorists.

1992.    After remaining at the kibbutz until the early hours of October 9, Maya and her friend made the difficult decision to leave the kibbutz and drive two hours north to Caesarea, to stay with family friends. They left the kibbutz with just the clothes on their back, navigating through dark roads littered with dead bodies and overturned cars. The sound of nearby gunfire in the background was audible.

1993.    The trauma Maya felt on October 7 continues to haunt her to this day. She struggles with continual flashbacks, sleepless nights, nightmares and panic attacks.

1994.    Maya has not felt safe in Israel since the attack, and she has relocated several times over the past year. As part of her efforts to heal from the trauma she experienced, Maya traveled to and lived in Thailand for a time. However, the nightmares and anxiety persisted during her time there.

1995.    Maya has since returned to Israel and currently lives in Tel Aviv. However, every day is a continual battle, and she is not able to be gainfully employed at the moment.

1996.    The events of October 7 have also deeply affected Maya's relationship with her father. Yosef Lamdan has continued supporting his team throughout the year, by organizing events and visiting survivors in the hospital. She is very empathetic and proud of her father's efforts on and after October 7. However, it is apparent to her that a part of her father's spirit has not yet returned.

351

**Sylvia Arad**

1997.   On the morning of October 7, 2023, Sylvia Arad was at her home, where she lived alone, in Kibbutz Mefalsim.

1998.   At approximately 6:30 a.m., red alert sirens began, which were not uncommon in Mefalsim due to its proximity to the Israel-Gaza border. Sylvia Arad remained in her bedroom, which also serves as a safe room, waiting for the sirens to cease.

1999.   Sylvia was horrified to hear a barrage of machine-gun fire within close proximity to her home. She knew this was not a typical rocket attack from Gaza, and a serious situation was unfolding in Israel.

2000.   At this point, Sylvia was consumed with anxiety and unease, which was further intensified when the power in her house went out. Sylvia had not yet learned that dozens of terrorists had infiltrated Kibbutz Mefalsim and were hunting down its residents.

2001.   The hours continued to pass into the night, and Sylvia remained alone hiding in her safe room. She was in contact with her granddaughter, Maya Lamdan, at nearby Kibbutz Nahal Oz, who planned to leave by car that night. However, Sylvia's car battery had died the day before, and she was effectively stranded in the terrorist-infested kibbutz.

2002.   On October 8, 2023, another resident on Kibbutz Mefalsim telephoned Sylvia and invited her to leave the kibbutz with her and her son. Sylvia fearfully left her home with few items to meet her ride. This was incredibly nerve-wracking, as it was the first time Sylvia had left her home in over 24 hours, and the threat of terrorists still loomed within the kibbutz.

2003.   Sylvia was able to evacuate Kibbutz Mefalsim, and she later arrived in Ramat Hasharon in central Israel where she stayed at a friend's home for over one month.

2004.   Following the October 7 attacks, Sylvia travelled to the United States and stayed until March 2024 as she was not emotionally ready to return to Israel. When she returned, she stayed in a hotel in the city of Herzliya with other Kibbutz Mefalsim residents who had not returned home yet.

2005.   Sylvia has since returned to her home, while members of her family have refused to come back since October 7. She continues to live an isolated life on the kibbutz, constantly reminded of death and destruction.

2006.   The trauma endured by Sylvia on October 7, 2023 is everlasting. It manifests itself in various ways, including a physical tremor in her right hand, which intensifies when she is experiencing stress and anxiety. Immediately after the attack on Kibbutz Mefalsim, Sylvia became physically ill, and she believes the trauma she has experienced has compromised her body's immune system. She also now has nightmares and problems sleeping.

2007.   As she has struggled to heal from the events of October 7, she was further devastated to learn that her brother, who lived in the United States, was terminally ill, and he eventually passed away. This further exacerbated the emotional trauma she has lived with since October 7, 2023.

2008.   Plaintiff Einav Vered brings this action individually.  She is a citizen and resident of the State of Israel.  She is the wife of Yosef Lamdan.

2009.   Plaintiff Tom Lamdan brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the son of Yosef Lamdan, the brother of Maya Lamdan, and the grandson of Sylvia Arad.

2010.   Plaintiff Guy Lamdan brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the son of Yosef Lamdan, the brother of Maya Lamdan, and the grandson of Sylvia Arad.

2011.   As a direct and foreseeable result of the October 7, 2023, attacks, Plaintiffs Yosef Lamdan, Maya Lamdan, and Sylvia Arad suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2012.   Plaintiffs Einav Vered, Tom Lamdan, and Guy Lamdan suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023 attack on their family members.

**Q.     The J.S. Family[169]**

2013.   J.S. is a citizen of the United States and a resident of the State of Israel.

2014.   J.S. holds the ranking of First Sergeant Major in the Israel Defense Forces ("IDF") and is a reservist in the Givati Brigade's Reconnaissance Battalion.

2015.   As a result of the attacks by Hamas in Israel on October 7, 2023, J.S. was deployed into Gaza on October 28, 2023.

2016.   On the evening of November 11, 2023, J.S.'s team was assigned a mission to clear an UNRWA school, where large amounts of Hamas weapons, ammunition, laptops and other equipment were being held.

2017.   UNRWA has established various social and health services in Gaza, including hospitals and schools, and the majority of Palestinian civilians in Gaza rely on their services. Since October 7, 2023, many of these sites have been uncovered by the IDF as Hamas hideouts, which

---

[169]     Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to J.S. and his family by their initials rather than disclosing their full names for fear of retribution against them.

are embedded within the dense civilian population of Gaza. Moreover, the IDF has discovered several Hamas tunnel-shafts inside UNRWA schools, which puts many innocent Palestinian children in Gaza at serious risk of danger and injury.

2018.  J.S. and his team were in the midst of their mission near the UNRWA school when a tank shell exploded at the team's location. J.S.'s body was jolted by the intense blast. A hard object punctured J.S.'s face with strong force. He was in excruciating pain and gushing blood through his mouth. The force of the blast caused his front tooth to avulse, striking a nerve around it as well.

2019.  One of the team's security officers is a dentist by profession and ordered J.S.'s evacuation from Gaza, in an effort to save his life from serious infection.  J.S. was immediately taken to the hospital, and after only one day of recovery, he re-entered Gaza to continue operational duty with his unit.

2020.  On November 16, 2023, J.S. and his team were on a mission to secure the perimeter of a newly-discovered Hamas tunnel. The team hurried through the dense and confined area when an RPG struck an apartment building next to them. There was a large explosion, and the area filled with dust and smoke. Before J.S. or his team could react, a second explosion occurred, and the intense blast threw several soldiers to the ground.

2021.  J.S. could barely see through the dense clouds of smoke and dust. Chaos ensued, and several soldiers were screaming in pain and agony. J.S. realized his combat partner, Dvir, had severely injured his arm, leg, and several ribs, and blood was gushing through his uniform. Dvir was stabilized and safely evacuated by helicopter. However, this event left a lasting effect on J.S.

2022.  In the midst of the chaos, J.S.'s team was cornered by by terrorists. Twelve RPGs were fired at J.S. and his team, trapping them, along with several other soldiers, in dire need of

355

medical attention. Death seemed imminent as the team was trapped for thirty grueling minutes before other IDF battalions arrived to rescue and evacuate them from Gaza.

2023.   Footage of J.S. and his team being attacked from a comrade's Go-Pro was later uncovered and presented on one of Israel's major news channels.  J.S. could only bear to watch seconds of the footage before he began to panic and hyperventilate in his home, eventually collapsing. J.S. is constantly triggered by the sights and sounds of war which cause him debilitating anxiety, including loud booms or the sound of a person screaming. Moreover, J.S. has developed a strong sense of survivor's guilt, as his friends and comrades were left with debilitating permanent injuries from which they will suffer the rest of their lives.

2024.   J.S. still cannot bring himself to listen to the screams of his comrades in the footage from the incident, particularly Dvir, and will live with these horrific memories for the rest of his life.

2025.   The events of October 7, 2023 and his time in reserve duty has affected J.S.'s relationships with others. He has found himself gravitating to individuals with similar experiences from the war, and he finds it harder to connect with others who are far removed. Moreover, J.S. has become more irritable and impatient, especially around his family. He has also found it difficult to develop romantic relationships as he is consumed by trauma, which has made it difficult for him to care for others.

2026.   October 7 and the events which followed, have impeded J.S.'s ability to pursue higher education and maintain employment. J.S. studies economics and business administration, and as a result of the war, he has missed an entire year of school and is behind on final exams. Professionally, his business has also been adversely affected.

356

2027. Plaintiff Ay.St. is a citizen of the United States and resident of the State of Israel. She is the sister of J.S.

2028. As a direct and foreseeable result of the October 7, 2023, attack and the events that followed up to and including November 16, 2023, Plaintiff J.S. has suffered conscious pain, severe mental anguish, extreme emotional distress, loss of solatium, loss of services, and economic damages.

2029. Plaintiff Ay.St. has suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023 attack on J.S.

**R.      The Haggai Family**

2030. Hoshea Haggai is a citizen of the United States and a resident of the State of Israel.

2031. On the morning of October 7, 2023, Hamas terrorists brutally attacked and shot to death Hoshea Haggai's only brother, Gadi Haggai, and his sister-in-law, Judith "Judy" Weinstein Haggai—both American citizens—in Kibbutz Nir Oz near the Gaza border. After they were viciously executed, their lifeless bodies were taken hostage to Gaza, where they still remain.

2032. For the past 35 years, every morning at 6:00 a.m., Gadi and Judy, both in their 70s, took their morning walk in the scenic fields surrounding Kibbutz Nir Oz, a ritual they followed even on the sacred Jewish holiday of Simchat Torah. They didn't know it would be their last walk.

2033. About half an hour into their walk, rockets began exploding all around them. Without a bomb shelter nearby, Gadi and Judy rushed to take cover behind trees and bushes, laying on the ground with their heads covered, terrified for their life.

2034. After approximately 20 minutes of incessant explosions, Gadi and Judy noticed motorcycles and vehicles speeding from the Gaza border in their direction. As they drew closer, Gadi and Judy realized these were terrorists carrying guns, grenades, and other deadly weapons,

357

intent on a massacre. Hiding on the ground, they texted their children, praying the terrorists wouldn't notice them. Tragically, they were spotted moments later.

2035. Showing no mercy for the defenseless elderly couple, the terrorists opened fire, severely injuring them both. Gadi's injuries were fatal, as brain matter was dispersed after he was shot. Judy was still alive but gravely injured, with gunshots to her face and arm, forced to witness her husband perishing before her eyes.

2036. With what little strength she had left, and desperate for help, Judy called Israel's national ambulance service, describing her and Gadi's injuries in harrowing detail. Yet no one was available to assist, as terrorists had already begun their killing spree in Kibbutz Nir Oz, even attacking ambulances on their way.

2037. Moments later, Gadi and Judy were dragged onto the back of a truck, with two terrorists standing near Gadi's mutilated body, cheering and making victory signs with their fingers as though their bodies were trophies.

2038. Gadi was an integral part of Hoshea Haggai's life. Only three years apart in age, the brothers grew up side by side, always looking out for each other. More than brothers, they were best friends. With their older brother having passed away due to illness, Gadi was the only remaining birth family member Hoshea Haggai had left.

2039. On the morning of October 7, 2023, at approximately 6:35 a.m., Hoshea Haggai was at his home in Ein Hashofet, in northern Israel, when he received a call from his son urging him to turn on the news. He quickly learned that the southern part of the country was under attack. His first thought was of his brother, knowing Gadi and Judy's morning walk routine. He tried to reach them but was unsuccessful, which led to a foreboding feeling that they were in grave danger.

2040.   Taking matters into his own hands, Hoshea gathered family members, including Gadi and Judy's four children. Together, they set up a home-based command center in Hoshea's home, working tirelessly to gather information about Gadi and Judy's fate. They reached out to the police, ambulance services, IDF members, the U.S. Embassy, and survivors from Kibbutz Nir Oz—desperately trying to find anyone who could shed light on what had happened. Despite their efforts, the following days and weeks were filled with unbearable uncertainty about the fate of his younger brother and sister-in-law.

2041.   Hoshea spent two agonizing months advocating for their release. He traveled twice to New York to meet with the United Nations Security Council, organized meetings and events with other families of kidnapped loved ones, met numerous times with U.S. Secretary of State Antony J. Blinken, and reached out to anyone who might help.

2042.   Hoshea desperately clung to hope that his younger brother was still alive—until the devastating news arrived confirming that Gadi and Judy had been murdered, extinguishing any last glimmer of optimism he had held.

2043.   Horrifyingly, Hoshea was given the gruesome task by the Israeli intelligence agency to identify his brother's and sister-in-law's bodies through images. The photos showed Gadi lying lifeless on the back of a truck and both Gadi and Judy wrapped entirely in aluminum foil, with only their faces exposed, being buried in an unknown location—scenes that continue to haunt him and likely will forever.

2044.   Following his younger brother's death and unable to properly mourn, Hoshea struggled to eat, sleep, or function in daily life. His overwhelming grief eventually left him physically incapacitated, falling into a catatonic state where, despite being awake and conscious,

359

he was completely unable to get out of bed. Fearing for his well-being, his wife intervened, urging him to see a doctor, who prescribed him sleeping pills and tranquilizers.

2045.   Until recently, Hamas used Hoshea's brother's remains as a bargaining tool, refusing to release the body and denying the family's basic request to conduct a respectful burial. This cruel injustice haunts Hoshea, filling him with anger, frustration, restlessness, and even a fear of losing his sanity.

2046.   Hoshea is only now learning how to cope with this extreme loss.

2047.   Plaintiff Hoshea Haggai experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the murder of his brother Gadi Haggai.

S.    The Edri Family

2048.   Plaintiff Eitan Edri is a citizen of the United States and a resident of the State of Israel.

2049.   Plaintiff Tair Edri is a citizen and resident of the State of Israel.  She is the wife of Eitan Edri.

2050.   Plaintiffs B.H.E. and N.S.E. are citizens and residents of Israel.  They are the minor children of Eitan Edri and Tair Edri, and their claims are being pursued by Eitan Edri and Tair Edri as their co-legal guardians.

2051.   Plaintiff Itzhak Edri is a citizen of the United States and a resident of the State of Israel.  He is a brother of Eitan Edri.

2052.   Plaintiff Itamar Edri is a citizen of the United States and a resident of the State of Israel. He is a brother of Eitan Edri.

2053.   Plaintiff Ariel Edri is a citizen of the United States and a resident of the State of Israel.  He is a brother of Eitan Edri.

**Eitan Edri, Tair Edri, B.H.E., and N.S.E.**

2054.   On the morning of October 7, 2023, at approximately 6:30 a.m., Eitan Edri and his family awoke to the deafening sound of rockets and sirens. Having lived in Sderot for ten years, they had endured multiple rocket attacks, but this time was different—the sheer volume of rockets was far beyond anything they had ever experienced.

2055.   Eitan Edri and his wife Tair Edri hurried B.H.E. and N.S.E. into the safe room as they shook with fear. Suddenly, another horrifying sound erupted: gunfire, followed by the chilling screams of their neighbors. Huddled in the bomb shelter, praying that they would not be hit by the rockets—or worse, that the terrorists would find them. With no help on the horizon, as the police station had been overrun, Eitan, Tair, and their children remained confined in their safe room for the next 24 hours without food, water, or access to a bathroom, unable to escape the relentless danger outside.

2056.   The next morning, on October 8, 2023, they packed their car and fled north, shielding their children's eyes from the horrors outside. As they drove out of Sderot, the trauma of what they witnessed became etched in their minds: pools of blood staining the streets, vehicles abandoned in the middle of the road with entire families—children included—slaughtered inside. Town residents scrambled to recover bodies from the roads amidst the devastation.

2057.   The family was evacuated, moving between hospitals and a hotel, displaced from their home with no access to their belongings. They learned that Tair's father, Haim Sasi, had been shot four times during the attack while trying to provide medical treatment to the injured. Their world had collapsed entirely, leaving them with no clarity about how to move forward.

2058.   Since the October 7 massacre, Eitan has not been the same. The trauma of that day left him feeling incapable of supporting his family—financially or emotionally. Before the attack,

361

he ran a thriving business specializing in team-building and empowerment workshops in the Gaza Envelope. However, as a direct result of Hamas' attack, the business was forced to shut down entirely.

2059.   Tair, once a confident and independent professional, is now paralyzed by fear. Overwhelming anxiety prevents her from commuting to her job as Head of the Digital Department at a finance company. What was once a simple train ride to Tel Aviv has become an unbearable thought, consumed by fear of potential dangers lurking at any moment.

2060.   As a result of the attack, B.H.E. has become emotionally withdrawn, struggling to communicate and engage socially.  N.S.E., a first-grader, was once a top student with a clear academic advantage over her peers. Today, she struggles to focus, her performance declining as she grapples with the trauma of that day.

**I.E.**

2061.   On the morning of October 7, 2023, at approximately 8:00 am, I.E., a reservist soldier in the IDF, received a call from his commander ordering him to report to base immediately. After a short preparation, I.E. and his team headed toward Moshav Mivtachim, a community only a few miles east of the Gaza Strip that was overrun by Hamas terrorists.

2062.   Along the way, they spotted what appeared to be a police vehicle stationed at an intersection. Assuming it was a checkpoint, they cautiously approached—only to realize too late that it was an ambush. Suddenly, machine guns, grenades, and RPGs were unleashed upon them. In the chaos, I.E. and his team fought back, managing to neutralize the attackers.

2063.   What awaited them at the junction was beyond comprehension. Vehicles filled with civilians—including children, the elderly, and law enforcement officers—lay abandoned, their

lifeless bodies bearing the unmistakable signs of execution. The sheer brutality of the massacre was unlike anything I.E. had ever seen.

2064. The horrors continued as I.E.'s team entered Moshav Mivtachim. Every turn revealed another tragic scene. Families had been slaughtered, their homes turned into battlefields. The most devastating moment came when two of his long-time comrades were killed in a gunfight. No matter how fast they moved, they were always "one second too late" to save lives.

2065. By nightfall, exhausted both mentally and physically, his team was sent to secure Moshav Pri-Gan approximately five miles to the southwest of Moshav Mivtachim, stationed at a local manufacturing site. For the first time that day, his heart rate began to slow—but the horrors were far from over. As daylight revealed their surroundings, they found themselves surrounded by the bodies of fallen security officers. One officer's phone lay on the ground, filled with missed calls from his wife and family—an image that will haunt I.E. forever.

2066. Since the October 7th attack, I.E. has not been the same. Immediately upon returning home, the nightmares began. He wakes up drenched in sweat, his heart pounding uncontrollably. On multiple occasions, he has woken to find that he has wet the bed. Even routine tasks like driving have become unbearable. Along Route 12 near the Egyptian border, flashbacks of ambushes consume him. In one instance, his distracted state caused him to lose control of his vehicle, crashing into a guardrail and requiring hospitalization.

**It.E.**

2067. On the morning of October 7, 2023, It.E., an on-duty vehicle officer, left his wife and three children behind as he prepared military vehicles for deployment. Among the soldiers he helped transport was his younger brother, I.E.

2068.   On May 21, 2024, during a mission in the Gaza Strip, It.E. was tasked with providing critical support under intense combat conditions. Under fire from grenades, gunfire, and missiles, he narrowly escaped physical harm. Yet, the traumatic events left an indelible mark, replaying in his mind endlessly.

2069.   Since the attack, It.E. has been plagued by sleepless nights and a constant fear for his safety and that of his family. The anxiety has disrupted his daily life, and the prolonged separation from his family during the chaos has strained his relationships, making him feel like an outsider in his own home.

**A.E.**

2070.   As a combat reservist in the IDF, A.E. was called to duty on the morning of October 7, 2023. The following day, he was deployed to the Gaza Envelope to search for additional threats and assist in evacuating civilians. During this mission, A.E. was exposed to unimaginable atrocities and cruelty carried out by Hamas terrorists.

2071.   Following the October 7th attack, A.E.'s unit operated in the Gaza Strip. On November 5, 2023, his team was assigned to conduct ambushes on Hamas terrorists attempting to reach the border in the Jabalia neighborhood of northern Gaza. However, within days, on November 11, their position was discovered by Hamas operatives. Chaos erupted instantly— snipers opened fire, at least five missiles and RPGs were launched, and indiscriminate gunfire rained down on them.

2072.   As the bullets and explosions surround them, A.E. fought to protect himself and his team, all while witnessing his friends getting injured. He returned fire, determined to hold the line and evacuate the wounded. Moments later, reinforcements arrived, allowing A.E. and his team to withdraw. Tragically, during that incident, he lost one of his closest friends.

2073.   Since the October 7 massacre and the harrowing events that followed, A.E. is no longer the same person. Over the past year, he has been forced to be absent from his job as a firefighter—jeopardizing the position he worked. His role as a husband and father has suffered due to his prolonged absence and the weight of the trauma he carries. The memory of being ambushed, of losing a friend by his side, refuses to leave his mind. He is haunted by those moments daily, easily triggered by reminders, and tormented by the unbearable thought that his friend's family is left without a father.

2074.   Plaintiff Sarah Edri brings this action individually. She is a citizen of the United States and a resident of the State of Israel.  She is the mother of Eitan Edri, It.E., A.E. and I.E.

2075.   Plaintiff Eliyahu Edri brings this action individually.  He is a citizen and resident of the State of Israel.  He is the father of Eitan Edri, It.E., A.E. and I.E.

2076.   Since October 7, Eliyahu and Sarah Edri have suffered immense emotional distress and ongoing anxiety. They are haunted by persistent thoughts of "what if"—what could have happened had events taken an even darker turn. Their thoughts remain consumed with concern for the safety and wellbeing of their children and grandchildren.

2077.   Plaintiff Avidan Edri brings this claim individually. He is a citizen of the United States and a resident of the State of Israel.  He is the brother of Eitan Edri, It.E., A.E. and I.E.

2078.   Avidan Edri was a source of calm and confidence for his family. Now, he struggles to manage his panic and fear, often visibly distressed and urgently guiding his family to the safe room during alarms. As a direct result of the October 7 attack, Avidan and his family are profoundly changed.

2079.   Plaintiff Achiya Edri brings this claim individually.  He is a citizen of the United States and a resident of the State of Israel.  He is the brother of Eitan Edri, It.E., A.E. and I.E.

365

2080.   For Achiya Edri, his brothers were a source of shared laughter, conversation, security, and belonging. But since the attack, every gathering has been overshadowed by the trauma they endured. Their conversations have turned into emotional discussions about coping with their collective pain and processing the horrors they witnessed. The profound suffering they experienced has irreversibly changed their lives and strained their relationships.

2081.   As a direct and foreseeable result of the October 7, 2023, attacks and injuries suffered, Plaintiffs Eitan Edri, Tair Edri, B.H.E., N.S.E, It.E., A.E. and I.E. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2082.   Plaintiffs Sarah Edri, Eliyahu Edri, Eitan Edri, Tari Edri, B.H.E., N.S.E., It.E., A.E. and I.E., Achiya Edri, and Avidan Edri each experienced severe mental anguish and extreme emotional distress, as a direct and foreseeable result of the October 7, 2023, attacks involving their immediate family members.

### T.      The A.B. Family[170]

2083.   Plaintiff A.B. is a citizen of the United States and a resident of the State of Israel.

2084.   A.B. was a Reservist in the IDF. His brigade was one of the first military forces to enter Gaza.

2085.   On October 7, 2023, at approximately 7:30 a.m., A.B. turned on his phone to find it flooded with missed calls and frantic messages. Something terribly wrong was unfolding at the Gaza border, and he had been urgently called up for reserve duty.

2086.   At approximately 5 p.m., A.B. and his team arrived outside Kibbutz Kissufim, a tight-knit agricultural community along the Gaza border. Reality quickly set in.

---

[170]      Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to A.B. and his family by their initials rather than disclosing their full names for fear of retribution against them.

2087. The scene was utter chaos. A.B. watched in horror as injured civilians and soldiers alike sought help from anyone who was able. Missiles constantly fired overhead, sending everyone scrambling for cover.

2088. A.B. and his team were tasked with securing the area and rescuing civilians trapped in their homes. Tragically, they found mostly dead bodies.

2089. Despite the unimaginable sights of terror, A.B. and his team would spend the next two days loading the mangled bodies into military hummers and searching the area for any terrorists still hiding among the wreckage.

2090. A.B. went straight from fighting terrorists in Kibbutz Kissufim to fighting terrorists in Gaza, where he was deployed for the next six months. Risking his life daily, he felt extremely fragile and constantly under threat.

2091. A glimmer of hope amid the chaos came on March 28, 2024. As A.B. prepared to get a few hours of sleep after a long day of fighting, he found a moment to call his wife, Zee Chana Joshua. She had life-changing news. She was pregnant with their first child.

2092. For a brief moment, the death and destruction surrounding A.B. faded away and his heart filled with joy and hope. He pushed away the thought of the gut-wrenching possibility that he may never meet his child.

2093. The next morning, on March 29, 2024, A.B. awoke and began preparing for another day of combat with his team. They didn't notice the two terrorists watching them from the neighboring complex.

2094. A split second later, the terrorists fired an RPG at the structure where A.B. and his team had been staying. The RPG blasted through the structure's window, knocking A.B. unconscious instantly.

2095.    When A.B. slowly regained consciousness, everything was foggy. Laying on his side with his head spinning and ears ringing, he struggled to make sense of his surroundings. The room was ablaze and everything around him was grey with ash. In his half-conscious state, he summoned the strength to pull himself up and distance himself from the flames.

2096.    Still disoriented, A.B. saw his friends lying injured in pools of blood on the floor, screaming in agony. Overwhelmed by excruciating pain, A.B. realized he had a severe stomach injury.

2097.    Slowly, he lifted his shirt to find a massive protrusion in his abdomen and a gaping, bloody hole in his side. The sight of his severe injury coupled with the extreme pain almost rendered A.B. unconscious once again.

2098.    Six pieces of scorching shrapnel had seared through A.B.'s body — two in his knee, one in his thigh, one in his arm, and one in his stomach. The piece lodged in his stomach severed his large intestine, causing severe internal bleeding. He was immediately evacuated and airlifted to a hospital for emergency surgery.

2099.    As he fought for his life, A.B. prayed he would get to see his wife and future child and prayed that his friends, who he last saw lying in pools of their own blood, would survive. He would later learn that one of his team members was immediately killed in the blast, and another did not survive his injuries.

2100.    As A.B. was wheeled into the operating room, his wife burst through the door. The joy of becoming parents that she and A.B. shared just a day earlier was replaced by all-consuming doom. They had just a few fleeting seconds to speak before the operating room doors closed.

2101.  In order to save his life, doctors removed eight inches of A.B.'s large intestine, along with the shrapnel lodged in his stomach. The shrapnel in his knee and arm, however, were too deeply embedded for doctors to safely remove.

2102.  In the weeks following his surgery and due to his severe injuries, A.B. could neither sit up in bed nor eat solid food, leaving him completely dependent on others for care. He still experiences stomach pain and struggles to get out of bed.

2103.  With shrapnel now permanently lodged in his knee, A.B. will never be able to move freely again. He must now live with debilitating pain as the shrapnel presses into his muscles and bone.

2104.  A.B. experiences paranoia when he is in public or in crowds, and shakes uncontrollably while sleeping, among other symptoms.

2105.  A.B. also still grapples with the loss of two of his team members. He can barely accept the painful reality that they have perished.

2106.  Plaintiff Z.C.J. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the wife of A.B.

2107.  Plaintiff Be.B. brings this action individually. He is a citizen of the United States and a resident of Isreal. He is the father of A.B.

2108.  Plaintiff Da.B. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the mother of A.B.

2109.  As a direct and foreseeable result of the October 7, 2023, Attack, Plaintiff A.B. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2110.   Plaintiffs Z.C.J., Be.B., and Da.B. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the subsequent injuries sustained by A.B. on March 29, 2024.

### U.    The Amar Family

2111.   Plaintiff Shai Amar is a citizen of the United States and a resident of the State of Israel.

2112.   Plaintiff Natalia Amar is a citizen of the United States and a resident of the State of Israel.

2113.   Plaintiff Shirley Amar, the mother of Shai Amar and Natalia Amar, is a citizen and resident of the United States. Although she was in the United States at the time of the attacks, she suffered trauma and fear for her family as she followed the horrors unfolding upon her family.

2114.   On the evening of October 6, 2023, Shai Amar and a group of ten close friends ventured from Moshav Amioz, to the city of Be'er Sheva, about 30 miles away, to celebrate a friend's birthday. The group considered continuing their festivities at the NOVA Music Festival that was starting that night, but most of them decided against it. One member of the group, a young man named Dan, decided to go to the nearby festival.

2115.   Around 6:00 a.m., Shai Amar returned to his apartment in Moshav Amioz and crashed on his bed from exhaustion, still dressed in his party clothes. The joyous memories of dancing and singing with his friends still flashed in his mind as he drifted off into a short slumber.

2116.   Approximately 30 minutes later, the piercing wail of rocket sirens jolted him awake. His heart was pounding in his chest as he leapt to his feet and sprinted to the nearest safe room at his grandmother's house nearby. He arrived at the safe room and joined his grandmother, sister Natalia Amar, and six cousins just as explosions from rockets shook the ground.

370

2117.  Shai grabbed his phone and saw a substantial number of message notifications from friends declaring that they were under attack. He proceeded to call his mother knowing that a catastrophe was unfolding.

2118.  Through the phone, Shirley Amar heard the sirens and explosions. She was all too familiar with those sounds because she too had lived on the moshav before moving to the United States. A sense of dread loomed over her as she realized she could not protect her children. The weight of helplessness overtook her, and panic set in.

2119.  Shirley turned on the television, desperate for information, but the news was scarce. On social media, she could only find posts, videos, and images from friends in real-time. She watched as the horror unfolded, powerless to stop it.

2120.  As the terrorists infiltrated Moshav Amioz, they were met by the community's security team. In an instant, a ferocious exchange of gunfire erupted. The deafening sounds of explosions and relentless gunshots filled the air and reverberated through the walls of the safe room. Trapped in the darkness of the shelter, Shai and his family prayed desperately that the bullets would not reach them.

2121.  Shai continued to monitor his phone as the terrorists uploaded videos across social media, depicting the murder, mutilation of bodies, sexual violence, kidnapping, and destruction that was ensuing across the Gaza Envelope. The sounds in each video mirrored the sounds that he heard clearly just outside of his shelter. Shai and Natalia then realized that their lives were in grave danger.

2122.  Convinced their end was imminent, Shai and Natalia made one final, heart-wrenching call to their mother, believing it would be their last chance to speak with her. They told her they loved her, finding fleeting solace in speaking those words one last time. Their voices

371

cracked under the weight of emotion, struggling to bring comfort to Shirley, who could do nothing but listen helplessly from afar.

2123.   Fear gripped Shai as he scanned the cramped, suffocating safe room, frantically searching for anything to protect his family. All he could find was a small knife and a can of pepper spray. The sounds of violence outside never stopped.

2124.   While they waited for more than 24 harrowing hours to be rescued by security forces, Shai could not stop thinking back to the early morning hours of that day, when he was still with his friends, celebrating life, dancing and singing. Finally, in the morning hours of October 8, 2023, the IDF arrived and rescued Shai and Natalia and their family.

2125.   Shai and Natalia were taken to Kibbutz Lotan, a safer place in the south. All of the residents of Moshav Amioz lost everything. Their community was reduced to ruins, and they were all displaced.

2126.   Moshav Amioz had been a place of life and community. Its residents took pride in their shared experiences and the bond of living so close to the Gaza border. But on October 7, 2023, that pride was shattered. None of the residents have been able to return to their homes.

2127.   Shai eventually learned that his friend, Dan, who continued celebrating at the NOVA Music Festival, was murdered there by Hamas terrorists, along with many other friends. Shai constantly replays the decision to abstain from the NOVA Music Festival in his head, wondering what would have happened if he had gone.

2128.   Shai's life is forever changed by the attacks of October 7, 2023. He struggles to find meaning and purpose in his life, plagued by the immense loss of friends and the displacement of his community at the hands of Hamas terrorists. He is riddled with survivor's guilt and spends

his time visiting lost friends' graves and speaking with other survivors.  Shai has not been able to return to any semblance of normalcy since the attacks.

2129.   Natalia's life has also changed drastically since October 7, 2023. Once a vibrant, social woman, she now struggles to even leave her apartment.  Natalia has not been able to hold a job due to her extreme mental distress.

2130.   Shirley continues to struggle with the terror she experienced on October 7, 2023, while her children were subjected to the threat of death for 30 agonizing hours. She is tormented by the thoughts of Moshav Amioz, empty and desecrated. Her fond memories of walking the fields with her friends are now replaced with the devastating massacre of that day.  Shirley struggles to eat and barely leaves her house. She has not returned to work since the attacks and still avoids leaving her house. Loud noises, or helicopters flying above, triggers her emotions and thoughts of October 7, 2023.

2131.   As a direct and foreseeable result of the October 7, Attack, Plaintiffs Shai Amar and Natalia Amar suffered extreme mental anguish, loss of solatium, loss of services, and economic loss.

2132.   Plaintiff Shirley Amar experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack on her children Shai Amar and Natalia Amar.

V.      The E.A. Family[171]

2133.   Plaintiff E.A. is a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

---

[171]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to E.A. and his family by their initials rather than disclosing their full names for fear of retribution against them.

373

2134. E.A. was a Commander in the IDF. His brigade was one of the first military forces to enter Gaza.

2135. On October 7, 2023, E.A. was at his apartment in Jerusalem, preparing for the Jewish holiday of Simchat Torah. At approximately 8:00 a.m., he received a call from his commanding officer. His heart dropped immediately as his commander never called him on a Saturday. E.A. knew something must be terribly wrong.

2136. The commanding officer explained that terrorists had infiltrated the Gaza border and were firing rockets into Israeli territory. E.A.'s heart sank deeper. Within moments of hanging up the call, rockets flew over his home miles away in Jerusalem, which was a rare occurrence in central Israel. In that moment, E.A. understood that his life would never be the same.

2137. E.A.'s first task was to get a bus to pick up all the soldiers in his battalion that lived in his district. Driving on Shabbat, which is forbidden according to Jewish tradition that he upholds, was unusual, so it was unnerving for him.

2138. At approximately 10:00 a.m., E.A. received a series of phone calls directing him to report to his base in the Golan Heights. He quickly quieted his anxiety and snapped into commander mode. Within 48 hours, E.A. and his battalion had packed up all their materials and headed toward the Gaza border.

2139. While on the bus ride south, E.A. looked around at his fellow soldiers, all of whom were in their late teens and early 20s. His stomach churned knowing that some of them would not make it out alive. The images of that bus ride have haunted him ever since.

2140. When the bus arrived at the Gaza border, E.A. was immediately struck by a deeply pungent, rotten smell. He learned that it was the smell of the decaying bodies of the victims from

374

the kibbutzim in the vicinity of the Gaza-Israel border.  That nauseating smell has lingered in his senses and tormented him ever since.

2141.  After a two-week training period under constant rocket fire, E.A.'s battalion received clearance to enter Gaza.  As a commander, E.A. was responsible for several extremely dangerous missions.  Every day, he fought for his life, uncertain whether his next breath would be his last.

2142.  After nearly six grueling months of fighting, one of the battalion's armored excavators broke down on a mission after being pummeled by an endless barrage of Hamas fire.  E.A. knew that if they abandoned the tank, the Hamas terrorists would hijack it and use it against Israeli troops.  He could not bear that possibility, so E.A. and his team had no choice but to tow the vehicle out of Gaza themselves.

2143.  Towing the excavator without proper equipment significantly injured E.A.  As they maneuvered through Hamas-ridden territory, the excavator crashed into his body at full speed for nearly three miles.  E.A. remarkably swallowed his tears and pushed through the excruciating pain to get his team out of Gaza.

2144.  They finally arrived back on base the following day.  E.A.'s body was damaged and destroyed.  Several doctors and specialists on base immediately treated him, but the damage was too severe.  E.A. spend the next month in excruciating pain, attending intensive physical therapy sessions that failed to provide any relief.

2145.  E.A.'s physical injuries extend beyond his spine.  After further medical inspection, a neurologist diagnosed him with a traumatic brain injury from whiplash and from being in such close proximity to numerous explosions.  As a result, E.A. experiences ongoing memory issues,

375

cognitive processing problems, and struggles with slurring words or even forgetting entire sentences.

2146. An ear specialist assessed that the proximity to explosions and gunfire or such an extended period caused permanent hearing sensitivities and ear pressure pain for E.A., compounding his physical torment.

2147. In addition to his numerous severe physical injuries, E.A. continues to endure extreme mental and emotional suffering as a result of the October 7 Attack and he no longer feels like himself.

2148. E.A.'s constant physical agony has rendered him unable to work, and psychologically, he continues to struggle with the emotional aftermath of the attack. He feels as if his life ended on October 7, 2023.

2149. Plaintiff Da.A. brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the father of E.A.

2150. Plaintiff Ar.A. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the mother of E.A.

2151. Plaintiff Ra.L. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the sister E.A.

2152. As a direct and foreseeable result of the October 7, attack, Plaintiff E.A. suffered conscious pain, extreme mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic loss.

2153. Plaintiffs Da.A., Ar.A., and Ra.L. have experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the subsequent injuries inflicted upon their family member E.A.

376

**W.    The Ben Zvi Family**

2154.    Amitai Ben Zvi was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas.  He was 80 years old.

2155.    On October 7, 2023, Amitai Ben Zvi was in his home in Kibbutz Nir Oz, with his devoted caregiver, Jimmy. Amitai Ben Zvi suffered from Parkinson's disease and had relied on Jimmy's attentive care for four years.

2156.    At approximately 6:30 a.m., sirens blared through the kibbutz, shattering the morning calm. Jimmy hurried into the safe room, which also served as Amitai's bedroom.

2157.    Fear and panic set in as the roar of six terrorists screaming on motorcycles circled Amitai's home. He realized that terrorists had infiltrated Kibbutz Nir Oz and he could not mobilize quickly enough to escape. He pleaded with Jimmy to tell his children he loved them and to flee to save himself. However, Jimmy steadfastly refused to abandon Amitai.

2158.    Terrorists yelling in Arabic burst through the door to Amitai's home searching for potential victims.  Jimmy hid under the bed while Amitai laid on top of it. They could hear the sound of shattering glass as the terrorists ransacked the home.

2159.    Eventually, the terrorists left the house, but moments later, the terrorists returned, blew open the safe room door, and executed Amitai, a defenseless elderly man lying in his bed.

2160.    The terrorists spotted Jimmy hiding under the bed and violently dragged him from his hiding place. As Jimmy passed Amitai's lifeless body, he begged for and was granted one final embrace of the man that he lovingly called "Abba," meaning father in Hebrew.

2161.    Go-pro cameras worn by the terrorists captured videos of Jimmy handcuffed and taken captive in a car, Amitai's home set on fire, and later Jimmy in Gaza surrounded by a mob.

2162.    Jimmy was mercilessly held hostage in Gaza for 49 agonizing days before his release on November 24, 2023.

377

2163.   In the days following the October 7, 2023, attack, Amitai's children suffered tremendous fear and distress as news flooded in from every direction, with no precise or official confirmation of their father's situation. Finally, on October 19, 2023, they received official confirmation that their father had been murdered in cold blood.

2164.   Plaintiff Avishay Ben Zvi brings this action individually and also as an heir-at-law for the Estate of Amitai Ben Zvi.  He is a citizen and resident of the United States. He is a surviving son of Amitai Ben Zvi.

2165.   Plaintiff Gilad Ben Zvi brings this action individually and also as an heir-at-law for the Estate of Amitai Ben Zvi.  He is a citizen and resident of the State of Israel. He is a surviving son of Amitai Ben Zvi.

2166.   Plaintiff Hagar Madnik brings this action individually and also as an heir-at-law for the Estate of Amitai Ben Zvi.  She is a citizen and resident of the United States. She is a surviving daughter of Amitai Ben Zvi.

2167.   Plaintiff Orna Avisrur brings this action individually and also as an heir-at-law for the Estate of Amitai Ben Zvi.  She is a citizen and resident of the State of Israel. She is a surviving daughter of Amitai Ben Zvi.

2168.   Plaintiff Ido Ben Zvi brings this action individually and also as an heir-at-law for the Estate of Amitai Ben Zvi.  He is a citizen and resident of the State of Israel. He is a surviving son of Amitai Ben Zvi.

2169.   Ido Ben Zvi was present at Kibbutz Erez when he was attacked by Hamas on October 7, 2023.  As a direct and foreseeable result of the October 7, 2023, Attack, Ido Ben Zvi suffered extreme mental anguish and economic loss.

2170.   As a direct and foreseeable result of the October 7, 2023, Attack, Amitai Ben Zvi suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, wrongful death, and economic loss.

2171.   Plaintiffs Avishay Ben Zvi, Gilad Ben Zvi, Ido Ben Zvi, Orna Avisrur, and Hagar Madnik experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the death of their father Amitai Ben Zvi.

### X.      The Sherman Family

2172.   Plaintiff Arie Sherman is a citizen of the United States and a resident of the State of Israel.

2173.   Plaintiff Livnat Sherman, the wife of Arie Sherman, is a citizen and resident of the State of Israel.

2174.   Plaintiff K.A.S., the minor child (daughter) of Arie Sherman and Livnat Sherman, is a citizen of the United States and a resident of the State of Israel.

2175.   Plaintiff G.S., the minor child (son) of Arie Sherman, is a citizen of the United States and a resident of the State of Israel.

2176.   Plaintiff S.S., the minor child (daughter) of Arie Sherman, is a citizen of the United States and a resident of the State of Israel.

2177.   Plaintiff Arie Sherman brings this action individually and as legal guardian of his three minor children, K.A.S., G.S., and S.S.

2178.   Arie Sherman, Livnat Sherman, K.A.S. G.S., and S.S. are hereinafter referred to as "The Sherman Family".

2179.   At approximately 6:30 a.m. on October 7, 2023, the Sherman Family awoke to loud explosions that affected the structural integrity of their home. Arie and Livnat Sherman grabbed

379

K.A.S., who was laying in bed with them, and frantically ran to their safe room. G.S. and S.S. quickly awoke and joined their parents and sibling in the safe room.

2180.  Gunshots rang out in close proximity to their home, and the Sherman Family embraced each other in fear for their lives. Realizing the severity of the situation, the minor children began trembling while their parents tried to comfort them.

2181.  Terrorists appeared from outside the walls of the safe room and began to pry open the window, which was only secured by a locked, steel shutter, but the terrorists were only able open a small crack in the window and left.

2182.  The Sherman Family then heard gunshots piercing their home's sliding-glass door. Hamas terrorists were heard shouting in Arabic outside the safe room, confirming the horrific reality that their home had been invaded.

2183.  The terrorists attempted to open the safe room door, and Arie Sherman summoned all his strength to pull back the inside door handle. For a moment, the Sherman Family believed they had fooled the terrorists into believing the safe room was locked.

2184.  Seconds later, the Sherman Family heard the whistle of a live grenade rolling on the floor, and an explosion blew open the safe room door. K.A.S., wailed, and Livnat attempted to hide K.A.S.'s small body with clothing. Arie stood at the door in a fighting stance, ready to protect his family at all costs.

2185.  Inexplicably, when the door to the safe room burst open, the Sherman Family were overcome with relief to discover that no one was outside the safe room.  Arie hurriedly closed the door.

2186.  At one point, the family could hear voices speaking in Arabic nearby.  Livnat believed the terrorists were using their home, or the area in its vicinity, as cover against the IDF,

380

who eventually arrived on the kibbutz to fight back against the terrorists. The Sherman family remained in utter silence for hours.

2187.  Livnat texted with family members pleading for help. However, due to vast amount of Hamas terrorists who had invaded the area, no one could directly help the family.

2188.  After hiding in their home for roughly ten hours, at approximately 2:30 p.m., the IDF arrived and evacuated the Sherman Family from their home to nearby Kibbutz Gvulot. Driving away from their home, they were horrified to see lifeless bodies lying on the road, as well as charred vehicles and tanks.

2189.  For over two months after the events of October 7, the Sherman Family lived in a hotel near the Ein Gedi Nature Reserve in southern Israel.

2190.  Living at the hotel was incredibly difficult for Livnat.  Arie was also deeply depressed and Livnat felt all familial responsibilities fall onto her as she tried to navigate her own healing.

2191.  Eventually, Arie made the decision to travel from Israel to the United States with his family. They stayed there for nine months, and the Sherman Family continued to experience emotional difficulty being so far from home. Arie and Livnat both suffered debilitating emotional trauma, which had a difficult effect on parenting their minor children.

2192.  Arie continues to struggle in his daily life with difficulty focusing, high anxiety, anger management problems and nightmares

2193.  The events of October 7 also had an effect on K.A.S.'s emotional and physical development. Prior to October 7, Livnat was in the process of weaning K.A.S. from breast-feeding; however, this process was greatly disrupted on October 7, stunting K.A.S.'s eating development.

381

G.S. and S.S. have suffered as well with increased anxiety and fears of the outside world around them.

2194. Livnat also believes that K.A.S. absorbed much of the trauma experienced by her family on October 7, even though she was too young to fully grasp the immediate situation. In addition, K.A.S. also attends Chinese acupuncture as a form of body and mind healing.

2195. As a direct and foreseeable result of the October 7, 2023, Attack, Arie Sherman, Livnat Sherman, K.A.S., G.S., and S.S. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2196. Plaintiffs Arie Sherman, Livnat Sherman, K.A.S., G.S., and S.S. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack and the trauma that each of their family members endured.

**Y.    The Shahar Family**

2197. Plaintiff Avraham Shahar is a citizen of the United States and a resident of the State of Israel.

2198. Plaintiff Idit Shahar is a citizen and resident of the State of Israel.  She is the wife of Avraham Shahar,

2199. Plaintiffs Avraham Shahar and Idit Shahar bring this action individually and as legal guardians of their minor children, Z.S. and R.S., both of whom are citizens of the United States and residents of Israel.

2200. At approximately 6:30 a.m., on October 7, 2023, Avraham Shahar and his minor child, Z.S., were training for a cycling triathlon in the vicinity of Kibbutz Kfar Aza, which is approximately three miles from the Israel-Gaza border.

2201. Avraham was supervising his minor child and another minor cyclist and was following behind them in his vehicle.

382

2202.  As they began their training, alarms began to sound causing the two minor children to seek protection on the ground outside Avraham's vehicle. Avraham quickly instructed the children to get into the car, and they drove away from the area.

2203.  As they approached Kibbutz Mefalsim, approximately four miles from the Gaza Strip, Avraham noticed what he believed to be a group of Israeli Defense Forces ("IDF") soldiers and he proceeded to slow down; however, as they got closer, Avraham's son began screaming in terror as he realized that the group were terrorists.

2204.  Suddenly, the terrorists unleashed a barrage of machine gunfire at the vehicle and a bullet pierced Avraham's right arm, just above his elbow. Despite the excruciating pain, Avraham focused on protecting the two children in his vehicle. As they attempted to navigate through the attack, Avraham's son was short in his left shoulder, and he was in agonizing pain.

2205.  Avraham and his son did their best to maintain their composure and try to help each other maneuver the car because Avraham was unable to do independently. They managed to make a U-turn and speed away from the terrorists, back towards Kibbutz Kfar Aza.

2206.  Near Kibbutz Kfar Aza, they stopped for medical help when the two gunshot wounds were treated.

2207.  They later encountered another member of the children's cycling club, who drove them to a nearby city, Netivot. From there, they took an ambulance to Soroka Medical Center in Be'er Sheva.

2208.  Avraham was eventually transferred to Wolfson Medical Center in central Israel, where he stayed for approximately one month. Then, he began rehabilitation in order regain functionality in his arm. Avraham still does not have full functionality or movement of his right hand.

2209. Avraham's minor child was also transferred to Wolfson Medical Center, where he remained for approximately two weeks. Since being discharged, he has focused on his rehabilitation. A large, disfiguring scar remains on his shoulder.

2210. The other child was also significantly injured on his face, and he lost vision in his right eye.

2211. When the terrorists attacked Kibbutz Or Ha Ner on October 7, 2023, Idit Shahar was alone with her young daughter, R.S., and they were forced to shelter in the safe room of their home to hide from the attack occurring on the other side of the door. While Hamas terrorists unleashed a barrage of heavy gunfire, grenades, explosive charges and sniper fire against the innocent civilian residents of the Kibbutz Or Ha Ner, Idit Shahar and her daughter endured the trauma of listening to the massacre of their community.

2212. Since that fateful day, Idit Shahar left her job to care for her traumatized family members.

2213. Yarden Shahar brings this action individually. Yarden Shahar is a citizen of the United States and a resident of the State of Israel. She is the daughter of Avraham Shahar and Idit Shahar. Although she was in San Diego, California, at the time of the attacks, she suffered trauma and fear for her family as she followed the horrors unfold upon her family.

2214. As a direct and foreseeable result of the October 7, Attack, Plaintiff Avraham Shahar and his son, Plaintiff Z.S. (through his parents as co-legal guardians), experienced conscious pain and suffering, severe mental anguish, loss of solatium, loss of services, and economic loss based on the gunshot wounds they endured.

2215. As a direct and foreseeable result of the October 7, Attack, Plaintiff R.S. (through her parents as co-legal guardians) experienced severe mental anguish and extreme emotional

384

distress when Hamas terrorists invaded her kibbutz and placed her in grave danger in the family's safe room.

2216. Plaintiffs Irit Shahar and Yarden Shahar suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack on their family members.

### Z.   The Raquel Natalie Sanandaji Family

2217. Plaintiff Raquel Natalie Sanandaji is a citizen and resident of the United States.

2218. Raquel Natalie Sanandaji travelled to Israel in the Summer of 2023 to visit family and friends. She extended her trip into the fall, in order to celebrate the Jewish High Holidays while in Israel.

2219. Raquel Natalie had also heard about the NOVA Music Festival, which was being held the weekend of October 7, 2023. She and her friends made plans to attend the festival, which was being held three miles from the Gaza Strip in the Negev desert. The festival was also being held on the sacred holiday of Simchat Torah in the Jewish calendar. Raquel Natalie was elated to be celebrating this momentous holiday, dancing to the music she loves with her close friends and thousands of other Israelis, who share the same passion.

2220. Raquel Natalie and her friends arrived at the NOVA Music Festival at approximately 1:00 A.M on Saturday, October 7. Upon arriving at the festival, Raquel Natalie was welcomed by a larger group, who led her to their campsite, and she unpacked her things. Raquel Natalie and her friends then congregated with the thousands of other festival-goers, where they danced freely through the night, never anticipating the terror and tragedy which would arrive in a few short hours.  At approximately 3:30 A.M., Raquel Natalie retired back to the campsite to get some rest, and she and her friends planned to return to the party for sunrise.

2221. At approximately 6:30 A.M., rockets began being fired and intercepted from Gaza into Israel in close vicinity to the festival grounds.

2222. During this initial rocket attack, Raquel Natalie was asleep and was woken by a friend. While Raquel Natalie understood that the festival's close proximity to Gaza added some security risks, her friend calmly explained that rocket attacks on Israel were normal during Jewish holidays, especially so close to Gaza, and that it would eventually pass.

2223. As Raquel Natalie counted several dozen rockets continuing to be fired, she became increasingly weary of a full-scale attack on Israel. This was further exacerbated when the festival organizers turned off the music and soon informed festival-goers to pack their things and evacuate the festival grounds immediately.

2224. Not yet having an understanding of the terror ensuing around her, Raquel Natalie took her time to get ready in the portable bathrooms, as she assumed traffic would be very slow on the two-lane dirt road leading out. She and her group departed this area, and days later, she learned that the portable bathrooms had been shot up by terrorists just moments after she left.

2225. Raquel Natalie and her friends anxiously began driving down a congested road with thousands of others towards the festival exit, following security's directions. After roughly ten minutes of driving, further panic ensued when security began screaming for everyone to get out of their vehicles and run.

2226. Raquel Natalie was confused and did not understand why attendees were being directed to run. Moments later, she heard gunshots ring out and understood that there were terrorists on foot and shooting indiscriminately at the festival goers.

2227. Not knowing what direction or area the terrorists were coming from, and without any other choice, Raquel Natalie and her friends exited their vehicle and began running aimlessly, following in the direction of others.

2228. During this time, Raquel Natalie's mother, who lives in the United States and suffers from Multiple Sclerosis, telephoned her, as she knew Raquel Natalie was at a music festival and heard Israel was under attack. Knowing that stress can greatly exacerbate symptoms of Multiple Sclerosis, Raquel Natalie dishonestly told her that she was not in the area nor at the NOVA Festival. This was a very difficult decision, as Raquel Natalie knew she may not make it out alive and was lying to her mother in a moment of life and death. However, Raquel Natalie was in contact with other friends and informed them of her situation, bracing herself for her own impending fate.

2229. By approximately 9:00 A.M., Raquel Natalie and her friends had been running for about two hours without any direction, in an effort to evade being seen by terrorists. At one point, Raquel Natalie reunited with others she knew from the festival, who were hiding in a large ditch in the ground. The group urged Raquel Natalie and her friends to hide with them, stating they would not be noticed by the terrorists. However, Raquel Natalie saw that they were essentially of group of sitting ducks and would have no chance at survival if terrorists arrived and began shooting at them. Raquel Natalie and her friends decided to leave the group and again began haphazardly running to find a proper hiding spot from the terrorists. Raquel Natalie would later learn that terrorists ambushed the group in the ditch, and none of them survived.

2230. Several minutes later, Raquel Natalie and her friends found a police officer, the first they had seen since the attacks started that day. The officer explained that terrorists had intercepted police radio signals, and he could not call for backup without compromising their location. The

387

officer accompanied them until they encountered a large group of festival-goers walking towards the town of Patish, which they learned had not been infiltrated by terrorists. At the suggestion of the officer, Raquel Natalie and her friends joined the group headed for Patish.

2231. Approximately thirty minutes later, Raquel Natalie and about ten other individuals stopped to rest for a moment by a small tree. The group caught their breath for roughly ten minutes, when suddenly, they noticed a pickup truck in the distance, driving towards them. As videos of terrorists ravaging through Israel in pickup trucks that morning, were being circulated over Telegram and WhatsApp, the group realized they were in grave danger and believed this to be terrorists. They had two options: run and risk being chased by the terrorists driving or stay in their spot and hope that the terrorists would not notice them.

2232. Understanding that they could not compete with the terrorists in a moving vehicle, armed with weapons, Raquel Natalie and the group accepted that this may be their last moments alive. Raquel Natalie knew that within minutes, the terrorists would arrive at their spot and kill them where they sat.

2233. As the pickup truck approached where the group was hiding, a woman wearing a festival wristband, could be seen signaling to them. Raquel Natalie realized that the pickup truck was actually coming to rescue them. Raquel Natalie and the group climbed onto the back of the truck and were taken to Patish.

2234. The driver, Moshe Sati, took Raquel Natalie and the group to an auditorium which was sheltering many of the survivors, and he then drove back towards the festival to save others.

2235. By approximately 11:30 A.M., Raquel Natalie had miraculously made it out of the NOVA Festival alive. In Patish, she was fed and was later able to return home. Upon returning

388

home, Raquel Natalie informed her mother that she had been at the festival and was directly in the line of fire.

2236.   Since the events of the October 7 Attacks, Raquel Natalie Sanandaji has become a global voice and advocate, outlining the events of October 7, 2023 and recalling her own experience to audiences around the world.

2237.   Before October 7, 2023, Raquel Natalie had not suffered from anxiety nor had panic attacks. Now something as simple as a loud noise on the street can trigger memories of machine guns and rocket sirens blaring that fateful day.

2238.   Being a recognizable advocate for Israel and a known Jew has also resulted in Raquel Natalie being subject to harassment in public and private spaces and being more self-conscious of her Jewish heritage and outward symbols identifying her as Jewish such as her Star of David necklace.

2239.   Plaintiff Raquel Natalie Sanandaji brings this action individually.

2240.   Dalia Yerushalmi brings this action individually. She is a citizen and a resident of the United States. She is the mother of Raquel Natalie Sanandaji.

2241.   As a direct and foreseeable result of the October 7, 2023, attack, Plaintiff Raquel Natalie Sanandaji experienced severe mental anguish and extreme emotional distress as she fled the scene of the NOVA Festival.

2242.   Plaintiff Dalia Yerushalmi suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack when her daughter was forced to flee invading terrorists at the NOVA Festival.

### AA.   The Lavi and Barak Families

2243.   Plaintiff Mor Levzelter Lavi is a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

389

2244. Mor Levzelter Lavi was traveling in Northern Israel when his mother and his brother were present at Kibbutz Kerem Shalom when they were attacked by Hamas on October 7, 2023.

2245. At approximately 6:30 a.m., Mor's mother, Iris Lavi, was home alone when rocket alarms started blaring through the kibbutz. Wasting no time as missiles fired overhead, she rushed to the safe room. Suddenly, she heard gunfire and threatening voices in Arabic just outside her window.

2246. Nearby in the kibbutz, Mor's brother, Raz Lavi, had just returned home from a birthday party in the city of Be'er Sheva when the rocket alarms started blaring. Terrified by the thought of being alone during the attack, he ran to his friend's apartment next-door and joined him and his girlfriend in their safe room.

2247. At approximately 7:00 a.m., Mor was shaken awake by a barrage of calls from his friends and family back home in Kibbutz Kerem Shalom. His heart sank and his head spun as his loved ones detailed the horrors that were unfolding at home. He could not bear the thought of being away from his family while their lives hung in the balance.

2248. Desperate to make it back to his family, Mor began driving south around noon. As more details emerged about the extent of the terrorist infiltration, Mor came to the gut-wrenching realization that he would not be able to save his family.

2249. Mor drove to Kibbutz Ein Hashofet, a community in Northern Israel and gathering point for civilians displaced by the Hamas attacks. He met other displaced civilians from Kibbutz Nahal Oz, a community that was also under attack by Hamas. Anguished by the fear of losing their family and friends, they all sat glued to their TVs and their phones, waiting for any sign of hope.

390

2250.  Meanwhile, Iris' heart pounded out of her chest as the grenades and gunfire exploded all around her home. Her mind began to race with panic as she pictured her son, Raz, alone in his apartment nearby on the Kibbutz. Unable to reach him, she was consumed by the fear that they would not survive the massacre.

2251.  Iris was no stranger to tragedy. Her brother was murdered in a terror attack and her sister was killed in a car accident. She trembled at the thought that her life would end in a similar fate as her beloved family members.

2252.  Iris' terror turned into overwhelming guilt as she feared her mother would soon lose a third child. She questioned whether her mother could survive that pain for a third time.

2253.  At the same time, Raz feared for his mother. The thought of her sitting defenseless in her home terrified him. He briefly thought of leaving the safety of his shelter to join her – but as horrifying news of terrorists hunting civilians in the streets came in, he knew he had to stay put if he wanted to survive.

2254.  Iris and Raz remained in the confines of their safe rooms for over 24 agonizing hours as explosions from grenades and gunfire blasted outside. They sat defenseless, ravaged by the fear of what the terrorists could be doing to their family and bracing for their imminent deaths.

2255.  Mor frantically monitored reports about what was unfolding in Southern Israel, desperate to understand what was happening to his family and his beloved home.

2256.  On the evening of October 8, 2023, Iris and Raz were finally evacuated from their safe rooms. This would be the last time they set foot in their homes to date. They emerged from hiding exhausted, emotionally devastated, and horrified by the terror they had endured.

2257.  With his home in Kibbutz Kerem Shalom in ruins, Mor was airlifted to a temporary residence near Eilat alongside other displaced civilians from Kibbutz Kerem Shalom. He then

relocated to the small village of Ashalim in southern Israel, where he was forced to start his life anew. He has yet to return home.

2258.   Mor continues to grieve as he mourns the loss of several close community members who were brutally murdered by Hamas on October 7, 2023. Some of his close friends are still held hostage in Gaza, and he struggles to focus on his personal responsibilities knowing his friends remain in captivity.

2259.   With the infrastructure of the kibbutz community destroyed, the responsibility now falls on civilians like Mor to keep the community afloat. Mor now manages the education system for Kerem Shalom's displaced children out of necessity.

2260.   Mor continues to struggle with the loss of life as he knew it. Amid such extreme uncertainty, he suffers from severe mental anguish and from persistent anxiety-induced pain in his muscles surrounding his lungs, neck and back, and struggles with shortness of breath.

2261.   Plaintiff Golan Barak is a citizen and resident of the United States. He is the Iris Lavi's brother.

2262.   As a direct and foreseeable result of the October 7 Attack on their family members, Iris Lavi and Raz Lavi, in Kibbutz Kerem Shalom, Plaintiffs Mor Levzelter Lavi and Golan Barak have suffered severe mental anguish and extreme emotional distress, and economic loss.

**BB.    The D.B.C. Family[172]**

2263.   Plaintiff D.B.C. is a citizen of the United States and a resident of the State of Israel.

2264.   Plaintiff D.B.C. holds the rank of Senior Sergeant Major in the Israel Defense Forces ("IDF").

---

[172]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to D.B.C. and his family by their initials rather than disclosing their full names for fear of retribution against them.

2265.  As a result of the October 7, 2023 attacks in Israel by Hamas, Plaintiff D.B.C. was deployed into Gaza on November 26, 2023. He and his team were on operational duty on December 4, 2023, in the Shuja'iyya neighborhood in Gaza.

2266.  As part of his operational duty, D.B.C. and his team were riding in an armored personnel carrier (APC) when an anti-tank missile hit the APC at close range and exploded inside causing a fire to spread quickly.

2267.  Panic and chaos ensued, and D.B.C. was disoriented and felt intense heat from the blast on his upper body. He determined that his right arm was on fire, and he was bleeding profusely from shrapnel wounds.

2268.  Once the team extinguished the fire, D.B.C. discovered that his teammate, Barak Elitzur, was seriously injured. Despite his serious injuries, D.B.C. cared for Barak, displaying his deep concern and allegiance to his comrades.

2269.  D.B.C. was airlifted from Gaza and transported to a hospital in Jerusalem where he spent two weeks in the hospital and underwent multiple painful surgeries and treatments for his injuries.

2270.  The night before the mission, D.B.C. and his team received a donation of new fire-resistant uniforms which were essential to saving D.B.C.'s life, as he would likely have perished in the fire without the fire-resistant uniform.

2271.  Following his release from the hospital, D.B.C. has undergone months of rehabilitation and will continue to receive further surgeries in the foreseeable future as he has significant scarring all over his body.

2272. Prior to the October 7 massacre, D.B.C. was calm, patient, and easy-going. However, he is now irritable and impatient, which has significantly affected his relationships with loved ones.

2273. D.B.C. is subject to burdensome restrictions including non-exposure to the sun on his arm. This has a lasting impact on his quality of life in Israel, as the country experiences intense heat and sunlight for the majority of the year. D.B.C. must keep the injured areas on his body covered, even during Israel's blistering summer months.

2274. Plaintiff D.B.C. brings this action individually, and as the co-legal guardian of his minor children, M.B.C. and A.B.C., both of whom are citizens and residents of Israel.

2275. Plaintiff Sh.B.C. brings this action individually. She is a citizen and resident of the State of Israel. She is the wife of D.B.C. She also brings this action as the co-legal guardian of her minor children, M.B.C. and A.B.C., both of whom are citizens and residents of Israel.

2276. Plaintiff Ya.B.C. brings this action individually. He is a citizen of the United States and resident of the State of Israel. He is the father of D.B.C.

2277. Plaintiff Or.B.C. brings this action individually. She is a citizen of the United States and resident of the State of Israel. She is the mother of D.B.C.

2278. Plaintiff Ori.B.C. brings this action individually. She is a citizen of the United States and a resident of the State of Israel. She is the sister of D.B.C.

2279. Plaintiff Ta.B.C. brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the brother of D.B.C.

2280. Plaintiff Shi.B.C. brings this action individually. He is a citizen of the United States and a resident of the State of Israel. He is the brother of D.B.C.

2281.   Plaintiff Ro.B.C. brings this action individually.  He is a citizen of the United States and a resident of the State of Israel.  He is the brother of D.B.C.

2282.   As a direct and foreseeable result of the October 7, 2023, attack and the events that followed on December 4, 2023, Plaintiff D.B.C. experienced conscious pain and suffering, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2283.   Plaintiffs Sh.B.C., Ya.B.C., Or.B.C., Ori.B.C., Ta.B.C., Shi.B.C., Ro.B.C., M.B.C., and A.B.C. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack and the subsequent December 4, 2023 attack in which Plaintiff D.B.C. was injured.

### CC.    The Rubin Family

2284.   Amichai Rubin was a citizen of the United States and a resident of the State of Israel when he was murdered by Hamas.  He was 23 years old.

2285.   Amichai Rubin was serving in the Golani Brigade in the Israeli Defense Forces ("IDF").

2286.   On October 7, 2023, Amichai Rubin and his fellow soldiers were stationed at a small outpost along the Gaza border, near Kibbutz Kissufim.

2287.   In the early morning hours of Simchat Torah – a sacred holiday on the Jewish calendar – rocket sirens erupted in a deafening cry, piercing the once tranquil skies, as barrages of mortar shells and projectiles rained down, unleashing chaos and terror on Southern Israel.

2288.   Bewildered by the unexpected and incessant wailing of the rocket sirens, Amichai Rubin and his comrades followed protocol and rushed to the outpost's cafeteria, which also served as a bomb shelter.

2289.    Amichai Rubin, armed with his Negev machine gun, and his fellow soldiers began hearing gunshots and violent screams in Arabic growing closer and closer. Only then did Amichai Rubin and his comrades realize that dozens of Hamas terrorists had breached the Gaza border and infiltrated the outpost where they were stationed.

2290.    For 30 minutes, Hamas terrorists relentlessly attempted to break into the cafeteria with machine guns, grenades, and other explosive devises.   After a rocket-propelled grenade managed to knock down the front door to the cafeteria, Amichai Rubin and his commanding officer were forced to fight back and defend their unarmed fellow soldiers by opening fire on the onslaught of terrorists outside.

2291.    Amichai Rubin and his commander managed to eliminate numerous terrorists and prevent them from entering the cafeteria. They waged a four-hour gunfight with the Hamas terrorists and successfully shielded their comrades from complete annihilation. During the siege, Amichai Rubin was shot by Hamas terrorists in the hand and leg but he continued battling fiercely.

2292.    Another bullet grazed Amichai Rubin's head, but he continued to fight on for another 20 minutes before he finally collapsed from his injuries.

2293.    Because of the sustained chaos and brutality surrounding the attack, six hours passed before Israeli rescue teams managed to evacuate Amichai Rubin to a Jerusalem hospital, where medical teams fought for two days to save his life.

2294.    Amichai Rubin was eventually declared brain dead, and his family made the noble decision to donate his organs, thereby saving the lives of five individuals.

2295.    Amichai Rubin and his commander, along with two other soldiers, were killed, and several others were wounded while battling Hamas terrorists at the small outpost near Kibbutz Kissufim.

2296.   Plaintiff Yishai Rubin is a citizen of the United States and a resident of the State of Israel.  He brings this action individually, as the surviving father of Amichai Rubin, and also as the heir-at-law for the Estate of Amichai Rubin.

2297.   Plaintiff Batya Rubin is a citizen of the United States and a resident of the State of Israel.  She brings this action individually, as the surviving mother of Amichai Rubin, and also as the heir-at-law for the Estate of Amichai Rubin.

2298.   Plaintiff David Rubin is a citizen of the United States and a resident of the State of Israel.  He brings this action individually as the surviving brother of Amichai Rubin.

2299.   Plaintiff Yedidya Rubin is a citizen of the United States and a resident of the State of Israel. He brings this action individually as the surviving brother of Amichai Rubin.

2300.   Plaintiff Oz Rubin is a citizen of the United States and a resident of the State of Israel. He brings this action individually as the surviving brother of Amichai Rubin.

2301.   Plaintiff Eitan Rubin is a citizen of the United States and a resident of the State of Israel. He brings this action individually as the surviving brother of Amichai Rubin.

2302.   Plaintiff Yair Rubin is a citizen of the United States and a resident of the State of Israel. He brings this action individually as the surviving brother of Amichai Rubin.

2303.   Plaintiff Odeya Ben Shimol is a citizen of the United States and a resident of the State of Israel. She brings this action individually as the surviving sister of Amichai Rubin.

2304.   Plaintiff Amiya Tiferet Gamla is a citizen of the United States and a resident of the State of Israel. She brings this action individually as the surviving sister of Amichai Rubin.

2305.   Since Amichai Rubin perished, the lives of his family members have drastically changed forever. Stricken by grief and sorrow, Plaintiff Batya Rubin finds herself struggling to focus on even the simplest of tasks, her mind clouded and distracted by loss and pain. Her ability

397

to work full-time has been severely compromised, and she fights daily to maintain a routine while caring for the remaining members of her family, who are all grappling with the emotional toll of their devastating loss.

2306.  Plaintiff Yishai Rubin's ability to carry out his work duties has also been severely affected. Once a sharp and proactive manager, he is now forced to invest every ounce of his remaining energy just to meet expectations, leaving him drained and exhausted at the end of each day.

2307.  As a direct and foreseeable result of the October 7, 2023, attack, Amichai Rubin experienced conscious pain and suffering, extreme mental anguish, wrongful death, and economic loss.

2308.  Plaintiffs Yishai Rubin, Batya Rubin, David Rubin, Yedidya Rubin, Oz Rubin, Eitan Rubin, Yair Rubin, Odeya Ben Shimol, and Amiya Tiferet Gamla have each experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack and the death of their family member Amichai Rubin.

**DD.    The Lahav Family**

2309.  Plaintiff Lotus Lahav is a citizen of the United States and a resident of the State of Israel.

2310.  Plaintiff Irit Lahav is the mother of Plaintiff Lotus Lahav, a citizen of Israel, and a resident of the State of Israel.

2311.  On the morning of October 7, 2023, at approximately 6:35 a.m., Plaintiffs Lotus Lahav and Irit Lahav were fast asleep in their home in Kibbutz Nir Oz when they were jolted awake by the sound of incoming rockets and sirens.

398

2312.   Irit rushed to the family's safe room and frantically yelled for Lotus to join her. Lotus quickly grabbed the family dog and Irit's cell phone and ran to join her mother. Immediately after they closed the door to their safe room, they heard gunshots and voices outside their window.

2313.   Panicked by this development, Lotus and Irit immediately locked the safe room windows and turned off all the lights — but there was no lock to secure the safe-room door.

2314.   Forced to find a solution with their lives on the line, Irit frantically messaged her brother and sister for help. Her brother responded with a picture of his safe-room door secured with two broomsticks, but Lotus and Irit had no broomsticks.

2315.   Hysteria began to creep into the mother and daughter.

2316.   Irit located a vacuum cleaner hose, a boat oar, and a leather strap, and using her ingenuity, she knotted the leather strap and strategically placed the oar and vacuum hose by the door to create a makeshift lock that she prayed would be enough to keep her and her daughter alive.

2317.   As they hid, Lotus and Irit heard the sounds of gunshots, grenades, and RPGs and learned that those sounds were coming from Hamas militants who had infiltrated Kibbutz Nir Oz.

2318.   At approximately 10:30 a.m., they heard male voices shouting in Arabic and a barrage of gunfire towards the house. Moments later, terrorists burst through the back door of their home.

2319.   Lotus and Irit sat in horrified silence as they listened to the sounds of the terrorists destroying their home, hearts pounding as the gunshots and crashing grew closer and closer. Within minutes, the terrorists discovered the safe room.

2320.   The terrorists started shouting and beating on the door, pushing Irit's makeshift lock to the brink.

399

2321. Believing they were going to die, Lotus and Irit held each other close, said their goodbyes, and braced for their deaths.

2322. Remarkably, Irit's lock withstood nearly ten minutes of terrorists clawing at the door. Finally, the terrorists gave up and moved on to a neighboring home.

2323. Approximately forty-five minutes later, the terrorists returned. Lotus and Irit held their breath in their safe room, their lives flashing before their eyes as terrorists burst back into the house, shouting and shooting indiscriminately. The terrorists made their way back to the safe-room door, attempting to pry it open, but they were unsuccessful once again.

2324. The terrorists attempted to breach the safe-room door on five separate occasions that day causing what felt like a never-ending cycle of terror for Lotus and Irit. With each pound on the door, they prepared for their imminent deaths.

2325. For nearly 12 hours, Lotus and Irit hid in the safe room in complete silence and utter darkness as the sounds of terrorists decimating their community echoed around them.

2326. At approximately 6 p.m., they heard a Hebrew-speaking man identify himself as an IDF soldier. Lotus and Irit were immediately wary of the man. They had heard stories of Hamas terrorists pretending to be soldiers to try to coax civilians out of hiding, only to brutally murder them. Extraordinarily, the IDF soldier was a friend of Irit's brother, and mentioning this fact convinced Lotus and Irit to cautiously emerge from the safe room. They found their home completely destroyed.

2327. The IDF soldier promptly escorted them to a safer location on the kibbutz along with other survivors. The brief sense of relief they felt from their rescue was quickly replaced by agonizing grief. As they walked through the ashes of their close-knit kibbutz community, the

ruthless devastation by the brutal Hamas attack was overwhelming. It was clear that their kibbutz would never be the same.

2328. On October 8, 2023, after a sleepless night in the community shelter, Lotus and Irit were finally allowed to return home. IDF soldiers escorted them through the ruins of their beloved community, guarding them closely as they cautiously navigated around unexploded grenades.

2329. When they arrived, Lotus barely recognized her home. Everything was in disarray: all the windows were shattered, and their belongings were ransacked and stolen. The terrorists had even raided Irit's jewelry – stealing an extremely sentimental necklace that had been passed down from her mother, among scores of other valuables.

2330. Lotus and Irit only had five minutes to gather their belongings and leave their lifelong home. Lotus froze — she could barely bring herself to touch anything, knowing that her possessions had been touched by the same hands that murdered her friends and neighbors.

2331. With their allotted five minutes quickly coming to a close, Lotus dug through the debris searching for her phone, wallet, and ID, but they were impossible to find in all the chaos. When she left, she took only one pair of pants, one T-shirt, and her toothbrush.

2332. The horrors of that day continue to traumatize Plaintiffs Lotus and Irit Lahav. Lotus has difficulty functioning in her daily life due to her mental suffering. Her life will never be the same. Irit has suffered from extreme insomnia, anxiety, crying spells, hyperawareness, anger and a constant general sense of unease — all of which rendered her unable to return to work until January 1, 2024. The terrorists not only destroyed her home but shattered her sense of peace and security.

2333. Plaintiff Ivonei Da Silva Daniel brings this action individually. He is a citizen and resident of Brazil. He is the father of Lotus Lahav.

2334.   As a direct and foreseeable result of the October 7, 2023, attack, Plaintiffs Lotus and Irit Lahav have suffered severe mental anguish, extreme emotional distress, loss of consortium, loss of services, and economic damages.

2335.   Plaintiff Ivonei Da Silva Daniel has experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack on his daughter.

### EE.   The B.E. Family[173]

2336.   Plaintiff B.E. is a citizen of the United States and is a resident of the State of Israel.

2337.   Plaintiff B.E. was a Paratrooper in the Israel Defense Forces ("IDF"). His brigade was one of the first military forces to enter Gaza.

2338.   B.E. and his team were stationed in Gaza's Shuja'iyya neighborhood, a central and highly populated enclave controlled by Hamas.

2339.   On December 4, 2023, B.E. and his team were on operational duty, riding in an armored personnel carrier (APC) used to transport soldiers deployed in the Gaza Strip.[174]

2340.   As the team was preparing to exit the APC, an anti-tank missile fired at close range blasted through the vehicle and exploded causing a fire to quickly spread inside the vehicle. The team began to flee in disarray through the vehicle's hatch.

2341.   Before B.E. could react, his entire body caught on fire, and he screamed in agony for his team to help him.  Because no one responded, he assumed that his team had been killed outside the APC by terrorists. B.E. realized that these might be his final moments alive.

---

[173]   Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to B.E. and his family by their initials rather than disclosing their full names for fear of retribution against them.

[174]   The APC is armed with three machine guns on its exterior and has an emergency hatch-exit on top and can hold 10 soldiers at once.

2342.   B.E. desperately reached out and located the emergency exit handle in the APC and faced a choice between dying from the fire or exiting the APC to be ambushed by terrorists. He grabbed the exit handle and burst out of the APC.

2343.   To his relief, no terrorists were outside the vehicle, and B.E. instinctively began rolling on the ground to extinguish the fire, covering his burning body with sand. He was able to put out the fire, but his hands were severely burned, and he was unable to operate his weapon. He was bleeding profusely and was in excruciating pain.

2344.   The night before this particular mission, B.E. and his team received a donation of fire-resistant uniforms, and this uniform helped save B.E.'s life.

2345.   Eventually, B.E. was located by his team, evacuated out of Gaza, and picked up by an ambulance. The 20-minute ambulance ride felt like hours and B.E. was overcome with emotion believing he would never see his wife and son again.

2346.   B.E. was airlifted to a hospital in Jerusalem where he was diagnosed with serious third-degree burns and hospitalized for three and a half weeks. He underwent daily treatments to clean and re-bandage his burns. The pain was unbearable during these treatments, bringing him to tears despite being administered pain medication.

2347.   Since his discharge from the hospital, B.E. has suffered from severe pain and has large scars on his body. As part of the healing process, he must apply silicone cream to his scars and wear pressure and silicone bandages.

2348.   B.E. is also subject to burdensome restrictions including non-exposure to the sun. This has greatly affected his quality of life, as Israel is subject to intense heat and sunlight for the majority of the year. B.E. must wear long-sleeve shirts, even in the hot summer months, and must constantly apply sunscreen lotion.

403

2349. B.E. is currently undergoing physiotherapy and hydrotherapy in an effort to improve body mobility and prevent future complications. While these treatments are often very painful, they are necessary to maintain what is left of B.E.'s normal mobility.

2350. Plaintiff B.E. brings this action individually, and as the co-legal guardian of his minor child M.E., who is a citizen of the United States and a resident of the State of Israel.

2351. Plaintiff R.T.E. is a citizen of the United States and a resident of the State of Israel. She brings this action individually, and as the co-legal guardian of minor child M.E. She is the wife of B.E.

2352. Plaintiff Sh.E. is a citizen and resident of the State of Israel. He brings this claim individually as the father of Plaintiff B.E.

2353. Plaintiff R.A.E. is a citizen of the United States and a resident of the State of Israel. She brings this claim individually as the mother of Plaintiff B.E.

2354. Plaintiff D.M.E. is a citizen of the United States and a resident of the State of Israel. He brings this claim individually as the brother of Plaintiff B.E.

2355. As a direct and foreseeable result of the October 7, 2023, attack and the events that followed on December 4, 2023, Plaintiff B.E. experienced conscious pain and suffering, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2356. Plaintiffs R.T.E., M.E., Sh.E., R.A.E., and D.M.E suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack and the subsequent December 4, 2023 attack in which Plaintiff B.E. was injured.

### FF.   The S.B. Family[175]

2357. S.B. was a citizen and resident of the United States when he was injured by Hamas.

---

[175]   Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to S.B. and his family by their initials rather than disclosing their full

2358.  S.B. was visiting Israel on October 7, 2023 and immediately re-enlisted with the IDF as a reservist. He spent approximately three months fighting in the West Bank, performing counter-terror operations, stopping infiltrations from the West Bank.

2359.  In January 2024, S.B. re-joined the paratroopers in Gaza and was there for two months.  While in Gaza, S.B.'s unit had no permanent housing and was open to attack at any time. His unit was attacked many times, and he saw his comrades shot and killed by Hamas terrorists. He witnessed dogs eating the bodies of deceased human beings.

2360.  S.B. was subsequently deployed to Lebanon from September 2024 through December 2024.  Here, he was subjected to rocket and mortar attacks hourly, with them landing less than 100 feet away, in one instance causing injury to S.B.'s right hip.

2361.  As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to the West Bank, Gaza, and Lebanon to fight against Hamas, Plaintiff S.B. has experienced severe mental anguish and extreme emotional distress, and economic loss.

**GG.    The Y.Y.B. Family[176]**

2362.  Y.Y.B. was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

2363.  Y.Y.B. is a first staff sergeant in the IDF and was called up to serve for two months following the October 7 attack. Y.Y.B.'s unit was responsible for collecting body parts from Sderot, Nachalot, and Be'rri.  This task was trauma-inducing and he requested to switch units.

---

names for fear of retribution against them.

[176]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to Y.Y.B. and his family by their initials rather than disclosing their full names for fear of retribution against them.

2364.   Y.Y.B. was moved to a unit in Lebanan where he was almost run over by a tank. On a separate occasion, he was 7 meters away from a mortar strike and in the vicinity of an air force strike on a building.  These situations also caused Y.Y.B. trauma.

2365.   As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to the Lebanon to fight against Hamas, Plaintiff Y.Y.B. has experienced severe mental anguish and extreme emotional distress, and economic loss.

### HH.   The E.S. Family

2366.   E.S. was a citizen and resident of the United States when he was injured by Hamas.

2367.   E.S. was a paratrooper in the IDF, where he served 10 months in Gaza.  During that time, he was shot at many times, causing crippling PTSD.

2368.   As a direct and foreseeable result of the Octo[177]ber 7 Attack and his subsequent deployment to Gaza to fight against Hamas, Plaintiff E.S. has experienced severe mental anguish and extreme emotional distress and economic loss.

### II.   The Skolnik Family

2369.   Beatriz Skolnik was a citizen and resident of the State of Israel when she was injured by Hamas.

2370.   Sylvia Ida was a citizen and resident of the State of Israel when she was injured by Hamas.

2371.   Plaintiff Avner Skolnik is a citizen and resident of the United States.  He is the son of Beatriz Skolnik and brother of Nir Yitzhak.

---

[177]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to E.S. by his initials rather than disclosing his full name for fear of retribution against him.

2372.   On October 7, 2023, Beatriz and Sylvia were residents of Kibbutz Nir Yitzak when Hamas terrorists infiltrated the kibbutz.  They, along with other family members, were trapped in their safe room for twelve hours.

2373.   As a direct and foreseeable result of the October 7 Attack and the injuries to Beatriz Skolnik and Sylvia Ida, Plaintiff Avner Skolnik has suffered severe mental anguish and extreme emotional distress.

### JJ.   The Vagim Family

2374.   Rachel Vagim was a citizen and resident of the State of Israel when she was injured by Hamas.

2375.   Plaintiff Raz Vagim is a citizen and resident of the United States.  He is the brother of Rachel Vagim.

2376.   On October 7, 2023, Rachel was a resident of Kibbutz Nir Yitzak when Hamas terrorists infiltrated the kibbutz.

2377.   As a direct and foreseeable result of the October 7 Attack and the injuries to Rachel Vagim, Plaintiff Raz Vagim has suffered severe mental anguish and extreme emotional distress.

### KK.   The M.M. Family[178]

2378.   Plaintiff M.M. is a citizen and resident of the United States.

2379.   M.M. was a member of the IDF on October 7, 2023 and fought in Gaza for three-and-a-half months.

---

[178]   Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to M.M. by his initials rather than disclosing his full name for fear of retribution against him.

407

2380. As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Gaza to fight against Hamas, Plaintiff M.M. has experienced severe mental anguish and extreme emotional distress.

### LL.    The A.M. Family[179]

2381. Plaintiff A.M. is a citizen and resident of the United States.

2382. A.M. was a member of the IDF on October 7, 2023 and fought in Lebanon.

2383. As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Lebanon to fight against Hezbollah, Plaintiff A.M. has experienced severe mental anguish and extreme emotional distress.

### MM.    The D.J. Family[180]

2384. Plaintiff D.J. is a citizen and resident of the United States.

2385. D.J. was a member of the Israeli Army from October 2023 through November 2024.

2386. From October 20, 2023 through December, D.J. was targeted with anti-tank missiles, bullets and suicide drones.

2387. D.J. was deployed to Syria from May through June 2024, where he was tasked with protecting the border and survived suicide drones coming from Lebanon.

2388. As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Syria to fight against the terrorist organizations involved in the October 7 Attack, Plaintiff D.J. has experienced severe mental anguish and extreme emotional distress.

---

[179]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to A.M. by his initials rather than disclosing his full name for fear of retribution against him.

[180]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to D.J. by his initials rather than disclosing his full name for fear of retribution against him.

## NN.    The Yehoshua Goodman Family[181]

2389.   Yehoshua Goodman was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.  He was 43 years old at the time.

2390.   Plaintiff Shayna Chaya Goodman is a citizen of the United States and a resident of the State of Israel when she was injured by Hamas.  She is the daughter of Yehoshua Goodman.

2391.   On October 7, 2023, Yehoshua was in Tifrach, Israel, unable to get back to his home in Ofakim.  Rockets fell two houses away from, and shattered windows in, the house where he was staying, causing him to fear for his safety.

2392.   When Yehoshua was able to return home to Ofakim, he was afraid to leave his house.

2393.   As a direct and foreseeable result of the October 7 Attacks on and the injuries of Yehoshua Goodman, Plaintiff Shayna Chaya Goodman suffered severe mental anguish and extreme emotional distress, and economic loss.

## OO.    The Chaitin Family

2394.   Plaintiff Julia Chaitin is a citizen of the United States and a resident of the State of Israel.

2395.   Plaintiff Noa Chaitin is a citizen of the United States and a resident of the State of Israel.  She is the daughter of Julia Chaitin.

2396.   Noa Chaitin brings this claims on behalf of Plaintiff N.S., her minor daughter.  N.S. is a citizen of the United States and a resident of the State of Israel.

---

[181]    Claims on behalf of Yehoshua Goodman in his individual capacity appear in the related case, *Balva, et al. v. Binance Holdings, Ltd., et al.*, Case No. 3-25-cv-266-PDW-ARS, Document 1 at ¶¶ 1361-1372.

409

2397.   On October 7, 2023, Julia, Noa, and N.S. were all at Julia's home in Kibbutz Urim. As the events of October 7, 2023 unfolded, they experienced rockets falling in their immediate vicinity and knew that the terrorists had reached the perimeter of Kibbutz Urim.

2398.   For over 24 hours, Julia, Noa, and N.S. remained locked in Julia's home while exchanging WhatsApp messages with Julia's son Daniel Chaitin.

2399.   Noa and N.S. have since received psychological counseling as a result of their trauma.

2400.   Plaintiffs Julian Chaitin, Noa Chaitin, and N.S. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attacks.

**PP.    The D.T. Family**[182]

2401.   D.T. was a citizen of the United States and a resident of the State of Israel when he was injured by Hamas.

2402.   D.T. served in Gaza in the IDF reserves for several two-month periods from October 2023 through the present where he has engaged with gunfire, grenades, and rockets, and also encountered IEDs emplaced by terrorists within Gaza.

2403.   Plaintiff M.T. is a citizen of the United States and a resident of the State of Israel. She is the minor child of D.T.  D.T. brings this action as M.T.'s legal guardian.

2404.   Plaintiff R.T. is a citizen of the United States and a resident of the State of Israel. He is the minor child of D.T.  D.T. brings this action as R.T.'s legal guardian.

---

[182]    Claims on behalf of D.T. in his individual capacity appear in the related case, *Balva, et al. v. Binance Holdings, Ltd., et al.*, Case No. 3-25-cv-266-PDW-ARS, Document 1 at ¶¶ 1743-1745. Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to D.T. and his family by their initials rather than disclosing their full names for fear of retribution against them.

2405.  As a direct and foreseeable result of the October 7 Attacks and D.T.'s subsequent IDF action in Gaza, Plaintiffs M.T. and R.T. have suffered severe mental anguish and extreme emotional distress.

### QQ.    The Daskal Family

2406.  Ahiya Daskal was a resident of the State of Israel when he was killed by Hamas.

2407.  Plaintiff Tehila Dansker is a citizen of the United States and a resident of the State of Israel. She is the sibling of Ahiya Daskal.

2408.  Plaintiff Atara Peter Daskal is a citizen of the United States and a resident of the State of Israel. He is the sibling of Ahiya Daskal.

2409.  Ahiya Daskal was serving in the Golani Brigade in the IDF when he was murdered by Hamas. He was 19 years old.

2410.  At the time the war began, Ahiya and his company were only three weeks away from completing their training. On the Sunday following the October 7 attack, the company was deployed to the staging areas near the Gaza border. Because their training was not yet complete, they were designated as the battalion's fifth company—assigned to serve as a reinforcement unit. The commanders determined that only a third of the company's soldiers would enter Gaza at any given time, while the remainder would wait in reserve at the staging area.

2411.  Ahiya viewed defending his nation as both a duty and a sacred mission. When informed that he was to remain behind in preparation for an upcoming squad commanders' course, Ahiya objected, saying: *"There's a war against the people of Israel, and I should be doing training exercises?"*

2412.  Despite being granted a short leave to return home, Ahiya refused to go. Determined not to miss the opportunity to contribute, he remained in the staging area—ready to enter Gaza at a moment's notice.

411

2413.   On November 30, 2023, Ahiya received word that he would join the ground operation in Gaza.

2414.   The company entered Gaza in "Namer" armored vehicles, advancing for ten days under constant threat. Afterward, they joined infantry forces conducting complex and dangerous operations in the Shejaiya neighborhood—clearing buildings and searching for tunnel shafts used by Hamas terrorists.

2415.   Although young and relatively new to service, Ahiya had already distinguished himself as a natural leader. His superiors appointed him to command one of the platoon's three squads—a clear acknowledgment of his courage, capability, and character.

2416.   On December 12, 2023, tragedy struck. A squad under the platoon commander's leadership entered a suspicious house. As they crossed the threshold, Hamas terrorists fired an RPG missile. The platoon commander was hit in the chest, and three soldiers were injured. Recognizing the gravity of the moment, Ahiya immediately assumed command. He radioed the company commander, directed the medic to tend to the wounded, and organized the remaining soldiers—dividing defensive sectors and maintaining composure under fire.

2417.   When the company commander arrived, he called for two volunteers to enter the building and rescue the wounded. Without hesitation, Ahiya was the first to step forward. As the three entered the house, a second RPG was launched by Hamas terrorists. The missile struck the team directly, killing Ahiya, the company commander, and the medic instantly.

2418.   Ahiya is survived by his parents, and his eight siblings—four brothers and four sisters, including Tehila Dansker and Atara Peter Daskal—who remember him as a devoted son, a loving brother, and a young man of rare conviction and courage.

2419.   Since Ahiya's death, the lives of his family members have been irrevocably altered. The Daskal family continues to endure unbearable grief and emotional suffering. His parents struggle daily to cope with the profound loss of their son, whose dedication and moral strength were a source of immense pride. His siblings remain deeply traumatized, their sense of security and peace forever shattered.

2420.   Plaintiffs Tehila Dansker and Atara Peter Daskal have each suffered severe emotional distress, loss of companionship, and ongoing psychological trauma as a direct and foreseeable consequence of the terrorist acts that claimed the life of their beloved brother Ahiya Daskal.

### RR.    The Eicoff Family

2421.   Plaintiff William Eicoff is a citizen of the United States and a resident of the State of Israel.

2422.   Plaintiff Hadassa Tungdim-Eicoff is a citizen and resident of the State of Israel. She is the wife of William Eicoff.

2423.   On the morning of October 7, 2023, thousands of missiles were launched from Gaza into Southern and Central Israel, while armed Hamas militants stormed through the border with the intention of killing as many Jews as they could get their hands on. William, his wife Hadassa, Hadassa's brother and his wife, and their eight children were confined to a small bedroom/bomb shelter in Bnei Menashe, Sderot, with limited food and no power, phone, or internet.

2424.   William recognized the coming danger as he heard the sounds of gunfire in the city of Sderot. William assumed responsibility for the safety and well-being of everyone, focusing on protecting the group while struggling to understand what could be done.

2425.   William had decided to break the sanctity of the Sabbath, realizing a dire situation was unfolding, but struggled to understand and locate any reports or news due to lack of

413

information and not understanding Hebrew. He could not fathom what was really unfolding outside the walls of the saferoom.

2426. From their location, they could hear the sounds of heavy machine-gun fire echoing throughout the city, which they would later realize was coming from the nearby police station. William had desperately hoped the army had surrounded the area, but he knew it was too dangerous to go outside to see what was unfolding. He had no weapon, no helmet, no protection. But it was clear they were in the middle of an active war zone.

2427. William and Hadassa, along with their 10 other family members, including their nephew who had not even reached the age of one, spent the entire day locked in their saferoom.

2428. In the evening hours of what was supposed to be the happiest day of the Jewish year, Simchat Torah, William ventured out of the house, to see what he could gather of what had been unfolding that day. He was immediately stopped by an armed IDF soldier, telling him to hurry back home and lock the doors. William was told there were an unknown number of Hamas militants in Sderot, and it was unsafe to leave their saferoom.

2429. On Sunday, October 8, 2023, the gunfire intensified, with the sound of mounted machine guns rattling in the distance. William looked out the window of his brother-in-law's apartment to see an endless convoy of military vehicles heading toward Gaza and the Sderot police station. Eventually, the family heard that the army had surrounded and destroyed the police station. Special forces, supported by a tank and a bulldozer, were deployed to eliminate the threat of the 23 terrorists that had taken over the station, killing approximately 30 policemen in their invasion. The IDF tank fired a shell that destroyed the police station, after confirming that no policemen had survived inside. The visible military presence offered some reassurance, but the danger remained immediate.

414

2430.   Deciding it was safe enough to leave the house, with the heavy military presence now in the city, William drove to Hadassa's nephew's house, who is a local rabbi, to see how he could possibly assist the community. The rabbi's wife informed William that he had gone to their synagogue to check if there was power in the building and to charge his phone, so he could be available to the community members that might need him. Without hesitation, William set out to help the rabbi.

2431.   As he arrived at the synagogue, a missile warning siren suddenly sounded. William immediately ran toward a nearby bomb shelter, and moments later, a missile struck a building adjacent to it. The explosion shook the area, and smoke filled the air. William narrowly escaped injury — another moment underscoring the extreme danger faced by civilians and those trying to help others that day.

2432.   William then evacuated six of the younger children, excluding the infant and the oldest child, to Kfar Tapu'ach, an Orthodox Jewish settlement in the West Bank where William and his wife resided at the time. He arranged for the rest of the family to follow in the coming days.

2433.   Upon arrival in Kfar Tapu'ach, William, Hadassa, and the children faced severe overcrowding in his 60-square-meter apartment with only two bedrooms, leaving most of the children to sleep in the living room area. When Hadassa's brother and his wife, along with their eldest and youngest children arrived, they had no choice but to sleep in a neighbor's spare room, as the apartment could not accommodate all twelve people.

2434.   For two weeks, they lived in constant tension and fear until the Israeli government arranged for members of the Bnei Menashe community, including William's brother-in-law and his family, to be evacuated to hotels, where some remained for six months or longer.

415

2435.   The situation in Sderot was chaotic, as the city had effectively become a near-war zone. William and Hadassa had been in Sderot not only to celebrate Simchat Torah (Jewish holiday) but also to purchase a house, with plans to finalize the contract on Sunday, October 8, 2023. The attacks and ongoing danger destroyed their ability to buy the house. As a result, their plans fell through entirely.

2436.   As a direct and foreseeable result of the Hamas attack on Sderot, Plaintiffs William Eicoff and Hadassa Tungdim-Eicoff have endured severe mental anguish and extreme emotional distress and economic loss.

### SS.   The Yehayes-Dekel Chen Family

2437.   Plaintiff Ophir Yehayes is a citizen of the United States and a resident of the State of Israel.

2438.   Yosef Yehayes is a citizen and resident of the State of Israel.  He is Ophir Yehayes' husband.

2439.   Naamit Dekel Chen is a citizen and resident of the State of Israel.  She is the mother of Ophir Yehayes.

2440.   Y.Y., minor child, is a citizen and resident of the State of Israel. He is the son of Ophir and Yosef Yehayes.

2441.   M.Y., minor child, is a citizen and resident of the State of Israel.  He is the son of Ophir and Yosef Yehayes.

2442.   At the time of the October 7 attack, Ophir was pregnant with their third child.

2443.   On October 6, 2023, Yosef's brother arrived at Kibbutz Nir Oz with his wife and young son to celebrate Yosef's upcoming birthday on October 8. The family decided to camp together outside Yosef and Ophir's home, pitching a tent on the grass beside the house.

2444.   At approximately 6:30 a.m. on October 7, 2023, rocket sirens began blaring across Kibbutz Nir Oz, signaling incoming fire from Gaza. Yosef, Ophir, Y.Y., M.Y., and their family had only seconds to react. Yosef shielded his sons with his own body as explosions shook the air. After a few unending minutes of sirens, unlike anything they had experienced before, they ran to the home's safe room.

2445.   Soon after, they received a message warning that terrorists had infiltrated the community. Yosef cautiously stepped outside the saferoom and saw two armed men on a motorcycle directly in front of the house and a white van parked about 100 meters away.

2446.   Yosef remained outside the saferoom to watch over the house and protect his family from within. Messages flooded in from neighbors reporting that terrorists were inside their homes. The realization that a massive assault was underway — and that they were trapped — filled the family with terror.

2447.   Inside the saferoom, the adults braced for what seemed inevitable. Yosef's sister-in-law devised a way to jam the saferoom door handle using a small IKEA play kitchen — the exact height of the door latch — in an effort to prevent the terrorists from breaking in. Calling Yosef back into the room, they locked themselves into the saferoom.

2448.   Moments later, the terrorists stormed their house. Over the next 45 minutes, multiple groups entered at different times. They looted the home, opened the refrigerator, removed the birthday cake meant for Yosef, and sat down to eat it. Between bursts of laughter and curses in Arabic, they repeatedly tried to kick down the saferoom door, shouting "Yiftah al-Bab" ("open the door"), "Yitbah al-Yahud" ("slaughter the Jews"), and "Happy Holidays." Gunshots rang out inside the house as the family cowered in silence, the children noiselessly crying. Ophir and Yosef were certain their lives — and those of their family — were about to end.

417

2449.   Around 11:45 a.m., the house grew quiet, but the family remained locked inside, frozen with fear. At approximately 1:30 p.m., they heard faint knocking on the saferoom door and recognized the voice of Ophir's mother, Naamit, calling for them to open. Terrified that it might be a trap and that terrorists were forcing her to speak, they hesitated. The children, realizing their grandmother was outside, cried and pleaded to open the door. Yosef tried to confirm her identity by asking questions, but she did not respond—her hearing had been severely impaired by nearby explosions. After a tense few minutes, they heard the sound of a single set of footsteps slowly moving away, indicating that she was alone.

2450.   Yosef cautiously stepped outside and discovered that Naamit was indeed alone, severely wounded and bleeding heavily. He carried her into the saferoom and began administering first aid. Her blood soaked the floor and splattered the walls. The children stood frozen in shock as Naamit drifted in and out of consciousness, recounting what had happened: terrorists had set her home on fire, forcing her to escape through a window; she was captured, loaded into a vehicle with other hostages, and taken toward Gaza; when the IDF engaged the terrorists from a helicopter, she escaped through the fields.

2451.   As Naamit relayed this ordeal, she bled profusely. Yosef bandaged her head, back, and legs, while Ophir held her hand and tried to calm the children. Yosef was forced to undress her to treat her wounds — an image that seared itself into the family's memory.

2452.   At approximately 1:45 p.m., realizing she would not survive without proper medical aid, Yosef left the saferoom to search for medical supplies at the kibbutz clinic. He walked through what he later described as "a valley of death." He genuinely thought his family was the only family that survived this awful attack. The entire kibbutz was engulfed in flames. Smoke

418

billowed from every direction. The silence was eerie — no birds, no voices, only the crackling of fire and the smell of death.

2453.   Finding no usable equipment at the clinic, Yosef encountered IDF soldiers arriving at the kibbutz and guided them back to his home. The family was evacuated to a designated assembly point, and Yosef joined the soldiers in rescuing other survivors and recovering the dead.

2454.   In the hours that followed, Yosef personally helped remove the bodies of friends and neighbors — the Siman Tov family and the burnt remains of Roy Monder, and Yosef and Margit, the parents of Shiri Bibas. He also assisted in identifying bodies for desperate relatives, an unbearable task made harder by the uncertainty of who had been killed and who had been kidnapped.

2455.   In the aftermath, Yosef and Ophir dedicated themselves to advocating for the return of the kidnapped, including Ophir's brother, who was held in Gaza for approximately 500 days before his return. They have spent the time since Ophir's brother has come home supporting his rehabilitation, caring for his daughters, and attempting to rebuild their shattered family.

2456.   Both Yosef and Ophir continue to receive treatment from psychologists and psychiatrists. They suffer from severe post-traumatic stress disorder, requiring medication for anxiety, depression, and sleep disturbances. They experience frequent nightmares, flashbacks, concentration difficulties, and emotional outbursts. Their children also exhibit signs of trauma — night terrors, separation anxiety, and hypervigilance — and are undergoing therapy at Hosen and in dyadic parent-child treatment.

2457.   When their daughter was born, Yosef was unable to lift her for six months. Each time he tried, he relived the moment of lifting a murdered infant's body from a safe room during

419

the rescue. Ophir remains haunted by the sound of Arabic spoken by nearby workers, triggering panic attacks. She locks the house, closes the shutters, and isolates her family until the sounds stop.

2458. Naamit Dekel Chen sustained grave physical injuries, extreme pain and suffering, and lasting psychological trauma as a direct and foreseeable result of the October 7, 2023 Attacks.

2459. As a direct and foreseeable result of the October 7, 2023 Attacks Yosef Yehayes, suffered conscious pain and suffering, extreme mental anguish, post-traumatic stress disorder, and loss of enjoyment of life. He also endured severe economic losses, the destruction of his home and community, and ongoing medical and psychological expenses.

2460. As a direct and foreseeable result of the Hamas attack on Kibbutz Nir Oz and the injuries sustained by Ophir Yehayes, Plaintiffs Yosef Yehayes, Naamit Dekel Chen, M.Y., and Y.Y. have endured severe mental anguish and extreme emotional distress.

**TT.    The Y.O. Family[183]**

2461. Plaintiff Y.O. is a citizen of the United States and a resident of the State of Israel. He was 23 years old when he was injured by Hamas.

2462. Plaintiff Y.S.O. is a citizen and resident of the State of Israel.  He is the father of Y.O.

2463. Plaintiff L.R.K. is a citizen of the United States and a resident of the State of Israel. She is the mother of Y.O.

2464. Plaintiff Y.A.O. is a citizen of the United States and a resident of the State of Israel. He is the brother of Y.O.

---

[183]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to Y.O. and his family by their initials rather than disclosing their full names for fear of retribution against them.

2465. Plaintiff M.D.O. is a citizen of the United States and a resident of the State of Israel. He is the brother of Y.O.

2466. Plaintiff I.O. is a citizen of the United States and a resident of the State of Israel. He is the brother of Y.O.

2467. Plaintiff Yo.O. is a citizen of the United States and a resident of the State of Israel. He is the brother of Y.O.

2468. Y.O. was serving in Beit Hanoun, Gaza as a member of the IDF on January 6, 2025 when a Hamas terrorist detonated an IED in the house Y.O. was in. Y.O. lost consciousness and was brought immediately to Barzillai Hospital, where he was treated for second-degree burns to his face, hands, and neck, and third-degree burns to his right leg. Y.O. was hospitalized for over two months and has spent eight months in out-patient treatment. He has permanent scarring and suffers excruciating pain.

2469. As a direct and foreseeable result of the October 7 Attacks and the events that followed on January 6, 2025, Plaintiff Y.O. experienced conscious pain and suffering, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2470. Plaintiffs Y.S.O., L.R.K., Y.A.O., M.D.O., I.O., and Yo.O. suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack and the subsequent January 6, 2025 attack in which Plaintiff Y.O. was injured.

421

**UU.   The Bedein Family**

2471.   Plaintiff Elchanan Bedein is a citizen of the United States and a resident of the State of Israel.

2472.   Plaintiff Elchanan Bedein was at home in Kibbutz Mefalsim, 1.9km from Gaza, on the morning of October 7, 2023.  He locked himself in his safe room with his dog and stayed there until the next morning.

2473.   While in his safe room, Elchanan heard explosions and shootings, but he assumed it was only one or two terrorists on the other side of the kibbutz.  It was not until he emerged from his safe room, and then home, that he realized the atrocities that took place on October 7th.  When he arrived at the kibbutz gate, he saw the kibbutz offices had been burned down, as well as the surrounding field. He saw cars rolled over, a Hamas motorcycle at the kibbutz gate, the bodies of people who tried to escape but were killed.

2474.   Elchanan was evacuated to a hotel in Herzliya for 10 months before returning home.

2475.   As a direct and foreseeable result of the October 7 Attacks and the events that followed, Plaintiff Elchanan Bedein experienced conscious pain and suffering, extreme mental anguish, loss of solatium, loss of services, and economic loss.

**VV.   The M.K. Family[184]**

2476.   M.K. is a citizen of the United States and a resident of the State of Israel.

2477.   M.K. holds the rank of Senior Sergeant Major in the Israel Defense Forces ("IDF") and serves as a reservist in Battalion 697 of the 551 Unit.

---

[184]   Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to M.K. and his family by their initials rather than disclosing their full names for fear of retribution against them.

422

2478.   Following the October 7 Attacks on Israel by Hamas, M.K. was deployed to Gaza on October 27, 2023.  On December 20, 2023, M.K. and his team were operating in Beit Hanoun, a neighborhood in northeast Gaza near the border with Israeli kibbutzim.  This area, evacuated of civilians, had been a base of operations for Hamas militants who launched their attacks on October 7.

2479.   At approximately 6:00 a.m., during a mission to search for potential threats, a member of M.K.'s team spotted a suspicious individual slipping into a building across the street. Knowing that civilians would not approach IDF forces and that the humanitarian zone was far away, it quickly became clear that this was a Hamas terrorist attempting to execute an assault.

2480.   Responding quickly, the team rushed to the building to neutralize the threat before an attack could occur. As they prepared to enter, M.K.'s commander ordered him to throw a hand grenade to clear the way. Under intense pressure and focused on executing the order quickly, M.K. inadvertently threw the grenade to the side of the door, causing it to roll back in their direction.

2481.   In that instant, time seemed to freeze as M.K.'s life flashed before his eyes, watching the grenade roll back toward him. He ran for cover but was unable to fully escape the explosion. Shrapnel from the grenade tore into his leg, causing a deep and excruciating wound. The searing pain forced him to clutch his leg tightly as blood poured from the injury. Alongside a teammate who sustained a shrapnel wound to the neck, M.K. experienced unbearable pain while desperately praying for his teammate's safety, terrified by the thought he would not survive. Both were swiftly evacuated to Beilinson Medical Center in Israel for treatment.

2482.   At the hospital, doctors treated M.K.'s leg and administered antibiotics. However, days later, his wound became infected due to not receiving any stitching, worsening his pain and prolonging his recovery. To combat the infection, his father—a podiatrist—had to undertake a

grueling and agonizing treatment process: involving repeatedly reopening the wound to stimulate bleeding and carefully closing it gradually over time. M.K. endured this painful process for about a month, which left him unable to perform basic physical tasks like walking properly which disrupted his ability to reintegrate into normal life.

2483.   In addition to his physical injuries, the experiences since October 7, 2023, have left lasting psychological scars on M.K. The memory of the grenade nearly taking his life and the guilt of injuring a teammate—who now suffers a permanent neck injury from a lodged shrapnel fragment, millimeters away from catastrophic consequences—continue to weigh heavily on him. These haunting memories add to his ongoing struggle to navigate daily life.

2484.   M.K. would not have been deployed into Gaza or injured in a friendly fire incident but for the October 7 massacre. Therefore, his injuries are a direct and foreseeable consequence of the Hamas terrorist actions on that day.

2485.   Plaintiff A.K. is U.S. citizen and a resident of the State of Israel. He is the father of M.K.

2486.   Plaintiff B.K. is U.S. citizen and a resident of the State of Israel. She is the mother of M.K.

2487.   Plaintiff Z.K. is U.S. citizen and a resident of the State of Israel. He is the brother of M.K.

2488.   Plaintiff Y.K. is a U.S. citizen and a resident of the State of Israel.  She is the sister of M.K.

2489.   Plaintiff D.K. is U.S. citizen and a resident of the State of Israel. She is the sister of M.K.

424

2490. As a direct and foreseeable result of the October 7 attack and the events that followed on December 20, 2023, Plaintiff M.K. suffered conscious pain, extreme mental anguish, loss of solatium, loss of services, and economic loss.

2491. Plaintiffs A.K., B.K., Z.K., Y.K., and D.K. experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, Attack and the subsequent December 20, 2023 attack in which M.K. was injured.

**WW. The Koenigsberg Family**

2492. Plaintiff Yechiel Koenisberg is a citizen of the United States and a resident of the State of Israel.

2493. Plaintiff Yechiel Koenigsberg was at his home in Ofakim on October 7, 2023. He and his family were confined to their home due to constant air raid sirens and infiltration of Hamas terrorists.

2494. Yechiel and his family fled to Jerusalem on October 8th, in total trepidation and fear, where they remained for two weeks. Upon returning home, Yechiel suffered from PTSD for a number of months, and to this day, has not returned fully to himself.

2495. As a direct and foreseeable result of the October 7 Attacks and the events that followed, Plaintiff Yechiel Koenigsberg experienced conscious pain and suffering, extreme mental anguish, loss of solatium, loss of services, and economic loss.

**XX. The Frank Family**

2496. Plaintiff Miriam Frank is a citizen of the United States and a resident of the State of Israel.

2497. Plaintiff Miriam Frank brings this action individually and as the legal guardian of her minor children, L.F. and S.B.Y., who are both citizens of the United States and residents of the State of Israel.

2498. Miriam was at home in Ofakim on October 7, 2023. She was awoken at approximately 6:00 a.m. to the sound of sirens. Her home did not have a shelter or a safe room due to its age. When Miriam heard the sirens, she stepped out and took cover under the staircase area in her building – but, the staircase area had an open window.

2499. Miriam decided to drive her and her minor children to her sister's home in the Ramat Shaked neighborhood, where they could hide in her sister's safe room. Miriam and her children heard sirens while driving there. They also heard gunshots but did not know at the time what was happening.

2500. Miriam and her children sheltered at her sister's home for much of the day on October 7th before returning to their home.

2501. Upon returning home, Miriam received messages from her neighborhood WhatsApp group regarding a terrorist in the neighborhood. Miriam's apartment was made of wood, so she dragged her refrigerator and sofa over to block the door in an attempt to protect herself and her children.

2502. L.F. understood the gravity of the situation and experienced panic and severe trauma. Both L.F. and S.B.Y. have trouble sleeping, sleeping with their mother every night and wetting the bed.

2503. As a direct and foreseeable result of the October 7 Attacks and the events that followed, Plaintiffs Miriam Frank, L.F. and S.B.Y. have experienced conscious pain and suffering, extreme mental anguish, loss of solatium, loss of services, and economic loss.

426

YY.    The M.d.J. Family[185]

2504.    Plaintiff M.d.J. was a citizen of the United States and a resident of Israel when he was injured by Hamas.

2505.    On October 7, 2023, M.d.J. was an IDF reservist who was activated and deployed to Gaza following Hamas's invasion into Israel. His team was assigned to locate Israeli hostages and seek out Hamas terrorists, tunnels, and weaponry.

2506.    While in Gaza, he was engaged with Hamas explosives and RPG fire on numerous occasions. He lost two comrades and was involved in firefights that left some of his fellow soldiers severely injured.

2507.    On or about December 1, 2023, M.d.J. sustained an inner ear injury from an explosion during operations against Hamas in Gaza.

2508.    Since the attacks, M.d.J. has sought help from a mental health professional, attending therapy weekly due to his traumatic experiences of encountering dead and mutilated bodies of Israeli civilians, and being under constant duress from Hamas munitions being fired at him and his unit. He has been diagnosed with PTSD, tinnitus and hearing loss. His condition has materially and adversely affected his family life, work, and social functioning.

2509.    Plaintiff J.d.J. is a citizen and resident of the State of Israel.  She is the spouse of M.d.J.

2510.    Plaintiff M.R.d.J. is a citizen and resident of the State of Israel.  M.R.d.J. is the minor daughter of M.d.J.

---

[185]    Given safety concerns that have arisen as a result of participation in actions carried out by the Israel Defense Forces in Gaza and elsewhere, Plaintiffs refer to M.d.J. and his family by their initials rather than disclosing their full names for fear of retribution against them.

2511. Plaintiff Z.B.d.J. is a citizen and resident of the State of Israel. Z.B.d.J. is the minor son of M.d.J.

2512. Plaintiff D.Y.d.J. is a citizen and resident of the State of Israel. D.Y.d.J. is the minor son of M.d.J.

2513. Plaintiff N.E.S.d.J. is a citizen and resident of the State of Israel. N.E.S.d.J. is the minor daughter of M.d.J.

2514. Plaintiffs J.d.J., M.R.d.J., Z.B.d.J., D.Y.d.J., and N.E.S.d.J. experienced severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023 Attack and the subsequent December 1, 2023 attack in which M.d.J. was injured.

2515. As a direct and foreseeable result of the October 7 Attack and his subsequent deployment to Gaza to fight against Hamas, Plaintiff M.d.J. has experienced severe physical and mental anguish and extreme emotional distress, and economic loss.

**ZZ.    The Weiner Family**

2516. Shachar Ben Naim was a citizen and resident of the State of Israel when he was murdered by Hamas at the Nova Music Festival on October 7, 2023.

2517. C.W. is the minor son of Shachar Ben Naim and Sapir Weiner. He is a citizen of the United States and a resident of the State of Israel.

2518. Plaintiff Sapir Weiner brings this action on behalf of her minor son, C.W.

2519. As a direct and foreseeable result of the October 7 Attack that caused the death of Shachar Ben Naim, C.W. has suffered severe mental anguish and extreme emotional distress.

**AAA.  The Urim Family**

2520. Yossi Urim is a citizen and resident of the State of Israel. He is the father of plaintiffs Harel Urim and Shilo Urim.

428

2521.  Plaintiff Harel Urim is a citizen of the United States and a resident of Israel.

2522.  Plaintiff Shilo Urim is a citizen of the United States and a resident of Israel.

2523.  Yossi Urim was shot in the back on October 7th in Sderot.  He had gone outside to pray and was shot by a terrorist.  The bullet passed through his lung and shoulder.  He was hospitalized for four weeks and suffers permanent lung and heart damage.

2524.  Following the attack, the family was displaced form their home for five months. During this time, Harel Urim and Shilo Urim experienced psychological trauma, including difficulty sleeping and anxiety.

2525.  Plaintiffs Harel and Shilo suffered severe mental anguish and extreme emotional distress as a direct and foreseeable result of the October 7, 2023, attack in which Yossi Urim was injured.

## CLAIM FOR RELIEF

### AIDING AND ABETTING THE COMMISSION OF ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2333(d)(2)
(Against All Defendants)

2526.  Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

2527.  Plaintiffs assert this cause of action against Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen under 18 U.S.C. § 2333(d)(2), which provides for liability (in an action under 18 U.S.C. § 2333(a) involving acts of international terrorism planned, authorized, or committed by a designated foreign terrorist organization), against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."

2528.  Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or are the estates, survivors, or heirs of such U.S.

nationals.

2529. The IRGC, Hamas, Hezbollah, and PIJ were all designated FTOs at the time they committed, planned, and/or authorized the October 7 Attacks that injured and/or killed the Plaintiffs or their family members and those terrorist attacks that followed from the October 7 Attacks in both Israel and Gaza. All of these attacks were executed by Hamas and other FTOs and financed, planned and orchestrated by the IRGC. Indeed, the IRGC is also responsible for committing each of these attacks.

2530. The October 7 Attacks and those terrorist attacks in Israel and Gaza perpetrated subsequently were acts of international terrorism as defined by 18 U.S.C. § 2331.

2531. Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen knowingly provided the IRGC, Hamas, Hezbollah, and PIJ substantial assistance, which included: (a) transferring significant sums of cryptocurrency and fiat currency to the IRGC, Hamas, Hezbollah, and PIJ and their respective agents; (b) maintaining wallets on Binance's platform for the benefit of the IRGC, Hamas, Hezbollah, and PIJ and their respective front organizations; (c) providing the IRGC, Hamas, Hezbollah, and PIJ with access to U.S. dollar-denominated liquidity and the U.S. banking system; (d) concealing transfers of fiat currency and cryptocurrency transacted by or for the benefit of the IRGC, Hamas, Hezbollah, and PIJ; and (e) enabling the IRGC, Hamas, Hezbollah, and PIJ to access and transfer assets that could foreseeably be used to commit terrorist attacks, including those set forth herein.

2532. Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen knowingly provided the IRGC, Hamas, Hezbollah, and PIJ with largely unrestricted access to Binance's cryptocurrency exchange platform, enabling the IRGC, Hamas, Hezbollah, and PIJ to receive and send payments, and to engage in cryptocurrency trading, in violation of U.S. law.

2533. Such unrestricted access included, but was not limited to: (a) concealing the presence of the IRGC, Hamas, Hezbollah, and PIJ on Binance's cryptocurrency exchange platform, in violation of U.S. law; (b) facilitating direct transmission of cryptocurrency to and from the IRGC, Hamas, Hezbollah, and PIJ, in violation of U.S. law; (c) failing to report known transactions involving the IRGC, Hamas, Hezbollah, and PIJ, in violation of U.S. law; and (d) assisting the IRGC, Hamas, Hezbollah, and PIJ to withdraw assets held with Binance.com, in violation of U.S. law.

2534. Binance continued providing these services even after senior executives learned that the platform was providing services to Hamas, the IRGC, Hezbollah, and PIJ and their funders, despite knowing that the IRGC, Hamas, Hezbollah, and PIJ are designated terrorist organizations.

2535. At the time Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen provided substantial assistance to the IRGC, Hamas, Hezbollah, and PIJ, they knew that: (a) the U.S. government had designated the IRGC, Hamas, Hezbollah, and PIJ as FTOs and/or SDGTs; (b) the IRGC, Hamas, Hezbollah, and PIJ engaged in acts of international terrorism resulting in the murder of hundreds of Israeli and U.S. citizens; and (c) clandestine funding was essential to the IRGC, Hamas, Hezbollah, and PIJ's ability to plan, coordinate, finance, and carry out terrorist attacks.

2536. Defendants Binance Holdings Limited, Changpeng Zhao and Guangying "Heina" Chen also knew that their substantial assistance would facilitate the ability of the IRGC, Hamas, Hezbollah, and PIJ to carry out terrorist attacks like the ones described herein.

2537. Given their knowing and substantial assistance to these terrorist organizations, Defendants Binance Holdings Limited, Changpeng Zhao and Guangying "Heina" Chen demonstrated conscious, voluntary, and culpable participation in the terrorist organizations'

431

wrongdoing.

2538.   Indeed, by knowingly moving and concealing the movement of hundreds of millions of dollars for, the IRGC, Hamas, Hezbollah, and PIJ, Defendants Binance Holdings Limited, Changpeng Zhao and Guangying "Heina" Chen provided pervasive and systemic assistance to these terrorist organizations.

2539.   The October 7 Attacks and subsequent attacks, as well as Plaintiffs' injuries in the attacks, were foreseeable results of Defendants' substantial assistance to the IRGC, Hamas, Hezbollah, and PIJ.

2540.   Defendants Binance Holdings Limited, Changpeng Zhao, and Guangying "Heina" Chen are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs for:

(a)    Compensatory damages in amounts to be determined at trial;

(b)    Treble damages pursuant to 18 U.S.C. § 2333(a);

(c)    Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 18 U.S.C. § 2333(a); and

(d)    Such other and further relief as justice requires.

Respectfully submitted this the _____ day of July, 2026.

**ROBINS KAPLAN LLP**

By:    /s/ Timothy Q. Purdon
       Timothy Q. Purdon
       1207 West Divide Avenue, Suite 200
       Bismarck, ND  58501
       Telephone: (612) 349-8767
       Facsimile: (612) 339-4181
       tpurdon@robinskaplan.com

*Attorneys for the Siman Tov, Daub, Butler, Hazoutte, Vahaba, Dan, Shani, Tali Gilberg, J.K., Strauss, S.S., Shain, Leshem, E.H., Guedalia, Berkowitz, Aharoni, N.P. and E.P., Lilintal-Huri, Lamdan, J.S., Haggai, Edri, A.B., Amar, E.A., Ben Zvi, Sherman, Shahar, Sanandaji, Lavi, Barak, D.B.C., Rubin, Lahav, B.E., S.B., Y.Y.B., E.S., Skolnik, Vagim, M.M., A.M., D.J., Goodman, Chaitin, D.T., Daskal, Eicoff, Yehayes-Dekel Chen, Y.S.O., Bedein, M.K., Koenigsberg, Frank, M.d.J. Weiner, and Urim Plaintiffs*


**MOTLEY RICE LLC**
John M. Eubanks
Michael E. Elsner
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9250
Facsimile: (843) 216-9450
jeubanks@motleyrice.com
melsner@motleyrice.com

*Attorneys for the Siman Tov, Daub, Butler, Hazoutte, Vahaba, Dan, Shani, Tali Gilberg, J.K., Strauss, S.S., Shain, Leshem, E.H., Guedalia, Berkowitz, Aharoni, N.P. and E.P., Lilintal-Huri, Lamdan, J.S., Haggai, Edri, A.B., Amar, E.A., Ben Zvi, Sherman, Shahar, Sanandaji, Lavi, Barak, D.B.C., Rubin, Lahav, B.E., S.B., Y.Y.B., E.S., Skolnik, Vagim, M.M., A.M., D.J., Goodman, Chaitin, D.T., Daskal, Eicoff, Yehayes-Dekel Chen, Y.S.O., Bedein, M.K., Koenigsberg, Frank, M.d.J. Weiner, and Urim Plaintiffs*

**MM~LAW LLC**
Gavriel Mairone (motion for admission pro hac vice forthcoming)
Ariel Mairone (motion for admission pro hac vice

433

forthcoming)
Christine N. Crane (motion for admission pro hac vice forthcoming)
875 North Michigan Avenue, Suite 3100
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590
ctlaw@mm-law.com
ariel@mm-law.com

*Attorneys for the Siman Tov, Daub, Butler, Hazoutte, Vahaba, Dan, Shani, Tali Gilberg, J.K., Strauss, S.S., Shain, Leshem, E.H., Guedalia, Berkowitz, Aharoni, N.P. and E.P., Lilintal-Huri, Lamdan, J.S., Haggai, Edri, A.B., Amar, E.A., Ben Zvi, Sherman, Shahar, Sanandaji, Lavi, Barak, D.B.C., Rubin, Lahav, B.E., Daskal, Eicoff, Yehayes-Dekel, Chen, M.K., and M.d.J. Plaintiffs*

434